# ROSENFELD & ASSOCIATES

A PROFESSIONAL CORPORATION

SUITE 715
44 SCHOOL STREET
BOSTON, MASSACHUSETTS 02108

S. STEPHEN ROSENFELD
MALA M. RAFIK
JULIE SCHWARTZ WEBER
SUZANNE L. SCHWARTZ

OF COUNSEL
RICHARD AMES

TEL. (617) 723-7470
FAX (617) 227-2843
HTTP://WWW.ROSENFELD.COM

April 21, 2000

**BY HAND**
Jamie W. Katz
Chief, Public Charities Division
Eric B. Carriker
Deputy Chief, Charities Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

　　　　Re: Albert Bleau/Greater Lynn Mental Health & Retardation Association, Inc.
　　　　　　("Greater Lynn")

Dear Mr. Katz and Mr. Carriker:

　　　　We are writing to you to address allegations brought against Albert Bleau. We have not heard these allegations directly from the Department of the Attorney General. However, we have carefully reviewed the letter from Roderick MacLeish to Bond Counsel for Greater Lynn, dated February 22, 2000 (MacLeish letter)(**See Exhibit A**). We have reason to believe that the allegations contained in that letter are essentially the same as were made to the Attorney General. These allegations seek to paint a composite picture that is untrue, wholly gratuitous in parts, and grossly unfair to Mr. Bleau. It was unwise for Mr. MacLeish, as counsel to Greater Lynn, to endanger the status of Greater Lynn by making these allegations, given the very different state of the facts, as this letter will attempt to explain.

　　　　At the outset, we would like to convey how difficult it has been for Mr. Bleau to be banished from Greater Lynn without an opportunity to respond to the allegations and to assist in a straightforward resolution of the allegations. Mr. Bleau is gravely concerned about the well-being of Greater Lynn as an organization. As someone who has given his professional life and complete personal commitment to building Greater Lynn, Mr. Bleau is totally invested in the future success of the organization. The members of the Board who have served over the years have the background to appreciate that he would never do anything consciously to harm the organization or detract from the superb reputation it has gained over the past 26 years of his leadership. Every action he has taken has occurred with the sincere belief that it was in the best interest of Greater Lynn. For background on Al Bleau's lifetime of exemplary service, see **Exhibit B.**

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 2

Any financial difficulties that the organization may face on account of the current uncertainty worry Mr. Bleau greatly. He wants to prevent such difficulties by cooperating fully, through his counsel, in resolving the questions raised by Mr. MacLeish. Accordingly, what follows are my responses to Mr. MacLeish's allegations.

A.   **Linda Bleau**

Mr. MacLeish accuses Mr. Bleau of somehow abetting his wife's alleged failing to work full-time in her job at Greater Lynn. Mr. Bleau and Ms. Bleau have been separated since 1997. To the best of Mr. Bleau's recollection, Ms. Bleau's alleged lack of attendance was brought to Mr. Bleau's attention for the first time in early 1999 by Deborah Thurber, a subordinate of Ms. Bleau, who expressed concern that she was not getting enough support from Ms. Bleau. In a subsequent meeting with Mr. MacLeish on another matter in the Spring of 1999, the issue of Ms. Bleau's attendance was specifically brought to Mr. Bleau's attention by Janine Brown Smith. Until that time, Mr. Bleau had been given no reason to question Ms. Bleau's attendance, and no one had previously raised the issue with him. Her program had been expanding and to Mr. Bleau's knowledge Ms. Bleau was performing her job in a satisfactory manner.

To provide additional context, in approximately April of 1998, upon the recommendation of Attorney Lawrence Donahue, of Morgan & Joy, Mr. Bleau met with the Executive Committee of the Board of Greater Lynn to discuss the supervision of Ms. Bleau. At that time it was decided that Elaine White, Chief Operating Officer (COO), should supervise Ms. Bleau, which she did for approximately three months. Also, for more than ten years, Elaine White had been designated, in lieu of Mr. Bleau, to sign Ms. Bleau's time sheets, evaluations, approval of benefits, and raises, as a way of avoiding any conflict between Mr. Bleau's role as executive director and his status as Ms. Bleau's husband. In June 1999, it came to Mr. Bleau's attention for the first time that Elaine White had not signed Ms. Bleau's time sheets for the previous twelve months. At that time, Mr. Bleau requested that Ms. White sign Ms. Bleau's time sheets as had been the agreed upon arrangement for over ten years. Ms. White stated that she was "not comfortable" signing the time sheets. With regard to time sheets, it is Greater Lynn's policy to discuss any concerns about time sheets at the close of the month. It is not Greater Lynn's policy to allow twelve months to go by without signing.

Mr. Bleau has no information as to whether or not Ms. Bleau's time cards contain false information about her attendance. Mr. Bleau, to this day, has never seen Ms. Bleau's time sheets.

In the fall of 1999, Mr. Bleau did speak with the Board about Ms. Bleau's work attendance. Mr. Bleau neither authorized nor stated to the Board that he authorized Ms. Bleau to work a part-time, twenty hour a week schedule. Mr. Bleau believes that several board members will corroborate him in this regard. In fact, the only reference to a twenty hour work week made at that board meeting was in connection with a proposed severance package for Ms. Bleau. In the past, when a manager has been terminated, as an element of the severance, an individual would

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 3

be permitted to work twenty hours a week in order to secure another position while transitioning out of the agency. To Mr. Bleau's knowledge, this "flexible" time was discussed only in reference to the proposed severance package offered Ms. Bleau. Ultimately, Ms. Bleau did not accept a severance package.

**B.    Loans and Financial Issues**

    1.    **Agency Loan**

The MacLeish letter misstates the facts. Mr. Bleau has had a deferred compensation plan. In February of 1998, the Board approved a loan of $20,000, which was secured by Mr. Bleau's deferred compensation plan. It was Mr. Bleau's understanding at the time that the February 1998 loan was interest free, and was to be paid back within a 10 year period or be subject to taxation plus penalties. Fiscal Manager Terri White, after communicating with the accounting firm, T.W. Mullin & Co.(Mullin), reported this understanding to Mr. Bleau. Consistent with this understanding, Mr. Bleau was not billed any interest in 1998 and the Mullin audit notes reflected that the $20,000 had been loaned to Mr. Bleau and secured against the deferred compensation plan, without any mention of interest. Mr. MacLeish knew of these circumstances when he wrote his February 22, 2000, letter, but chose not to include them.

In late 1998 or early 1999, the Board authorized another loan to Mr. Bleau. At that time, Mr. Bleau, was informed by his fiscal staff that, according to Mullin, the tax rules had changed and that interest was in fact due on the borrowing. Mr. Bleau was informed for the first time that he would have to pay interest not only on any pending loan, but on original loan as well. At that time, Mr. Bleau consulted Cathy Mayo, Assistant Fiscal Manager, to determine an agreeable method to repay the loan and structure his debt. From this consultation Mr. Bleau did clarify his obligations and arranged for an amortized payment plan for what was by this time a total loan obligation of $35,000, plus interest, over 10 years, at 8 1/4 %. Payroll deductions began some months later.

    2.    **Employee Loan Program**

The Employee Loan Program was initiated more than fifteen years ago with full Board approval. Loans made under this program require the approval of Elaine White. The Board was also aware of the entirely separate Revolving Loan Account (RLA), in which advances against payroll are permitted for various items, with a payroll deduction program for repaying the advance. Under the RLA, employees are permitted to have agency funds advanced to them, to subsidize sporting tickets, vacations and various other items. Employees have until the end of the current fiscal year to repay the agency for this "revolving loan" through payroll deductions. Such payroll deductions do not require Elaine White's approval.

Mr. Bleau, through advances offset by payroll deductions, did borrow from the agency

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 4

under its RLA. Mr. MacLeish in his letter fails to distinguish between the employee loan program and the RLA and suggests mistakenly that Mr. Bleau violated agency rules by not obtaining Elaine White's approval.

Mr. Bleau sought the advice of Fiscal Manager Terri White, to assist him in managing his finances, which were seriously under stress during the time of his separation and divorce. In May of 1998, Mr. Bleau and Terri White decided that a regular payroll deduction of $1500 monthly, or $18,000 annually, would cover the costs of his yearly vacations, taxes and miscellaneous expenses. Terri White was responsible for the accounting associated with the RLA. Documents in the Fiscal Department should reflect the exact salary advances provided to Mr. Bleau and the record of payroll deductions associated with them.

In 1999, on account of his divorce-related obligations, Mr. Bleau was unable to pay off his revolving loan account through payroll deductions by the end of the fiscal year. The amount of his obligations was never in dispute and was known at all times by the fiscal manager. An objective review of the sequence of loans and payroll deductions will show that Mr. MacLeish has grossly exaggerated the balances reached in the account, by adding all the advances in one fiscal year, but failing to deduct the payroll deductions as they were made regularly during the year. Mr. Bleau has made it clear to Greater Lynn that he is anxious to pay off all outstanding loans, with interest, and is currently taking steps to do so, in conjunction with conversations between his counsel and Mr. MacLeish.[1]

C.   Sporting Events

To begin with, the use of sporting event tickets for staff was well known to everyone in the Greater Lynn community, including the Board. The Greater Lynn newsletter made constant reference to the use of the tickets, and regular mailings announcing their availability were made to all. The Staff was also informed via email.

Mr. MacLeish is incorrect in saying that Mr. Bleau took a payroll deduction for half of the tickets he reserved in 1996-1997. In fact, Mr. MacLeish's letter, by his own subsequent admission, was in error in the year-to-year ticketing information presented in his letter. There apparently is no dispute regarding 1996-1997. It is true that in 1997-1998 Mr. Bleau took a

---

[1] Mr. Bleau was distressed and regrets that the figure had reached a higher amount than any time in the past, and learned later that the causes were as follows:(1) Mr. Bleau had filed a request of $4,000 for the use of vacation properties which he later found out was not recorded by the fiscal department and which therefore was not deducted from his salary; (2) Mr. Bleau was not informed that payments for his IDS loan had doubled and had been added to the loan amount for several months; and (3) Mr. Bleau had an emergency obligation to pay $10,000 in taxes, which he had anticipated totaling $4,000.

payroll deduction for approximately half the tickets he had reserved. However, it is untrue, as Mr. MacLeish indicates, that Mr. Bleau took the remaining tickets for himself, without paying. Mr. MacLeish fails to mention, and perhaps did not inquire sufficiently to learn, that the remaining tickets were reserved by Mr. Bleau for use by staff, Greater Lynn consumers and fund raising events.

Tickets to the Patriots and Red Sox games were paid through Association funds, not including funds from state contracts, and reimbursed in part by charging the employees for the tickets. No funds from the Employee Fringe Incentive Plan (EFIP) were used for the Patriots and Red Sox tickets.

Any ticket cost not reimbursed to the Association is explained by the use of a portion of the tickets for achievement awards to employees, fund raising events, and for use by consumers. Consumers would fill out an annual "future plan" and according to individual requests, pursuant to "individual dreams", tickets would be distributed to consumers on a sliding scale basis. In most instances the tickets were supplied to consumers free of cost.

Tickets to Bruins and Celtics Games were paid for through the EFIP program and reimbursement was handled in the manner described above, except that because the price of the tickets was so high, the EFIP subsidized the ticket price for staff and consumers in an amount of approximately 25% to 40%.[2] Otherwise tickets were given to staff through Achievement awards, used for fundraising, or given to consumers as part of their "future plan."

It was curious that Mr. MacLeish's inquiry did not reveal any record of 1997-1998 ticket activity, because it was Mr. Bleau's clear recollection that he did reserve tickets and pay for them in the usual manner during that year. Subsequently, we have learned that Mr. MacLeish had the wrong year, and that he was referring to 1998-1999, not 1997-1998. Mr. Bleau is prepared to cooperate fully to clarify the situation for both years.

Mr. Bleau on behalf of Greater Lynn did purchase "Premium Seats" at the Fleet Center with the knowledge and support of the staff and the Board. Among other things, purchase of Premium Seating allowed for "guaranteed" seats clustered together, adjacent to the wheel chair section. Such an arrangement provided a safe environment for consumers to enjoy benefits that they could not otherwise obtain. In fact, because of the arrangement, Greater Lynn has been able

---

[2] The 1997-1998 season was the last season for which Greater Lynn purchased premium seats for the Celtics and Bruins games. For approximately two years, when Greater Lynn had premium tickets, in order to help subsidize the tickets for consumers and staff, Greater Lynn packaged 20 of the 60 Bruins and 20 of the 60 Celtics tickets to sell to area businesses as a combination purchase-contribution. In the subsequent two years, Greater Lynn purchased tickets to Bruins and Celtics games from a ticket agency.

to secure priority seating to major events of interest to Greater Lynn consumers and staff. For example, up to thirty consumers and staff had the opportunity to enjoy Disney on Ice, an experience they otherwise would not have been afforded, as they received 20% discount in the first five rows mid ice. Additionally, consumers and staff were able to get tickets to garden events at the ticketed price, and in many instances staff and consumers saved $30 to $100 per ticket.

Mr. MacLeish seeks to characterize such an opportunity as an indulgence rather than a part of Greater Lynn's creative efforts to provide not only staff but mentally retarded and mentally ill individuals with opportunities that others are afforded. Consumers were able to take advantage of tickets. The tickets were widely advertised and distributed on a first come, first served basis.

### D. Other Items

#### 1. Winston Cup

This letter will address only the most outrageous of the allegations in the MacLeish letter. The allegations regarding the Winston Cup are completely untrue. Mr. Bleau was not "provided with $500 worth of tickets" annually. In 1999, Mr. Bleau went to one Winston cup race. Mr. Bleau paid the ticket price, which he believes is approximately sixty dollars, in cash to James McKissick, an employee of Greater Lynn.

#### 2. Transfer of Funds

The allegations regarding transfer of funds are untrue, a serious distortion of actual conversations and events. Mr. Bleau had authority from the Greater Lynn Board to invest his deferred compensation funds (since they were going to accrue to him at retirement or separation from the company). Mr. Bleau contacted Community Credit Union of Lynn, in order to either obtain a second mortgage or loan to pay his debt in late summer or early fall of 1999.

After making inquiries about the matter with Community Credit Union of Lynn (Community Credit), Mr. Bleau authorized Cathy Mayo to withdraw money from Mr. Bleau's high risk growth mutual funds to Community Credit Union CD in the amount of $45,000. Within a day or two of the transfer, Mr. Bleau met with Mr. MacLeish about Linda Bleau, as reported above, and also at that time discussed his deferred compensation plan. Mr. MacLeish informed Mr. Bleau that he could not borrow money from his deferred compensation plan or the entire plan would be taxable. Mr. Bleau was informed that the loans approved by board, $35,000 of which had actually been borrowed, would have to be considered as an agency loan and that interest would have to be paid and security provided. Mr. Bleau informed Mr. MacLeish that he was already paying principal and interest on the loan. Mr. MacLeish was unaware of the

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 7

payments at that time. Mr. MacLeish stated that any change in the loan arrangement would make the whole deferred compensation plan taxable. At that time, Mr. Bleau informed Mr. MacLeish that he had transferred $45,000 to Community Credit to be used as collateral to pay off his debt.

When Mr. Bleau was informed that such a transaction was not permissible, he personally called Community Credit and canceled the proposed transaction. Upon Mr. Bleau's request, the credit manager, George Koutisis, canceled the loan. Mr. MacLeish is incorrect in his assertion that the Board canceled the loan.

3. **EFIP**

The status of the Employee Fringe Incentive Plan (EFIP) requires a careful explanation, which Mr. Bleau is prepared to provide in detail, when given the opportunity. Greater Lynn, by vote of the board of directors in 1982, decided to set up a restricted fund account, titled the EFIP. The funds for the EFIP come from the Association, after a process of payment for various employee coverages, and savings experienced by the Association.

Greater Lynn provides its employees with health benefits, dental benefits, life insurance, and disability benefits. With the exception of the life insurance benefits, which are fully insured by a life insurance company, these benefits are self-insured by Greater Lynn. "Contributions" are paid by both Greater Lynn and its employees. If surplus assets exist, after accounting for necessary reserves, unfunded claims, administration, legal costs and unfunded premium increases, these assets are used for employees for non-budgeted benefits and for consumers for non-budgeted recreational and vacation opportunities.[3]

Under this plan, employee contributions for coverages vary depending on: (1) whether the employee is married or single; (2) the amount of salary received; and (3) longevity (employees with higher salaries and longevity pay more). Employees pay a monthly fee for the medical, dental and disability plans. According to Mr. Bleau's understanding, the Employee Retirement Income Security Act of 1974 (ERISA) requires that employee contributions for these coverages be allocated as the first dollars attributable for benefits and for such premiums as stop loss insurance. ERISA guidelines state further that when an employee and a company contribute to a benefit plan, and after the employee dollars are exhausted for benefits and premiums, then and only then are the additional costs covered by the employer's contributions. Pursuant to this understanding, any surpluses in these accounts are the property of the employer.

It is our understanding, contrary to Mr. MacLeish's statements, that the EFIP is not an employee trust fund. Rather, it is properly characterized as an agency trust fund voluntarily

---

[3] On the permissibility of this arrangement, see United States Department of Labor, ERISA Technical Release 92-01.

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 8

restricted for certain uses. The agency is allowed to use funds for certain purposes, as defined by the plan documents. It is Mr. Bleau's understanding that the EFIP satisfies the requirements of ERISA. He further believes that a full inquiry will show that no EFIP funds have been diverted for private or unlawful purposes.

Greater Lynn also self- insures for certain other potential claims, including some property damage, collision coverage, unemployment compensation, and worker's compensation. Contributions are made to a trust by Greater Lynn and any funds in excess of a necessary reserve for claims are used to provide benefits for employees, e.g. holiday parties, employee outings, vacation vouchers, and educational assistance.[4]

Finally, to answer Mr. MacLeish's accusation regarding Mr. Bleau's exemption from payment for benefits, it is well-known to the Board that, as part of his original employment agreement with Greater Lynn, the Board agreed that it would pay the entire cost of Mr. Bleau's benefits. When Greater Lynn became self-insured, the agreement translated into the Agency paying for the costs of the Mr. Bleau's benefits. There is no wrongdoing.

As a dedicated and ingenious executive director, Mr. Bleau, with Board involvement and approval, pioneered both the policy of broad self-insurance and the creation of the EFIP. However, the EFIP has been managed by a third party, the insurance broker. From its inception in 1982, Mr. Bleau as well as the oversight committee, known first as the Investment Committee and recently titled the EFIP Committee, have been responsible for deciding how expenditures are

---

[4] The concept of self-insured plans has served Greater Lynn very well. The cost of premiums to both employees and the employer has been lower than any other comparable organization and has resulted in savings to both Greater Lynn and the Commonwealth of Massachusetts. For example, despite medical plans in the state increasing at an average cost of 8 to 12% over the past eighteen years, Greater Lynn's plan has increased at an annual rate of under 4%, resulting in savings to the Commonwealth and Greater Lynn of approximately $200,000 to $250,000 per year. The dental and disability premiums have increased at an annual rate of under 3%. On at least two occasions there were no annual increases in either plan and on one occasion the medical premiums were decreased. Savings in unemployment taxes have totaled over $1.5 million since the inception of the plan and presently result in savings of over $250,000 annually. Workers' Compensation savings and dividends have resulted in savings of over $180,000 this fiscal year, and vehicle insurance savings have totaled over $100,000 per year over the past two years.

If Greater Lynn were not self-insured, these surpluses would have been profits for the insurance companies. Additionally, Greater Lynn has invested the reserves and those returns have stayed in the EFIP. Moreover, the total cost of the fringe benefits are far below comparable organization: 17% of Greater Lynn's payroll account for fringe benefits, whereas 25% of Vinfen's payroll accounts for fringe benefits.

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 9

to be made from the EFIP. Mr. Bleau has been actively involved in these decisions. However, he has done so in conjunction with the Committee and with the awareness of staff, consumers and board members.[5]

### E.    Vacation Properties

Eastern Mass. Housing Corporation (EMHC) owns several properties in New Hampshire and Florida, which it leases to Greater Lynn for use by its consumers and staff.

One of the homes in Florida was originally owned by Mr. and Ms. Bleau for seven years prior to its sale to EMHC. During the time they owned the home, they leased it to staff at a reduced rate and donated weeks to staff and consumers alike.[6] Because of the use and demand for vacations, a second home in Florida was purchased by EMHC.

Greater Lynn has strong clinical and corporate reasons for providing its consumers and staff with the opportunity to have access to vacation properties. It represents an effort to reduce the major obstacles to vacations facing mentally retarded – cost and discrimination. Greater Lynn has attempted to create a safe haven for consumers so they may enjoy their vacation time. The side-by-side properties in Florida and the clustered properties in New Hampshire have provided opportunities for skilled staff to both vacation and assist consumers in vacationing safely and comfortably. Staff and consumers have uniformly praised the agency's initiative in providing them this opportunity.

---

[5] The EFIP was supervised by Mr. Bleau with the involvement of the oversight committee, which met two to five times annually, and which included the President and Treasurer of the Greater Lynn Board. Until approximately three years ago, the minutes from the Committee meetings were routinely attached to the materials made available to the full Board. At that time, it was decided by a consensus of the Board that the attachment of the EFIP minutes was not necessary, as both the Treasurer and the President of the Board received the EFIP minutes. If major policy changes concerning the EFIP were made, the Board was to be informed.

[6] After several years the Bleaus could no longer afford the personal cost associated with the uses of the property by Greater Lynn staff and consumers. Mr. Bleau estimates that they lost up to $25,000, personally over the seven years. Two years ago, Mr. Bleau approached the EMHC and communicated that he could not afford the yearly losses of up to $5,000. The property was appraised and was sold at "arms length" to the EMHC. In fact, it was appraised at $103,000 and was purchased by EMHC for $96,000. There is no dispute that the property is now worth more than the purchase price.

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 10

### F. Sources of Funding

The funding used to encourage vacations and the employee incentive programs (e.g., sporting tickets) came from several permissible sources. Principally, surplus agency funds have been used to subsidize consumer and staff benefits. Other permissible sources include, without limitation, fund raising, the Agency Prevention Account and the EFIP.

The Board has also approved mortgage-backed loans with 2% interest to Eastern Massachusetts Housing Corporation (EMHC), as authorized by law.[7]

The EFIP is self-supporting and in accordance with law. For example, surplus funds from sources other than state contracts and employee contributions are directed yearly to the EFIP and are used to underwrite ancillary expenses, including, among other things, lobbying expenses, limousine transportation services[8], sporting tickets and low cost mortgages. Also, agency funds are used to subsidize employee vacations at EMHC-owned properties. Mr. MacLeish has unfairly characterized these subsidies as funding a "deficit" in the revenues of the vacation properties. In fact, the subsidies for employees and consumers were budgeted as a revenue stream for the properties, and therefore in no way constitute an after-the-fact funding of a deficit.

\* \* \*

---

[7] A so-called "interfund" between Greater Lynn and EMHC exists for a similar purpose. The Board, upon the advice of accountants, understood that loans between non-profit organizations could be interest free and the Greater Lynn Board ultimately approved 2 to 6% loans to EMHC to buy property for the benefit of consumers and staff. Similarly, the "interfund" has existed to permit borrowing between Greater Lynn and EMHC for agency-related purposes, at no interest.

[8] The limousine transportation services were purchased in a lot of 30 rides at a discount, a $3,000 savings to Greater Lynn. The limousine services were used for events and staff incentives. It proved to be a low cost benefit for consumers and staff. Of the 30 rides, 20 were purchased by staff and the additional 10 were paid for by the Agency. Mr. Bleau gave eight limousine vouchers to Senior Managers for program purposes. The additional two services were used to transport staff to engagements, saving the Agency an estimated $500 in transportation costs.

Jamie W. Katz and Eric B. Carriker
April 21, 2000
Page 11

    Mr. Bleau is being unfairly treated. Your thorough and timely investigation can mitigate the tremendous damage that has already been done. We request a meeting as soon as possible to help reach a just resolution.

Respectfully Submitted,

S. Stephen Rosenfeld

Enclosures

April 24, 2000

Addendum to Rosenfeld and Associates letter to Jamie Katz, State Attorney General's Office in response to Atty. McLeish's letter to Van Kampen American Capital.

Page 4, footnote 1

Two days after Atty. Stephen Rosenfeld's correspondence had been mailed to Atty. Jamie Katz and Atty. Carricker, and one week after the GLMHRA Board voted for Mr. Bleau's resignation, Atty. Eric McLeish and GLMHRA's fiscal manager, Terri White met with Atty. Rosenfeld and gave him financial documents that disputed the allegations by McLeish and Sherman that Mr. Bleau had received illegal salary advances and loans.

Mr. MacCleish failed to inform the GLMHRA board, the bondholders or the Attorney General's office concerning two of Mr. Bleau's escrow accounts that were held by GLMHRA. Funds in these accounts should have been used to cover any alleged advances from his salary escrow account.

As stated earlier Mr. Bleau had $18 000 taken from his paycheck annually to cover payments to his retirement loans, life insurance, United Way contributions, charitable contributions to GLMHRA, child support, alimony and a payment for vacation rentals and for sporting tickets. Payments to a retirement plan were also made from this account. Federal and state taxes due from Mr. Bleau's EMHC's paycheck were also paid from this salary account.

Additionally, Mr. Bleau had funds taken from his EMHC payroll and held in escrow. These funds should have been used to cover advances from the salary account. Approximately $ 5000 / year, was deposited to this account. The availability of these funds held by GLMHRA was never reported to the board or the AG's office.

Mr. Bleau also had a tuition reimbursement account held by GLMHRA and as of November 1997, had over $ 27 000 deposited to that account. These funds could also have been used to cover any alleged advances made from the salary account. These funds were never reported to the board or to the AG's office.

We also learned last Thursday that GLMHRA payroll personnel overpaid Mr. Bleau's retirement loan over a two-year period without his knowledge or consent. It is uncertain at what point the fiscal manager was made aware of this error. These overpayments amounted to over $12,000 and were funds Mr. Bleau had deducted from his GLMHRA paycheck to pay for his retirement plan, taxes, charitable contributions, child support, alimony and vacation and sporting tickets.

In conclusion, the three escrow accounts: salary account, EMHC, and tuition reimbursement held by GLMHRA had sufficient funds to cover all payments made from Mr. Bleau's salary account and their would have been a surplus of over $15,000 had these accounts been used by the fiscal department. Also, had the $12,000 in overpayments to his retirement loan not been made, sufficient funds would have been available to make all the scheduled payments from Mr. Bleau's salary account without having to use any of the funds deposited into Mr. Bleau's tuition reimbursement account. In effect GMHRA would have held over $27,000 of Mr. Bleau's funds.

For this reason, Mr. Bleau was shocked and surprised to learn that it was alleged that his payroll deductions were not sufficient to cover his scheduled payments.