**UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

Albert William Bleau Jr.    :

    Plaintiff    :

                                                             :

vs.    :    Civil Action
                                                            No. 04 – 10469REK

                                                            :

Greater Lynn Mental Health    :
& Retardation Association, et al,

    Defendants

**<u>Motion In Opposition To Defendants' Greater Lynn Mental Health & Retardation Association (GLMHRA), Et al, Motions For Summary Judgment, Dismissal And Entry Of Separate And Final Judgment & Memorandum Of Plaintiff Albert W. Bleau Jr. In Support Of His Motion For Summary Judgment</u>**

Plaintiff, Albert W. Bleau Jr., respectfully requests that the court deny the defendants GLMHRA's motion for summary judgment, MacLeish and Sherman's motion for dismissal and Griffin's motion for entry of separate and final judgment and in the alternative grant the plaintiff's motion for summary judgment. The plaintiff submits the following justification for this request.

1)  The defendants bear the burden to articulate a non discriminatory reason for Mr. Bleau's discharge from GLMHRA and they have not done so and have been dishonest in their justifications and facts, therefore as a matter of law the plaintiff's motion for summary judgment should be granted.

2) The plaintiff has presented direct evidence of discrimination and if the plaintiff's motion for summary judgment is denied he will present additional direct evidence. The plaintiff needs only to show that the discrimination was a motivating factor and not a principal factor leading to his discharge and GLMHRA's refusal to rehire him at GLMHRA.

Mixed motive analysis cases include direct evidence and can be taken out of McDonnell Douglas Framework and plaintiff need only prove that the discriminatory action was a motivating factor in an adverse employment decision. See Weaton-Smith v. Cooley Dickinson Hosp. 282 F. 3d at 64 (quoting 42 U.S.C. 2000e-5(g) (2) (B)).

3) The defendant wants this court to assume that the severance agreement was a one way agreement, with GLMHRA giving Mr. Bleau money and benefits and Mr. Bleau giving up nothing in return. In effect, Mr. Bleau gave up more than he received – the potential for a full time job and benefits at Eastern Mass Housing Corporation (EMHC) where he was the Executive Director at the time of the signing of the severance agreement. Also, he would not have signed the agreement had he not been given false information concerning GLMHRA's intent to dissolve EMHC or had he known that a new document defaming Mr. Bleau was circulating that was prepared by Atty. Robert Griffin. Mr. Bleau did not know that this document existed until the summer of 2002 when he
was called by a reporter from the Boston Herald news corporation who stated that he was given a copy of a "confidential" document prepared by Atty. Griffin that made various statements alleging improprieties by Mr. Bleau while he was

the Executive Director of GLMHRA and EMHC. Mr. Bleau would not have resigned from EMHC if he had known that they intended to dissolve the corporation. EMHC was a designated Community Housing Development Corporation designated by Housing and Urban Development an eligible for hundreds of thousands of grant funding each year to develop affordable housing for the disabled and their families. Once merged with GLMHRA they would lose this designation. In fact they have lost this designation and have lost edibility for thousands of HUD dollars. Mr. Bleau had worked very hard to achieve this designation from HUD and it meant a lot to him.

4) Additionally, Mr. Bleau was under duress when he signed the agreement but did so in good faith assuming that GLMHRA would honor its major motivating provisions: no more retaliation or defamation by board members and employees and a letter outlining Mr. Bleau's accomplishments and reasons for leaving GLMHRA and EMHC. Instead GLMHRA committed a major breach of the agreement. Additionally, GLMHRA accused Mr. Bleau of committing a "major breach" and stated that because of this breach they were not bound by any of the provisions of the severance agreement. And refused payment of his training expenses. (See attached correspondence). I make the same claim against them. GLMHRA at the time of the severance agreement was deliberately withholding over $200,000 of deferred compensation retirement funds illegally. Mr. Bleau had just obtained free legal counsel from the University of Massachusetts at Boston and he would have been financially solvent soon and this is why GLMHRA pushed for the agreement. Mr. Bleau was collecting unemployment insurance and was unable to pay his mortgage on his house.

Quoting from Stephen prozinski vs. real Estate Services, LLC. *59 Mass. App. Ct. 599; 797 N.E.2d 415; 2003 Mass.*

"'Northeast also relies on the principle that every contract, including every employment contract, is subject to an implied covenant of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract. See *Fortune v. National Cash Register Co.*, 373 Mass. 96, 104, 364 N.E.2d 1251 (1977); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473, 583 N.E.2d 806 (1991). See generally Diamond & Foss, Proposed Standards for Evaluating When the Covenant of Good Faith & Fair Dealing Has Been Violated: A Framework for Resolving the Mystery, 47 Hastings L.J. 585, 586-589 (1996).'"

"A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract.' *Lease-It, Inc. v. Massachusetts Port Authy.*, 33 Mass. App. Ct. 391, 396, 600 N.E.2d 599 (1992), quoting from *Bucholz v. Green Bros.*, 272 Mass. 49, 52, 172 N.E. 101

"Northeast's obligation to fulfil the contractual promises it had made, for 'it is well established that a material breach by one party excuses the other party from further performance under the contract.' *Ward v. American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100, 443 N.E.2d 1342 (1983). See *Restatement (Second) of Contracts* § 237 [***21] (1981). n8 Accord *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 171, 675 N.E.2d 403 (1997)"

GLMHRA's agreement not to retaliate or defame the plaintiff, to distribute a letter to the newsletter list and others and to retain the EMHC as an independent entity were "essential and inducing features of the agreement and the violation of them was a major breach of contract.

5) The plaintiff will be filing an amendment to his original complaint to include substantial proof that RICO applies in this case and that the severance agreement was part of a continuing conspiracy of the defendants to remove Mr.

4

Bleau from control of GLMHRA and EMHC and to use the resources of the companies for their own personal financial benefit.

6) The defendants rely on an affidavit from Mr. Robert Tucker that is inaccurate and from an individual who is deeply complicit in the RICO aspects of this complaint and who has benefited financially from his decision to vote for Mr. Bleau's termination. Mr. Tucker was voted a raise and promotion at the Water & Sewer Commission shortly after he voted to create a new unnecessary position at GLMHRA and voted James Cowdell, the President of the Lynn City Council into the $75,000 position even though Mr. Cowdell had no college degree and was the least qualified applicant for the job.

7) Summary judgment should not be granted to the defendants since there are substantial material facts supporting a judgment for the plaintiff as a matter of law.

8) GLMHRA is responsible for the actions of defendants MacLeish, Sherman and Griffin whether they are considered agents of GLMHRA or are determined to be de-facto employers and of their senior employees and board members.

See John R. Cariglia v. Hertz Equipment Rental Corporation and James Heard, United States Court of Appeals For the First Circuit April 4, 2004
As in Cariglia, Griffin, MacLeish and Sherman did not inform the board that their information was incorrect and allowed them to make a decision on incorrect discriminatory information.
A corporation can be held liable for discrimination when neutral decisionmakers,

free of any age-based animus, rely on information that is manipulated by another employee (agent, board member) who harbors age-based discriminatory animus. This is the case of some of the Board of Directors when making their decisions in April 2000 and in August 2003.

Employees, board members and agents of GLMHRA withheld exculpatory information from the report prepared by MacLeish and Sherman and the subsequent report prepared by Robert Griffin. (See Attachment – addendum and Fallon rebuttal to Griffin report)

Thus individuals and agents of GLMHRA as in <u>Cariglia</u> presented or intentionally let stand a completely false and misleading impression that the plaintiff engaged in financial misconduct and that he was unfit mentally to serve as Executive Director.

Quoting <u>Cariglia</u>, "In Medina-Munoz v. <u>R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 10 (1st Cir. 1990), the Court held that the 'biases of one who neither makes <u>nor influences</u> the challenged personnel decision are not probative in an employment discrimination case,' implying that the biases of those who do make or influence the employment decision are probative."

Also <u>see</u> <u>Stoller</u> v. <u>Marsh</u>, 682 F.2d 971, (D>C> Cir. 1982) where the court ruled that "an unfavorable employment decision resulting from inaccurate, discriminatorily-motivated evaluations by the employee's supervisors violates Title VII," even if the decisionmaker was completely free of amicus. "When a supervisor... deliberately places an inaccurate, discriminatory evaluation into an employee's file, he intends to cause harm to the employee....The employer—that is, the organization as a whole—cannot escape Title VII Liability simply because

6

the final decisionmaker was not personally motivated by discrimination." Id. At 977. Similarly, the Fifth Circuit has held that the "discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the manager... had influence or leverage over" the decisionmaking. Laxton v. Gap Inc., 333 F.3d 572, 84 (5th Cir. 2003). See also Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000)("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker."); Abramson v. William Paterson Coll., 260 F.3d 265, 285-86 (3d Cir. 2001)("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.").

Also see Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993) and Wallace v. SMC Pneumatics, Inc. 103 F.3d 1394, 1400 (7th cir. 1997) and Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1323 (8th Cir. 1994)

Additionally, Claire Jackson the vice-president and past president took advantage of her position and garnered confidential information from Mr. Bleau that she then used against him. She should have recused herself from the vote to terminate the plaintiff.

GLMHRA board of directors should have seriously questioned the recommendations of their agents and Mr. Tucker and Manning, after EMHC, faced with the same accusations, refused to fire Mr. Bleau and in fact were so disgusted with the management of the properties by GLMHRA during Mr. Bleau's leave of absence voted for EMHC to terminate the management contract with

7

GLMHRA and have Mr. Bleau take over full management of the properties. EMHC began paying Mr. Bleau's medical benefits, car expenses and cell phone expenses and other work related expenses in August and September and began negotiations with Mr. Bleau to run EMHC full time when the severance agreement was agreed to and signed by the parties.

The EMHC, at that time included three past presidents of GLMHRA, its past treasurer, and its current Assistant Clerk. This was an experienced and well seasoned board that had worked with Mr. Bleau for many years and were well aware of his accomplishments and capabilities. They, through their president, Stephen Speropolous, requested that the attorney general's office put in writing any request to fire Mr. Bleau and put forth charges. Erick Carricker refused to do so and refused to respond to the request in writing. They voted five to one with only Atty Sam Vitale, the Water and Sewer Commission legal counsel voting against the motion to take over the full management from GLMHRA.

9) Defendants MacLeish, Sherman and Griffin met all the requirements of de-facto employers. They functioned as receivers for GLMHRA with all the necessary functions and powers of an appointed receiver under Massachusetts law.

<u>Quoting from Oscar Camacho</u> v. <u>Puerto Rico Ports Authority</u> (1st Cir. 2004) <u>Camacho</u> v. <u>P.R. Ports Auth.</u>, 254 F. Supp. 2d 220, 227-28 (D.P.R. 2003)

"In <u>Nationwide Mutual Insurance Co.</u> v. <u>Darden</u>, 503 U.S. 318 (1992) 'There the Court posited that, 'in determining whether a hired party is an employee under the general common law of agency,(an inquiring court should) consider the hiring party's right to control the manner and means by which the product is

8

accomplished' Id. At 323"

'The Court then elaborated: Among other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; the extent of the hiring party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. MacLeish, Sherman and Griffin's roles were that of a receiver but without the liability protection afforded receivers under Massachusetts law. A non profit can be put into receivership only if the life safety of the clients are affected or if there is insolvency. Neither was the case with GLMHRA or EMHC.

See Sibley Mem'l Hosp. v. Illinois, 69 F.3d at 171-72 supports liability for an employer who interferes with an individual's employment relationship.

'We have held before, and today reaffirm, that the ADEA and Title VII "stand in pari passu" and that "judicial precedents interpreting one such statute (are) instructive in decisions involving (the other)" Serapion v. Martinez, 119 F. 3d 982, 985 (1st Cir. 1997).

10) The requirement that Mr. Bleau drop all charges at the EEOC as a condition of signing the severance agreement is by itself discriminatory especially considering the knowledge of GLMHRA, its officers and agents of the extent of the discriminatory practice against Mr. Bleau, the RICO implications in this case and the existence of yet another document defaming Mr. Bleau - (Atty. Griffin's

report).

11) The defendants' actions are so egregious that any other remedy would not provide justice for the plaintiff in this case and would serve as encouragement for similar behavior by individuals, agents and corporations. Any non-profit or profit making company in the State of Massachusetts could be taken over by these individuals or other individuals using the same tactics.

12) Mr. Bleau has suffered emotionally and financially from the actions of these defendants. He was forced to sell his home, cash in all his retirement assets and file for bankruptcy (see attachment II). He still has not been able to secure permanent employment or a single job interview despite applying for hundreds of jobs and paying over ten thousand dollars to three separate employment firms – Haldane, Stephens Associates and Allen Associates.

## Memorandum Of Plaintiff Albert W. Bleau Jr.

### Defendants' Burden to Articulate A Non Discriminatory Reason For Termination

The defendants have not articulated a non discriminatory reason for termination of the plaintiff in April 2000 or for not hiring the plaintiff in August 2003 and for this reason summary judgment should be granted to the plaintiff.

Additionally, the defendant' motions should be denied since the plaintiff has submitted sufficient facts and documentation that he may be entitled to a judgment as a matter of law.

See Zapata-Matos v. Reckitt & Colman, F.1st (1st Cir. 2002) "Under the McDonnell Douglas framework, once the plaintiff has met the low standard of showing prima facie discrimination, the employer must articulate a legitimate

10

nondiscriminatory reason in response. " See <u>Texas Dep't. of Comt'y. Affairs</u> v. <u>Burdine</u>, 450 U.S. 248, 22-253 (1981).

GLMHRA has not articulated a reasonable and sufficient response that the plaintiff was terminated for a non discriminatory reason and the plaintiff has presented sufficient evidence that the termination had to be for discriminatory reasons or that agents and certain board members for their own personal and financial reasons (RICO) presented discriminatory information and justifications to gather the four votes to terminate Mr. Bleau and especially to garner one board member to abstain creating a four to three vote.
"Disbelief of the reason, may along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated. " <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, v. 530 U.S. 133, 147 (2000) and <u>Thomas</u> v. <u>Eastman Kodak Co.</u>, 183 F.3d 38, 56 (1st Cir. 1999)

"Summary Judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must examine the record evidence 'in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party.'" <u>Feliciano de la Cruz</u> v. <u>El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000) As quoted in United States Court of Appeals for the First Circuit , October 9, 2002, <u>Bailey</u> v. <u>Georgia-Pacific Corp.</u> , 176 F Supp. 2d 3, 9-10 (D. Me. 2001).

11

## Plaintiff Was Disabled Under The Law

The ADA defines a disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102 (2).

Alcohol and drug addiction are definitely considered impairments. See Evans v. Fed. Express Corp., 133 F.3d 137, 139 (1st Cir. 1998). This conclusion is reinforced by the statute's legislative history. See H.R. Rep. No. 101-485 (II), at 51 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 333 (noting that "physical or mental impairment" includes "drug addiction and alcoholism"

Quoting from Bailey, "the Supreme court ruled in Sutton: There are two Apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual - - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. The plaintiff must show that he was perceived as disabled within the meaning of the ADA, that is that he was perceived as being "unable to work in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities. See 29 C.F.R. § 1630.2 (j) (3) (i). See Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 524

12

(1999) plaintiff must show that "he is regarded as unable to perform a class of jobs."

Working is a major life activity. See Gelabert-Ladenheim v. Am. Airlines, Inc., 252 F.3d 54,58 (1st Cir. 2001).

The fact that GLMHRA not only did not interview the plaintiff for the position of Executive Director but interfered through its agents and employees and board members with Mr. Bleau's ability to gain similar employment elsewhere demonstrate that they were convinced that he was perceived as not being able to work in a class of jobs namely the job of Executive Director.

## Additional Facts To Support Plaintiff's Motions

The plaintiff submits the following additional facts and arguments to support his Motions:

1) When the plaintiff asked then GLMHRA president, Thomas Manning why he had been terminated, Mr. Manning stated that MacLeish and Sherman had informed them that the bond holders would not approve the tax-exempt bond required by GLMHRA if the plaintiff remained as Executive Director. This same argument was told to Mr. Bleau by Mr. Tucker, Claire Jackson, the former president and current vice-president, and Nancy Rizzo, board member and chairperson of a subcommittee that was deciding whether to pay Sherman and MacLeish the more than $125,000 still owed them out of over $225,000 that they billed GLMHRA for legal services over a six month period.

2) Mr. Bleau submitted a letter pursuant to the personnel practices requesting a hearing before the full board to discuss their decision and to request

13

reconsideration. GLMHRA never responded to his request. (See attachment in the original complaint)

3) Subsequent to the vote, Mr. Bleau secured three loans of over $600,000 financing for GLMHRA and had EMHC sell various properties and transferred over $1.8 Million dollars to GLMHRA so that the bond financing would not be necessary and the predicate for firing Mr. Bleau would no longer exist.

4) Mr. Bleau received a letter from the bond holders specifically stating that they never stated that Mr. Bleau's termination was a condition of the bond ( See attachment in the original complaint) This was sent to GLMHRA prior to the closing of the bond.

5) GLMHRA's reasoning does not support the facts. EMHC owned the properties that were securing the bond and they were providing the major collateral for the bond and 95% of the proceeds of the bond was going to EMHC for renovations to properties that it owned and to replace higher priced bank mortgages.

6) EMHC refused to terminate Mr. Bleau's employment and in August 2000 voted to have him take over full management of EMHC properties and to remove GLMHRA as property manger. At this time, Mr. Bleau was working as a 14 -20 hour per week Executive Director of EMHC. This new assignment would require him to work full time for EMHC. ( See attachments - letter from Stephen Speropolous to Erik Carricker and minutes of the August board meeting filed with the original complaint)

7) GLMHRA should have looked to the expertise of the EMHC board that had three past presidents, the past treasurer and the current clerk of GLMHRA

14

on its board. Stephen Speropolous was the past president and vice-president of GLMHRA and was on that board for over twenty years and was the president of EMHC for twenty one years. Martena Fallon was the past president, vice-president and clerk of GLMHRA and was the present clerk of EMHC, Peter McGuinn was the past treasurer of GLMHRA and the current treasurer of EMHC with over fifteen years of service on both boards and had a brother in GLMHRA's residential program, Ralph Fredette had been a member of GLMHRA for over twenty years and was its past vice-president and president, Norman Thibodeau, had a son in GLMHRA's residential and day programs and was the current clerk of GLMHRA and he was one of three members who voted no on the Plaintiff's termination.

8)  Only Atty. Sam Vitali, EMHC's vice-president, who had a serious conflict of interest did not support the plaintiff to take over full control of property management from GLMHRA. Mr. Vitali was and is the counsel for the Water & Sewer Commission, where GLMHRA president and past treasurer, Mr. Robert Tucker was the deputy director. His law firm also was city solicitor for the City of Lynn where James Cowdell, newly promoted Administrative Assistant for GLMHRA was the president of the Lynn City Council that had appointment authority over the City solicitor position and the members of the Lynn Water & Sewer Commission who were responsible for hiring the counsel as well as approving Mr. Tucker's promotion and salary increase to $90,000. (See attached newspaper clippings in original complaint).

9)  The defendants asserted in various reports and written documentation that the Employee Fringe Incentive Plan and its reserves were subject to ERISA

15

and that Mr. Bleau had violated ERISA for which GLMHRA and EMHC had great liability. Mr. Bleau had an independent Attorney who specializes in ERISA law review the plan and she issued a letter to the board stating the plan as presented was not subject to ERISA. (Sell Atty. Slavin's letter attached to original complaint) Also see Tena Fallon's draft Affidavit - Attachment III that further supports Mr. Bleau's contention that the reserves were funds controlled by GLMHRA that had been voted by the board for benefits for the employees and consumers of GLMHRA.

10) Once Mr. Bleau left GLMHRA and EMHC, GLMHRA used the Employee Fringe Incentive Plan funds for operating expenses and to cover unreimbursed legal and consultant costs of the defendants MacLeish, Sherman and Griffin. This clearly demonstrates that the defendants did not consider these funds subject to ERISA.

11) Financial problems at GLMHRA were created by Mr. Tucker, the treasurer and the president, Tom Manning, MacLeish, Sherman and Griffin while Mr. Bleau was placed on a leave of absence. They completely mismanaged the company and personally and financially benefited from their control. GLMHRA ended the year with a deficit for the first time in its history while EMHC which continued to be managed by the plaintiff finished the year with a surplus exceeding one million dollars.

Respectfully submitted,

*[signature]*

Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907
(781) 962-2662

Dated: March 8 2005

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon all counsel of record by First Class Mail on March 8, 2005.

*[signature]*
Albert W. Bleau Jr.