UNITED STATE DISTRICT COURT FILED
FOR THE DISTRICT OF MASSACHUSETTS OFFICE

Albert William Bleau Jr.                    :        2005 MAR 22  A 9: 38

    Plaintiff                              :        U.S. DISTRICT COURT
                                                     DISTRICT OF MASS.
                                            :

vs.                                         :        Civil Action
                                                     No. 04 – 10469REK
                                            :

Greater Lynn Mental Health                  :
& Retardation Association, et al,

    Defendants

## Amendment Of Plaintiff's Motion

## In Opposition To Defendants' Greater Lynn Mental Health & Retardation Association (GLMHRA), Et al, Motions For Summary Judgment, Dismissal And Entry Of Separate And Final Judgment & Memorandum Of Plaintiff Albert W. Bleau Jr. In Support Of His Motion For Summary Judgment Originally Filed On March 9, 2005
## &
## Motion To Amend Original Complaint Dated March 8, 2004 to Bring Action Under The Racketeer Influenced and Corrupt Organizations Act (RICO) , 18 U.S.C. § § 1961-62  (2000)

1.) Plaintiff, Albert W. Bleau Jr., in his March 9, 2005 motion to the Court respectfully requested that the court deny the defendant GLMHRA's motion for summary judgment, MacLeish and Sherman's motion for dismissal and Griffin's motion for entry of separate and final judgment and in the alternative grant the plaintiff's motion for summary judgment.

2.) Should the plaintiff's motion for summary judgment not be granted, the plaintiff believes that as a matter of law that he has the right to discovery before any motions for dismissal, summary judgment, or entry of separate and final

judgment are granted to the defendants by the Court and before the Court rules in favor of defendant's motions regarding the severance agreement.

3.) Discovery would be essential and directly germane to the plaintiff's Complaint. Discovery would substantiate the RICO elements in this case. It would uncover additional examples of discrimination and retaliation. It would show that the severance agreement was part of a conspiracy and that it was signed under duress. It would also show that the defendant's committed a material breach of the agreement.

4.) MacLeish and Sherman have asserted that the Court's December 2004 ruling dismissed the plaintiff's complaint against them as individuals and also as de-facto employers. The plaintiff understands that the complaint has been dismissed against them as individuals in the original complaint and not yet decided as a result of this amended complaint and RICO. The plaintiff must now show that Sherman and MacLeish met the criteria of de-facto employers. The plaintiff has made substantial proof of their role as de-facto employers. See Martena Fallon draft affidavit and affidavit of John Pappanastasiou and the motions s filed with the Court.

The plaintiff is now submitting additional documentation with this amendment.

5.) Additionally, should RICO be proven in this complaint, the plaintiff respectfully requests that MacLeish, Sherman and Griffin be held personally responsible and as de-facto employers. It is unreasonable to assume that the Congress and the Court's when drafting and interpreting the ADA and the 1973 Rehabilitation Act, Title VII and the Civil Rights Act wanted to allow agents, especially attorneys to use these laws as a shield to give them immunity

2

from unlawful acts.

6.)   It would be a reasonable and acceptable reach of this court to find the defendant's including Robert Griffin liable as individuals. Whether or not the the defendants should be held liable as individuals is "a genuinely disputable issue of law for which no clear answer appears in the sources of authority to which the judge turns for guidance, including federal and state constitutions, federal and state statutes, and court decisions that are recognized as guiding precedents. This kind of issue is commonly referred to as an 'issue of first impression.'" See Robert E. Keeton, <u>Guidelines for Drafting, Editing and Interpreting,</u>, p 11, (Lexis Law Publishing 2002) and Robert E. Keeton, <u>Judging in the American Legal System</u>, § 17.1.1© (Lexis Law Publishing 1999)

7.)   Should the Court decide that the plaintiff has not submitted sufficient information to ascertain that MacLeish, Sherman and Griffin were de-facto employers, he is certain that with discovery he will gather additional information to support the plaintiff's contention that MacLeish, Sherman, and Griffin were de-facto employers.

8.)   The plaintiff is requesting that his original complaint dated March 8, 2004 be amended to include an allegation that the defendants were engaged in a criminal conspiracy to remove the plaintiff from his position as Executive Director of GLMHRA and EMHC and control over these corporations and to remove the board of the EMHC for the defendants' personnel and financial benefit and to cover up illegal and professional misconduct in violation of state and federal laws and specifically RICO.

## Amendment of March 8, 2004 Complaint To Include RICO

The plaintiff has submitted prior motions and attachments and will now present additional documentation and argument that the defendants engaged in "(1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering activity." N. Bridge Assocs., Inc. v. Boldt, 274 F.3d 38, 42 (1st Cir. 2001) quoted in Soto-Negron v. Taber Partners I, (1st Cir. 2003)

1.) GLMHRA, Griffin, Eric MacLeish and Robert Sherman's motions for summary judgment, dismissal and entry of a final judgment should not be allowed by this court because these defendants were involved in a criminal conspiracy (RICO) to take over GLMHRA and EMHC for their own personal financial benefit. They participated in a plan to cover up illegal activity of GLMHRA board members, employees, staff from the Attorney General's Office and the Lynn Water and Sewer Commission. The RICO factor additionally supports the plaintiff's claim of continuing discrimination and retaliation. It also supports his claim that the provision in the Severance Agreement that prevents the Plaintiff from bringing a complaint against the defendants for actions that occurred prior to November 3, 2005 should not be binding on the plaintiff.

2.) The defendant's conspired to extract hundreds of thousands of dollars from GLMHRA and the EMHC for unsubstantiated fees, payoffs, private property improvements, employment, promotions and to cover up gross mismanagement of charitable assets. They also conspired to receive beneficial treatment from the State Attorney General's Office to cover up their activities and to prevent a through investigation of corruption and wrongdoing at the Lynn Water & Sewer Commission and at the Lynn City Council. They also obtained

4

5.) Sherman and MacLeish threatened staff and board members with civil suit and prosecution if they talked to one another or to the plaintiff.

6.) MacLeish and Sherman drafted a document concerning the plaintiff that was blatantly false. They sent it to bondholders, the AG's Office, and state agencies without giving a copy to the plaintiff or to members of the EMHC board of directors.

MacLeish and Elaine White met with the Commissioner and Assistant Commissioners of DMH and DMR and gave them a copy of this document.

7.) MacLeish and Sherman billed the GLMHRA without a vote or knowledge of the full board of GLMHRA over $225,000 in legal billing in less than seven months.

8.) After drafting the false report, Sherman told the board that he was a friend of the Attorney General and that he could help them with the AG's office concerning the report that he and MacLeish had drafted. This forced the board to continue with their contractual arrangement although a majority of its members wanted to fire MacLeish and Sherman.

9.) Robert Sherman was a former Assistant District Attorney in the AG's Office. He had extensive friendships and contacts in that Office and generated substantial legal business from these associations.

10.) Sherman was the principal fundraiser for Attorney General Reilly's campaign for Attorney General and at a victory fundraiser November 1999, the Attorney General stated to a gathering of over 200 people, "I owe my victory to

6

Robert Sherman". James Cowdell, Sherman, MacLeish and Smith were at this fundraiser. See attachment.

11.) After the board voted in January 2000 for the plaintiff to return from leave, the defendants, MacLeish and Sherman, orchestrated Janine Brown Smith and the Acting Executive Director, Elaine White, to file a false complaint with the AG's Office against the plaintiff and his wife.

At that board meeting, the board informed the plaintiff that they were disappointed with Ms. White's performance and her misrepresentations and that they wanted the plaintiff to eliminate her position as Director of Operations. The president, Claire Jackson, informed Ms. White of the board's intentions.

12.) Sherman, MacLeish and GLMHRA took control of the plaintiff's medical records from the Insurance Broker and had them sent to GLMHRA auditors Mecone and Sanella for review and analysis.

They shared these records with the board. They distributed plaintiff's counseling record at the April 23, 2000 board meeting to influence the board to vote to terminate the plaintiff. Nancy Rizzo told the plaintiff and Martena Fallon that this was one of the reasons that she voted to terminate the plaintiff.

13.) Nancy Rizzo was on the board and her ex-husband was arrested in 1997 and 1998 by federal agents for illegal drug distribution after an extensive undercover investigation including wire taps. He was supplying cocaine and heroin to Maine and Southern NH and North Eastern Massachusetts, primarily Lawrence. He was considered the biggest drug dealer ever arrested by Massachusetts law enforcement. Hundreds of pounds of cocaine and heroin were found in his office in Ms. Rizzo's rooming house on South Common

7

St. in Lynn and in the trunk of his car. Also, $267,000 in cash was found in the rafters and ceilings of the Rizzo's' newly built home on Puritan Road in Swampscott. This was his second arrest, having been arrested by federal agents in Revere some four months earlier for distribution and possession.

14.)    Nancy Rizzo voted to fire the plaintiff and to pay MacLeish and Sherman over $225,000 in legal fees and chaired a committee of the board that recommended that an outstanding bill of $125,000 be paid. At this time, the Attorney General's Office was petitioning the federal attorney to transfer Rizzo's case from federal court to his jurisdiction in state court. Had Rizzo remained under federal jurisdiction, he would have served twenty years to life.

Rizzo's trial and case was transferred to state court in Middlesex County where Attorney General Reilly had been the District Attorney for many years. If the case were to be transferred to state court, it should have been transferred to either Suffolk or Essex County where the arrests occurred.

The AG's staff had the charges reduced and recommended that Rizzo be given a one-year sentence with three months served, work release after three months and parole after six months. The judge who was assigned to Middlesex Court "smelled a rat" and opposed the recommendation and gave him three years and a day, the maximum allowed given the charges that were filed. This required Rizzo to serve a full three years without parole. Still a very lenient sentence compared to twenty years to life.

15.)    Thomas Manning, the president of the board in 2000 mysteriously had $70,000 deposited into an investment account in Florida and was recruited

8

and trained and hired by a Boston investment company with ties to the defendants and their associates after he voted for plaintiff's termination.

16.) Claire Jackson, the 1999 president and 2000 vice-president who was given a part time job at the North Shore Community College where she had recently retired. She also worked for the local Psychiatric Hospital where a newly recruited board member and former Regional Director for DMH, was her boss.

She also had over $30,000 in improvements done to her property and it was alleged by some board members and staff that some of this work was done by contractors affiliated with GLMHRA. The plaintiff met with her in May 2000 after the vote the termination vote to discuss the possibility of his return to his position at GLMHRA. This was conditional on the plaintiff raising sufficient funds to solve GLMHRA's cash flow problems.

Ms. Jackson was extremely defensive when she met with the plaintiff and insisted that she had done the work on her deck, in her house and the driveway her self.

17.) The plaintiff and the EMHC board attempted for over a year without success to obtain the financial documents for the renovation of The St Francis Church (The church had been purchased by EMHC in the fall of 1998 and GLMHRA was supervising a one million dollar plus renovation of the building.) It was to become a three story office and educational and training program for physically handicapped and elderly developmentally disabled adults. They were concerned that materials and labor costs may have been used at Ms. Jackson's residence and at the residence of various staff members who were

also renovating their homes during the construction at the church. GLMHRA and MacLeish and Sherman refused to turn over the records to the plaintiff or to the board. The plaintiff was investigating the costs when he was put on leave.

18.) During 1999 and 2000, The Lynn Water and Sewer Commission was under investigation by the Inspector General's Office (IG) for possible corruption in the award of a multi-million dollar no bid contract for sewer design and work. The losing bidder had filed suit against the city alleging organized crime connections of the winning bidders. They also alleged kick-backs to City Council members and the Mayor.

19.) The IG requested the power of subpoena and a grand jury investigation from the AG's Office in 2000 to expand the investigation. The Attorney General denied his request.

20.) Shortly after the IG's request, the Attorney General attempted to dissolve the IG position and office and transfer its staff to his control. Only the opposition of Massachusetts' Auditor DeNucci prevented this from occurring.

21.) The plaintiff filed complaints with the FBI and with the Inspector General's Office in 2000. Both agencies expressed their interest. They were interested in the possible RICO implications and the connection between GLMHRA and the Lynn Water & Sewer Commission. Very Suddenly, staff from the FBI and the IG's Office informed the AG's Office that the plaintiff had filed a complaint against the defendants while implicating the AG's staff in the conspiracy. Shortly, thereafter, the AG's office contacted the plaintiff to investigate him regarding the MacLeish, Sherman and Griffin's allegations. ~~Plaintiff's counsel~~

22.) The IG's Office refused to meet again with the plaintiff after the Attorney General threatened to eliminate the IG's Office. They told him to send his information to the press. Plaintiff's counsel advised the plaintiff not to voluntarily give any more information to the FBI but to cooperate if they requested any additional information. To date they have not.

23.) The plaintiff met twice with the AG's staff, Hollingsworth and Ahern, (see Hollingsworth and other correspondence attached to the March 8, 2004 original complaint). The AG's Staff abruptly terminated the second meeting and escorted the plaintiff from the AG's office.

The plaintiff was removed because he had begun documenting their questions and a summary of his answers. They refused to allow tape recordings of the meetings as the plaintiff had requested. They said it was against AG Reilly's new policy. They also accused the plaintiff of being a drug addict as they escorted him from the AG's Offices.

24.) The plaintiff's initial meeting with MacLeish in late October 1999 or early November attended by incoming president, Tom Manning, HR Director, Anne Perry and secretary Tina Adams was tape recorded. Although MacLeish had promised a copy to the plaintiff, he has not fulfilled that promise. MacLeish took the tape and its whereabouts is unknown.

25.) MacLeish and Sherman requested that the board hire Tom Manning as the Acting Executive Director of GLMHRA. Manning had no managerial experience or supervisory or human services experience.

26.) The EMHC bylaws were removed from GLMHRA offices and there location is unknown.

11

27.) The Employee Fringe incentive Program records, contracts and minutes of meetings are non-existent according to Griffin's report. Since they did exist, either he was deliberately misrepresenting the facts or they were removed from the GLMHRA offices and their location are unknown.

28.) Robert Tucker, past president and treasurer, of GLMHRA was the Deputy Commissioner of the Lynn Water & Sewer Commission. James Cowdell, president of the Lynn City Council and newly appointed Administrative Assistant at GLMHRA, was responsible for appointing board members and City Council members to the Commission. He also served on the Commission when certain improprieties had been alleged to occur. Sam Vitali, EMHC board member was legal counsel for the Lynn Water and Sewer Commission.

They all financially benefited from plaintiff's termination and had a self interest to have the IG's investigation terminated into possible kickbacks and corruption in the awarding of water and sewer contracts.

29.) John Sanella one of GLMHRA's auditors and his family were the largest contributors to Attorney General' Reilly's campaign for Attorney General

30.) Griffin, MacLeish Sherman, Mecone and Sanella profited greatly from business contacts, contracts and receivership business assigned to them by the AG's Office.

31.) The four board members who voted for the plaintiff's termination had major conflicts of interest and expected to gain financially from the plaintiff's removal from his position. They participated in a conspiracy to remove him and to profit financially from his termination and the takeover of the EMHC and

12

GLMHRA.

32.)    On July 1, 2001 Robert Tucker became the president and sole director of the EMHC effectively taking over control of the corporation without a vote or knowledge of the only existing board member, Martena Fallon, the EMHC clerk.

33.)    Van Kampen American Capital benefited financially from the new bond as they were given substantial collateral and beneficial financing. The defendants benefited by receiving extra funds that they could use to pay for the deficits that they had accumulated during their nine months in control of GLMHRA. It also guaranteed a cover up and justification for their illegal actions. The AG's staff, Jamie Katz and Eric Carricker intervened in the bond financing and required that Griffin be hired as a monitor - read "receiver" of GLMHRA.

34.)    Mecone & Sanella made a major auditing error when they failed to recognize the reserves that GLMHRA had created in the Self Insured Plans. For many years, they prepared the State 1100 form for Administration and Finance, the 990 for the IRS and the PC15 for the Attorney General's Office Annually. They did not report the reserves as corporation assets as required. Griffin conveniently covered up this violation in his report to prevent GLMHRA or Administration and Finance (A&F) from holding them liable. Under A&F guidelines, They could have lost their right to audit sate contracted human service agencies.

The reserves were under the control of the Fiscal Department of GLMHRA and available for inspection by the auditors. Without consulting the plaintiff or the plan administrator, they assumed that the reserves were ERISA funds and

not corporate assets. Yet, if they were ERISA funds, they should have recognized them as part in their ERISA audit of the GLMHRA self funded retirement 401k retirement plan. They had been auditing this plan for at least five years.

35.) Bob Sherman and MacLeish obstructed the plaintiff's attempts to defend himself with the board and blocked access to important files. They also attempted to intimidate the plaintiff's attorney to end representation of the plaintiff. These actions took place prior to the April 23, 2000 vote. See attached correspondence from Attorney Rosenfeld dated February, 18, 28 and March 1, 2000.

36.) The defendants violated the rights of the plaintiff in violation of the GLMHRA personnel practices that were amended on November 26, 1999.

a.) The practices allow for an appeal to the Executive Committee within three working days of the termination. The plaintiff requested a meeting in his April 26th letter to Tom Manning and received no response. He was never allowed to meet with the board to discuss his termination. See page 61 of the attached abridged version of the Practices.

b.) They violated the GLMHRA Drug/Alcohol Free Workplace Policy that requires the employee's supervisor to document in writing any suspicion of drug use and require that a drug test can only be approved by the Human Resource's Director. The board put nothing in writing and the HR Director did not approve the drug screen on the plaintiff. MacLeish and Sherman ordered it. See page 57 of the attached abridged version of the Practices.

c.) It is unclear who hired MacLeish and Sherman. It wasn't the

14

board and it wasn't the Executive Director. They probably hired themselves. The practices are clear that only the Executive Director can hire outside consultants. It was also GLMHRA policy that only the Executive Director could approve payment of legal bills. See pages 24 & 25 of the attached abridged version of the Practices.

        d.) The board and its employees and agents (defendants) violated the confidentiality of the EAP plan and conduct guidelines of the personnel practices. They shared plaintiff's medical records with others such as the Ag's Office, auditors, prospective employers, staff, board members, etc. Bob Sherman is quoted in the April 23 minutes prior to the vote to terminate the plaintiff, "the employees paid for his mediator for his pending divorce." This mediator was part of the EAP program and the plaintiff was referred to her by EAP. This was supposed to be a confidential service and not used as a discriminatory reason to terminate me. See pages 25 & 26 & 55 of the attached abridged version of the Practices and pages 2 and 3 of the April 23, 2000 minutes.

        e.)    e.) Defendants deliberately reported that the plaintiff owed funds to GLMHRA when the reverse was the case. They never informed the board or the AG and others that he had $27,000 in his education fund and was owed over $60,000 in deferred compensation funds and that these were eligible benefits available to all employees or identified senior employees. See pages 40 & 42 of the attached abridged version of the Practices and pages 2 and 3 of the April 23, 2000 minutes.

15

# Examples of Direct Discrimination and Retaliation and Defamation

The plaintiff does not believe that he is required to show direct evidence of discrimination or of a "forbidden consideration". See Desert Palace Inc. v. Costa ( US, 2003). Justice Thomas writing for the majority of the Supreme Court stated that the plaintiff "need only 'demonstrate' that an employer used a forbidden consideration with respect to any employment practice'" Quoted from the attached article by Joanna Grossman, A Recent Supreme Court Decision Makes It Easier for Plaintiffs to Proceed When Discrimination is One Motive, But Not The Only One.

However, the plaintiff's motion for summary judgment is strengthened by presenting instances of direct discrimination and retaliation.

1.) The denial of services to plaintiff's brother and his subsequent suffering and death in June 2002 were an extreme example of discrimination and retaliation.

GLMHRA needed to find funds to cover deficits created by the defendants and plaintiff's brother was an easy target.

## Plaintiff's Brother

GLMHRA contends that they did not retaliate or discriminate against the plaintiff by decreasing services to his brother resulting in his death and that the plaintiff had no right to see him or to monitor his health since he was not

16

his guardian.

What are the facts: The plaintiff was the Executive Director of the agency that operated the group home and the day program. The plaintiff regularly visited his brother in his day program in Melrose and was always in communication with staff and his family concerning his well-being.

Massachusetts state law allows heirs to the estate of an individual to bring a claim in state court for wrongful death and for pain and suffering. Therefore, as his brother, the plaintiff does have status to challenge and question his death. He also had permission from the guardians (plaintiff's sister and his eldest son) to monitor and stay involved in his care. It was GLMHRA and DMR policy to involve all family members in the lives of its residential consumers.

An example of the plaintiff's involvement was the class action suit that he filed on his brother's behalf in 1984 preventing him and some twenty other disabled adults from being reinstitutionalized. This resulted in his brother being placed in the Saugus Intermediate Care Facility in 1985.

Two years before his death, he was hospitalized and almost died. The plaintiff intervened in the hospital when he was being over medicated. Staff from his group home stayed with him around the clock to assure his continuing care.

Hospital staffing of high risk developmentally disabled citizens was standard practice and has always been GLMHRA's policy for years. It was an important service to assure proper medical treatment for these individuals especially those who were non verbal like my brother and had a history of serious medical or behavioral problems. This was especially true for ICF residents who by definition

had these characteristics or they couldn't be placed in this type of facility. For example, residents of Intermediate Care Facilities (ICF's) did not have to be capable of self preservation and evacuation, many were in wheelchairs or had ambulation problems such as plaintiff's brother.

GLMHRA eliminated the dietician from the program, cut back on nursing and the training of staff as well as psychological services. My brother died because the line staff were not properly trained and supervised and did not realize that he had an ulcer from the medications, ( a common side effect from anti seizure medications) and had dietary restrictions. He should not have been fed cook out food such as burgers etc. It was not the staff's fault that they had no dietary guidelines, no dietician and no training concerning ulcer's side effects from anti seizure medications.

After he was hospitalized, he was not given aggressive treatment. He was bleeding in his stool and the hospital decided to wait until Monday to see how he was doing. Staff should have shared his past medical history and he should have had immediate surgery. The plaintiff called the clerk of the board and President, Robert Tucker, that evening on several occasions and requested staffing at the hospital. He also called James Cowdell. They never returned his calls or authorized needed hospital staffing or additional nursing for plaintiff's brother.

The next day, the Association nurse and the program director informed the plaintiff that no staffing was authorized by GLMHRA and that they were at the hospital voluntarily.

The plaintiff was waiting word from his sister who was communicating with the Doctor when he received the news that his brother had passed.

18

Plaintiff's brother suffered and was left alone. In addition to his medical problems, he suffered from an anxiety disorder. The stress of being abandoned could very well have contributed to his death.

Plaintiff's brother was over 50 but still looked like a teenager. He was down syndrome and about four feet tall and weighed less than 75 lbs. He deserved to live a little longer and he certainly didn't deserve to suffer. June will be the third anniversary of his death.

The Saugus group home was a former Intermediate Care Facility that was converted under the Federal Waiver Program by DMR around 1998. As a condition of the waiver, GLMHRA and DMR were required to maintain all services. Additionally, plaintiff's brother was a Federal Consent Degree client designated by Federal Judge Tauro. Services for my brother could only be cut by a modification to his Individual Service Plan signed and approved by his guardians, GLMHRA and DMR. This did not happen.

Paul Cote, the newly hired Executive Director was the past Assistant Commissioner of DMH – DMR when the consent degree was in force and was knowledgeable of the waiver program as well. He should not have approved any reduction in clinical services and staffing at the Saugus group home and especially for plaintiff's brother.

The GLMHRA board and Robert Tucker hired unqualified individuals for key Supervisory positions. James Cowdell, the newly hired Administrative Assistant had no knowledge or experience operating a residential program and no clinical training and no knowledge of the Consent Decree or the waiver program. The Association staff members who were more qualified than Mr. Cowdell were not

19

hired for the position, Anne Perry, The Director of Human Resources and Deborah Phelps, the Director of Community Relations and Fund Development.

They had been Program Directors of Intermediate Care Facilities. Ms. Phelps had been the Program Director of the Saugus ICF. They knew my brother well and were very knowledgeable of the Consent Decree and Waiver Programs.

The newly hired and created position of CFO (Brian Bransfield, another political appointment) also had no knowledge of the Consent Decree or the Waiver Programs. He also had no experience or knowledge of DMH or DMR contracts, rules or regulations.

The outgoing contract manager, Dianne Pallochi, who had worked at GLMHRA for over twenty years told the plaintiff that Bransfield was unable to independently complete a state contract for DMH or DMR. Yet, he was one of the principle individuals helping to make budgetary decisions for the plaintiff's brother.

Kelly Johnson, who was married with three children to a former GLMHRA employee and had worked under Janine Brown Smith, as the Quality Assurance Director, was promoted to Director of Mental Retardation Services by Paul Cote. They were having an affair and this put her in a conflict of interest. She therefore did not challenge the cuts in services for my brother although she was knowledgeable of the Consent Decree and Waiver Program. She was also aware of Association policies regarding hospital staffing.

2.) The wide spread dissemination of the October 2000 Griffin Document that was full of misstatements and falsehoods that were known to

20

be false by Robert Tucker and other members of the GLMHRA board including past presidents Manning and Jackson and its dissemination to a major Boston newspaper chain.

3.) The wide spread dissemination of the December 1999 document of MacLeish and Sherman and GLMHRA and its agents' negligence in not disclosing the inaccuracies and falsehoods in this document. See the attached addendum dated April 24, 2000 a day after the vote to terminate the plaintiff.

4.) MacLeish and Sherman ordered a drug screen be performed on the plaintiff in violation of the personnel practices and state and federal privacy laws. The board of directors supervised the plaintiff and direct evidence of drug abuse affecting the plaintiff's performance would have to have been given to the board and a vote taken by the board or its Executive Committee. This was not done.

5.) MacLeish, Sherman and GLMHRA auditors Mecone and Sanella had access to plaintiff's confidential medical records without his knowledge or consent in violation of Association policies and state and federal privacy laws. They shared its contents with others.

6.) At the April 23, 2000 board meeting, Atty. Sherman distributed a bill and detailed voucher of the plaintiff's Employee Assistance Program (EAP) counselor's record to the board and then requested that they vote to terminate him.

7.) They Interfered with the plaintiff's ability to gain employment elsewhere exemplified by the plaintiff's application for the Executive Director's position at Kennebec Valley Mental Health Center in Maine. (See plaintiff's