motion of March 9, 2005) and at other agencies.

8.)    The plaintiff attempted to meet with the directors of the Human Service Agencies in Region III (Essex and Middlesex Counties) in the winter of 2002. he wanted to present his consultant proposals to the group. He was refused access by its president, Art Brady, who told the plaintiff that he didn't want to offend Paul Cote, GLMHRA's Executive Director. He also stated that Paul had told him about the plaintiff's actions at GLMHRA and that the plaintiff was under investigation by the AG's Office.

9.)    Elaine White was the Acting Executive Director while plaintiff was on leave. She and Janine Brown Smith filed a false complaint with the Attorney General's Office in January 2000. They were prompted, prepped and counseled by MacLeish and Sherman.

10.)    Elaine White told GLMHRA managers that the plaintiff had "stolen the retirement money." This was stated at a manager's meeting in February 2000 and again in 2001 after the severance agreement was signed. She continued making comments concerning the plaintiff to staff and representatives from other agencies. This was after the Plaintiff signed the severance agreement.

11.)    GLMHRA took no action to stop her comments as agreed. She also interfered with an EMHC loan application in May 2000. She informed the Vice President of Commercial Lending at the Warren Bank in Peabody that the plaintiff was under investigation. That was the end of the plaintiff's career in banking.

12.)    GLMHRA refused to implement the essential and motivating elements of the severance agreement. They refused to draft a letter explaining plaintiff's accomplishments and new business initiatives. Cowdell and Cote had agreed to distribute this to the newsletter list of GLMHRA, a mailing list of approximately 3500 individuals and businesses, including the Lynn Item.

13.)    Tucker and Cote gave press interviews critical of plaintiff's Leadership and they refused to discipline staff and board members who were defaming the plaintiff.

14.)    This letter was extremely important to the defendant, because without it, the plaintiff believed that the state agencies and their managerial employees, GLMHRA employees and parents of consumers, local political leaders and businesses and non profit agencies would continue to believe that the MacLeish, Sherman and Griffin documents were true and accurate.

15.)    They also denied the plaintiff training funds of $10,000 to assist him in his gaining employment and his career. He expended those funds assuming that he would be reimbursed.

16.)    The defendants informed others that the plaintiff was a drug addict. The plaintiff met at the Attorney General's (AG) Office in 2000 with Michael Ahern,  a special investigator for the AG. He accused the plaintiff of being a cocaine addict and was not aware that the plaintiff tested negative in a drug screen six months earlier.

17.)    The Assistant Human Resources Director at the North Shore Association of Retarded Citizens informed a former GLMHRA employee who had

just been hired by the agency that " you don't have any retirement money from GLMHRA since Al Bleau stole the retirement money" The plaintiff had also unsuccessfully attempted to gain consultant opportunities from the agency. James Mecone and John Sanella were this agencies auditors.

18.)    The Plaintiff applied at the May Institute in 2002, as director of a day program. Bob Griffin was and is their legal counsel. The plaintiff was not given an interview and his calls were not returned.

19.)    The May Institute's Executive Director had informed Martena Fallon in 2003 that they had heard that the plaintiff had stolen funds from GLMHRA and that he was under investigation by the AG's Office. She corrected them. They had recruited her to be on one of their Boards. She refused once she learned that Griffin was their attorney.

20.)    Two weeks ago, the plaintiff was talking to Deborah Thurber a former supervisor at GLMHRA and currently a supervisor with the DMR. He asked her if she could use his services as a trainer and she replied, that she thought he was still under investigation by the AG's Office and that there were charges against him. When she was informed that this was not the case, she said," Well, everyone, especially here at DMR, thinks you are still under investigation".

21)    The plaintiff met with the newly hired Executive Director of the Work Inc, a Massachusetts' non-profit agency to explore employment and consultant possibilities in the spring of 2001. The Executive Director informed him, that Bob Griffin was the attorney for his company and that "Bob told him about what happened at GLMHRA and that he didn't think he could hire the Plaiontiff or

use him as a consultant."

22.) There is indirect evidence of discrimination and retaliation as well. The Plaintiff has attached a sample list of positions and companies that he has sent applications during the past three years. He has not been called or granted an interview for any of these positions. With few exceptions, the plaintiff's calls for justification or information have been referred to entry level clerks. Calls to senior staff and human resource staff have not been returned.

## Additional Examples of Discrimination and Retaliation

1.) The Court ruled in December 2004 that the documents prepared by the defendants were "like a letter" and should not be considered an example of continued discrimination, retaliation and defamation. The plaintiff has and now submits sufficient documentation for the Court to reconsider this determination and rule that these documents were more than a letter.

These documents were substantial in their size and content and were used by state agencies and others to deny the plaintiff employment and contractual work. The defendants knew them to be false and did not correct them.

2.) It is important to the plaintiff that the Court completely understand the importance of the documents prepared by MacLeish and Sherman and the subsequent document prepared by Robert Griffin.

The plaintiff asserts that these documents were deliberately crafted and the defendants deliberately decided not to acknowledge their inaccuracies.

3.) State Agencies such as DMH, DSS and DMR and non-profit agencies and board members of GLMHRA, past and present, the Attorney General's

Office, the news media and others were not informed of the mistakes and inaccuracies.

4.)    The contents of these documents were communicated throughout the Human Service's Industry. The defendants had extensive relationships with the non profit community and with the funding agencies of these non-profits. They were the attorneys for many non-profit agencies.

5.)    Bob Griffin also worked very closely with GLMHRA auditors, John Sanella and James Mecone. The plaintiff hired Griffin in 1988 based on a referral from James Mecone.

6.)    Mecone and Sanella's specialty was and is non-profits and nursing care facilities. At one point, James Mecone told the plaintiff that they audited and consulted to over forty non-profit agencies. Griffin has been appointed by the Attorney General's Office as a receiver for many nursing homes in Massachusetts. He would use Mecone and Sanella to perform the bookkeeping and audits.

MacLeish and Sherman also recruited the Legal Counsel from DMR to their Firm. He had been  the legal counsel at DMR and DMH for over fifteen years.

7.)    These defendants, their associates, business partners and clients had extensive contacts and relationships throughout the state agencies and throughout the non-profit community. They defamed the plaintiff and shared The information with the three principal state agencies and the non-profit community that the plaintiff had had a working relationship for over thirty years.

8.)    These agencies were also logical future employers or clients and they

had communication links into other New England states through regional associations such as the New England Association of Human Resource Directors, The New England Association of Dual Diagnosis and many other regional and state associations and groups.

9.) Additionally, GLMHRA was the fifth largest agency in the state and its newly hired Exec Director, Paul Cote who was not only a personal friend and business associate of Robert Griffin but was a past Assistant Commissioner for the DMH – DMR.

10.) Newly recruited board members who were involved in the decision not to honor the severance agreement or to interview or rehire the plaintiff in August 2003 included several current and former managerial employees from state funding agencies such as DMR, DMH and DSS and other local and state appointed officials.

11.) James Cowdell was a recognized political person as the President of the Lynn City Council as was Robert Tucker who was the past President of the Lynn City Council and was the current Deputy Water and Sewer Commissioner.

12.) For this reason, the need to disclose the falsehoods in the Defendants' documents was essential to prevent continued discrimination and retaliation against the plaintiff. The plaintiff could deny the facts in the documents but who would believe him with such a cast of document supporters. All evidence to date indicates that the defendants deliberately circulated and left to circulate defaming and discriminatory information against the plaintiff to interfere and scare potential employers from employing or contracting for his services. This has been part of their continuing cover up and conspiracy.

27

## **Additional Facts Concerning Defendants' Role In RICO and Further Analysis of Defendant's Documents of December 1999 and  October 2000**

The plaintiff has already submitted to the Court substantial

documentation disputing the accuracy of these documents substantiating his

claim that GLMHRA did not have a non-discriminatory reason for his termination.

This documentation includes Martena Fallon's presently unsigned affidavit.  (She

is making some minor changes in the document and will be getting it notarized.

She is in Florida making it difficult for the plaintiff to have the document finalized

and signed). Also submitted to the Court was her complaint to the Bar of

Overseers against Sherman and MacLeish, an analysis of the Self Insured Plan

and ERISA analysis (EFIP), an analysis of the Robert Griffin report dated

October 13, 2000,   Attorney Stephen Rosenfeld's critique of the MacLeish

document and  his February 2000 letter to  Attorney General Reilly. Additional

documentation submitted to the Court included an August 2000 letter from the

bondholders, Van Kampen American Capital, a January 2000 letter from Attorney

Slavin, plaintiff's April letter with attachments to board president Thomas

Manning, and an approved but yet unsigned affidavit from John Pappanastasiou,

Stephan Speropolous' letter to the Assistant Attorney General Erick Carricker

and his letter to president Tom Manning asking for written documentation from

the AG's office preventing the plaintiff from entering EMHC properties.

28

## Griffin

1.)    Robert Griffin's report dated October 2000 seems very professional and straightforward. Martena Fallon did a fine job analyzing and critiquing the report. The report is full of omissions, discrepancies and falsehoods. It is difficult for anyone to assume that Mr. Griffin was incompetent given his expertise and that he inadvertently wrote an incorrect report.

2.)    Mr. Griffin could be best interpreted as the cover-up man. He gave credence to the MacLeish Sherman allegations while at the same time paving a blueprint for the take over of GLMHRA and EMHC and covering up the unethical and illegal activities of MacLeish, Sherman and certain members of the board. He also cemented endearment from the AG's staff and he certainly expected to be rewarded with continued referrals and legal work.

3.)    Griffin was the plaintiff's attorney when the plaintiff was a receiver for Associated Group Homes (AGH) from 1988-1992. He was in serious conflict of interest and it was unethical for him to accept the appointment as a consultant and monitor of GLMHRA. He criticized the plaintiff leading to his resignation from EMHC, forcing him to sign the severance agreement.

4.) The AG's staff called Atty. Bob Cowden, of Casner & Edwards, to give advice to the AG's Office on receivership law. He refused since he had been the plaintiff's attorney during the AGH receivership as well. His interpretation of legal ethics was obviously different than Griffin's or MacLeish and Sherman's. Griffin had a strong motivating force to violate ethics and conflict

29

of interest standards: namely, to maintain and improve his business relationship with the AG's Office and to cover up Mecone and Sanella's incompetence and oversight in not disclosing and reporting the reserves that had been created by GLMHRA's self-insurance plan. See Attorney Slavin's letter of January 2000 that stated that the reserves should have been reported on the IRS 990 form that had been prepared annually by Mecone and Sanella.

5.)    He had a business and personal relationship with Paul Cote, the Executive Director hired by GLMHRA upon the recommendation of Griffin in the summer of 2000.

6.)    GLMHRA and a majority of its board members assumed that they were required to hire Cote and had to find the extra money to pay him the $200,000 in annual salary.

7.)    Griffin gave the board of GLMHRA a choice of three people for the Executive Director's position but made it clear that he favored Cote.

8.)    During 2000, Griffin refused to talk to the plaintiff or return any telephone calls to his office.

9.)    Griffin never contacted the plaintiff regarding the Fringe Incentive Plan or John Pappanastasiou concerning the plan documents or former employees such as plaintiff's Executive Secretary who maintained those files and knew of their existence and location. He stated that there was no description anywhere and that he thought the program started in 1988. The program started in 1981 and the dental and disability portions started in 1985. The personnel practices devote thirteen pages to the EFIP, but Griffin never found it. See the attached abridged version of the Practices , Table of Contents pages i and ii pp 29-42.

Also see the attached contract signed by the plaintiff and John Pappanastasiou with addendums signed on July 15, 1985 and July 7, 1986. It describes the goals of the EFIP that are almost identical to the goals stated in the 1999 personnel Practices. MacLeish and Sherman made similar allegations in their reports.

10.)     Griffin's report was marked confidential but was distributed to the Boston Herald News Corporation, board members and others without the plaintiff's knowledge.

11.)     Griffin had a substantial legal business from non- profits and from receivership and other work controlled by the AG's Office.

12.)     Griffin was and is the legal counsel for Work Inc and the May Institute, the second largest provider in Massachusetts, where Mr. Bleau attempted to gain employment and was not given an interview or a returned phone call.

13.)     Griffin had to know that his report and facts were incorrect.

14.)     Griffin never mentioned in his report the excessive fees and consulting costs and charges by MacLeish and Sherman and their associates; He knew that these expenses were not reimbursable under state contract law due to his specialization in rate setting law and non-profit reimbursement.

15.)     Griffin supported the hiring of James Cowdell as Administrative Assistant knowing that it was a made up job; that there were no funds budgeted for it and that he was the least qualified for the position and did not meet the criteria for the job. Cowdell had no grant development experience; no contract writing experience; did not have a masters degree or equivalent; had no experience in Human Resources and had no Human Services or relevant

31

supervisory experience. He was hired over two long term female employees who met the criteria for the job.

16.)    Griffin approved the creation of two new senior management positions and the hiring of two politically connected individuals who were unqualified for the positions knowing that there were no funds budgeted to pay for their salaries and benefits.

17.)    Griffin accepted as fact the outdated EMHC by-laws given to him by GLMHRA. They had not been in effect for almost twenty years. He accepted the Financials as fact. He never contacted the plaintiff who was the Executive Director of the EMHC or its board of directors. He never contacted the ~~Ethic~~ EMHC's auditing firm of Demakis and Demakis who had been EMHC auditors since its inception in 1978 to gain input into the Financials or the by-laws.

We would have told him that GLMHRA actually had a deficit of close to one million dollars and not the less than $200,000 that he reported to the AG's Office.

We would have told him that EMHC had a surplus of over one million dollars for the year ending July 2000 and not $280,000 as he reported to the AG's Office.

18.)    GLMHRA illegally and without approval transferred funds from EMHC and billed EMHC for costs and services accrued to GLMHRA. GLMHRA received state approval to delay its reporting to the state in December 2000 so it could effectively take over EMHC and "cook the books" now that the plaintiff had been forced to resign. They couldn't wait to get rid of the plaintiff. Cote fabricated over $614,000 of bills owed to GLMHRA from EMHC immediately after he plaintiff signed the severance agreement. See the attached Tena Fallon letter to

32

the EMHC board on January 20, 2001.

19.)    Griffin was bond counsel for the first tax exempt bond of the EMHC in 1990 and had in his possession a corrected copy of the by-laws. Corrected copies could also have been found at various banks that had financed loans for EMHC such as Warren Five and Laconia Savings Bank. He chose to accept the outdated by-laws.

20.)    It gave justification to GLMHRA's control of EMHC and its assets. This provided funds to pay his bill and the expenses of MacLeish, Sherman and other consultants. It also provide ᵈˢ funds to pay for the program deficits created by his handpicked Executive Director, Paul Cote, the board of GLMHRA, MacLeish and Sherman and the AG's Office's staff, Carricker and Katz.

21.)    Griffin made no mention in his report of the excessive legal bills of MacLeish and Sherman or the fact that they were hired and paid without the approval of the Executive Director or the board.

22.)    Griffin made no mention of the affair between Janine Brown Smith and MacLeish and the conflict of interest that this created. He failed to mention that Janine submitted fraudulent billing to DMH leading to her departure from GLMHRA. He did not mention that MacLeish and Sherman should be investigated to ascertain their knowledge or participation in this billing scheme.

23.)    Griffin made no mention of the fact that MacLeish and Sherman's decision to freeze all new contracts with DMH and DMR resulted in a loss of over $1Million dollars in contract revenue for GLMHRA and almost $200,000 in profits.

24.)    Griffin never mentioned his own role in causing the deficit. He was

the attorney for GLMHRA and EMHC negotiating with HUD to have HUD funds released in Lowell. The delay was causing a cash flow problem for "GLMHRA of over $300,000. (See plaintiff's April 23, 2000 letter to Tom Manning.)

25.)    Griffin never mentioned that the bondholders, Van Kampen American Capital were required under the existing bond to finance the renovations to the new day program in Lynn and by refusing to do so resulted in a $400,000 cash flow problem for GLMHRA.(See Plaintiff's April 23, 2000 letter to Manning). He also never explained how the interference of MacLeish and Sherman was the primary reason that Van Kampen did not promptly approve additional financing.

26.)    Griffin supported the bond and never mentioned that the bond was not in the best interests of EMHC or GLMHRA. It put outside individuals including himself in control of GLMHRA. The bond interest and conditions (collateral) exceeded what was required in the existing loans and what would have been required from conventional financing available through local banks. He also never mentioned that the $1.8 million dollars loaned to GLMHRA by EMHC more than satisfied their cash flow requirements if they properly managed the company and stopped paying for unnecessary consultant and legal fees.

The bond was not necessary except as a vehicle to take control of GLMHRA and EMHC and to continue to siphon funds from the non-profits.

27.)    Griffin never disclosed his personal and business relationship with Paul Cote to the GLMHRA board.  Cote was hired as Executive Director at $2000,000 per year making him the highest paid Executive Director in the State. This was $100,000 more per year than allowed under Administration and

34

Finance Regulations.

28.)    GLMHRA would have to identify over $100,000 each year of non-contract funds to cover his salary. This provided additional motivation and necessity to take over EMHC and its cash and real estate assets. It also made it imperative to force the plaintiff out of EMHC. It must have been at this point that defendants decided to withhold the plaintiff's retirement money as leverage to force him to sign the severance agreement.


## MacLeish, Sherman & GLMHRA

## Additional Facts Concerning MacLeish and Sherman & GLMHRA Supporting Defendant's Motion for Summary Judgment

The plaintiff provides additional information to support his statement that defendants MacLeish, Sherman and GLMHRA knew that the MacLeish Sherman document was false but continued to disseminate it and share its contents with others. They allowed others to make decisions regarding the plaintiff knowing that the document was part of a discriminatory practice and was defaming. See attached addendum to MacLeish – Sherman document dated April 24, 2000.

1)    After the April 23, 2000  vote to terminate the plaintiff, MacLeish and Fiscal Manager, Terri Kasper, met with the plaintiff and his attorney, Stephen Rosenfeld. They informed the plaintiff that the amount of the so called "interest free loans" owed by the plaintiff was inaccurately stated in the document. They told the plaintiff that there was $5,000 withheld from the plaintiff's EMHC payroll

check that GLMHRA forgot to list in the document given to the board and the AG. They also had miscalculated the amount of outstanding "loans" by about $7,000. According to them. Instead of owing close to $30,000, the plaintiff owed only $13,000.

Additionally, the plaintiff had over $27,000 in his education fund. These funds had been withheld from the plaintiff's paycheck during a fourteen-year period. This was a program available to all employees. This was more than sufficient to cover the alleged "interest free loans."

They also confirmed to the plaintiff and his attorney that the fiscal department had mistakenly double paid the Plaintiff's retirement loan by over $12,000 using money that had been payroll deducted for vacations, sporting tickets, charitable donations, child support etc. This mistake occurred while the Fiscal Manager was out on maternity leave and an assistant was paying the bills and she hadn't been adequately supervised.

A revised report and page insert, (See attachment) was sent to MacLeish, Sherman, Griffin, Mecone, Sanella, and the AG's office and to the board of GLMHRA. None of the defendants revised their documents to reflect these changes nor did they inform individuals who had been privy to the original documents or who had received a copy of the documents.

2.)     GLMHRA senior managers, Tucker, Jackson and Manning, MacLeish and Sherman had to have known that their information was incorrect prior to the vote to terminate the plaintiff and they did not inform the other members of the board.

3.)     No disclaimer or corrected report has been distributed by the

defendants despite having received the revised report and page insert.

4.)    GLMHRA has submitted the same incorrect document to this Court as an attachment and without the page insert.

This further demonstrates their continuing actions to discriminate and retaliate against the plaintiff.

5.)    Two major issues in the MacLeish document that there was a violation of ERISA and that the plaintiff had unauthorized interest free loans have been addressed by the plaintiff's March 9, 2005 motion for summary judgment. They also alleged that the plaintiff was guilty of improper reporting to the state and the Department of Labor and others. This statement is false and they knew it to be false. The appropriate ERISA forms – NO. 5500 had been filed by GLMHRA and John Pappanastasiou for the dental plan, the disability plan and the retirement plan and MEDTAC filed the 5500 for the medical plan. Auditors Mecone and Sanella however failed to report the reserves on the IRS 990, and the A&F 1100 forms.

6.)    The Defendants' assertion that Mecone and Sanella were not aware of the reserves in the Fringe Incentive Plan is false. During the past five years, they audited the retirement plan that received its funds from the Employment Fringe Incentive Plan (EFIP).

7.)    During the previous ten or more years Mecone and Sanella reconciled hundreds of thousands of dollars of annual Interfund transfers between John Pappanastasiou's trust accounts and GLMHRA as part of the yearly audit. They also were responsible for preparing GLMHRA's annual 990 for the IRS, the PC15 for the Attorney General's Charitable Division and the Form 1100 for A&F,

37

DMH and DMR. They never included the reserves of the EFIP or the Interfund transfers in their reporting.

8.)    In fact the defendants lied in their reports to protect the auditors and to fabricate charges against the defendant. They stated that the Pappanastasiou trust accounts and EFIP were not reported to Mecone because they were under Pappanastasiou's name and he didn't know that they existed.  This is not true. He had to know of these accounts. It is true that Pappanastasiou managed the working accounts, but this is typical of any medical benefit plan. He managed these accounts and paid claims from these accounts and he was properly bonded to do so. However the surpluses  not needed for claim payments were under the control of GLMHRA and the fiscal department and certainly available for Mecone's inspection.

9.)    Paul Tempesta, former senior accountant at GLMHRRA, was a private consultant hired by Pappanastasiou. He prepared financial reports that were routinely submitted to GLMHRA and were also available to Griffin and Mecone-Sanella. They never asked the fiscal manager, the plaintiff or Pappanastasiou to see them.

## MacLeish,  Sherman and Griffin  Were De-Facto Employers

1.)    The plaintiff submits that the defendants Griffin, MacLeish and Sherman were de-facto employers. MacLeish and Sherman assert that the ADA, the 1973 Rehabilitation Act, defamation and retaliation complaints against them have been dismissed. The plaintiff understands that the complaint as individuals has been dismissed but not as de-facto employers and not if RICO is proven in

38

the plaintiff's current motions for summary judgment or if RICO is proven in the plaintiff's amended March 8, 2004 complaint.

2.)    The plaintiff asserts that Griffin can also be held liable as an individual and as a de-facto employer if RICO is proven in the amended March 8, 2004 complaint. He can also be held liable as an individual and as a de-facto employer if RICO is proven in the plaintiff's current request for summary judgment and it is determined that he participated in a cover up of illegal activity and participated in recommending and approving quid pro  favors, promotions, and salary increases for RICO participants.

3.)    The defendants Griffin, MacLeish and Sherman approved all major decisions of the GLMHRA board of Directors including decisions typically reserved to the boards of  non-profit corporations by statute, regulation and common practice.

4.)    The plaintiff has previously submitted documentation in the March 9, 2005 motion to the Court and now presents additional information:

a.)    They set their own fees and hours of employment and billed and provided services without authorization from the board of GLMHRA.

b.)    MacLeish and Sherman made the decision to have a drug test conducted on the plaintiff at his home at 8:30am without the knowledge or approval of the Board of Directors of GLMHRA. Two months after the test, the plaintiff discussed this test with six of the eight board members including the president, treasurer and clerk and they were not aware that the test had been conducted or of  its results.

c.)    MacLeish and Sherman ordered the board not to talk to the plaintiff or any members of the staff except Elaine White. They also ordered the staff not to talk to members of the board or risk being fired. Board members were threatened with expulsion and criminal prosecution and civil lawsuits if they talked to staff or the plaintiff.

d.)    MacLeish was having an affair with Janine Brown Smith, the second highest paid employee at GLMHRA ($90,000/yr). She was the Director of Contracting and Quality Assurance. He was providing legal assistance to her without board approval and billing GLMHRA. Neither MacLeish nor Sherman disclosed this relationship to the board or to the Attorney General's Office.

e.)    Smith subsequently filed false billing statements to the state to generate additional income to cover up the substantial deficits created by MacLeish, Sherman and the board. She was forced to resign. MacLeish found her employment at a lesser salary at a non profit agency in Lexington where he served as counsel and was apparently a board member. He subsequently assisted her in her application and scholarship to law school.

f.)    MacLeish and Sherman ordered the staff to deny the plaintiff access to Association rental properties. The plaintiff was the Executive Director of EMHC that was the owner of most of the Association's rental properties. They knew that he had a brother in the GLMHRA's day program in Melrose and a group home in Saugus.

g.)    The gag order imposed by MacLeish and Sherman and continued by Griffin and GLMHRA effectively prevented the plaintiff from having contact with his brother and the staff who worked with him. It also prevented

board members and staff uncover the conspiracy and the misrepresentations until it was too late to act.

h.)    The defendants MacLeish and Sherman ordered that the Agency business plan not to be implemented and that no new contracts between DMH or DMR be implemented. This decision cost the agency over $200,000 in surplus contract funds. They also allowed an across the board raise for senior managers and other staff despite the fact that there were no funds in the budget and it was not supported in the business plan.

i.)    When a majority of the board exerted its authority and began to doubt MacLeish and Sherman's honesty, they voted to meet with the plaintiff in December 1999 to "get his side of the story." They subsequently voted to have him return from leave in January.

j.)    Janine Brown Smith and Elaine White and possibly Kelly Johnson were recruited coached and assisted to file MacLeish and Sherman's document with the AG's Office. Carricker from the AG's Office came to a GLMHRA board meeting and requested that the plaintiff not be allowed to return from leave. The board subsequently fired MacLeish and Sherman in May and hired the present attorney Garrick Cole. However, their influence continued beyond this date.

k.)    Griffin continued the same policies of MacLeish and Sherman. Sherman had major links and influence in the AG's Office where Griffin reported. Griffin relied on their document to draft his own document.

l.)    In the summer and fall of 2000, board members informed the plaintiff that they could not hire staff, fire staff, initiate new programs or bring on

41

any new board members without Griffin's approval. Griffin provided the list of the three candidates for the vacant Executive Director's position, not exactly a typical Executive search. They chose, of course, his friend and business associate, Paul Cote.

m.)    In December 1999 and again in January 2000, after the board voted for me to return to work, the board requested that I present a report on the EFIP and the self-insured plans to counter MacLeish and Sherman's report. The board and president Jackson and Vice President Manning authorized me to retrieve all necessary documents from GLMHRA offices. When I called to retrieve the documents, I was told by Elaine White that despite what the board had stated, MacLeish and Sherman had ordered them not to give me the documents or copies of them.

n.)    It seems that the board could vote all they wanted but the staff were working for MacLeish and Sherman.

## Summary

1.)    In conclusion the defendants' MacLeish, Sherman and Griffin were more than agents of GLMHRA and their discrimination continued beyond and after their control over GLMHRA and its board ended. It continued due to their extensive reach in the non-profit community and in the state and due to the fact that they never corrected the falsehoods in the documents that had been extensively disseminated including to a major Boston newspaper chain, the Herald.

2.)    The defendants would have the Court believe that because the Attorney General's staff was involved that there could be no RICO in this case. They want the Court to believe that all their actions had the AG's "stamp of approval" and that their actions were justified.

3.)    No one knows what the Attorney General knew or didn't know. We assume he had some knowledge of the activities but not the in-depth knowledge alleged by the defendants. Jamie Katz supervised Assistant District Attorney, Eric Carricker and the Charitable Division. AG Reilly appointed him. Also, plaintiff's Attorney, Stephen Rosenfeld, sent a letter (previously attached to the March 9, 2005 motion for summary judgment) to Reilly in February 2000 complaining of Carricker's actions and the injustice against the plaintiff. The AG never responded.

4.)    GLMHRA is responsible for the actions of defendants' MacLeish, Sherman and Griffin whether they are considered agents of GLMHRA or are determined to be de-facto employers. They are also responsible for the actions of their senior employees and board members.

5.)    See John R. Cariglia v. Hertz Equipment Rental Corporation and James Heard , United States Court of Appeals For the First Circuit April 4, 2004. As in Cariglia, Griffin, MacLeish and Sherman did not inform the board that their documents were incorrect and allowed them to make a decision on incorrect discriminatory information. Board members and senior employees who knew the information to be false remained silent and allowed other board members and senior staff to make decisions based on incorrect and discriminatory information.

43

6.)    Robert Tucker for example remained silent during the April 23. 2005 vote and following that vote and again when the board was deciding to hire a new Executive Director in August 2003.

7.)    The defendants' actions are so egregious that summary judgment should be granted to the plaintiff as a matter of law and for justice to be served. It would also provide a deterrent to prevent similar behavior by these defendants their agents and associates or other such individuals.

8.)    Any non-profit or profit making company in the State of Massachusetts could be taken over by these defendants and their associates or other individuals using the same tactics.

10.)    The plaintiff has previously stated that he has suffered emotionally and financially from the actions of these defendants. He was forced to sell his home, cash in all his retirement assets and file for bankruptcy (see attachment that was inadvertently not attached to the March 9, 2005 prior motion of the plaintiff.)

Respectfully Submitted,

Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907
(781) 962-2662

44

Dated:  March 21, 2005

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of
the above document was served
upon all counsel of record by
First Class Mail on March 21,
2005.

Albert W. Bleau Jr.