**UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

Albert William Bleau Jr.                    :

    Plaintiff                              :

                                               :

vs.                                            :     Civil Action
                                                     No. 04 – 10469REK
                                               :

Greater Lynn Mental Health              :
& Retardation Association, et al,


### AFFIDAVIT OF ALBERT W BLEAU JR.

My name is Albert W. Bleau Jr.

I live at 60R Humphrey St. Swampscott, MA  01907

I am over 18 years of age.

I hereby depose and swear as follows

That all motions and attachments to motions submitted to this Court including that of March 8, 2004, October 1, 2004 and those of March 8, 14, & 21, 2005, and April 4, & 21, 2005 are true to the best of my knowledge and I have submitted them under the pains and penalties of perjury. I additionally swear that:

    Plaintiff, Albert W. Bleau Jr., respectfully requests that the court deny the defendants GLMHRA, MacLeish and Sherman's motions for dismissal and for entry of separate and final judgment and in the alternative grant the plaintiff's motion for summary judgment and for discovery. The plaintiff submits his attached affidavit to support his motions.

    1)   The defendants bear the burden to articulate a non discriminatory reason for Mr. Bleau's discharge from GLMHRA and they have not done so and have

been dishonest in their justifications and facts, and violated the personnel practices in their discharge and prior and subsequent dealings with the plaintiff. Therefore, as a matter of law the plaintiff's motion for summary judgment should be granted.

2) The plaintiff has presented direct evidence of discrimination and the plaintiff needs only to show that the discrimination was a motivating factor and not a principal factor leading to his discharge and GLMHRA's refusal to rehire him at GLMHRA.

3) The defendant wants this court to assume that the severance agreement was a one way agreement, with GLMHRA giving Mr. Bleau money and benefits and Mr. Bleau giving up nothing in return. In effect, Mr. Bleau gave up more than he received – the potential for a full time job and benefits at Eastern Mass Housing Corporation (EMHC) where he was the Executive Director at the time of the signing of the severance agreement. Also, he would not have signed the agreement had he not been given false information concerning GLMHRA's intent to dissolve EMHC or had he known that a new document defaming Mr. Bleau was circulating that was prepared by Atty. Robert Griffin. Mr. Bleau did not know that this document existed (See Attachment I March 8, 2005 Motion) until the summer of 2002 when he was called by a reporter from the Boston Herald news corporation who stated that he was given a copy of a "confidential" document prepared by Atty. Griffin that made various statements alleging improprieties by Mr. Bleau while he was the Executive Director of GLMHRA and EMHC.

4) Mr. Griffin's document had attached the 1999-2000 document prepared by Macleish and Sherman that had been completely discredited by a response from Mr. Bleau and subsequent responses by Tena Fallon and other members of the board of directors of the Eastern Massachusetts Housing Corporation. See attachments of GLMHRA and of plaintiff's motions of March 2004, October 2004, March and April of 2005. Especially note the letter from Attorney Slavin regarding ERISA and the Employee Fringe Incentive Plan and Plaintiff and Fallon's analysis and response to allegations regarding vacations for special needs citizens and ERISA and the employee Fringe Incentive Plan.

5. Mr. Griffin's document as well as the copy of the MacLeish document submitted by GLMHRA failed to include the one page addendum that completely discredited the MacLeish document's key point that GLMHRA had advanced Mr. Bleau funds without the approval of the board when in fact Mr. Bleau had advanced funds to GLMHRA and GLMHRA had paid additional funds to his retirement loan without his knowledge or approval accidentally when the fiscal manager was out on maternity leave.

6) Mr. Bleau signed the severance agreement but did so in good faith assuming that GLMHRA would honor its major motivating provisions: no more retaliation or defamation by board members and employees and a letter outlining

Mr. Bleau's accomplishments and reasons for leaving GLMHRA and EMHC. Mr. Bleau needed this letter to counter the extensive damage that had been done to his reputation by the defendants. Mr. Bleau had an outstanding reputation in the field of Human Services and for years was one of its leading advocates. Without this letter he knew that future employment would be impossible and that any chance to start his new business would be unsuccessful since he would be marketing his services in the Human Services community.

7) Mr. Bleau met with GLMHRA Executive Director, Paul Cote and Administrative Assistant James Cowdell on three occasions in the office of the president of the Lynn City Council at their request. These meetings took place in October 2000 after Mr. Bleau had filed a complaint against GLMHRA with the US EEOC office in Boston and after GLMHRA had received a letter from Mr. Bleau's attorney that they were in violation of ERISA by withholding over $200,000 of Mr. Bleau's retirement money.

8) During the first meeting a draft severance agreement was presented to Mr. Bleau that he refused to sign since it did not have language preventing GLMHRA and its employees board members and associates from defaming or disparaging Mr. Bleau. It also did not have a clause requiring GLMHRA to send out a letter to the GLMHRA newsletter list outlining Mr. Bleau's accomplishments while at GLMHRA and EMHC and his desire to pursue private business opportunities. It also did not have funds for training or retraining.

9) At the second meeting, Mr. Bleau again refused to sign the severance agreement since although it included a reciprocal clause not to disparage or defame one another, a training fund clause but it did not include any requirement that GLMHRA send out a letter on behalf of Mr. Bleau.

10) At the third meeting Mr. Bleau again refused to sign the severance agreement since although it included reference to the letter, there was no draft letter attached to the agreement and the clause did not state that the letter would be sent to the newsletter list. This was an important element since this list included over 4,000 individuals including all present and past GLM HRA employees and board members, state and locally elected officials in Essex and Middlesex counties and various staff and Directors of public and private agencies including the Department of Retardation, Department of Mental health and the Department of Social Services, and local and area school departments.

11) Paul Cote and James Cowdell stated that these were oversights and that I needed to trust them and the board and that everyone wanted to move forward in a positive way. They stated that they would definitely mail the letter to the newsletter list and that they were certain that there would be no problem to jointly draft a letter.

12) The defendant GLMHRA following the signing of the agreement continued to defame the plaintiff despite his objections, refused to give him training funds and refused to write a joint letter and mail it to the newsletter list. Paul Cote and James Cowdell reused to talk to him and referred him to Attorney Lawrence Donahue who also refused to talk to the plaintiff. The principal motivating factors for the plaintiff to sign the severance agreement were violated by the defendant and are still being violated by the defendant. Comments made by GLMHRA's attorney at the last court hearing were lies and he knew them to be false statements.

13) The plaintiff did not violate ERISA as was stated by GLMHRA's attorney but GLMHRA may very well have when they spent Fringe reserve funds totaling over $800,000 for program deficits and for MacLeish, Sherman and Griffin's legal fees and for their designated private consultants instead of using the funds for employee retirement and benefit plans. The funds were also used to give James Cowdell a promotion and to pay the exorbitant salary of Paul Cote at $200,000 per year making him the highest paid Human Services Director in the state and possibly the country.

14) The statement by GLMHRA that the plaintiff had not filed appropriate reports with the state was false and he had to know that it was false. All appropriate forms and reports were filed with ERISA and the state by the plaintiff. The reserve fund was not reported on state form 1100. This form was implemented by Governor Weld and was never in existence when the fringe reserves were established in the 1980's. The auditing firm of Mullen and Company prepared the 1100 with the fiscal manager each year. They were aware of these funds since the investment accounts were under the control of the fiscal manager and the mortgages held by the reserve fund were reported in the audit report of the Eastern Mass Housing Corporation that was given to Mullen and Company each year. They were also reported by the plaintiff to the Department of Retardation annually as part of the recontracting process that requires disclosure of related party transactions. Additionally, Mullen and Company reconciled Interfund transfers between the Employee Fringe Incentive Plan and GLMHRA each audit year for over fifteen years.

15) The person responsible for preparing the 1100 was James Mecone, a personal friend of Robert Griffin and he should be held accountable for not filing a correct 1100, but his mistake was covered up by Griffin and GLMHRA. To not include the reserve in the report was a minor infraction against GLMHRA that has never led to any penalty by the commonwealth as long as the funds are used for charitable purposes and one need only file an amended report. GLMHRA knew this, but made a "mountain out of a mole hill" to try and find some justification for terminating the plaintiff and not rehiring him. They also needed to blame some one in order to protect Mecone. Not filing a correct report is a black mark against the auditing firm and they could be suspended from public work. It is also bad for

their reputation and for future business. This was a motivating factor for Griffin not to disclose James Mecone's mistake and to blame the plaintiff.

16) The plaintiff has filed an amendment to his original complaint to include substantial proof that RICO applies in this case and that the severance agreement was part of a continuing conspiracy of the defendants to remove Mr. Bleau from control of GLMHRA and EMHC and to use the resources of the companies for their own personal financial benefit. GLMHRA finished the year 2000 with over $800,000 in deficit due to the mismanagement of the defendants and their greed and improper use and confiscation of charitable assets.

17) The defendants relies on an affidavit from Mr. Robert Tucker that is completely false and from an individual who is deeply complicit in the RICO aspects of this complaint and who has benefited financially from his decision to vote for Mr. Bleau's termination.

18) Summary judgment and final judgment should not be granted to the defendants unless there are no triable issues. There are many triable issues, principal among them are the severance agreement and what were the motivating factors leading to its implementation, the degree and extent of the retaliation and defamation of the defendants, the validity of their accusations against the defendant and whether the defendants defrauded charitable assets and then engaged in a conspiracy to cover up their actions and as part of that conspiracy defamed, retaliated and discriminated against the defendant. Discovery is essential to substantiate the plaintiff's allegations and claims.

19) GLMHRA is responsible for the actions of defendants MacLeish, Sherman and Griffin whether they are considered agents of GLMHRA or are determined to be de-facto employers.

20) Defendants MacLeish, Sherman and Griffin met all the requirements of de-facto employers. They functioned as receivers for GLMHRA with all the necessary functions and powers of an appointed receiver under Massachusetts law.

21) The requirement that Mr. Bleau drop all charges at the EEOC as a condition of signing the severance agreement is by itself discriminatory especially considering the knowledge of GLMHRA, its officers and agents of the extent of the discriminatory practice against Mr. Bleau, the RICO implications in this case and the existence of yet another document defaming MR. Bleau - (Atty. Griffin's report).

22) The defendants' actions are so egregious that any other remedy would not provide justice for the plaintiff in this case and would serve as encouragement for similar behavior by individuals, agents and corporations. Any

non-profit or profit making company in the State of Massachusetts could be taken over by these individuals or other individuals using the same tactics.

23) Mr. Bleau has suffered emotionally and financially from the actions of these defendants. He was forced to sell his home, cash in all his retirement assets and file for bankruptcy. He still has not been able to secure permanent employment and only one job interview despite applying for hundreds of jobs and paying over ten thousand dollars to three separate employment firms – Haldane, Stephens Associates and Allen Associates

I certify that the above statement is true to the best of my knowledge. I sign this statement under the pains and penalties of perjury.

Date: 2/19/05

Signature of Affiant

Typed name and address of affiant:
Albert W. Bleau Jr.
60R Humphrey St.
Swampscott, MA 01907

State of N.H.
Rockingham
July 19, 2005

PAMELA J. CHIECO, Notary Public
My Commission Expires December 6, 2005