UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Albert William Bleau Jr.              :

    Plaintiff                      :

                                   :

Vs.                                    :        Civil Action
                                                No. 04 – 10469REK
                                       :

Greater Lynn Mental Health             :
& Retardation Association, et al,

    Defendants

**Objection Of Plaintiff Albert W. Bleau Jr, To Defendant Greater Lynn Mental Health & Retardation Association, Inc Local Rule 56.1 Statement In Support of Defendant's Motion of August 9, 2005 To Dismiss Plaintiff's Breach Of Contract Claim or For Partial Summary Judgment**

**And**

**Local Rule 56.1 Statement of Plaintiff Albert W. Bleau Jr. In Support Of His Motion For Summary Judgment And For Discovery**

Pursuant to Local Rule 56.1, Plaintiff Albert W. Bleau Jr. objects to defendant Greater Lynn Mental Health & Retardation Association, Inc Local Rule 56.1 Statement. Defendant's statements are inaccurate and contain numerous omissions and misleading statements. Plaintiff also objects to defendant's characterization of its statement as being "undisputed material facts," since the plaintiff has submitted affidavits, attachments and motions disputing many of these statements presented as facts by the defendant. Many of the defendants'

1

so called undisputed facts are disputed by the factual evidence in this case and are triable issues and will be shown to be untrue as discovery moves forward.

Pursuant to Local Rule 56.1, Plaintiff Albert W. Bleau Jr., submits the following statement of the undisputed material facts upon which the Plaintiff bases his objection to GLMHRA's motions for dismissal and partial summary judgment of the plaintiff's claim for breach of contract and upon which the plaintiff bases his motion for summary judgment of the plaintiff's claim for breach of contract.

1. Prior to November 2000, the plaintiff had been the Executive Director of GLMHRA for thirty years from April 8, 1974 and had developed the company from one full time employee, himself, to over 600 full and part time employees. The company expanded from a $12,000 annual budget to over $25 Million dollars.

2. At the request of the GLMHRA board, the plaintiff agreed to a voluntary leave of absence in November 1999 for a cooling off period since his wife who had filed for divorce from the plaintiff and who was also an Association Managerial employee had filed a complaint in August 1999 against senior managers, Elaine White and Anne Perry, as well as against the plaintiff. The complaint was investigated by the board and found to be baseless and a written notice to this effect was given to the plaintiff in December 1999.

3. Without the plaintiff's knowledge or approval and in violation of the personnel practices, defendants' Attorneys MacKleish and Sherman were secretly hired in September 1999 and they interviewed staff and board members,

threatened them with arrest and prosecution and investigated the plaintiff. See Affidavit of former GLMHRA President and Vice President and Clerk of EMHC, Tena Fallon, previously submitted to the court.

4. In December, following a request by MacKleish, that president Tom Manning be appointed Executive Director and following a meeting with the Board of Directors of GLMHRA and over the objection of MacKleish and Sherman, the board voted for the plaintiff to return from a leave of absence in January. They also directed him to reorganize the managerial positions in the agency and specifically to eliminate, Elaine White's Director of Operation's position.

5. Defendants' MacKleish and Sherman, MacKleish's girlfriend, Janine Brown Smith, GLMHRA's Director of Contracts and Quality Assurance; Elaine White, Tom Manning and others interfered with the contractual relationship between the plaintiff and the board. The defendants' planned and orchestrated a

process including the involvement of the state Attorney General's Office. They drafted and submitted a document to the board, bond holders, state agency commissioners of DMH and DMR and the state attorney general's office. The document falsely accused GLMHRA and the plaintiff of violating ERISA with the self insured medical and benefit plan. It accused the plaintiff of receiving unauthorized loans and of authorizing his ex-wife to work less than 40 hours per week. Upon request of Erick Carricker of the Attorney General's office the board reversed their decision one day before the plaintiff was due to return from leave.

5. The plaintiff repeated his request to have the state auditor's office

3

investigate MacKleish and Sherman's allegations and his pleas were ignored. The plaintiff had previously requested the state auditor's involvement in a meeting with Defendant MacKleish, president elect, Tom Manning, Human Resource Director, Anne Perry and secretary recorder, Tina Adams in October 1999. His request was refused as being unnecessary. MacKleish and Manning stated that the issues were minor and could best be handled in house.

6. At the direction of Defendant MacKleish, the director of the EAP program, Jeff Zeizel came to plaintiff's home in November 1999 while the plaintiff was out on leave and conducted a drug test on the plaintiff at 8:30 am in the morning. The plaintiff was informed of the test by MacKleish at approximately 10pm the night before. He also informed the plaintiff that the board would fire him if he did not take the test. The plaintiff subsequently learned in January 2000 from past president Claire Jackson that the board did not authorize the test, was not aware that it took place and was not given the results. The plaintiff was never given the results of the test but was later told that he tested negative.

7. In January 2001, officer Ahern at a meeting with the plaintiff at the State Attorney General's office accused the plaintiff of being a cocaine addict. He was not aware that the plaintiff had been tested and that the test was negative.

9. In April 2000, the GLMHRA board voted 4 to 3 with one abstention to terminate the plaintiff following a presentation by Defendant Sherman. Sherman shared a counseling bill and summary of the counseling session of the plaintiff and told the board that the plaintiff was using agency funds for his own personal benefit in violation of state law and regulations and that the payment of the

4

bill had been authorized by the plaintiff. In fact marital counseling and mediation were a common benefit authorized by the agency EAP program for all employees and the plaintiff and his wife were referred by the agency's EAP program and the payment was authorized by Human Resources and the agency insurance consultant as it had for other employees.

Sherman further stated that the agency needed a tax exempt bond to survive or it would go into receivership and that the bond holders would not agree to the bond if the plaintiff remained as Executive Director of GLMHRA. Elaine White, who was now serving as acting Executive Director, confirmed Sherman's statements. A letter from bondholders two months latter refuted this statement.

No date was set for termination and the plaintiff remained on the payroll of GLMHRA until September 8, 2000.

10. Following the board vote, the plaintiff requested in writing, a hearing under the personnel practices before the full board for reconsideration of their vote. Neither the board nor its president, Tom Manning responded to this request and no hearing ever took place. When the plaintiff spoke with the president, he informed the plaintiff that he was terminated because of the bondholders. Nancy Rizzo who voted for the plaintiff's removal and Joanne George who had abstained from the vote stated that they were also influenced by the alleged illegal counseling bill.

11. In July 2000, the plaintiff met with the bondholders counsel and bond representative and they informed the plaintiff that they never required the plaintiff to resign from GLMHRA as a condition of the bond. They called the allegation

ludicrous since the plaintiff was still thethe Executive Director of EMHC. They stated that the reason the bond hadn't closed to date was because Elaine White and GLMHRA had not furnished the necessary documents to their attorneys. EMHC was a co borrower of the funds and it was EMHC's real estate that was securing the bond. Most of the bond was for refinancing of real estate owned by EMHC.

They agreed to write a letter stating these facts to the board which they did in July 2000. They also proposed that the plaintiff and EMHC work with them without GLMHRA on additional property development and additional bonds. See letter from bond holders, Van Kampen, attached to original complaint and RICO amendment. This doesn't sound like someone who didn't want to do business with the plaintiff.

12. Prior to November 2000, the plaintiff was the Executive Director of Eastern Mass Housing Corporation, a corporation that he had founded in February 1978. He grew this company from zero assets to assets of over $20 Million dollars with an annual operating budget of over $3Million dollars. It owned over seventy pieces of residential and commercial real estate. The corporation also operated numerous rooming houses and apartment houses for homeless Vietnam War Veterans, recovering individuals with addictions, and homeless mentally ill individuals and families of disabled children.

13. GLMHRA had overspent their budget and informed the EMHC board in a May joint meeting that they could not meet the end of the year payroll without the bond. However the bond closing was being delayed by GLMHRA according

to the bondholders and the bond did not close until after the fiscal year ended.

EMHC transferred approximately $700,000 from the sale of four pieces of real estate to GLMHRA. The plaintiff then negotiated loans from private individuals and the Laconia NH Savings Bank totaling over $600,000 and requested that the EMHC board vote to transfer those proceeds to GLMHRA.

The intent of the EMHC board was not only to off set the GLMHRA deficit spending to avoid possible receivership but to give GLMHRA sufficient funds so that the bond would not be necessary and the bond covenants requiring Attorney Robert Griffin to be hired as a private consultant and monitor would not be implemented. The plaintiff also hoped that this would allow him to return as Executive Director of GLMHRA or as a consultant to the corporation. This was stated to the plaintiff by board members' Robert Tucker, Claire Jackson and Nancy Rizzo and James Cowdell speaking for Robert Tucker.

14. Following the transfer of these funds to GLMHRA, the EMHC voted not to go forward with the bond. The plaintiff presented an analysis to the EMHC board showing that he could arrange bank financing at a lower interest rate with less closing costs than what was offered by the bond. This information was also shard with the GLMHRA board.

In June, treasurer, Robert Tucker and Fund Developer, James Cowdell called and lobbied and pleaded with EMHC board members and the plaintiff to change their vote and approve the bond. They stated that the financial problems at GLMHRA were worse than expected and they needed the extra $900,000 immediately that the $2 Million dollar bond would give GLMHRA to pay off bills

and for cash flow. Believing that they were sincere and there was no other agenda, the plaintiff recommended to the EMHC board to approve the bond.

15. From May to July of 2000, the plaintiff and the Eastern Mass Housing Corporation board were in contact with their Auditor, Timothy Demakis who was concerned that GLMHRA had presented him with approximately $614,000 of unexplained charges against EMHC assets as part of the end of the year audit of GLMHRA and EMHC. Despite numerous requests for information and opposition to these charges by the plaintiff and the EMHC board, GLMHRA would not explain these charges or remove them from the financial records of EMHC. GLMHRA had a contract with EMHC to maintain its financial records.

16. Plaintiff, Albert W. Bleau Jr., was not terminated by the board of Eastern Mass Housing Corporation and enjoyed full support of five of the six board members including the President, Treasurer and Clerk. The board voted in August 2000 five to one with only Lynn Water and Sewer counsel, Sam Vitali, opposed for Mr. Bleau to take over the management contract of EMHC and full management of the properties and vehicles from GLMHRA. They also directed the plaintiff to take control of all bank accounts and to remove any GLMHRA employees as signatures to those accounts which the plaintiff did.

17. Plaintiff, Albert W. Bleau Jr., was the Executive Director of EMHC in November 2000 and was being paid $34,600 per year plus medical benefits, an agency vehicle, a cell phone, and a retirement insurance policy. He was in the process of taking over full management of all EMHC operations that would lead to full time employment. Since his abrupt removal from payroll on

September 8, 2000, he was also collecting unemployment benefits of $525 per week.

18. Defendant GLMHRA never negotiated with the plaintiff prior to cutting him off payroll and medical benefits on September 8, 2000. They gave him a severance agreement and told him to take it as is. The plaintiff refused to sign it since it did not include assurances that they would not disparage and defame him and it did not include a clause requiring the defendant to provide training funds and most importantly it did not include a requirement that they send a letter to the agency newsletter list explaining his departure and accomplishments at GLMHRA and EMHC.

It also took away his rights guaranteed in the by-laws for free legal representation if any complaint were filed against him due to the false accusations of MacKleish, Sherman and Griffin and GLMHRA.

19. Plaintiff had over $28,000 in a training fund that he had created through payroll deductions over a fifteen year period as well as approximately $280,000 in retirement funds under the control of GLMHRA as of September 8, 2000.

19. In September 2000, the defendants refused to release the defendant's retirement funds in violation of ERISA. In October 2000 the Plaintiff subsequently was represented by legal counsel from the University Of Massachusetts' Geriatric Legal Defense program who notified GLMHRA of their ERISA violation and requirement to release plaintiff's retirement funds.

20. In October 2000 the plaintiff filed a complaint of discrimination under

9

ADA with the EEOC and a complaint with the Attorney General's Wage and Hour Division for unpaid vacation leave of approximately six weeks. Subsequently, James Cowdell, Administrative Assistant of GLMHRA, contacted him to meet with him and Executive Director, Paul Cote to negotiate a severance agreement. Three meetings took place in October and early November at the Lynn City Hall Office of City Council President, Salvy Miglaccio.

21.  While Cowdell and Cote were negotiating a severance agreement with the plaintiff and were agreeing not to disparage or defame the plaintiff and to send out a letter to employees, parents, board members and the friends of the Association, they were in possession of the Robert Griffin document that defamed the plaintiff and that had been circulated throughout the Association and the state funding agencies.

Cote and GLMHRA were circulating this so called confidential document prepared by defendant Robert Griffin. This document included MacKleish and Sherman's first draft unsubstantiated allegations against the plaintiff that had been rejected by the board of GLMHRA. A revised version had been written by MacKleish and Sherman and was circulated since January 2000. Griffin's report did not include plaintiff's attorney's response to this document or the addendum that had been developed and given to GLMHRA and to Erick Carricker. It used the MacKleish Sherman document as a basis to attack the reputation of the plaintiff.

Defendant Griffin also included assertions that EMHC was not an independent corporation but an affiliate of GLMHRA despite the fact that his law

10

firm had been given a set of bylaws and articles of organization in 1990 clearly showing that EMHC was a separate 501c (3) corporation. It also recommended that GLMHRA close EMHC and take over its assets.

The report also presented financials that showed EMHC, which was under the direction of the plaintiff ended the fiscal year ending June 30, 2000 with an $181,835 surplus and GLMHRA which was under the direction of either MacKleish, Sherman, the GLMHRA board and/or Elaine White with a deficit of $280,788. See attachment.

The report made no mention of the $614,000 that had been challenged by auditor Timothy Demakis and the plaintiff and the EMHC board. If the $614,000 is factored into the financials correctly, EMHC finished the year with a $794,000 surplus and GLMHRA had an actual deficit of $894,000.

He also falsified how the deficit occurred and did not mention that MacKleish and Sherman had billed over $225,000 in legal fees, had authorized thousands more in private consultant costs and had advised the board to cancel any new state contracts and not to apply for any new contracts during 1999-2000 costing the agency hundreds of thousands of dollars in revenue.

He also did not mention that the board did not object when Elaine White gave all managers a salary raise despite having no money in the budget for raises. Additional legal costs and consultant costs to defend allegations of MacKleish and Sherman, and to pay for a new corporate counsel, Garrick Cole, and to pay defendant Griffin's legal bills added an additional $50,000 or more to the deficit. Griffin made no mention of the efforts of the plaintiff and EMHC to sell real estate

of EMHC and negotiate loans to assist GLMHRA with its financial problems.

This left the impression that the Plaintiff was responsible for the mismanagement and the deficit when in fact the plaintiff was on leave during 1999-2000 and had no control over the GLMHRA budget or operations. He stated that GLMHRA's deficit was the result of GLMHRA renovating property for EMHC. He failed to mention that most of these renovations were GLMHRA's Responsibility due to DMH and DMR licensing requirements and all renovation costs completed for EMHC had been reimbursed by EMHC by March 2000 four months before the end of the fiscal year.

Griffin also never mentioned that he had been plaintiff's private attorney when the plaintiff was a court ordered private receiver from 1988-1993. He also never mentioned that the plaintiff hired him to execute a release of $345,000 owed GLMHRA by HUD and that he failed to accomplish this during 1999-2000. He had assured the plaintiff in August 1999 that the funds would be released. All information to assure the release of the funds had been submitted to HUD. This was a major contribution to GLMHRA's cash flow problems.

Griffin never returned plaintiff's phone calls after May 2000 or responded to his correspondence or voice mails or consulted him or EMHC board members in the research or writing of his report..

The Griffin report, the Dukakis's financial note to the board and Tena Fallon's response to the report and the plaintiff's affidavits have been submitted to this court as attachments to the RICO amended complaint.

22.     When the plaintiff was running for state senate in 2002, the Griffin

document with the MacKleish and Sherman document attached were given to the Boston Herald News Corporation. The plaintiff was called by the editor of the North Shore Sunday to comment on these documents. When the plaintiff informed the editor that he had never seen the report no was aware of its existence and requested a copy from the editor, the editor refused the plaintiff a copy. He also would not tell him the specifics of the report. However, the editor and the editor of the Lynn Item as well consistently thereafter spoke of management and leadership problems at GLMHRA that led to changes and state involvement at GLMHRA.

This was the first time that the plaintiff was made aware that the report existed. He subsequently was able to get a copy of the report.

23. The plaintiff agreed to resign as Executive Director of EMHC, forgo any additional claims for over $40,000 in retirement funds that were owed him by GLMHRA and $28,000 in training funds owed the plaintiff by GLMHRA, six weeks vacation pay totaling $15,600 totaling $83,600 and pay GLMHRA $13,000 for loans. In exchange, GLMHRA and EMHC agreed to pay the plaintiff six months salary totaling $85,000, allow him to keep the vehicle he was using while Executive Director of EMHC, set aside $10,000 in training funds and continue plaintiff's medical benefits but at a reduced benefit amount for one year. Additionally, the plaintiff agreed not to seek any additional claim s against GLMHRA or EMHC such as the fact that GLMHRA refused his request in January 2000 when he was on leave to transfer his retirement fund investments from growth and equity stocks to lower risk investments costing him over $60,000

13

in lost retirement income when the stock market took a dramatic drop in the Spring of 2000.

25.   In December 2000 and in 2001, following the signing of the severance agreement, the plaintiff notified the agency by phone and by certified letter that GLMHRA had not sent out a letter as agreed or contacted the plaintiff to write the letter to employees, board members, parents and the friends of the Association as agreed and had not written him a letter outlining his accomplishments as agreed by James Cowdell and Paul Cote. The plaintiff also informed GLMHRA that defamation was continuing against him especially by Elaine White. They responded by refusing to communicate with the plaintiff except by writing through their counsel who never addressed the requests or issues of the plaintiff. See attached correspondence

26.   GLMHRA did not attach a letter to the severance agreement, Attachment A and never mailed out a letter following the signing of the agreement. James Cowdell and Paul Cote arrived at the final meeting without the draft letter that they had agreed to bring. They told me not to worry about it and to trust them and there would be no problem coming up with a letter. I trusted them and signed the agreement. No draft was ever sent to the plaintiff, no letter was ever sent out and they refused all requests to draft a letter.

27.   GLMHRA suddenly and without notice laid off seventeen employees, thirteen of whom were singe parent moms in January 2001. Many of these employees had worked for GLMHRA for five to fifteen years. Some were given only a one day notice and no severance. GLMHRA personnel practices in place

14

for over thirty years required a sixty day notice from employees and from the agency for any termination or lay off. The plaintiff cared for these employees and felt their pain and disappointment. The plaintiff had attended many of their weddings, christenings, and family funerals and had supported their careers. The letter was never sent out publicly and its contents were already well known to all employees and board members and the community since many of these employees were local residents. The letter was meant only to support the employees and not disparage GLMHRA. GLMHRA never requested a remedy such as a rescission by the plaintiff.

28. The January letter followed an interview by GLMHRA Executive Director, Paul Cote with the editor of the Lynn Item that was published in the Item. Cote stated that GLMHRA had many management problems that he was hired to correct, a direct disparaging remark against the plaintiff. Everyone in the community knew the plaintiff was the Executive Director for over thirty years.

29. After the plaintiff mailed the letter to seventeen former employees who had been suddenly laid off by GLMHRA in January 2001, the plaintiff received a letter form GLMHRA's counsel, Laurence Donoghue, informing the plaintiff that GLMHRA would not pay the $10,000 in training funds required by the severance agreement because he had written a disparaging letter to employees.

31. The plaintiff objected and informed GLMHRA counsel that they had no right under the agreement to unilaterally refuse the $10,000 payment that had already been expended by the plaintiff and that the agreement required them to seek remedy in the courts, section D.7, paragraph 2, and that only the court

could determine that the letter was disparaging and assign damages. The agreement states, "Breach of this paragraph by either party shall cause the other party irreparable injury and shall entitle such party to any and all remedies available under the law, including but not limited to injunctive relief."

32    The plaintiff apologized in a letter sent to James Cowdell in December 2001. See attachment

33.    The plaintiff sent a non disparaging letter to the GLMHRA and EMHC board and to DMH and DMR outlining problems and issues with the corporations and requesting that they hire him as a consultant to correct the problems. A follow up letter was also sent to DMH and DMR. The letter was kept in house (board) and never distributed to employees or publicly and was not disparaging. It was factual and contained information that was already known by the parties and had already been distributed or given to them by the plaintiff before November 2000 or by the EMHC board itself and Tena Fallon in January and February 2001. The only thing new in the letter is that it brought all the information together in chronological order and it promoted the plaintiff's availability and the need for receivership to protect his brother, the assets and other disabled citizens.

34.    The plaintiff's brother died while under the care of GLMHRA in October 2002 and his estate has alleged that his death was due to negligence of GLMHRA from the reduction of nursing, dietary staff, direct care consultants and staff training and supervision.

35.    There were at least four additional deaths and one in house rape of

mentally retarded citizens within the two years following the death of the plaintiff's brother.

35. Prior to the plaintiff's letter, DMH had already contacted GLMHRA and informed them that they had submitted false financial reports for which they had received reimbursement. They billed for staff in the Community Case Management Program who never worked in the program. The billing was done by Janine Brown Smith when the plaintiff was on leave. Brown Smith resigned from GLMHRA to receive employment arranged by defendant MacKleish.

37. DMR notified the defendant in 2001 that GLMHRA incurred legal and consultant bills from 2000 and 2001that were excessive and could not be reimbursed with state DMR and DMH funds per Executive Office of Human Services and Purchase of Services Regulations

38. GLMHRA suffered no damages as a result of the letters written by the plaintiff. DMH and DMR not only continued to fund GLMHRA but gave them additional contracts and special funding to help them through their financial problems.

39. Section D was not a motivating factor for GLMHRA to sign the severance agreement and they have never said so during these proceedings or at the time of the negotiations. The resignation of the plaintiff from EMHC, the plaintiff's dropping of the EEOC ADA complaint and financial clams against GLMHRA and the plaintiff's agreement not to hold GLMHRA or its agents liable for past actions including wrongful discharge were the principal motivating factors.

17

40. EMHC's motivating factor for signing the agreement was that the plaintiff was satisfied with the agreement.

39. Principal motivating factors for the plaintiff to sign the severance agreement were: 1. compensation for the plaintiff's resignation from EMHC and loss of a guaranteed job and income and the dropping of the EEOC complaint and other financial claims against GLMHRA 2. the writing and distribution of a letter to employees, board members, parents and friends of the GLMHRA to explain plaintiff's resignation and his accomplishments 3. the right to receive payment and legal representation as outlined in the bylaws of the corporation. The firm of Centullo & Capone of Boston was designated by the Insurance Carrier in 2001 to represent the plaintiff should it become necessary. There services have not been necessary.

Respectfully submitted,

_____
Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907
(781) 962-2662

Dated: August 29, 2005

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon all counsel of record by First Class Mail on August 29, 2005.

_____
Albert W. Bleau Jr.

18