# *ALBERT W BLEAU JR*

James Cowdell
Administrative Assistant
GLMHRA
37 Friend St.
Box 408
Lynn, Mass. 01903

December 7, 2001

Dear Jim,

I received your letter informing me that I owe $1565.72 for my health insurance.

It is my understanding that my insurance was to be paid for one year beginning December 1, 2000. EMHC was responsible for any payments prior to that date per a vote of that board authorizing me to set up a separate office and administrative functions from GLMHRA. These functions included the salary of the Executive Director and his benefits. I continued to receive my consultant pay from EMHC through November 1999.

For you to cancel my insurance therefore would be a violation of ERISA since I was paid up through the end of November 2000. Additionally I am no longer in need of family benefits under COBRA. I require individual benefits only. Please send me a bill for individual benefits for December and I will pay the bill.

I am scheduled for a colonostomy in December. Should you terminate my benefits, it could have serious effects on my health. Blue Cross-Blue Shield has already approved the procedure.

We still have not resolved the termination of various health benefits since I have been on COBRA. Specifically, my- out- of- pocket dental benefit costs and prescription drug and office visit costs have increased at a rate of almost $200 per month during the past year.

I will be writing to the Department of Labor to get clarification concerning the termination of these benefits per COBRA.

There are still other unresolved issues between GLMHRA and myself:

*Training*

The severance agreement stated that GLMHRA and EMHC would reimburse me $10,000 for training expenses. (See page 2, paragraph 5c). To date I have expended over ten thousand dollars for training and have received nothing from GLMHRA. Invoices from

Clark University have previously been sent to your office. I have other invoices for training expenses as well.

Your Attorney notified me that I was ineligible for funds because I made disparaging remarks about GLMHRA. This is untrue. I made no remarks about GLMHRA's functioning to anyone outside the organization. The remarks I made were not disparaging and secondly, the Association had no authority under the severance agreement to unilaterally change the agreement. Your redress should have been in a court of law if you felt the agreement had been violated. (See page 3, paragraph 7).

Actually, as I have come in contact with employees and Greater Lynn residents, I have praised the work of the organization in the community. I am proud of my accomplishments and those of thousands of employees who worked with me and continue to contribute at GLMHRA.

*GLMHRA-EMHC Violation of Severance Agreement*

*Disparaging Comments*

Page 3, section 7 of the severance agreement specifically prohibits GLMHRA from engaging in disparaging remarks against me.

However, it has been brought to my attention by business people in the City of Lynn, by state and locally elected and appointed officials, by employees of the DMH and DMR and by employees of other non-profit agencies in the commonwealth that you and other present and former management and supervisory employees of GLMHRA-EMHC and present and past Board members have made disparaging and untrue statements about my employment at GLMHRA-EMHC and about my character.

Parents of youth soccer teams that I have coached or have been affiliated with in Swampscott during the past year and neighbors have reported similar instances of disparaging comments from individuals affiliated with your organizations.

Disparaging comments have negatively affected my ability to start my consultant business and to gain employment in the field. It has also impacted my relationships within the community, with my neighbors, friends, and parents of my children's classmates. GLMHRA and EMHC have done nothing to correct this injustice or compensate me for the harm that has been done or discipline the offenders as promised by you, Executive Director Cote and the Boards of GLMHRA and EMHC during the negotiations of the severance agreement.

Some of the comments include that I took money from the retirement fund and misappropriated state funds. Just the opposite is true. I donated over forty thousand dollars to GLMHRA and thousands of hours of my time to GLMHRA over my thirty years of employment. GLMHRA was the only state agency to be found with no findings

by the state auditors office after a nine-month intensive audit. The company was financially and programmatically strong when I left on leave in October 1999. I grew this company from forty children in a six-week summer camp to and an annual budget of $30,000 to a company serving over two thousand people annually, 24 –7, with an annual operating budget of over $30 million dollars.

Other comments are that I was a drug addict. No mention of course has been made that in October 1999, Atty. MacLeish, without board approval or knowledge, ordered a surprise drug test. He threatened me with termination if I did not comply. He also lied and stated that the Board had ordered the test. I took the test at 8:30 in the morning at my home and urinated into a cup in the presence of the director of our EAP program, Jeff Zeizel. I was found to be drug free. I informed senior managers, board members, and You, Jim, that this test was negative. Yet, you did nothing to dispel rumors of my supposed drug addiction and actually spread those rumors.

I informed you and Bob Tucker after the test in October and other senior staff and board members in January 2000 when it was brought to my attention that MacLeish and Sherman had lied and had not informed Board members of their actions, of the test or the results of the test.

It is particularly troubling that some of these comments have been attributed to you, James Cowdell, considering your position in the community as the President of the Lynn City Council and your senior position in the Association. Additionally, I supported you when you were fired by the Mayor and the North Shore Employment and Training before Christmas some six years ago.

I hired you as the fund developer at GLMHRA. On numerous occasions the press, politicians, employees and regular citizens commented about the corruption and mismanagement at NSET and about your termination and work performance at NSET. My hiring of you was also questioned. I never engaged in disparaging discussions and only cited the value that I felt you would bring to GLMHRA and its citizens.

The Mayor called me and stated that he would cut all funding for our agency unless I fired you from this new position and I refused to do so. The Mayor then cut the funds for Camp Pinecrest and the Lynn Friendship Club. I still did not back down.

It is only reasonable and just that I receive the same professionalism from you, Jim, and from GLMHRA-EMHC that I have demonstrated regarding you and other Association employees.

*Joint Statement*

GLMHRA-EMHC has not followed through on their promises to issue a positive joint statement concerning my accomplishments at GLMHRA and the reasons for my departure. (See page 1, paragraph 2 of the severance agreement) This letter was to be sent to all employees, parents and friends of the Association.

Exhibit A was never attached to my agreement for my review. It was promised by James Cowdell and Cote that we would meet to draft a joint letter. This was never done. Board members that I talked to, including Bob Tucker, assured me as well. Everyone told me to sign the agreement and that the Exhibit A would be resolved soon after. I unfortunately trusted Bob Tucker, you, and Paul Cote.

*Misrepresentation*

During the negotiation of the severance agreement, I was repeatedly told by Claire Jackson, Vice-President and past President; Bob Tucker, the Treasurer and President-Elect; Nancy Rizzo, board member, and you, Jim, that Paul Cote was a temporary appointment. You all stated as well that I would be reconsidered for reappointment and minimally would be hired after January 1, 2000 as a consultant for GLMHRA and EMHC.

Shortly after I negotiated the agreement, Paul was hired full time at $200,000 plus per year; a gag order was put into effect prohibiting me from talking to or communicating in writing to the Corporations except through your attorney at Morgan and Joy. This gag order included any contacts from prospective employers or clients seeking recommendations, seriously jeopardizing my ability to gain employment or consultant contracts.

After January I 2001, the EMHC was combined with GLMHRA and three board members who had supported me and who were opposed to the take over of EMHC by GLMHRA were threatened and forced out of office in violation of state charitable laws and IRS regulations.

Over thirty line staff and senior managers, many with over ten years of service, and many of whom were opposed to GLMHRA's action to remove me and cut services to consumers were given two weeks or less notice and terminated from service.

Many had also voiced opposition to the million dollar deficits that had been incurred by the Board and Acting Executive Directors Elaine White and Paul Cote. All of the deficit spending went to politically connected consultants, attorneys and to politically connected employees. These expenditures were incurred while spending for employee benefits, consumer recreation services, and nursing and psychological services were curtailed or eliminated. Building maintenance was neglected and plans to provide new and expanded services to needy individuals were scrapped.

It is obvious that the board, the Executive Director and senior staff deliberately mislead me to gain my signature on the severance agreement and to prevent me from continuing legal and public action against the GLMHRA-EMHC and their agents and employees.

*Retirement-ERISA*

The GLMHRA is in violation of ERISA and of employment contracts and commitments that have been made to employees going back to 1981 when the self-insured plan was established at GLMHRA. Over $900,000 is owed to me and to present and former GLMHRA employees.

The plan was unanimously implemented by a vote of the board of directors. This initial vote had been reaffirmed on numerous occasions including annual votes of the board from 1981 through `1995 approving the investment of the plan's assets and the annual distribution of the plan's assets to the employees and to consumers in the form of benefits and services.

Additionally, the board approved the original contract with Papathanasiou Insurance Co. to administer the plan and it approved various amendments to the plan and this Insurance contract over the nineteen year existence of the self-insured plan. (See attached 1985 approved contract)

GLMHRA had over $800,000 in the self-insured plan when I was placed on leave in 1999. These were funds that had been generated prior to 1995 and were being held in reserve. (Attachment) According to the plan documents that were distributed to all employees, if the plan were to be cancelled all reserve funds in the plan would be distributed to the employees in the form of an ERISA retirement plan. (Page, paragraph)

Since GLMHRA has eliminated the self-insured plans, these funds are owed to the employees and to me and need to be deposited into the 401-k plan.

Additionally three years payment into the retirement plan was never made by GLMHRA as required by the plan documents for fiscal years 1999, 2000 and 2001. Original plan documents called for a minimum of $17,400 to be contributed annually to the employee's 401-k plan before July 1, from premiums paid during the current fiscal year. It also, called for this amount to increase minimally by 3% per year. The GLMHRA has documentation of these board votes. Papathanasiou Insurance and various past board members and past and present employees can verify my assertions.

Approximately, $100,000 is owed to Association employees for these three years. Based on my longevity and salary I am owed approximately $21,000 for these three plan years. These funds are not affected by my signing of the severance agreement since these are retirement funds to which all eligible employees and I are entitled.

I also am owed a prorated portion of the assets in the self-insured plan based on my longevity and salary at the time of my departure from GLMHRA. Since a secret decision to terminate this plan had been made while I was still Executive Director of GLMHRA and EMHC, I am eligible for these benefits. In December 1999, upon the

recommendation of Attys. MacLeish and Sherman, and without my knowledge or consent, the board froze the plan assets and began the process to terminate the plan.

The personnel practices of the agency gave me and only me exclusive rights to enter into and sign and terminate all contracts with outside parties. The contact with Papathanasiou Insurance was cancelled in December 1999 without my knowledge and his records confiscated.

In summary: unresolved issues include:

1) The proposed cancellation of my insurance coverage and funds owed to GLMHRA under COBRA
2) The defamation of my character and steps to be followed by GLMHRA to correct this injustice, discipline the offenders and to compensate me for lost employment, consultant contracts and income.
3) Contribution to my retirement plan per ERISA and GLMHRA plan documents
4) Joint letter to past and present board members, parents, employees and friends of the Association
5) Increased out-of-pocket benefit costs

I hope we can meet shortly to resolve these outstanding issues and prevent unnecessary litigation.

Sincerely,

Albert w. Bleau Jr.
Cc James Carroll, Esq.
Morgan & Joy, Paul Cote, Bob Tucker, Tom Costin

## EASTERN MASSACHUSETTS HOUSING CORPORATION

37 Friend Street      Lynn, MA 01902      (781) 593-1088

TO:     Steve Speropolous, Chairman
         Sam Vitali
         Peter McGinn
         Norm Thibodeau
         Ralph Fredette

FROM:    Tena Fallon

RE:     Vote for $614K

DATE:    January 20, 2000 2001

Please forgive me, but I still find things wrong with information given us by Mr. Cote reference the EFIP and the $614K

Please refer to Paul's <u>GLMH&RA EFIP Summary 1989 Through 1999</u> which he gave us. When I sat down to digest the figures, I realized that Paul's spatial configuration and figures didn't make sense. According to Paul's scenario, employees and GL contribute only to the cost of the claims. Note that the entries for the two rows identified by "Estimated Amount of Employee Contributions* Amount of Claims Paid in Excess of Employee Contributions*" exactly total the amount identified as "Claims" in the first set of entries at the top of the page. If employees contribute to payment of claims only, then we need to conclude that GL pays for the premiums. Mr. Cote's report impressed us with the insignificant contributions that GL made to the employees' plans so that we were led to believe that the EFIP takes improper advantage of employee assets. My analyses lead me to conclude that this is untrue and misleading and was a gross misrepresentation.

Among the papers bequeathed to me from Al, I found a Med Tac bill for 11 months of 1995. The total cost for medical is $996,234.66; annualizing the total 1995 Med-Tac bill would be $1,086,801.45. Paul's summary to us indicates the premium cost for medical insurance for 1995 is $232,274 (which is more than a $700K differential). Paul's figure is a fraction of what it should be. He indicates that the employees contributed $118,094 for insurance for 1995 This totals less than 12% for medical insurance only. With respect to claims (we are self-insured so we pay both premiums and claims and receive a rebate for unused insurance) the amount of all claims that Paul reports is $312,165 and the Med-Tac report states that the amount of medical claims alone is $884,650.96 (annualized to $965,073.77). It is clear that the figures given are so incorrect they are unuseable and they convey a different picture than what we were led to believe.

It is also clear at this point that Paul's description of the EFIP Plan's fund distribution scenario was incorrect. Not only is there is no "commingling" of funds; there can't be commingling of funds because employee contributions are so small and they are spent immediately upon receipt on their insurance contributions. This is what I told him, and he said I was wrong. I am not wrong. I find it appalling that neither Paul nor anyone else will allow Al to explain the EFIP Plan to the Board. Before handing over $614K and getting into fiduciary trouble and IRS trouble it seems to me that a prudent action on our part would have been to ask Al to describe the plan that he devised. It sure makes a lot of sense to me to take only prudent steps and to be fully informed when decisions of such magnitude need to be made.

I had forgotten that Al told me that he already had DOL review the EFIP Plan; if this is so, then we have less to fear from DOL than from the IRS. Both Tim Demakis and Atty. Ken Shutzer (with whom I have been discussing the matter for many months), as well as my financier-client have warned me that we cannot hand this money over like this without committing breach of fiduciary duty and without risking serious IRS trouble, not to mention bank fraud. Our decision was based on information presented to us that clearly is faulty. Personally I would like to hire a lawyer (Shutzer or Leslie Slavin) to deal with Paul Cote and Garrick Cole.

I know we are all short on time; however, I feel we need to quickly discuss whether we are acting prudently by making last minute decisions of significant magnitude based on incorrect information on ERISA. If we have to face the IRS for this decision, we need to cover all of our bases.

*[signature]*

## GLMH&RA EFIP
## SUMMARY
## 1989 THROUGH 1999

| Total Plan | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Premiums | 85,629 | 153,885 | 195,739 | 313,560 | 135,926 | 920,710 | 232,274 | 356,717 | 551,604 | 226,589 | 660,454 | 3,833,087 |
| Interest Income | 1,416 | 3,214 | 4,136 | 3,286 | 302 | 1,896 | 3,587 | 620 | 285 | 114 | 0 | 18,856 |
| Claims | -47,060 | -85,400 | -77,614 | -97,574 | -107,130 | -249,875 | -312,165 | -315,385 | -313,175 | -184,492 | -272,966 | (2,062,836) |
| Commissions | 0 | -3,027 | -2,754 | -4,418 | -5,640 | -10,730 | -14,725 | -26,564 | -36,911 | -34,266 | -30,611 | (169,646) |
| Gross Surplus | 39,985 | 68,672 | 119,507 | 214,854 | 23,458 | 662,001 | (91,029) | 15,388 | 201,803 | 7,945 | 356,877 | 1,619,461 |
| Estimated Amount of Employee Contribution * | 43,442 | 74,452 | 100,515 | 156,628 | 36,517 | 215,621 | 118,094 | 136,238 | 177,688 | 104,381 | 229,179 | 1,392,755 |
| Amount of Claims Paid In Excess of Employee Contributions * | 3,620 | 10,951 | (22,898) | (59,051) | 70,616 | 34,257 | 194,074 | 179,150 | 135,490 | 80,114 | 43,790 | 670,113 |
| Less: | | | | | | | | | | | | |
| Administrative Costs | | | | | | | | | | | | |
| Other Benefit Costs ** | 0 | 4,408 | 0 | 17,297 | 0 | 0 | 90,330 | 0 | 49,784 | | | 161,819 |
| Plus: | | | | | | | | | | | | |
| Investment Gains | 2,637 | 5,273 | 7,910 | 10,547 | 13,184 | 15,820 | 18,457 | 21,094 | 23,730 | 26,367 | 29,004 | 174,023 |
| Interest Income | 1,623 | 3,246 | 4,869 | 6,492 | 8,115 | 9,738 | 11,362 | 12,985 | 14,608 | 16,231 | 17,854 | 107,123 |
| Net Surplus | 44,245 | 72,783 | 132,286 | 214,596 | 44,757 | 687,559 | (151,540) | 49,467 | 190,357 | 50,543 | 403,735 | 1,738,788 |

\* Extrapolated amount based upon auditor's analysis for the same period.
\*\* Unemployment Expense.

**Adjustment to Net Surplus**
Surplus                        1,738,788
Less
Nonreimburseable
Expenses                         638,015
Adjusted Net Surplus           1,100,773

**Nonreimburseable Analysis**
EM Vac. Subsidies                226,000   Should be reclassified as loan to Eastern Mass. and paid back with funds from equity on properties.
GL Vac. Subsidies                158,699   Should be reclassified as loan to Eastern Mass. and paid back with funds from equity on properties.
Remaining Balance                253,316   Should be paid back through investment gains and interest on loans or from agency working capital.

Attachment "A"

```
MED73C-E      MED-TAC  PROGRAM  REPORT           PAGE:      8
183000 GREATER LYNN MENTAL HEALTH & R            DATE: 10/16/95
OVERALL SUMMARY FOR SEP 1,1994 THROUGH JUL 31,1995  11 MONTHS

                              ACTUAL       GUARANTEED
        CATEGORY               COST         MAXIMUM

             *  *  BILLING SUMMARY  *  *

        MEDICAL              218,796.50    218,796.50
        MED AGG               12,810.57     12,810.57
        LIFE #1               11,246.84     11,246.84
        AD&D #1               10,496.66     10,496.66
        FSA                      715.00        715.00
        PROC FEE               2,550.00      2,550.00

             *  *  LOSS FUND SUMMARY  *  *

        MEDICAL              622,424.13    734,007.83
        SMR & SIDS               387.26        387.26
        PEER REVIEW            5,224.00      5,224.00
                             ----------    ----------
                             884,650.96    996,234.66

    *** MEDTAC SAVINGS ***   111,583.70
```

# Cote plans additional programs

**LYNN**

By Thor Jourgensen
The Daily Item


Cote

Paul Cote officially became the director of one of Lynn's largest social service agencies last night, signaling a pivotal change that is being echoed in two other local human services organizations.

Cote in July left a career in state government to become temporary director of Greater Lynn Mental Health and Retardation in the wake of troubled times facing the agency's leadership.

Cote marked the end of that transition period Thursday by presiding over Greater Lynn's annual dinner at Nandee's and officially taking his place as the agency's new director.

Cote is anticipating an expansion in Greater Lynn's services that is likely to be matched by similar growth in two other major agencies - Greater Lynn Senior Services (GLSS) and All Care Visiting Nurse Association of Lynn, Inc.

The three agencies provide a major share of the care, including long-term health and housing assistance, for developmentally disabled residents and seniors across the North Shore. Greater Lynn and All Care employ nearly 1,500 people between them.

Home health care workers are in constant demand, and All Care this year helped win significant changes in medical billing procedures that will allow it to improve pay for its employees. The changes allow All Care and similar home health agencies to build in profit margins that were formally banned from payment calculations.

"Before you were basically in the dark on what you were getting paid. Now we can grow much more than we ever did," All Care Chief Executive Officer Shawn Potter said, adding, "The industry as a whole has to upgrade pay."

The scope of GLSS's services parallels All Care's: The Silsbee Street-based agency transports 1,500 seniors a day and provides at home care and meals to hundreds of others. It marked its 25th anniversary this year.

In the last several years GLSS has reached out to Lynn's Russian and Cambodian seniors and started one of the first elder domestic violence programs. The agency's basic services, including transportation and providing information, remain among the most vital it provides.

"I'm proud of our flexibility and ability to meet needs without being over bureaucratic. I think the agency has become truly integrated into the community," Director Vincent Lique said.

Cote brings close ties to state human services agencies to Greater Lynn. He was chief of staff to former state Health and Human Services chief and Swampscott resident Charles Baker.

He is working to improve training for agency workers and expand his work force at a time when the state is helping developmentally disabled individuals move from nursing homes to community residences similar to the type Greater Lynn operates.

"I'm very much a believer in the individual achieving maximum independence. The question is, 'how can we work with them,'" he said.

---

Albert Bleau, Jr.
P.O. Box 408
Lynn, MA 01903 0508

PERICO, P.C.
GERALD M. KRAMER, D.M.D.
MYRON NEVINS, D.D.S.
GARY M. REISER, D.D.S
ROGER J. WISE, D.D.S.
JAMES J. HANRATTY, D.D.S.
NINETY HUMPHREY STREET
SWAMPSCOTT, MASSACHUSETTS 01907

Albert W. Bleau, Jr.

$ 136.00 REPRESENTS CHARGES THAT ARE OVER NINETY (90) DAYS OUTSTANDING. PLEASE REMIT IMMEDIATELY.

You actual balance is $225 - $130 - is outstanding

Albert W. Bleau, Jr.

12/5/00

# Al Bleau — 2002
### First Essex District - Massachusetts

AlBleau2002.com

## The Choice is yours:

The same old failed Beacon Hill and Lynn City Hall politics or the Solution... **Al Bleau** Your Voice on the Inside

---

**Position: $1M Buy-out of Lynn Superintendent Salaries**

Migliaccio: As President of the City Council, he approved the buyouts.
McGee: He sat quietly in his Beacon Hill office and watched as state funds were used to pay for it.
Bleau: Would call the School Committee & Mayor and say: " Spend it on the kids or the state will take it back." No state funds to pay for litigation or settlements.

---

**Position: $100M Secret Water & Sewer Contract raising rates in Lynn, Swampscott and Saugus**

Migliaccio: As President of the City Council and Lynn Water and Sewer Commission he approved the contract and lobbied the state to stop investigating the city and the Commission.
McGee: Sat quietly in his Beacon Hill Office and approved $50 Million dollars of your tax money from the rainy day fund to give interest free loans to Lynn and other Commissions.
Bleau: He would have voided the contract, investigated and opened it up to competitive bidding.

---

**Position: Clean Elections Law**

McGee and Migliaccio are having second thoughts. They say it is too expensive.
Bleau: He says fund it and get the special interests out of Massachusetts. 80% of the incumbents go unopposed. We must hold them accountable at election time.

---

**Position: The Environment**

McGee and Migliaccio attend meetings, are sympathetic, but have no plan.
Bleau: Has a plan for the environment. He says no to coal at the Salem Power Plant, no to fly ash at Aggregate Industries, no to Resco expansion.

---

**Position: $2.1 Billion Construction & Stimulus Plan in Legislative Committee since 2/01 and 6/01**

McGee and Migliaccio have had no comment at three different debates.
Bleau: He would push for immediate passage. It would generate $300 million dollars in New tax revenue, create thousands of new jobs, and help our elderly, businesses, and Public safety.

---

**Position: Lay-offs, Cuts in Health Human Services and Education, Increased Property Taxes**

McGee and Migliaccio support tax-and-spend policies with no solution to the 'real' problem.
Bleau: He has a plan to reduce property taxes, no new state taxes, and to clean up the environment and move toward Universal Health Care.

---

**With Al Bleau, there will be No More Broken Lives. Al Bleau:**
"A business-minded reformer with a human service worker's heart" (Lynn Item)

## Vote Democrat AL BLEAU for State Senate March 26th.

No special interests, only Your interests and the public interest.