UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<u>Amended
Memorandum Of Plaintiff Albert W. Bleau Jr. Objecting To Defendant
Greater Lynn Mental Health & Retardation Association, Inc Motion of
August 9, 2005 To Dismiss Plaintiff's Breach Of Contract Claim or For
Partial Summary Judgment</u>

<u>And</u>

<u>In Support of Plaintiff's Motion For Summary Judgment of Plaintiff's Breach
Of Contract Claim & To Continue And Expand Discovery To Include
Damages and Rescission</u>

<u>Including</u>

<u>Corrections To Plaintiff's Memorandum and 56.1 Statement of Facts Dated
August 29, 2005.</u>

| | |
|---|---|
| Albert William Bleau Jr. | : |
| Plaintiff | : |
| | : |
| Vs. | :     Civil Action<br>No. 04 – 10469REK |
| | : |
| Greater Lynn Mental Health<br>& Retardation Association, et al,<br>Defendants | : |

    Plaintiff Albert W. Bleau Jr. inadvertently did not attach certain documents to his previous Memorandum and 56.1 Statement of Facts Dated August 29, 2005. Plaintiff has included those documents with this Amended Memorandum and 56.1 Statement of Facts.

    Plaintiff also needs to correct a mistake in his Memorandum of August 29, 2005. Plaintiff's Memorandum of August 29, 2005 in the "<u>Introduction</u>" section, page 4 paragraph five, line four should be changed from: "<u>of contract claim or rescission and for discovery for damages…</u>" to "<u>of contract claim and for</u>

1

<u>discovery for damages...</u>", eliminating the words "<u>or rescission</u>".

Plaintiff will now provide additional documentation and argument to support Plaintiff Albert W. Bleau Jr.'s motion for summary judgment and objection to defendant's motion for dismissal or partial summary judgment of plaintiff's claim for breach of contract and to support plaintiff's requests that discovery be ordered to assess damages on the breach of contract claim and on a possible claim for rescission and to support that discovery include grounds for contract rescission and that discovery continue on all outstanding issues and include pre November 2000 actions of the defendants to determine claims and damages on all outstanding issues including defamation and ADA and justification for rescission.

## **Argument**

1.  The plaintiff has stated that the primary motivation for GLMHRA to initiate and sign the severance agreement was to have the defendant resign from EMHC so they could take control of the cash and real estate assets of the EMHC corporation to offset over one million dollars of deficits that the defendants and their senior managers and lawyers accumulated from October 1999 to June 2000 while the plaintiff was on a leave of absence. EMHC funds and assets were also needed to offset an anticipated deficit of an additional $1 Million Dollars from July 1, 2000 to June 30, 2000.

2.  Neither EMHC nor the plaintiff would have signed the severance agreement had they been furnished a copy of the Griffin report with its recommendation for GLMHRA to take over EMHC.

3.  The Griffin report submitted to the GLMHRA board and the Attorney General's Office during the first week of October 2000 (attached to the plaintiff's RICO complaint to this Court) stated that GLMHRA had a deficit of $280,000 for the fiscal year ending June 30, 2005 and an anticipated deficit of $1Million dollars for fiscal year 2001. It recommended the take over of EMHC by GLMHRA.

2

4. Attachment IIC, a bond covenant given to the bondholders by GLMHRA on May 29, 2000, anticipated a deficit of $336,000 on July I, 2000. Martena Fallon's memo to the EMHC board in January 20, 2001(attachment I A30) demonstrates that GLMHRA needed an additional $612,000 from EMHC to cover FY 2000 deficits and to include these funds in their audit report and in the Administration & Finance Report 1100 that had been due on December 31, 2000. GLMHRA had requested and received an extension to file these reports.

5. The actual deficit of GLMHRA during FY 2000 was $892,000 to $948,000 or possibly more. The plaintiff worked to raise funds through borrowing and real estate sales to assist GLMHRA with their deficit spending. See Attachment I F, letter to Donald Lonberg, to raise $300,000 and attachment I L, to Paul Keating regarding a $500,000 loan. Also, see EMHC board minutes of June 29, 2000 outlining the lack of accounting for over $1.6 Million dollars loaned to GLMHRA during the fiscal year. (attachment I M)

6. Attachments II A & B of the amended Rule 56.1 Facts are excerpts from the official audit reports and demonstrate that in fiscal years 1998 and 1999 EMHC and GLMHRA while under the direction of the plaintiff were expanding in services and assets and finished each year with surpluses. They also demonstrate that the loans between GLMHRA's EFIP fund to EMHC were fully disclosed in the EMHC audit, comment sections.

7. The aforementioned audit reports were distributed to bondholders, banks, DMH, DMR, GLMHRA Auditor, James MeCone, Public Charities Division of the Attorney General's Office and the Mass' Department of Human Services and the EMHC and GLMHRA board. This is contrary to statements made by GLMHRA counsel, Garrick Cole to this Court and contrary to the Griffin and MacKleish – Sherman reports that stated that there was no authorization or reporting of the EFIP reserves or promissory notes that existed between EMHC

and GLMHRA.

8. The EMHC audit demonstrates that EMHC had over $22 Million Dollars in assets as of June 30, 1999 and $647,000 in cash and that these assets were at book value. The market value of the real estate assets was at least 40% higher since most of the real estate had been purchased ten or more years earlier.

9. It is obvious that EMHC and GLMHRA were very well managed under the plaintiff's direction and the finances of GLMHRA deteriorated after he was put on leave and removed from decision making in November 1999.

10. It is also obvious that GLMHRA's finances were on a downward slide and they desperately needed an additional infusion of cash over and above what they had received from the bond. As of November 1, 2000, GLMHRA owed EMHC over $One Million Dollars from loans and real estate sales and was also deficit spending by $One Million Dollars according to the Griffin report.

11 The takeover of EMHC was essential for GLMHRA's survival to allow them to cancel their EMHC loans, control the $667,000 in EMHC cash that had grown to over One Million dollars by June 30, 2000 and to control the real estate assets for eventual sale.

12 Attachment I V is a news article supporting plaintiff's contention that the Marquis Resort was on schedule to convert to condos increasing its value to $1.2 to 1.7 Million Dollars. Once GLMHRA gained control of EMHC, they cancelled the conversion and sold the resort below market value for $880,000 because they needed the cash immediately and could not wait for condo sales. Additionally, they had mismanaged the condo conversion.

13. GLMHRA sold the Marquis Resort for $820,000 below market value effectively mismanaging and misappropriating charitable assets with this sale and used over One Million Dollars of EMHC cash assets to pay for unbudgeted & unfunded legal and consultant fees and for new senior management positions

4

given to local politicians and their supporters and for unbudgeted raises for senior management staff.

14.　GLMHRA has sold other EMHC assets as well and most recently is selling their flagship corporate headquarters office and training center building at 37 Friend St., Lynn, Massachusetts. The building is worth over Four Million Dollars. This building was built by the Plaintiff who supervised the construction, fundraising, leasing and financing for this building in 1989-1990. Had this building been held until the bond were discharged, it would have provided a low cost valuable asset to both corporations.

15.　Plaintiff's letter of 4/13/2001 presented by the defendants to this court with their August 9, 2000 motions contained no new information concerning GLMHRA that they and state agencies, local and state politicians, the press and many association employees had not already received from the Plaintiff and others prior to November 8, 2000. (See amended Rule 56.1 Statement of Facts dated October 3, 2005, section 1, p 1; section 3, pp 2-3; section 4, pp 4-6; and section 5, p 7)

Additionally the plaintiff's letter was sent to gain support for his attempt to be appointed Chief Financial Officer of GLMHRA and not to disparage GLMHRA.

16.　The plaintiff has attached a Chronology from April 20, 2000 to April 2, 2002 with attachments that supports the plaintiff's motions and objections. (See amended Rule 56.1 Statement of Facts dated October 3, 2005, section 1, p 1)

### Defendant and Plaintiff's Motivations To Sign The Severance Agreement

1.　The best documentation to support the plaintiff's contention that the defendant's primary motivation for signing the severance agreement was the plaintiff's resignation from EMHC are the various severance agreements and communication submitted to the plaintiff by the defendant. See amended Rule

56.1 Statement of Facts dated October 3, 2005, sections 8, 9, 10, 11, pp 8-9)

2.     The first severance agreement given to the plaintiff by defendant's attorney, Laurence Donoghue on August 7, 2000 offered $80,000 in benefits less $51,000 that they alleged the plaintiff owed the defendant. It included an offer for the plaintiff to purchase or lease the vehicle he was driving from them, although the plaintiff was still the Executive Director of EMHC and the vehicle was owned by EMHC and not GLMHRA. GLMHRA had no authority to lease or sell the vehicle. Additionally, it called for the plaintiff not to disparage GLMHRA and not to hold them liable for their actions.

3.     Interestingly, there was no mention of the EMHC or that the plaintiff had to resign as a condition of the severance agreement with GLMHRA. President, Bob Tucker's letter to the plaintiff of 7/5/2000 also made no mention of the plaintiff's resignation from EMHC. Two additional severance agreements were sent to the defendant in August and when the plaintiff refused to sign the agreements, GLMHRA removed him from payroll and from benefits. Neither of these agreements contained any mention of EMHC. (See amended Rule 56.1 Statement of Facts dated October 3, 2005, section 8 and 9, pp 8-9)

4.     GLMHRA therefore, was willing to forgo the protection from disparaging remarks from the plaintiff or from a potential lawsuit for discrimination or wrongful discharge that would have been afforded to them with a severance agreement. These were obviously not primary motivating factors for them to sign a severance agreement with the plaintiff despite what they are now saying to this Court in their August 9, 2000 motion.

5.     Griffin's report was completed in early October, and recommended that GMHRA take over EMHC. It also outlined an unaudited deficit of $280,000 for the year just ended on June 30, 2000 and a projected deficit for 2000-2001 of One Million Dollars. Griffin did not know that the financials that projected a

6

$280,000 deficit ending 6/30/2000 included an approximate $612,000 credit that belonged to EMHC. Therefore, the deficit was actually about $892,000.

6. Following the dissemination of this report to the board, AG's office and DMH and DMR and Paul Cote, and other senior managers of GLMHRA, the plaintiff received a call from James Cowdell to set up a meeting to negotiate a severance agreement. Their newly proposed agreement contained the provision that the plaintiff resign from EMHC.

7. The plaintiff rejected this agreement and two additional agreements for the reasons stated in his August 29th motions: It did not include a clause preventing GLMHRA from disparaging or defaming the plaintiff, it did not include a letter to be sent out to the newsletter list "employees, parents, friends of the Association and board members," it did not protect the plaintiff's rights to free legal counsel as stipulated in the bylaws, it did not include training funds. The plaintiff has been consistent with his requests and conditions as depicted in his e-mails to Atty. Donoghue on August 15, 17, and 18th, 2000 and his correspondence to Tom Manning on September 21, 2000 and to Atty. Donoghue on October 12, 2000. (See amended Rule 56.1 Statement of Facts dated October 3, 2005, sections 12, 13, 14, pp 9-10)

8. The third agreement submitted to the plaintiff was agreed upon and it included the changes requested by the plaintiff.

9. GLMHRA had no intention of complying with the severance agreement. They committed fraud by withholding the Griffin report from EMHC and from the plaintiff and convincing the plaintiff that they would comply with the agreement. On November 16, 2000 following a telephone call from the plaintiff complaining about the continuing defamation by Association employees and board members and the lack of a letter from GLMHRA, GLMHRA sent a letter to the plaintiff informing him to direct all communication to their attorney. They refused to return any of plaintiff's phone calls even when plaintiff's brother was dying in the hospital. (See

7

amended Rule 56.1 Statement of Facts dated October 3, 2005, sections 6, pp 7-8)

10. On or about June 10, 2002 on Friday afternoon and evening and Saturday morning the plaintiff called the president Robert Tucker, James Cowdell, Paul Cote, and the Clerk of the board requesting assistance to properly staff plaintiff's mentally retarded brother who was ill at the hospital. Staffing had been included in plaintiff's brother's ISP since his placement in community residences from Wrentham State School due to serious medical anxiety, medication reactions, etc. He was a consent decree client.

They did not answer or return plaintiff's calls and did not order additional staffing as needed and plaintiff's brother died that weekend.

11. Plaintiff made numerous attempts to have GLMHRA honor its commitments under the severance agreement without success especially its commitments not to defame the plaintiff and to send a letter to employees, friends of the Association, board members and parents and their refusal to negotiate or to prevent continuing defamation and retaliation . Plaintiff called the defendant on or about November 12, 2000; sent letters to the defendant on December 12, 2000, 5/8/2001, 5/22/2001, 6/20/2001,12/7/2001 and 4/2/2002 and to the EEOC on 11/22/2000, 11/28/2000 and 12/12/2000. (See amended Rule 56.1 Statement of Facts dated October 3, 2005, section 5,6,7, pp 7-8)

## Conclusion

For the reasons set forth above and in the accompanying Local Rule 56.1 Amended Statement of Material Facts and Affidavit and in the plaintiff's motions and objections of August 29, 2000 and their accompanying Local Rule 56.1 Statement of Material Facts, and accompanying Memorandum, the plaintiff requests that the Court deny defendant's motions for dismissal or partial summary judgment and in the alternative grant plaintiff's motion for summary judgment on

the breach of contract claim and order discovery on damages for breach of contract and on rescission and continue to order discovery on all outstanding issues including defamation and the ADA claims and that discovery include pre November 2000 actions by the defendant and its agents.

The plaintiff also requests that discovery be allowed to determine whether there are grounds to rescind the severance agreement of November 8, 2000.

Dated: October 4, 2005

Albert W. Bleau Jr.

Respectfully submitted,

_____

Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907
(781) 962-2662

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon all counsel of record by First Class Mail on October 4-5, 2005.

_____

9