# UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN CLERKS OFFICE

2005 DEC 27 P 1: 03

U.S. DISTRICT COURT
DISTRICT OF MASS.

Albert William Bleau Jr.

      Plaintiff

                      :

Vs.                     :          Civil Action
                                       No. 04 – 10469REK

Greater Lynn Mental Health     :
& Retardation Association, et al,
      Defendants

### Memorandum
### In Support Of Plaintiff Albert W. Bleau Jr.'s Motion for Reconsideration Of The Court's Memorandum And Order Of October 25, 2005 And Plaintiff's Amended Motion For Summary Judgment.

Defendants have never complied with Section 4 of the Severance Agreement and defamed and disparaged the plaintiff before the signing of the Severance Agreement and immediately thereafter. See letter to James Cowdell and his response, previously submitted to this Court, Attachment XVI.

When plaintiff's prospective employers and clients called GLMHRA and other defendants for a recommendation or certification and dates of employment, they were told that they could not confirm or respond to any questions and they were referred to the Association's Attorney. This was not exactly a comforting response for prospective employers or clients.

This action resulted in lost business and employment opportunities for the plaintiff and was a direct violation of Section 2 and 4 of the Agreement. Section 7 was inserted into the Agreement fraudulently to prevent the plaintiff from protecting his reputation and from exercising his rights and to continue the cover up of violations of RICO, Fraud and mismanagement. It was also intentional to prevent the plaintiff from challenging the withholding of vital information from the

1

plaintiff prior and during the negotiations of the Agreement, namely the Griffin Report and the Audits of GLMHRA and EMHC. It was also inserted to cover up their intent to take over EMHC and its assets.

Had the plaintiff been aware of Griffin's Report and the EMHC and GLMHRA Financials, Audits, and Audit Recommendations, he would have required an independent audit from the State Auditor's Office prior to signing the Agreement and that his and Martena Fallon's analysis of the Fringe Incentive Plan be submitted to the State Auditor's Office, the Attorney General's Office, DMH, DMR, the Department of Social Services (DSS) and the GLMHRA and EMHC Boards.

Had EMHC been aware of the Griffin Report and the EMHC and GLMHRA Financials, Audits, and Audit Recommendations, they would have requested that the plaintiff continue as Executive Director and would not have approved GLMHRA's Executive Director, Paul Cote, as EMHC's Executive Director.

The plaintiff would have requested that GLMHRA furnish the current EMHC by-laws to Griffin, DMH, DMR, and the Attorney General's Office. The by-laws referenced in the Griffin Report had been amended in 1979 and were over 20 years old. He also would have required that GLMHRA furnish a copy of the 1978 Articles of Organization that the plaintiff has recently recovered from the Attorney General's Office and has attached to this Memorandum as Attachment XIV.

When EMHC learned that GLMHRA was asserting that EMHC was a subsidiary of GLMHRA, they voted at their annual meeting to reaffirm their independence from GLMHRA and confirmed their current by-laws. The former and still the legal Clerk of EMHC, Martena Fallon, has affirmed this vote.

The plaintiff would also have requested an amendment to Section 2 of the Agreement to require GLMHRA to assert, "that any statements or comments by prior or present Association employees, board members or its agents and attorneys that Mr. Bleau mismanaged GLMHRA and EMHC or GLMHRA's retirement funds or its Fringe Incentive Plan were and are false."

2

Plaintiff argued in his motion for Summary Judgment filed on August 29 and amended on October 3, 2005 and additionally amended on October 11, 2005 that the principal and only motivation for GLMHRA to sign the Severance Agreement was to have the defendant resign from EMHC so they could take control of the cash and real estate assets of the EMHC to pay for improper and unethical use of charitable assets and to cover up their mismanagement of GLMHRA. The plaintiff now alleges Fraud in the negotiation and signing of the Severance Agreement by the Defendants and a cover up to conceal their actions.

### Legal Standard

1.    It is well established under contract law that if one of the parties to the contract commits fraud, misrepresentation, deceit or engages in illegal activity in the negotiation and signing of the contract that it constitutes a material breach and the offended party can return to the status quo before the contract were signed and be allowed damages. It is well established that if it can be proven that one party to the contract did not intend to fulfill one of the inducing and essential features of the contract that resulted in the contract being signed by the other party that the contract could be rescinded.

In Telegram Corporation v. Marketwatch. Com, Inc., Civil Action No. 02-11138-DPW United States District Court For The District Of Massachusetts, December 29, 2004, Lexis 26410 it was stated, " In this Commonwealth it has been held in a long line of cases that the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case  it is not necessary to make any further proof of an actual intent to deceive.

2.    An allegation of fraud or deceit does not have to be pled with specificity.

3

Massachusetts' courts do not impose this requirement on c. 93A claimants and certainly, it should not be applied to a breach of contract claim. See <u>U.S. Funding, Inc., of America v. Bank of Boston, 28 Mass. App. Ct. 404, 407, 551 N.E.2d 922 (1990, and Li'l Peach of Massachusetts, Inc., v. Frances Prendergast 6 Mass. L. Rep. 43; 1996 Mass. Super. LEXIS 356.</u>

### **Argument**

1.    My complaint alleges that RICO and Fraud was involved in their actions and was the motivating reason for my termination as Executive Director of GLMHRA and for the Breach of Contract, defamation and continuing retaliation and discrimination by GLMHRA and their associates.

2.    I have alleged that as a result of their actions that over $One Million Dollars was diverted from the fore mentioned non profit corporations and from services for the developmentally disabled and individuals with mental illness for their and their associates and co-conspirators personal benefit.

3.    Additionally, I have alleged that they employed unethical and illegal tactics to take control of another non-profit, EMHC, and diverted over $20 Million Dollars of its assets to GLMHRA for their personal use and to cover up the misappropriation of GLMHRA funds.

4.    I have alleged that favors and consideration were given to past and present GLMHRA board members and staff to support the conspiracy and the misappropriation of funds.

5.    I have alleged that the financial dealings at the Lynn Water and Sewer Commission were not fully investigated by the Inspector General and the Attorney General's Office in return for GLMHRA removing me as Executive Director and GLMHRA paying all legal and consultant costs to Attorney's MacKleish, Sherman, Griffin and their associates totaling over $900,000 and appointing new board

members who would not investigate or challenge the prior actions of the board, staff or their agents and consultants..

6.    I alleged that the State Attorney General's Office interceded unsuccessfully in the Middlesex Superior Court sentencing of a major New England drug dealer with connections to New England's organized crime syndicate to have his sentence reduced to six months: three months served and three months work release. He was the ex-husband of a past and current GLMHRA board member, Nancy Rizzo.

7.    According to local news reports, over forty pounds of Cocaine, slated for distribution in Maine, Southern New Hampshire, and Lawrence, Massachusetts was found in a Lynn, Massachusetts' rooming house owned by this board member. Additionally, over $267,000 in drug profits were found by Federal Drug Enforcement Agents in the ceiling and walls of their newly built home on Puritan Road in Swampscott. I also alleged that this same board member made a large cash purchase (over $200,000) for a three family investment property on Arlington St. in Lynn, Massachusetts following her ex-husband's arrest.

8.    I further alleged that for this reason this board member voted for my termination. Also, as the chairperson of the GLM HRA legal sub-committee, she supported the payment of over $225,000 in legal fees to Attorney Roderick MacKleish and to Attorney, Robert Sherman a former Assistant District Attorney in the Attorney General's Office and the principal fundraiser, campaign advisor and leader of the Attorney General's successful campaign for Attorney General.

9.    My complaint also alleges that three past GLMHRA Board Presidents of GLMHRA received financial rewards and other considerations in return for their vote for my termination as Executive Director and their vote to pay over $900,000 in legal and consultant fees to the defendant attorneys and their associates and for their vote to support the take over of EMHC and its assets.

10.    My complaint alleges that the above individuals were a Racketeering

5

Influenced Corrupt Organization (RICO) in violation of federal law and that my opposition was the motivating reason for my termination as Executive Director of GLMHRA and for the Breach of Contract, Defamation and for their continuing retaliation and discrimination. My disability and allegations of ERISA and other violations were fabricated to win support from reluctant board members, staff and state agencies to support my termination.

11.    Another compelling reason for this court to act is that the statute of limitations is due to expire and these individuals could escape responsibility for their actions. This would serve as encouragement for them and others to repeat these actions and as a deterrent for citizens to come forward in the future to disclose similar unethical and illegal activities. Additionally, the public and the disabled citizens could forever loose the opportunity to recover these misappropriated funds. The existing board of GLMHRA includes former and current state assistant commissioners and individuals who conduct business with state and local governments. Their self-interest is not to pursue the recovery of these funds and they have done nothing to do so.

In fact, the current Board of Bridgewell (GLMHRA) recently reappointed Nancy Rizzo, ex-wife of the convicted drug dealer to the board.

### Additional Documentation of Fraud and RICO

12.    The motivation for fraud and therefore to negotiate a final severance agreement with the plaintiff was for the defendants and GLMHRA to gain access to the assets of EMHC to offset substantial losses incurred by the defendants while in control of GLMHRA during 1999-2001 and to prevent the Attorney General's Office, the State Auditor's Office and the Department of Mental Health (DMH) and the Department of Mental Retardation (DMR) from knowing the true extent of their mismanagement and personal access to GLMHRA assets and state contract funds. The cover up has continued to this day and was directly

6

relevant to the Board's refusal to consider the plaintiff for the CFO position in April 2001 and for the Executive Director's position in 2004 and for the recent vacancy in the CFO position in 2005 applied for by the plaintiff.

13.    Attachment I is pages 1-3 of the Massachusetts Office of the Attorney General, Division of Public Charities, Form PC 15 for Defendant Greater Lynn Mental Health & Retardation Association, Inc. for fiscal year July 1, 1999 to June 30, 2000. Attorney General Account Number: 003871, Federal ID Number: 04-2296940.

14.    GLMHRA's Form PC 15 page 2, for Fiscal year ending June 30, 2000, Attachment I shows a deficit reported to the Attorney General's Office of $262,615. It shows that GLMHRA received $168,528 in contributions and $27,843,405 in program revenue totaling $28,011,933 and had expenditures of $24,563,694 for services and $3,710,854 for Administrative Costs for total expenditures of $28,274,548.

It also shows on Form PC 15, page 2, that of this $3,710,854 in Administrative Fees, $128,159 were paid to the law firm of Greenberg and Traurig (this was for legal work of defendants MacKleish and Sherman, $120,143 for auditing and accounting for the firm of McGladrey and Pullen, LLP where James Mecone and John Sanella are principal partners; $75, 082 for the law firm of Smith and Duggan, the law firm of their current attorney, Garrick Cole.

15.    Since the PC 15 only requires that the five top paid consultants be listed, other consultants and legal fees were not listed on the report. For example, fees paid to the former law firm of defendants MacKleish and Sherman and any private fees that may have been paid to these defendants; fess paid to the law firm of defendant Robert Griffin of the law firm, Krokidas and Bluestein; fees paid to the law firm of Attorney Laurence Donoghue, of the law firm Morgan and Joy; fees paid to the law firm of Stephen Rosenfeld totaling over $33,000, fees paid to

EMHC board member, Vice-President and Assistant Clerk, Samuel Vitali as a result of a bond legal work requested by GLMHRA. It also did not include legal fees of approximately $3,300 paid to the Attorney Leslie Slavin who issued a statement to the Board that the Self Insured Fringe Incentive Plan was not a violation of ERISA.

16.    The Unified Financial Report UFR), is required annually by the Division of the Purchase of Services. The FY 2000 UFR, Attachment II that was completed by the GLMHRA Fiscal Department and their auditors, McGladrey and Pullen, on Line 237 – Other professional Fees reports that $402,000 was expended for legal fees from July 1, 1999 to June 30, 2000.

The PC 15 also does not include fees paid to management consulting firms hired by the Defendants since they were not one of the top five paid consultants. It is estimated that approximately $30,000 was expended for consulting fees.

17.    The plaintiff estimates that GLMHRA expended over $550,000 in legal, accounting and consulting fees from July 1, 1999 to June 30, 2000 while he was either placed on a leave of absence after November 1, 1999 or secretly authorized without the plaintiff's knowledge or approval by Janine Brown Smith, the Director of Contracts and Quality Assurance ( Ms. Brown-Smith functioned as the comptroller and was responsible to review and sign off on all legal bills before they were submitted to the Executive Director for signature and approval. She was also secretly having an affair with defendant MacKleish.) Legal and consultant charges were expended with the knowledge and approval of Treasurer, Robert Tucker, President Elect, Thomas Manning and President, Claire Jackson and without the knowledge and approval of the plaintiff as required in the personnel practices of GLMHRA and without the knowledge or approval of the board of EMHC and some board members of GLMHRA as well such as Joanne George, Charles Comeau, Norman Thibodeau, Martena Fallon and Paul Tremblay all of whom were opposed to the plaintiff's dismissal.

8

18.    The unbudgeted overspending on consultant, legal and consulting fees continued after July 1, 2000 with additional fees paid to Defendant Robert Griffin, Attorney Garrick Cole, Atty. Laurence Donoghue, Attorney Samuel Vitali, Auditors Mecone and Sanella and consultants still unknown to the plaintiff. The fees paid out in FY 2000 and FY 2001 exceeded the guidelines of the Division of Purchase of Services of the Commonwealth of Massachusetts.

19.    During the prior ten years, accounting and legal fees averaged approximately $70,000 per year and were within the Massachusetts Division of Purchase of Service guidelines. During the year FY 2000, expenditures exceeded prior year 1999 expenditures by $480,000 dollars and were not within state regulations. Mecone and Sanella's accounting and auditing charges usually ran approximately $50,000 each year versus the $120,000 billed in FY 2000.

20.    During the previous ten years, legal fees not related to Contract appeals, that is corporate and personnel legal fees averaged les than $20,000 per year and the Association expended no funds on Management consultants.

21.    The FY 2001 Attorney General's PC 15 for GLMHRA, page 2, Attachment III, shows typical consultant expenditures for GLMHRA that supported the consumers. The top five paid consultants were for nursing, occupational therapy, psychological services, cleaning and maintenance services versus the legal and auditing and accounting charges reported in the FY 2000 PC 15, page 2.

22.    The PC 15 for FY 2000 shows that GLMHRA ran a deficit of $262,615. The actual deficit however, was $966,603. The EMHC Audit for FY 2000 compiled by Demakis and Demakis, Attachment IV, Note 9, page 13 shows a prior year adjustment that they received from James Mecone and John Sanella totaling $703, 988 for services provided by EMHC for GLMHRA employees and

9

consumers. Attachment V, Mecone's and Sanella's audit report and combined financials for FY 2000, Note 12, page 15, also supports the transfer of funds and was the basis for Demakis and Demakis reporting this change in assets.

23.    Page 2 of the Demakis' Audit, Attachment IV, shows total assets for EMHC ending June 30, 2000 of $24,998,023. The assets are actually valued higher since this does not include the market value of the assets but rather their book value. The Cash Flow Analysis of the same audit report, page 5, shows a reduction of assets for EMHC during FY 2000 of $533,258 despite proceeds from the sale of real estate of $823,155 (See Attachment V , page 5, line 22, Combined Statement of Cash Flows") from actions of the plaintiff when he was the Executive Director of EMHC from July 1, 1999 to June 30, 2000. Additionally, page 4 of the audit shows a budget surplus from operations of $170,730 during the plaintiff's direction. Page 4 also shows a drop in net assets from $617,949 at June 30, 1999 to $84,691 on July 1, 2000 despite the profit of $170,730 and the proceeds fro the sale of real estate by the plaintiff and the EMHC Board totaling $823,155.

24.    GLMHRA and the other defendants and their accomplices as described in the plaintiff's RICO complaint to this Court conspired and did engage in RICO and drained EMHC and GLMHRA of their charitable assets including available cash assets and created additional liability for the companies for their personal use and then did conspire and engage in a cover up.

Once GLMHRA obtained control of EMHC and its assets, they transferred the $703,988 from EMHC without EMHC and the plaintiff's approval to GLMHRA. This transfer was recommended by James Mecone and John Sanella, and was included in their FY 2000 audit of GLMHRA and in the combined financials of GLMHRA prepared by their auditing firm of McGladrey & Pullen, LLP, Attachment V, Note 12, page 15.

25.    This massive deficit was concealed by the defendants from the

Attorney General's Office, the state auditor's office, the Division of Purchase of Services and from DMH, and DMR, EMHC Board Members, the plaintiff and from most GLMHRA Board Members. The facts are being concealed to this day.

It was also concealed from the plaintiff during the negotiations of the severance agreement and from the EMHC board and all but three or four board members of GLMHRA. Sections 4 and 7 of the severance agreement were a direct result of this fraudulent activity and were part of the cover up plan and the plaintiff's obligation under these sections should be rescinded by the Court.

26.    This was the first deficit in the 42-year history of GLMHRA since it was founded in 1959. The GLMHRA operated with substantial surpluses under the plaintiff's direction and the company expanded from a $12,000 annual budget and revenue to over $27 Million dollars under his leadership as the elected Executive Director from April 8, 1974 to November 1, 1999.

EMHC was founded by the plaintiff and grew from zero assets in 1978 to over $25 Million dollars in assets in November 2000 when he resigned his position. EMHC ended each year from 1978 with a surplus.

For example, the combined Financials for EMHC and GLMHRA completed by McGladrey & Pullen,  for FY 1998 and 1999 were previously submitted to this Court and show substantial profits during these years.

27.    The Administrative fees of $3,710,854 represent 14.5% of the operating budget. Prior year Administrative costs under the Plaintiff's direction ran 10.5-11.5% or approximately $560,000 to $840,000 less than what was expended by the defendants.

One can only imagine the quality and quantity of services and the number of unserved individuals with disabilities that could have been served with this $560,000-$840,000 of overspending. The four consent decree clients who died during 2002-2004, including my brother could very well be alive today had these

11

funds not been diverted from expenditures for consultant nurses, dieticians, psychological consultants, trainers and staffing instead of consultant lawyers, accountants and Management consultants.

28.    In addition to the excessive consultant fees, GLMHRA paid excessive salaries to other employees ( See Attachment VI taken from Mecone and Sanella's schedule submitted as part of the 2000 UFR) including the Executive Director, Paul Cote ($200,000 per year) making him the highest paid Executive Director in Massachusetts some $80,000 over the amount authorized by the Division of Purchase of Services for Human Services' Executive Directors. He admitted to the plaintiff in the fall of 2000 that he was a personal friend and business associate of Defendant Robert Griffin.

29.    The Defendants also created a new job for City Council President, James Cowdell raising his salary as a fundraiser from $45,000 per year to over $77,500 per year. Robert Griffin's October 8, 2000 report to the Board and the Attorney General's Office previously submitted to this Court confirms the creation of this position and the promotion of James Cowdell.

30.    Griffin stated that Mr. Cowdell was well qualified for the position. He made no mention that Cowdell had no college degree, no direct care or supervisory experience with the mentally ill or the mentally retarded. Although his new position required him to supervise the Human Resource's Department and the Fund Development Departments, James Cowdell had no experience in Human Resources and no training in this area and he had never written a government or private foundation grant for funding. Griffin also did not mention that two qualified internal applicants including the then current Fund Developer, Deborah Phelps who had a Masters degree in counseling and over fifteen years of Human Services supervisory experience was denied the position. The then current Human Resource's Director, Ann Perry, who had over ten years of

12

supervisory experience also applied for the position and also was not hired.

31.    James Cowdell, as President of the Lynn City Council, had control over the appointment of board members to the Lynn Water and Sewer Commission where GLMHRA President, Robert Tucker, was the Deputy Commissioner. He was voted a $10,000 raise and a promotion following his vote to approve a new job and salary increase for James Cowdell. A Lynn item press release announcing the $10,000 salary increase for Tucker was previously submitted to the Court in the plaintiff's March 8, 2004 complaint and with the plaintiff's RICO complaint.

32.    Attachment III, page 3 from the Attorney General's Report PC 15 for FY 2001 shows the top salaries paid out in FY 2001. It should be noted that neither Paul Cote nor James Cowdell received these new salaries until after August 1, 2000, meaning that their annual compensation was above $200,000 and $77,500 respectively.

33.  GLMHRA upon Griffin's direction and recommendation created a new position of Clinical Nurse Specialist at $80,152 while at the same time eliminated direct care nursing in former consent decree Intermediate Care Facilities MR (ICF-MR) like the one plaintiff's brother had resided. The defendants created a new position of CFO for Keith Bransfield at $85,000 per year although he had never prepared or submitted a DMH or DMR budget or contract and had never been the CFO of a corporation larger than one to two million dollars.

34.  Bransfield's father was the chief psychologist for the Lynn School Department and a political operative and a personal friend of former and present Lynn state and locally elected officials. These were his principal qualifications for this newly created position. They eventually transferred the Assistant Fiscal Manager, Kathy Mayo from the fiscal Department to do his work when it was apparent he couldn't perform the duties. She subsequently resigned and Bransfield subsequently resigned. The plaintiff applied for this position in 2005

and was not granted an interview. Attachment VI from the FY 2000 UFR shows non-reimbursable salaries of $270,110 due to defendants' mismanagement.

### Additional Examples Of Fraud And Violation Of RICO By The Defendants In The Negotiation Of The Severance Agreement

### Withholding Of FY 2000 Audit Report And Its Recommendations

35.    Attachment  V, is the "Independent Auditors Report" prepared by Mecone and Sanella's auditing firm of McGladrey & Pullen, LLP. It was dated November 14, 2000, and had to have been completed well before this date. The Demakis Audit, Attachment IV, reports the $703,988 transfer of EMHC assets to GLMHRA and was dated September 25, 2000. It relied on financials and recommendations from the McGladrey Audit. The Griffin Report that sited approximately $280,000 in deficits for the year ending FY 2000 and was issued on October 8, 2000 made no mention of the $703,988 transfer.

36.    Neither audit report was submitted to the Board of EMHC nor to the plaintiff who was still the elected Executive Director of EMHC until November 8, 2000. The reports during past years were mailed to the Fiscal Department of GLMHRA. Only the Executive Director, Paul Cote, and the Board of GLMHRA led by President Robert Tucker could have withheld their distribution to the EMHC Board and the plaintiff.

36.    The audit report appears to have been withheld from Attorney Robert Griffin. He did not include its financials or conclusions in his October 8, 2000 report to the Attorney General's Office and to the Board of GLMHRA. In the alternative, Robert Griffin, could have deliberately withheld the proposed transfer of $703,988 therefore, concealing the true extent of GLMHRA's deficit that was over $One Million Dollars from the EMHC Board, the Attorney General and from GLMHRA's funding agencies, DMH and DMR.

37.    Following the receipt of financial information from Mecone and

14

Sanella, defendant GLMHRA contacted the plaintiff to reopen negotiations of the Severance Agreement and added the provision that he resign from EMHC in return for certain compensation most of which he would have received anyway since it had been either payroll deducted such as retirement funds and education funds or were owed the plaintiff by law such as vacation accruals and salary.

## False Reporting to The State In the 2000 UFR

38.    Defendant GLMHRA with the assistance of their Auditing firm filed a false UFR with the state and approved a false audit report for FY 2000 and 2001 to cover up over $9000, 000 in deficits from DMH, DMR and the State Attorney General's Office, the Board of EMHC, and the plaintiff.

39.    Mecone and Sanella finished the Audit at least by November 14, 2000 and the President, Robert Tucker, signed a statement under the pains and penalties of perjury that the Audit was correct and was approved by the Board on December 12, 2000. He had to have known that it falsely reported the deficits at GLMHRA to conceal this fact from the State Agencies, DMH and DMR and the Attorney General's Office. See Attachment VII.

40.    GLMHRA and Mecone and Sanella did not include the Bond proceeds from the 2000 Bond in their audit report voted by the GLMHRA Board, but submitted supporting schedules with the 2000 UFR, Attachment VIII, after December 12, 2000 and reported that the statements were unaudited although the audit was complete. In the UFR, they stated that the 2000 bond was finalized on May 1, 2000 and showed $1.332 Million Dollars in additional cash flow for GLMHRA, see page 7 of Attachment VIII. This was not stated in the 2000 audit.

41.    Then in the FY 2001 audit they reported that the Bond had closed on May 1, 2000 and showed proceeds of $1,945,000. See FY 2001 audit, Attachment IX.

15

42. The bond did not close until July 2000 and was initially opposed by the
EMHC board. Only after intense lobbying from Robert Tucker, James Cowdell and
Sam Vitali in July 2000 did the Board of EMHC approve the Bond. They never
would have approved the Bond had they known that GLMHRA had expended
over $550,000 in legal and consultant fees and were going to use the proceeds
for this purpose versus for charitable purposes.

## Filing A False UFR To Use State Contract Funds For Disallowed Legal, Consultant, and Administrative Salaries.

43.      The Unified Financial Report (UFR) is filed annually by all non-profits
doing business with the Commonwealth of Massachusetts. Prior to 2000, at
GLMHRA, the UFR was completed by the auditing firm, McGladrey and Pullen
with assistance from the Fiscal Manager, Terri Kasper, and her Assistant, Kathy
McGonicle as well as the Director of Contracts, Janine Brown Smith. The plaintiff
does not know what staff from GLMHRA worked with the auditing firm on the UFR
for FY 2000.

44.      It appears that there was an attempt to categorize $1.666 Million Dollars
in contract related income received from various state contracted programs as
"outside third party income." This would allow GLMHRA to use contract generate
funds to pay for disallowed legal fees, Paul Cote's excessive salary, and other
disallowed expenses. See Attachment XV, two letters from McGladrey & Pullen to
Joseph Cronin of the Bureau of Audit dated May 5, 2003 and dated May 14, 2003.

45.      This was a sophisticated decision to categorize these revenues in this
fashion. The auditing firm and the GLMHRA Fiscal Department have completed
the UFR's for many years and only in the FY 2000 UFR were these revenues so
categorized.

46.      This was another fraudulent attempt to cover up the deficit and the true
legal and other disallowed expenditures and additionally to have them paid

16

through the state contracts. This would have freed up EMHC assets for additional improper and disallowed expenditures.

### Defendants' Misrepresentation of EMHC Articles Of Organization & By Laws

47.    Defendants fabricated the myth that EMHC was a subsidiary of GLMHRA and informed the state agencies and the Attorney General's Office as well in order to fraudulently take control of EMHC and its assets, force the plaintiff out of my position as Executive Director with empty promises and eventually force the board to resign.

48.    The plaintiff has submitted an affidavit certifying that he received a true copy of the original Articles of Organization of EMHC on file at the Massachusetts' Attorney General's Office, Attachment IX is a copy of those original Articles received from the Attorney General's Office. These articles were on file at GLMHRA when the plaintiff was in charge of GLMHRA and EMHC and was available to Defendant Robert Griffin.

49.    Griffin, in his October 8, 2000 Report to the Attorney General's Office, chastised GLMHRA's Board for not appointing members to the EMHC Board and asserted that EMHC was a totally controlled subsidiary of GLMHRA. He recommended the take over of EMHC by the GLMHRA Board despite the fact that the Articles of Organization from 1978 that had only one minor change in over 22 years and that change was a directive of the IRS that if dissolved, that the assets of EMHC had to be distributed to another 501© 3 Corporation and not restricted to GLMHRA only.

50.    Page 2, section 4.6 specifically gives the corporation, EMHC, the right to appoint directors and officers to the board. Sections 4.4, 4.7 and 4.8 give it full powers to own, pledge, mortgage, sell, lease, and purchase real estate. Section 4.15 give it full powers to amend its by-laws.

17

51.    The Articles do not state that the EMHC needs permission
from GLMHRA for any corporate activities or functions or that GLMHRA has the
authority to appoint its members as reported by Griffin in his October 2000 Report.

52.    Griffin prepared and submitted a false report. He, Paul Cote, and
GLMHRA knew it was false, yet acted on its recommendations, and submitted it
the State Agencies, DMH and DMR and the Attorney General's Office as if it were
fact.

53.    This Report was central to their conspiracy and RICO and is further
proof of fraud in the negotiation and signing of the Severance Agreement.

## Sale & Purchase Of EMHC Assets Not At Market

54.    Additional actions of the current and past Boards of GLMHRA further
supports the plaintiff's allegations that they have mismanaged EMHC charitable
assets and needed to take control of EMHC to cover up the mismanagement and
improper use and receipt of charitable assets.

55.    GLMHRA has sold three of its most valuable assets at well below
market value and there are questions as to whether these were arms length
transactions and whether any one connected personally or politically  with
present or past Association staff and board members benefited from the sale or
purchase of these assets.

56.    The Marquis Resort properties in Tilton ANN. were sold for $400,000 or
more below market value. GLMHRA's, former EMHC properties at 38-44 Central
Sq. in Lynn were sold for $681,000, Attachment X, when a vacant lot across the
street with half the land area and no improvements or building on the site sold for
$One Million Dollars. There office building on 37 Friend St. in Lynn that cost $3.2
Million Dollars to build in 1990 and had a $500,000 fourth floor addition added in
2000 was sold in November 2005 for $2.3 Million Dollars well below its market

value. See Attachment XI.

An adjacent buildable lot on Friend St. with over 17,000 sq. ft. purchased for approximately $200,000 in 1990 was included in the sale free. See Attachment XI.

57.    Some of the above proceeds were used to purchase an office building in Lynnfield for $2.894 Million Dollars from Mark H. Donovan. See attachment XII. A property in Lynn was purchased from a Lynn company, Tower Hill Associates, LLC, principal officer, Patrick McGrath for $500,000. See Attachment XIII. His company purchased it from Lynn's Economic Development Commission for a fraction of the cost one year earlier.

The plaintiff is concerned that these purchases were not arms length transactions and were purchased at above market prices.

### Federal Receivership

58.    The overspending and improper uses of charitable assets and the subsequent and ongoing cover-up warrant a Federal Court Receivership of GLMHRA (Bridgewell).

59.    The plaintiff is gathering additional information regarding the sale and purchase of assets and will be filing a motion with the Court to have GLMHRA put into Federal Court Receivership to protect GLMHRA's assets and EMHC's former assets. The motion will also request the Receiver to protect the Federal Consent Decree Clients still serviced by GLMHRA. Since 2001, at least three Consent Decree mentally retarded individuals protected by Federal Judge Tauro's landmark decision have died due to GLMHRA negligence, including plaintiff's brother.

60.    Plaintiff's motion will request that the Receiver pursue all avenues to recover unauthorized and improper fees paid to the defendants and their associates and to recover funds from non-market based real estate transactions.

61.    Neither DMR, DMH, the Attorney General's Office nor the GLMHRA Board and Executive staff have acted to protect these assets, to recover assets already lost or to protect the Consent Decree individuals from further risk, injury or death. The only recourse is a Federal Court Receivership.

## Conclusion

62.    The motivation for fraud and therefore to negotiate a final severance agreement with the plaintiff was for the defendants and GLMHRA to gain access to the assets of EMHC to offset substantial losses incurred by the defendants while in control of GLMHRA during 1999-2001. They wanted to prevent the Attorney General and the State Auditor's Office and the Department of Mental Health (DMH) and the Department of Mental Retardation (DMR) from knowing the true extent of their mismanagement and personal access to GLMHRA assets and state contract funds.

63.    The cover up has continued to this day and was directly relevant to the Board's refusal to consider the plaintiff for the CFO position in April 2001 and for the Executive Director's position in 2004 and for the recent vacancy in the CFO position in 2005 applied for by the plaintiff.

64.    Any of the plaintiff's correspondence that could be considered disparaging needs to be put in context with the actions of the defendants. Plaintiff's actions were either part of the plaintiff's application for employment or to defend him against continuing disparaging actions and remarks by GLMHRA and the defendants who were engaged in Fraud, RICO and cover-up.

65.    Had GLMHRA and EMHC complied with the Severance Agreement and ceased from defaming the defendant and had drafted the letter as agreed upon in the Severance Agreement, the plaintiff would have had no cause to defend him against false accusations and defamation.

20

For the above reasons the plaintiff requests that this Court Reconsider its Order of October 25, 2005 and rescind plaintiff's responsibility to perform under Sections 4 and 7 of the Severance Agreement. The plaintiff also requests that his Amended Motion for Summary Judgment is granted.

Respectfully submitted,

Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907
(781) 962-2662

Dated:  December 27, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon all counsel of record by First Class Mail on December 29, 2005.

21