# ALBERT W BLEAU JR

Ms. Jennifer Hollingsworth
Financial Investigator
Criminal Investigator
Office of the Attorney General
One Ashburton Place
Boston, Mass. 02107

May 10, 2001

Dear Ms. Hollingsworth,

I have met on three occasions with you and Officer Ahern. The first meeting was very brief in the parking lot of the Dockside Restaurant in Nahant, the second lasted for about three hours at your office on Thursday, May 3rd and the third meeting was very brief when Michael threw me out of your offices on Tuesday, May 8th.

I participated in all three meetings without the benefit of counsel. I did so because I have done nothing wrong and have violated no laws. After the third meeting, I am convinced that you have no intention to fully investigate the happenings at GLMHRA and the "rip off" of over $500,000 by various Attorney's, board members and employees and consultants of GLMHRA many of whom had ties to the AG's Office.

Your sole intent is to find some way to indict me to justify the actions of these individuals and especially to protect the actions of Attys. Eric McLeish and Robert Sherman who personally billed GLMHRA and EMHC over $200,000 in unnecessary legal and consultant costs. Atty. Sherman is a close, personal friend of the AG and a former Assistant Attorney General. He convinced the AG, Jamie Katz and Eric Carricker of the AG's office to help take over GLMHRA and EMHC, primarily to cover up McLeish's and his fraudulent activities and billing.

I am retaining counsel and will only meet with you in the future in the presence of counsel. Until this occurs, please submit all your questions to me in writing and I will respond in writing.

I requested at both meetings to have the sessions tape-recorded and you and Mr. Ahern refused. On May 8th you stated that you didn't trust my tape recorder. I then requested that you furnish two tape recorders, one for my use and one for your use. You again refused to tape the meeting. When I started taking detailed notes of your questions and mine and the responses, Michael Ahern removed me from the building.

I have enclosed various documents that I wanted to give you on the 8th and that you refused to accept. They demonstrate that: Officials at GLMHRA with their Attorney's

and Eric Carricker of the AG's Office fraudulently took over GLMHRA for their own financial and personal benefit. They misrepresented the Self-insured plans and the EFIP to justify my termination, their legal and consultant costs, an amendment to the bond that was disadvantageous to GLMHRA and EMHC and the consumers they serve, the take over of EMHC, and to bilk EMHC of over $600,000 to cover-up their exorbitant legal and consultant costs.

These individuals should be required to reimburse both corporations all legal and consultant costs as well as over $100,000 in excessive salary increases to selected and politically connected individuals: James Cowdell, Elaine White, Keith Bransfied, and Kelly Johnson. Their salary increases place them as the highest paid individuals in the non-profit industry for these positions and they are the least qualified. This is a violation of IRS charitable rules and these salaries should be reimbursed to the organizations.

Paul Cote, the Executive Director is the highest paid non-profit CEO in the state earning over $200,000. This is also a violation of the IRS guidelines for salaries. He is less qualified than me and has more management and consultant staff to assist him.

At the last meeting, you asked me how the EFIP plan was funded. I asked you to define the EFIP. You refused to do so and said you knew what it was. If you knew what it was you wouldn't have asked the question that you did. The EFIP is not funded by anyone. The self insured plans are funded by GLMHRA and EMHC and include Vehicle self insurance for fire theft and collision and property damage, Workmen's comp, medical, dental, disability, unemployment compensation, and building contents insurance.

Surpluses from these self insured plans are then used to pay for the administration of the plans and any audits required, additional benefits for employees and additional services for consumers, any additional premium costs not budgeted in the state budget, an employee retirement plan and for reserves.

Reserves are set aside to protect the GLMHRA against losses not funded in the medical loss fund, a large or multiple fires destroying building contents, unemployment comp claims, and any negligence claims arising out of the Workmen, comp self insurance program. When I left on leave there was approximately $800,000 in reserves. They were distributed in three areas: Mortgages with EMHC, investments, working checking accounts.

The self-insured plans were set up to lower costs for insurance. For example, our medical premiums went up on average only three percent over 12 years while we also increased benefit coverage while other plans escalated with fewer benefits by 8 to 12 %. It also allowed any surpluses to remain with GLMHRA and not in profits with the insurance companies. This gave GLMHRA funds to provide additional benefits to employees and consumers and consequently we had the lowest turnover rate in the State, less than 10% while others experienced over 20 to 30 %. We were the only company not required to use relief agencies to staff our programs resulting in more consistent, better service to our consumers and at a lower cost to the state.

Since benefits have been reduced to the employees, the turnover rate has escalated and GLMHRA is now forced to hire relief agency personnel at $15 - $25 per hour and up. Also, their medical premiums have increased by 20% per year during the past two years versus the 3% under the management of John Papi and me and the EFIP Committee. This has cost GLMHRA and the Commonwealth over $200,000 in additional premium costs taking very needed funds away from consumer services and other employee benefits.

The reserves also made good business sense since it protected GLMHRA against sudden changes in the business climate causing sudden increases in workmen's comp rates or medical premiums. No other non-profit had this competitive advantage. It is estimated that over 21 million dollars could be saved if all Non Profits in the Commonwealth adopted self-insurance programs similar to the one GLMHRA had established.

Additional benefits given to employees and consumers included: Hepatitis shots, tuition reimbursement, crisis services to their families, discounted sporting tickets to Bruins and Celtics and Fleet center events, discounted vacations, retirement benefits, mammogram screening, turkey's at Thanksgiving, and a company outing to name a few.

Various Questions have been asked regarding the Self-Insured Plans and the EFIP.

QUESTIONS:

1) Were the expenditures for self insurance reflected on the 990's and the UFR's?

Yes all expenditures and all surpluses that were generated were expended for eligible fringe benefits and were reflected in the payroll fringe and tax line items and other line items.

2) Were there expenditures that were disallowed by the UFR?

Yes. Any administrative fees paid to GLMHRA would be disallowed. However, under the State revenue retention program, GLMHRA was allowed to retain over $4 million dollars in program surpluses. Also, when the UFR was instituted in 1992-1994, non-profits were allowed to report any funds that they had generated from non-state revenues in prior years going back to 1988. The state actually owed GLMHRA over 1.3 million dollars. This means that GLMHRA could have up to 1.3 million dollars in disallowed costs and not have to find alternate sources of revenue to cover these costs.

3) Where else could a company find funds for disallowed costs?

Disallowed costs are not illegal. They are costs not paid by the contracts. Fundraising dollars, third party revenue, transportation contracts, market rentals, non 07-contract revenue, donations could be used, as well as investment income.

4) Were the reserves reported on the UFR's and the 990's?

GLMHRA is required to contribute a minimum of about $35,000 per year. Effective this June, three payments will have been due. All present and past employees and I are owed money.

This is a significant ERISA violation. All employees who worked for GLMHRA during the past three years are eligible for these funds.

No other funds are owed the employees. The EFIP was not an employee trust fund. DOL rulings support that the first dollar paid for benefits is the employee's dollar. All surpluses in the reserves of the EFIP belong to GLMHRA and are plan assets. Only the minimum contribution just mentioned belongs to the employees.

Enclosures include a detailed explanation of the self-insured plans with attachments and a copy of the FaniMae Program. (This program is a result of a Fair Housing complaint that I filed against FaniMae in 1990. It resulted in FaniMae setting aside over $200 million dollars in secondary mortgage financing for non-profits and families of handicapped, retarded and mentally ill citizens nationwide. I gave this handout to Carricker, Griffin and both boards of GLMHRA and EMHC. I demonstrated that it was a less expensive and cheaper program than the bond with lower closing costs as well, and the property equity wouldn't be tied up for twenty years. The EMHC voted no on the Bond. However, after threatening phone calls from Cowdell, Tucker and threats from Carricker and Griffin, they changed their vote and the bond was approved. It is interesting to note that Atty. Vitali, (Water and Sewer Commission Attorney) supported the bond despite opposition from all five other EMHC board members. They wanted the bond because the bond had a vehicle that allowed them to put in restrictive language giving them complete control over the two corporations, to remove me permanently, and cover up the over expenditures and pay the $125,000 still owed to McLeish and Sherman.)

If you have any additional questions, please contact me.

Sincerely

Albert w. Bleau Jr.