Albert W. Bleau Jr.
505 Paradise Rd. #208
Swampscott, MA 01907

ATTORNEY GENERAL'S
OFFICE

06 APR 12 PM 1: 29

April 8, 2006

PUBLIC CHARITIES
DIVISION

Eric Carricker
Assistant Attorney General
Deputy Chief, Public Charities Division
One Ashburton Place
Boston, MA 02108-1598

Dear Mr. Carricker,

I am responding to your recent correspondence of April 5, 2006.

First, I did expect that the Attorney General, a constitutional officer and elected official would accept voluntary service of a federal subpoena.

I am not aware of any federal rule that would allow the Attorney General to refuse to respond to a federal subpoena without first receiving an order from the court. The Attorney General and his staff including you and Jamie Katz have vital information relevant for discovery.

If an Attorney General or his staff used the power of their office to direct and force a charitable agency to give hundreds of thousands of dollars of no bid contracts to lawyers, consultants and audit firms who had employees or if they were personal friends of the Attorney General and his staff, had actively worked for his election and contributed substantial funds to his campaign, their communications with the Attorney General and his staff would certainly be relevant for discovery.

If these same individuals discriminated against and disseminated defaming and false information concerning a current and former Executive Director to cover up their financial mismanagement and unethical conduct and if they had knowledge and covered-up an illicit relationship between Roderick MacKleish and the Chief Financial Officer of the company, Janine Brown Smith, that resulted in $225,000 in legal fees for MacKleish and Attorney Robert Sherman, that is also relevant for discovery.

Robert Sherman is a personal friend, campaign organizer and contributor and former employee of the Attorney General's Office. He and his law partner, Roderick MacKleish received over $225,000 in legal fees from GLMHRA with your knowledge and approval. An additional $120,000 was paid to auditors James Mecone and John Sanella whose family was a major supporter and contributor to Reilly's campaign. Robert Griffin received over $20,000 in legal fees and was appointed by your office to oversee GLMHRA. Additional legal fees and consultants were also hired.

The total cost reached over $One Million dollars and not one penny of it was in the DMR and DMH and Board approved budget for that fiscal year. The Attorney General's Office and you forced GLMHRA and EMHC to approve a new Tax Exempt Bond that had fees and interest rates

*Attachment 1*

higher than conventional bank financing and also forced EMHC to sell off over a million dollars in charitable real estate assets to pay the fees for the above mentioned individuals.

There are other issues relevant for discovery including the Griffin report of October 8, 2000, the prosecution and sentencing of a major drug dealer, Anthony Rizzo; the Inspector General's investigation of the Lynn Water and Sewer Department; and the relationship between the Attorney General's Office, the State Auditor's Office and the Inspector General's Office.

### Relationship Between The Attorney General, State Auditor and the Inspector General's Offices

The Attorney General, his staff and your office received a complaint orchestrated by Robert Sherman and Roderick MacKleish filed by, a GLMHRA senior manager who had a personal relationship with MacKleish and you made no attempt to independently verify the accusations or explore the obvious conflicts of interest and unethical conduct of these individuals.

The logical step would have been to file a request for an audit from the State Auditors Office versus forcing a non profit to expend over $One Million dollars of its charitable assets for private audit, consultant and legal fees.

I allege that your office did not involve the State Auditor's Office for political reasons and because you feared that the State Auditor would have uncovered the unethical and possible illegal and racketeering activity of individuals who were close friends and political associates of the Attorney General. The State auditor would certainly have cited the unbudgeted and unnecessary expenditures of charitable assets for legal fees and consultants who had close ties to your Agency and the Attorney General that at that stage in January 2000 had reached approximately $250,000.

During 1999-2000 the Attorney General was supporting legislation by then Governor Cellucci to transfer the Inspector General's Office under the supervision of the Attorney General which in effect would end its existence as an independent investigatory agency. DeNucci opposed this legislation and in addition was lobbying to be appointed the new Inspector General. Reilly opposed his appointment. The law establishing the IG Office required agreement from the Governor, the Attorney General and the State Auditor. The conflict was averted when the State Auditor's salary was increased to be commensurate with its responsibilities. Prior to this, the Inspector General was paid more than the State Auditor.

Certainly, DeNucci's Office would not have tolerated the over spending of charitable assets for personal gain or would they have participated in a cover up of the unethical conduct of Robert Sherman and Roderick MacKleish. This was the primary motivation why you did not request a State audit and continued to use private legal counsel and auditors with ties to your office to conduct the audit and required GLMHRA to pay for these expenses. It is also why you supported the bond and the sale of charitable assets so GLMHRA would have sufficient funds in the short term to pay for these expenses.

### Griffin Report

Robert Griffin was chosen by you and the Attorney General ostensibly to analyze the finances of GLMHRA and Eastern Mass Housing Corporation (EMHC) and to make recommendations concerning the two corporations. The October 8, 2000 Griffin report was marked confidential and became the blueprint for the unauthorized and possible illegal take over

of EMHC and its charitable assets for personal use. This action was supported by you and the Attorney General's Office.

The State Auditor's Office was certainly more qualified to conduct this review and would have done so at no cost to GLMHRA or EMHC versus the $120,000 that was paid to Mecone and Sanella and the more than $20,000 paid to Griffin plus related consultant and corporate legal fees totaling over $50,000. Why weren't they utilized or consulted?

Why wasn't your office suspect of a report that alleged that EMHC was operating for 22 years in violation of their by-laws without the knowledge of GLMHRA's Board of Directors? Was it possible that the by-laws given to Griffin by GLMHRA had not been in use for over twenty one years and had been amended in 1978 and that the Articles of Organization given to Griffin were also amended following recommendations from the IRS in 1978 as well? Could bond counsel and the counsels for over seventeen banks who had granted over one hundred loans to EMHC based on a vote of the EMHC board after reviewing the by-laws and Articles of Organization of both corporations been incompetent? Could the auditing firms of Mecone and Sanella and Demakis and Demakis been in error during this time as well? General Accounting principles require that the auditors maintain current copies of the by-laws and articles of organization and names of the board of directors of the organizations. Could HUD and DMH and DMR been wrong for all these years?

Miraculously, it was discovered that GLMHRA had the authority to appoint the board of EMHC. This as it turns out was the case with the original appointment of the board of EMHC in 1978. This miraculous discovery came when it was clear that MacKelsih, Sherman, Griffin and GMHRA under the oversight and direction of your office and the Attorney General had created a multi million dollar deficit at GLMHRA and desperately needed control of EMHC's assets to cover these deficits and to offset anticipated future deficits..

Why did neither you nor Griffin consult and talk to EMHC President, Stephen Speropolous, or EMHC Treasurer, Peter McGinn both of whom held similar responsibilities at GLMHRA in 1978 and voted to approve the original by-laws and Articles as well as the current documents? They both had served on the EMHC board for over 22 years and on the GLMHRA board for at least six years. Why was the plaintiff not consulted when he was the one who drafted the Articles of Organization and the By-laws and submitted them to the IRS?

### Griffin Report and The Boston Herald and The North Shore Sunday

The Boston Herald News organization received the October 8, 2000 Griffin "confidential report" that you had commissioned. Only staff of the Attorney General's Office, members of GLMHRA's board and its Executive Director, Paul Coty and select senior managers such as James Cowdell, president of the Lynn City Council, were eligible to have a copy of the report. Did your office give a copy to defendants, Attorney's MacKleish and Robert Sherman? It was released, in 2002, during my campaign in the democratic primary for the senate seat now held by Tom McGee. The timing of this leak is no coincidence as it occurred during the primary election. Did someone in your office disseminate this confidential document and why was a copy not given to me or to board members of EMHC prior and after the signing of the Severance Agreement in November 8, 2000?

Griffin also, with your knowledge, supported the hiring of Paul Coty, a personal friend and business associate as Executive Director for $200,000 per year despite the financial straits of the agency making him the highest paid Executive Director of a Human Services non profit in

Massachusetts. He also supported, with your knowledge, the hiring of the president of the Lynn City Council, James Cowdell, for $75,000 as administrative assistant despite him being the least qualified applicant for the position. He had no college degree and despite the job duties requiring him to supervise the Human Resources Department and the Fund Development Department, he had no Human Services supervisory experience, no grant writing experience and no experience or training in Human Resources. This was an obvious political appointment and this position never existed in the forty year history of GLMHRA.

Following his appointment, GLMHRA president, Robert Tucker, was given a $10,000 raise and a promotion at the Lynn Water and Sewer Commission whose board is controlled by the Lynn City Council where Cowdell was president. Cowdell controlled appointments to that board.

Weren't you and the AG's Office concerned that this was a conflict of interest and an exchange of favors? Where was GLMHRA going to find the $75,000 for Cowdell and the $200,000 for Coty? The take over of EMHC and its charitable assets were the only alternative. Your participation in concealing the Griffin report followed by its timely dissemination during my campaign for state senate and the false premise and facts included in the report that were never refuted by the AG's Office and continued to be repeated by others resulted in my defamation and emotional stress and are relevant areas for discovery.

### Anthony Rizzo

Anthony Rizzo was arrested in Revere for dealing drugs and within six months was arrested again in Lynn with over 40 kilos of cocaine found in the trunk of his car and in an office that he rented in a rooming house owned by his wife, Nancy Rizzo, a GLMHRA board member.

The FBI and Federal Drug Enforcement Agents found $267,000 in the ceiling and rafters of Nancy Rizzo's newly built home on Puritan Road in Swampscott.

It was reported to me by a former Assistant District Attorney in Middlesex Court that Attorney General Reilly and his staff did not prosecute Anthony Rizzo as a major drug dealer but for a lesser charge and recommended to the Middlesex Court that he be sentenced to one year. This would have required him to serve three months, three months work release and six months probation. The judge was appalled by the plea agreement and gave Rizzo the most that he could give based on the charges before him and sentenced Rizzo to three years and a day requiring him to serve a full three years. This was still ten or more years less had he been tried under federal drug laws or under state law as a major drug dealer.

No charges were ever filed against Nancy Rizzo.

Your knowledge and that of the AG's staff in this affair is relevant since you and Robert Sherman met with various GLMHRA and EMHC board members and attended various GLMHRA board meetings pushing for my termination. Nancy Rizzo was on the GLMHRA board while these decisions were being discussed and she was the swing vote in a three-three deadlock on a vote for my termination. She was the fourth vote. She also chaired the legal sub-committee and voted to pay hundreds of thousands of dollars to MacKleish, Sherman and Griffin.

It appears that her vote on the GLMHRA board was compromised by your office and that she and her ex-husband received favorable treatment from your office in return for her vote and support to pay the legal and consultant fees, to support the bond, to take over of EMHC, to hire

Coty and Cowdell and to remain silent about the true course of events that ultimately resulted in the continuing discrimination and defamation of the plaintiff.

### Lynn Water and Sewer Commission

While you were meeting with the GLMHRA board, Sherman, MacKleish, Griffin, president, Robert Tucker, and EMHC Vice President, Attorney Sam Vitali, and others planning a strategy to have me removed from GLMHRA and EMHC, the Inspector General's Office was investigating the Lynn Water and Sewer Commission for possible kick backs in the awarding of over $50 Million dollars in no bid contracts.

The state legislator later that year voted a $55Million Dollar bond fund with most of the proceeds going to the Lynn Water and Sewer Commission to cover its financial mismanagement.

How is this relevant? GLMHRA President, Robert tucker, was and is the Deputy Commissioner and second in command at the Lynn Water and Sewer Commission, EMHC Vice-President, Sam Vitali was the general counsel for the Commission and GLMHRA Administrative Executive, James Cowdell's relationship was previously stated.

The Attorney General, refused a request from the Inspector General to fully investigate the dealings at the Lynn Water and Sewer Commission. Was this in any way related to the Attorney General's and your request for support from Cowdell, Vitali and Tucker to have me removed and to approve the bond, to pay the outstanding legal and consultant fees, to take over EMHC, and to cover it up and defame me to deflect charges of financial mismanagement away from MacKleish, Sherman and Griffin and towards me and board members who opposed these actions?

### Attorney General Responsibilities Regarding Discovery

For the Attorney General and his staff to claim protection from discovery or for their actions they would have to show that their actions were typical of other employees and Attorney General's faced with similar circumstances, that their was no personal or financial gain for them or their associates and that by denying discovery, they would not be engaging in a cover up of unethical and illegal activity or engaging in a cover up to favor a party in a civil action. If President Bill Clinton can be subpoenaed in a civil case while President and under investigation for perjury, certainly the Attorney General and his staff can also be subpoenaed and required to release information pertinent to a civil suit.

Sincerely,

Albert W. Bleau Jr.

cc. Garrick Cole, Salo L. Zelemeyer, Donald Stern

- 5 -