UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ALBERT WILLIAM BLEAU, JR.,            )
                                      )
         Plaintiff,                   )
                                      )    Civil Action. NO. 04-10469WGY
    v.                                )
                                      )
BRIDGEWELL, INC. et. al,              )
                                      )
         Defendants.                  )

## ATTORNEY GENERAL'S MOTION FOR RELIEF
## FROM ORDER COMPELLING DISCOVERY

The Massachusetts Attorney General, pursuant to F. R. Civ. P. 60 (a), respectfully requests that this Court amend and correct an error arising from an oversight in the Court's December 13, 2006 order compelling the Attorney General to respond to plaintiff's November 21, 2006 subpoena. The Attorney General alternatively requests relief arising from a mistake, pursuant to F. R. Civ. P. 60 (b)(1). The Court erred because the plaintiff had moved to compel the Attorney General to respond to his March 21, 2006 subpoena. As detailed below, this Court should not compel a response to the November subpoena because it is not reasonably calculated to lead to the discovery of admissible evidence and seeks documents protected by grand jury, law enforcement investigative, deliberative process and work product privileges:

### I. Although Plaintiff Moved to Compel a Response to his March 21, 2006 Subpoena, this Court Compelled a Response to Plaintiff's November 21, 2006 Subpoena

1. The Attorney General received a third party subpoena from plaintiff Albert William Bleau, Jr. ("Plaintiff") on March 21, 2006. Attachment I to Document 133.

1

2. On April 3, 2006, the Attorney General mailed Plaintiff a letter objecting to the subpoena pursuant to F. R. Civ. P. 45(c) (2)(B) on the grounds that the subpoena had not been properly issued and served. The Attorney General also objected on the grounds of relevance and a number of privileges. Attachment II to Document 133.

3. On November 21, Plaintiff served a motion to compel the Attorney General to respond to the March subpoena (Document 140-1). The motion stated that the Attorney General had objected to the March subpoena, and that "this motion to compel discovery was not filed sooner since discovery was suspended during the Plaintiff's appeal of the February 8, 2006 order of the Court." Plaintiff served the motion with a new subpoena attached (Document 140-2), which could have caused the Court to conclude that Plaintiff had attached the March subpoena which he was seeking to compel the Attorney General to respond to (Attachment I to Document 133).

4. On December 8, 2006, the Attorney General mailed Plaintiff a letter objecting to the November subpoena pursuant to F. R. Civ. P. 45(c) (2)(B) on the grounds of relevance and privilege. Attachment I hereto.

5. On December 11, 2006, the Attorney General filed an opposition to plaintiff's motion to compel the March subpoena. The Attorney General had no reason to believe that there was a need to address plaintiff's November subpoena, because F. R. Civ. P. 45(c) (2)(B) provided the opportunity for the Attorney General to mail an objection to the November subpoena before Plaintiff could seek an order compelling the Attorney General to respond.

6. On December 13, 2006, this Court ordered the Attorney General to respond to paragraphs 4-7 of Plaintiff's subpoena. The Court has apparently ordered the Attorney General to respond to Plaintiff's November, which contained seven paragraphs. Plaintiff's March

subpoena contained only five paragraphs.

## II. The Court Should Not Compel The Attorney General to Respond to Plaintiff's November Subpoena, Which is Overly Broad, Unduly Burdensome, and Seeks Information That is Neither Relevant Nor Reasonably Calculated to Lead to the Discovery of Admissible Evidence.

### A. Factual Background

7. In early 2000, confidential informants provided the Attorney General with information that: (a) Plaintiff had misappropriated funds from the employee benefit plan of the defendant Greater Lynn Mental Health and Retardation Association ("Greater Lynn"; later renamed Bridgewell); (b) the board of directors of Greater Lynn had temporarily suspended Plaintiff as executive director; and (c) that Greater Lynn was facing serious financial difficulties.

8. The Attorney General's Public Charities Division entered into protracted negotiations with Greater Lynn's board over the operation and control of Greater Lynn. The board permanently suspended Plaintiff and executed a governance agreement with the Attorney General on May 2, 2000. Under that agreement, Greater Lynn hired attorney Robert Griffin as a management advisor with additional responsibilities for reporting to the Attorney General.

9. The Public Charities Division also conducted an investigation of the operation and finances of Greater Lynn. The investigation included interviews with confidential informants, officials from state funding agencies, Robert Griffin, and bondholders. In addition, the Attorney General's Criminal Bureau conducted a separate grand jury investigation.

10. Robert Griffin filed an extensive report with Greater Lynn and the Public Charities Division on October 13, 2000. That report concluded that: (1) Plaintiff had improperly misspent funds from Greater Lynn's employee benefit fund for purposes unrelated to employee benefits,

3

including payments for real estate acquisitions by Greater Lynn's affiliate, Eastern Massachusetts Housing Corporation; (2) Plaintiff had misreported costs of the employee benefit fund to state funding agencies, resulting in Commonwealth overpayments to Greater Lynn; (3) and Plaintiff had concealed financial records for the employee benefit fund from auditors and state agencies.

11. Griffin's report also concluded that: Greater Lynn's board of directors had not provided satisfactory oversight of Plaintiff's activities; Greater Lynn had not exercised appropriate control of Eastern Massachusetts Housing Corporation; and that Greater Lynn was in financial duress because of mismanagement.

12. The Public Charities Division continued to monitor and investigate Greater Lynn's activities. After continued negotiations, Greater Lynn hired Paul Cote, an interim professional executive director, implemented governance reforms, and replaced many of its board members. Greater Lynn also caused Eastern Mass Housing Corporation to sell certain assets to repay funds to Greater Lynn's employee benefit fund and to the Commonwealth.

**B.   The Attorney General's Investigation Was Irrelevant to Plaintiff's Cause of Action.**

13. Plaintiffs November subpoena essentially seeks documentation of Greater Lynn's communications to the Attorney General about Plaintiff's character and asserted disability. The Public Charities Division, on the other hand, investigated Plaintiff's misconduct - his alleged misuse and improper reporting of Greater Lynn's employee benefit fund. The Public Charities Division also focused on restoring Greater Lynn to institutional and fiscal health following Plaintiff's departure. Plaintiff's character and disability were irrelevant to those investigations.

14. A litigant seeking to compel the production of documents must establish that the documents are either relevant to the subject matter of the litigation or reasonably calculated to

4

lead to the discovery of admissible evidence. See Fed. R. Civ. Proc. Rule 26(b)(1); Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 350-52 (1978). See also Heidelberg Americas v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 40, 41 (1st Cir. 2003) (party seeking to enforce subpoena has burden of establishing that the material is relevant and discoverable).

15. Furthermore, the First Circuit has recognized that discovery from non-parties should be more circumscribed than that against litigants. See, e.g., Heidelberg, 333 F.3d at 41-42; In re Cusumano, 162 F.3d 708, 717 (1st Cir. 1998). Consequently, courts in this Circuit have required the moving party to making a higher showing – including a heightened showing of both need and relevance – before compelling discovery from non-parties. See, e.g., id.; Bio-Vita Ltd. v. Biopure Corp., 138 F.R.D. 13, 17 (D. Mass. 1991) ("To obtain discovery from nonparties, a party must establish that its need for discovery outweighs the nonparty's interest in nondisclosure").

### III. The November Subpoena Encompasses Protected Grand Jury Materials

16. The Federal Rules of Civil Procedure expressly prohibit the use of a subpoena to obtain information that is "privileged or otherwise protected" from discovery and mandate that a court "*shall* quash or modify" a subpoena that "requires disclosure of privileged or otherwise protected matter." Fed. R. Civ. P. 45(c)(3)(A)(iii) (emphasis added). In this case, the November subpoena seeks responses to grand jury subpoenas; assistant attorney generals' handwritten notes, drafts and outlines as part of a grand jury investigation; and communications with witnesses and potential witnesses as part of that investigation. Such grand jury documents should not be disclosed, because there is a strong public interest in maintaining the confidentiality of grand jury proceedings and Plaintiff has shown no countervailing interest which outweighs the tradition and interests of secrecy of grand jury proceedings. See Douglas Oil Co. of Cal. v. Petro Stops

Northwest, 441 U.S. 211, 222 (1979) (stating that a party seeking grand jury information must show (1) that the material is needed to avoid injustice in another proceeding; (2) that the need for the material outweighs the need for continued secrecy; and (3) the party's request is tailored to cover only the material needed). This burden is not easily met. Cullen v. Margiotta, 811F. 2d 698, 715 (2d Cir. 1987), affirmed on other grounds, Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143 (1987).

IV. **The November Subpoena Seeks Files Protected By the Law Enforcement Investigative Privilege.**

17. Plaintiff's November subpoena seeks documents and information that are protected by the federal law enforcement investigative privilege and therefore are not subject to disclosure. The law enforcement investigative privilege has long been recognized and enforced as a matter of federal common law by numerous federal courts, including the District of Massachusetts and other district courts in the First Circuit. See United States v. Cintolo, 818 F.2d 980, 1002 (1st Cir. 1987); Association for Reduction of Violence v. Hall, 734 F.2d 63, 65-66 (1st Cir. 1984). The law enforcement investigative privilege exists to prevent "the harm to law enforcement efforts which might arise from public disclosure of . . . investigatory files." Raphael v. Aetna Cas. & Surety Co., 744 F. Supp. 71, 74 (S.D.N.Y. 1990) (quoting Black v. Sheraton Corp., 564 F.2d 531, 541 (D.C. Cir. 1977)). The privilege serves, *inter alia*, "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." In re Dept. of Investigation, 856 F.2d 481, 484 (2d Cir. 1988).

18. The law enforcement privilege applies equally to concluded investigations as it does to ongoing investigations. As the court explained in Black:

> It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired. Few persons would respond candidly to investigators if they feared that their remarks would become public record after the proceedings. Further, the investigative techniques of the investigating body would be disclosed to the general public.

Black, 564 F.2d at 546 (quoting Aspin v. Department of Defense, 491 F.2d 24, 30 (D.C. Cir. 1973) (internal quotation marks omitted).

19. The Attorney General's files include grand jury documents; assistant attorney generals' handwritten notes, drafts and outlines; and communications with witnesses and potential witnesses. These documents were prepared out of the public view, and have not been disclosed to the public. The documents therefore fall squarely within the law enforcement investigative privilege. See e.g., Association for Reduction of Violence, 734 F.2d at 65-66; Black, 564 F.2d at 545-46.

V. **The November Subpoena Seeks Files Which Are Subject to the Massachusetts Investigatory Privilege.**

20. It is also appropriate for this Court to recognize Massachusetts' investigatory privilege. See In re Hampers, 651 F.2d 19, 22-23 (1st Cir. 1981); Krolikowski v. University of Massachusetts, 150 F. Supp.2d 246, 248-49 (D. Mass. 2001). The Massachusetts investigatory privilege is virtually identical to the federal law enforcement privilege; it is intended to prevent the disclosure of confidential investigative techniques, procedures or sources of information, and to encourage private citizens to "come forward and speak freely with police concerning matters

under investigation." Bougas v. Chief of Police of Lexington, 371 Mass. 59, 62, 354 N.E.2d 817, 872 (1976). See also WBZ-TV4 v. District Attorney for the Suffolk District, 408 Mass. 595, 603, 562 N.E.2d 817, 822 (1990).

21. The November subpoena seeks file protected by Massachusetts's investigatory privilege. Under Massachusetts law, moreover, the exemption from disclosure of investigatory materials does not involve consideration of the requesting party's need for the documents. Bougas, 371 Mass. at 63, 354 N.E.2d at 877. "That decision turns on whether, because of its possible effect on law enforcement, such a disclosure would not be in the public interest." WBZ-TV4, 408 Mass. at 603, 562 N.E.2d at 822. Disclosure of the files would be contrary to public interest because it would reveal confidential sources; impair law enforcement officials' candor in discussing and recording their observations, hypotheses and conclusions; and have a chilling effect on the willingness of private citizens to "come forward and speak freely with police concerning matters under investigation." Bougas, 371 Mass. at 62, 354 N.E.2d at 872. As a result, the files should not be produced.

## VI. The Court Should Prevent Any Inquiry into the Thought Processes or Deliberations of the Attorney General's Office.

22. It is well-established that the judgment and wide discretion of prosecutors are not subject to judicial review or approval. See Gomez v. City of Nashua, New Hampshire, 126 F.R.D. 432, 434-35 (D. N.H. 1989) (deliberative process privilege protects from public inquiry the deliberative process leading to "[t]he decision whether to prosecute"). Accordingly, a prosecutor's decisions and thought processes are privileged from disclosure. See Gomez, 126 F.R.D. at 435 ("The decision whether to prosecute is the product of a deliberative process which

should be afforded a high degree of protection from public inquiry"). The privilege is designed not only to protect the ultimate decision-maker from disclosing the process by which the decision was reached, but is also designed to ensure that public officials freely exchange views without fear of disclosure. See N.O. v. Callahan, 110 F.R.D. 637, 642 (D. Mass. 1986) ("The reason for the longstanding recognition of this privilege is to protect the free flow of information necessary to informed decision-making by a government agency").

23. To overcome the prosecutorial decision-making privilege, the party seeking discovery must make a specific showing of need, requiring proof that the information sought is *both* highly relevant to the instant action *and* is unavailable from any other source. See Association for Reduction of Violence, 734 F.2d at 66; In re LTV Securities Litig., 89 F.R.D. 595, 618 (N.D. Tex. 1981). Plaintiff cannot demonstrate that the materials he seeks are highly relevant to the instant action. Furthermore, any inquiry regarding an assistant attorney general's deliberations and thought processes; the initiation of a criminal proceedings; and interoffice prosecutorial memos or notes would directly encroach upon prosecutorial discretion in charging and disposing of criminal proceedings. See Association for Reduction of Violence, 734 F.2d at 66; In re LTV Securities Litig., 89 F.R.D. at 618.

### VII. The November Subpoena Seeks Protected Attorney Work Product.

24. Plaintiff's November subpoena seeks documents which are protected by the attorney work-product doctrine. The Attorney General's Public Charities Division conducted an extensive investigation in anticipation of enforcement litigation. Similarly, the Attorney General's Criminal Bureau conducted a grand jury investigation in anticipation of criminal prosecution. The protections accorded the attorney work-product are well established. See Fed. R. Civ. P. 26(b)(3);

Hickman v. Taylor, 329 U.S. 495 (1947). Before gaining access to such carefully-protected material, moreover, Plaintiff must establish both substantial need and undue hardship. He has made no such showing.

25. Moreover, many of the attorney-work product documents in the Attorney General's files contain the "mental impressions, conclusions, opinions, or legal theories" of assistant attorneys general, which must not be disclosed even if a showing of need for "ordinary" work product is made. See In re San Juan Dupont Hotel Plaza Fire Litig., 859 F.2d 1007, 1014-15 (1st Cir. 1988) (discussing difference between "ordinary" and "opinion" work product and higher level of protection accorded the latter); In re Grand Jury Subpoena (Legal Svcs. Center), 615 F. Supp. 958, 962-63 (D. Mass. 1985) (at a minium, requesting party must make a "far stronger showing of necessity and unavailability by other means" than is required for ordinary – i.e., fact – work product).

26. Although the Attorney General's Office is not a party to this action, it still has the full protection of the attorney work-product doctrine. See Slack v. Federal Trade Comm'n, 1980 WL 1984, *3 (D. Mass., Nov. 18, 1980) ("[T]he attorney work product privilege protects documents prepared in anticipation of litigation with third parties in unrelated cases"); In re Grand Jury Subpoena, 220 F.R.D. 130, 148-50 (D. Mass. 2004) (Supreme Court decisions do not support view that work-product protection ends with the conclusion of the litigation; after surveying opinions from other circuits, court holds that work-product doctrine extends to subsequent lawsuits, even if those suits are unrelated to the first litigation).

WHEREFORE, the Attorney General respectfully requests that this Honorable Court modify its December 13, 2006 Order and deny Plaintiff's Motion to Compel Discovery from the Massachusetts Attorney General, Thomas Reilly.

RESPECTFULLY SUBMITTED,
THOMAS REILLY
ATTORNEY GENERAL

By: *[signature]*

Eric Carriker, BBO # 075820
Assistant Attorney General
Acting Chief, Public Charities Division
One Ashburton Place, Room 1813
Boston, MA 02108
Tel: (617) 727-2200, Ext. 2118
Fax: (617) 727-2920

Dated: January 9, 2007

**CERTIFICATE OF SERVICE**

I, Eric Carriker, hereby certify that on this 9th day of January, 2007, I served a copy of the foregoing by U.S. mail, postage prepaid, upon the plaintiff, Albert W. Bleau, Jr., 505 Paradise Road, # 208, Swampscott, Massachusetts 01907 and upon the attorney of record for each other party.

*[signature]*

Eric Carriker