UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————————
                                          )
ALBERT WILLIAM BLEAU, JR.,                )
            Plaintiff                     )
                                          )        CIVIL ACTION
v.                                        )        NO. 04-10469-WGY
                                          )
BRIDGEWELL, INC., et al,                  )
            Defendants                    )
—————————————————————————)

### DEFENDANT BRIDGEWELL'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF BRIDGEWELL'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the defendant, Bridgewell, Inc., ("Greater Lynn"), hereby submits the following statement of the undisputed material facts upon which it bases its motion for summary judgment.

### BACKGROUND

1.      Greater Lynn is a regional non-profit mental health agency.  It provides residential facilities, outpatient clinic services, job placement and support, counseling, and other mental health services to clients in Middlesex and Essex counties.  It receives substantial support from the Commonwealth of Massachusetts, primarily through its Department of Mental Health ("DMH") and Department of Mental Retardation ("DMR").  *Affidavit of Robert F. Tucker ("Tucker Aff."), ¶ 3.*

2.      Greater Lynn is also a public charity under Massachusetts law and is regulated by the Public Charities Division of the Massachusetts Attorney General's Office.  *Tucker Aff., ¶ 4.*

3.      The business affairs of Greater Lynn are managed by its Board of Directors (the "Board").  The Board appoints several officers who are responsible for the day-to-day operations of the agency.  *Tucker Aff., ¶ 5.*

4.      The plaintiff, Albert W. Bleau ("Bleau"), was Greater Lynn's executive director since the mid-1970's. *Tucker Aff., ¶ 6.*

## INVESTIGATION OF WRONGDOING AND TERMINATION OF BLEAU

5.      During the fall of 1999, the Board was informed of certain personnel matters, among which were issues that involved Bleau and his (now former) wife, who was also an employee of Greater Lynn.  While some of these issues were resolved when Bleau's wife resigned from her position, others remained open. *Tucker Aff., ¶ 7.*

6.      As a result of these issues, Greater Lynn placed Bleau on paid administrative leave in late October, 2000. *Tucker Aff., ¶ 8.*

7.      The Board authorized counsel to commence an investigation.  The scope of this investigation included Bleau's management of Greater Lynn's employee fringe benefit program; certain expenditures of Greater Lynn funds that Bleau had made or that were made under his direction; and Bleau's management of the operations of Eastern Massachusetts Housing Corporation ("Eastern Mass."), a close affiliate to Greater Lynn of which Bleau was also executive director.  Greater Lynn's counsel at that time were Roderick MacLeish ("MacLeish") and Robert Sherman ("Sherman").  *Tucker Aff., ¶ 9.*

8.      In December 1999, the Public Charities Division of the Massachusetts Attorney General's Office ("Public Charities Division") made an initial inquiry. *Tucker Aff., ¶ 10.*

9.      In early February 2000, the Massachusetts Attorney General's Office informed the Board that its Public Charities Division had initiated an investigation of Greater Lynn and that its Criminal Division had initiated a criminal investigation of Bleau.  The Board informed the Attorney General's Office that it would cooperate fully in the investigations. *Tucker Aff., ¶ 11.*

10.    During the winter and spring of 2000, Robert F. Tucker ("Tucker"), a member of the Greater Lynn Board met several times with Assistant Attorney General Jamie Katz and Assistant Attorney General Eric Carriker, both assigned to the Pubic Charities Division.  They informed Tucker that the Attorney General's Office regarded Greater Lynn to be in serious financial and management difficulty and that the Office placed the responsibility for these difficulties in the hands of the Board and identified Bleau as the individual whose actions had created them.  In particular, they asserted that Bleau had made improper expenditures of state contract funds; that he had misused Greater Lynn and employee retirement funds; that Greater Lynn had submitted incorrect financial reports to DMH and DMR.  The two AAGs further informed Tucker and other members of the Board that, unless a management agreement were entered into pursuant to which the Board would retain the services of a management advisor, restructure its membership, and appoint a new executive director, the Attorney General's Office would commence an action to place Greater Lynn in receivership. *Tucker Aff., ¶ 12; Affidavit of Paul J. Cote, Jr. ("Cote Aff."), at ¶ 4.*

11.    As part of its response to the Attorney General's Office's investigation, the Board appointed additional counsel to negotiate a resolution of the investigation.  These negotiations culminated in a management agreement between Greater Lynn and the Attorney General's Office that was entered into in May 2000.  Along the way to this agreement, the Board received information from the Attorney General's Office sufficient to warrant its termination of Bleau's employment. *Tucker Aff., ¶ 13.*

12.    On April 20, 2000, the Board voted to terminate Bleau's employment.  Given his length of service to the company, the Board voted to negotiate a severance agreement with Bleau and to offer him the opportunity to resign. *Tucker Aff., ¶ 14.*

13.    In early May 2000, Greater Lynn and the Attorney General's Office entered into a management agreement, pursuant to which the parties agreed that Attorney Robert Griffin would be appointed to the position of management adviser of Greater Lynn and would report to both the Board and the Attorney General. *Tucker Aff., ¶ 15 and Exhibit A, AG Management Agreement, ¶ 1.*

14.    During the period of May through December 2000, Board President Robert F. Tucker participated on behalf of the Board in continuing negotiations with the Public Charities Division.  The Public Charities Division opposed any further role for Bleau with either Greater Lynn or Eastern Mass.; required Greater Lynn to revise its employee benefits program; and sought the resignations of all of the members of the Board and their replacement by persons with no prior contact with or knowledge of Greater Lynn. *Tucker Aff., ¶ 16.*

15.    While Greater Lynn had placed Bleau on administrative leave in the fall of 1999 and voted to terminate him in April 2000, Eastern Mass.'s Board did not do the same and allowed Bleau to continue working. *Tucker Aff., ¶ 17.*

16.    The Public Charities Division also urged Greater Lynn to merge with Eastern Mass. as well as to correct certain accounting matters, primarily interagency loans and transfers, and to liquidate certain assets that Eastern Mass. held for the benefit of Greater Lynn or its employee benefits funds. *Tucker Aff., ¶ 18.*

17.    Negotiations with Bleau on a severance agreement continued throughout the summer of 2000.  *Tucker Aff., ¶ 20.*

18.    Bleau never signed the proposed agreement and his salary was discontinued, effective September 8, 2000. *Tucker Aff., ¶ 20.*

## BLEAU'S 2000 EEOC COMPLAINT

19.    On October 6, 2000, Bleau filed a discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"), alleging that his termination was on the basis of his gender, age, and perceived disability. *Cote Aff., ¶ 9 and EEOC Complaint, Cote Aff., Exhibit B.* While not specifying what his perceived disability was, the complaint alleged that his medical information was shared and that this "gave a perception of age problems." *Id.*

20.    At some point in October, Bleau also filed a complaint against Greater Lynn with the Fair Labor and Business Practices Division of the Massachusetts Attorney General's Office. *Cote Affidavit, ¶ 10.*

## THE GRIFFIN REPORT

*21.*    On October 13, 2000. Attorney Griffin submitted his 17-page report (the "Griffin Report" or the "Report") to the Public Charities Division. *Cote Aff., ¶ 6 and Exhibit A, Griffin Report.* The Report criticized Bleau's leadership at Greater Lynn and criticized the Board for giving Bleau too much leeway in the management of Greater Lynn and the EFIP. *Griffin Report, at 16.* The Report also criticized the Board for taking too long (April 20 until September 8, 2000) in removing Bleau from the payroll. *Id. at 14.* The Report made various recommendations, including the merger of Eastern Mass. into Greater Lynn.

*22.*    The Griffin Report indicates that copies of it were sent to Margaret Chow Menzer and Marianne Greeno. *Id. at 17.* At the time, Margaret Chow Menzer was the legal counsel for the Massachusetts Department of Mental Retardation ("DMR") and Marianne Greeno was the legal counsel for the Massachusetts Department of Mental Health ("DMH"). *Cote Aff. ¶ 7.* The Griffin Report is a public record accessible by the general public upon request. *Id.*

## THE SEPARATION AGREEMENT

23.    In October, given Bleau's continued role with Eastern Mass. and because of Bleau's complaints, Greater Lynn reinitiated discussions with Bleau to negotiate an agreement covering Bleau's separation from both Greater Lynn and Eastern Mass. and containing a general release in favor of both Greater Lynn and Eastern Mass. *Cote Aff., ¶ 11.*

24.    James Cowdell and acting Executive Director Paul J. Cote, Jr. ("Cote"), negotiated the separation agreement with Bleau. *Cote Aff., ¶ 12; Affidavit of James Cowdell ("Cowdell Aff."), at ¶ 3.*

25.    On November 6, 2000, Cote and Cowdell presented the Separation Agreement and General Release (the "Separation Agreement") to Bleau for signature. Cowdell had previously met with Bleau and had several telephone conversations with him about the agreement. *Cowdell Aff., ¶ 4.*

26.    Through oversight, the Separation Agreement that was presented to Bleau for his signature referenced a letter attached as Exhibit A that would state that he resigned to pursue other interests. No letter was drafted or brought to the signing. It was agreed that in the near future a letter would be prepared stating simply that Bleau had left the Agency to pursue other interests. The letter would be non-specific regarding reasons for the departure. Bleau understood that no draft letter was attached. Shortly after the severance agreement was signed, Bleau requested that Greater Lynn make a lengthy announcement in its newsletter outlining his accomplishments. Both Cote and Cowdell rejected this demand. At no point did they agree to send out a lengthy announcement listing Bleau's accomplishments. They made clear that they would not. They told him that they would send out a letter that would announce that he had resigned to pursue other interests as they had agreed to. *Cowdell Aff., ¶ 5.*

*27.*    Bleau signed the Agreement on November 6, 2000 and acknowledges that he read the Agreement before signing. *Bleau Dep., at 28, 90.*

28.    Within a week, the Separation Agreement was then adopted by the Boards of both Greater Lynn and Eastern Mass. *Cote Aff., Exhibit C, Separation Agreement, p. 5.*

29.    The Board intended that the Separation Agreement, among other things, put an end to Bleau's relationship with the two companies. *Tucker Aff., ¶ 21.*

30.    Pursuant to the Separation Agreement, Bleau acknowledged that his employment with Greater Lynn terminated, effective September 8, 2000, and terminated from Eastern Mass., effective November 10.  The Agreement also provided Bleau with the opportunity "to submit a letter of resignation, if he so chooses." *Separation Agreement, Cote Aff., Exhibit C, ¶ 1.*

*31.*    The Separation Agreement also provided that Greater Lynn and Eastern Mass. would "issue a letter, in the form attached as Exhibit A, informing employees, consumers and friends of the Corporations that Mr. Bleau has resigned his employment with the Corporations to pursue other interests." *Id. at ¶ 2.*  At the time of the signing, all parties were aware that there was not letter attached to the Agreement. *Bleau Dep., at 33-35; Cowdell Aff., ¶ 5; Cote Aff., ¶ 14.*  Bleau never submitted a letter of resignation. *Bleau Dep., at 33.*

*32.*    Under the Agreement, Greater Lynn and Eastern Mass. agreed to pay Bleau $84,3000 in compensation and to pay for his health insurance for twelve months in the amount of $10,900 (for a total of $95,200.00). *Separation Agreement, ¶ 5A; Bleau Dep., at 93-94.*  In addition, the corporations agreed to deed to Bleau the company vehicle used by Bleau at no cost, that had an agreed upon fair market value of $21,600. *Id. at ¶ 5B; Bleau Dep., at 94.*  Greater Lynn did in fact pay Bleau. *Bleau Dep., at 93-94.*

*33.*    In addition, the companies agreed to pay up to $10,000 in training funds. Under this provision, for a period of two years, the companies would "pay an amount for Mr. Bleau's enrollment in a program or course of training at an accredited college of Mr. Bleau's choice, or any training course leading to licensing or certification." Such payments would not exceed $5,000 in each year and the payments would be made directly to the college. *Id. at ¶ 5C.*

*34.*    By signing the Separation Agreement, Bleau acknowledged his indebtedness to Greater Lynn in the amount of $13,918.21 as a result of loans, and that Greater Lynn would be able to deduct this amount from the amount in his deferred compensation account. Greater Lynn would pay the net amount in the account to Bleau within 30 days. *Separation Agreement, ¶ 6.*

*35.*    In exchange, Bleau agreed to release all claims against Greater Lynn, Eastern Mass., and their respective employees, agents, and attorneys. *Separation Agreement, ¶ 4; Bleau Dep., at 90-92.* Bleau also agreed that "he shall not portray in a false way or disparage the professional reputation of the Corporations, their directors, managers or employees" *(Id. at ¶ 7)* and to withdraw, within 48 hours, his complaint with the EEOC. *Id. at ¶ 8.*

*36.*    The Separation Agreement also contained an integration clause, under which the parties agreed that the Agreement "is a fully integrated documents and constitutes the entire agreement between them . . . [and that] [t]he parties expressly disclaim reliance on any representations, written or oral, other than those contained in this document." *Separation Agreement, ¶ 9.* Bleau acknowledged that he had "thoroughly reviewed all aspects of this Agreement" and that he had "read and fully understands all of the provisions of this Agreement and is voluntarily entering into this Agreement." *Id. at ¶ 10; Bleau Dep., at 28, 90.*

## POST-SEPARATION DISCUSSIONS RE LETTER

37.    Greater Lynn had hoped that the signing of the Separation Agreement would end its relationship with Bleau.  However, within days of signing the Agreement, Bleau was repeatedly calling Cowdell and making demands and accusations.  On November 16, 2000, Cowdell sent Bleau a letter telling him that all further contact with Greater Lynn should be made to Greater Lynn's attorney, Laurence Donoghue of Morgan Brown & Joy in Boston.  Despite this, Bleau continued to contact Cowdell.  He repeatedly demanded that Greater Lynn send out a multi-page announcement setting forth his accomplishments at Greater Lynn.  *Cowdell Aff., ¶ 6.*

38.    Sometime in late November or December 2000, Bleau provided Cowdell with a document either identical or substantially similar to the four-page documents entitled "Albert Bleau:  A Life of Service" that is attached to Cowdell's Affidavit at <u>Exhibit A</u>.  Bleau demanded that Greater Lynn send it out to Greater Lynn's newsletter list, local newspapers, and elected officials.  He made clear that he did not want the document to be changed.   Cowdell informed him that Greater Lynn would send out a brief letter stating that he resigned to pursue other interests.  Bleau complained, and made clear that he did not want such a letter to be sent out.  *Cowdell Aff., ¶ 7.*

39.    Greater Lynn and Bleau were never able to reach a resolution as Bleau made clear that he did not want Greater Lynn to send out a letter stating that he resigned to pursue other interests, and insisted that the announcement promote him and list, in multiple pages, his accomplishments at Greater Lynn.  *Cowdell., ¶ 8.*

## BLEAU'S BREACHES OF THE SEPARATION AGREEMENT

40.     In early 2001, Greater Lynn learned that Bleau had sent out letters to 17 terminated Greater Lynn employees in early 2001, disparaging Greater Lynn and recommending to the former employees to file complaints against Greater Lynn with the Massachusetts Attorney General's Office.  *Cowdell Aff., ¶ 9 and Exhibit B.*

*41.*     In April 2001, Greater Lynn learned that Bleau had sent a letter to the members of the Boards of both Greater Lynn and Eastern Mass. making various disparaging remarks about Greater Lynn management.  *Cowdell Aff., ¶ 9 and Exhibit C.*

*42.*     On April 13, 2001, Bleau sent separate similar letters to the Commissioner of DMR and the Commissioner of DMH requesting, among other things, that Greater Lynn be placed immediately into receivership.  *Cowdell Aff., ¶ 9 and Exhibit D.*

## CONCLUSION OF ATTORNEY GENERAL INVESTIGATION AND FURTHER RESTRUCTURING OF GREATER LYNN

43.     Following the Separation Agreement, the Public Charities Division continued to press for the replacement of all of the members of the Board.  Further negotiations resulted in an agreement that, among other things, provided for the resignation of all but two of the Board members; the recruitment of new members from among those persons suggested by the Public Charities Division, as well as others with an interest in mental health agency operations; and the amendment of the Board's bylaws to provide for staggered terms and a limit of six years of continuous service. *Tucker Aff., ¶ 22.*

44.     In December 2000, the Board voted to accept the results of Tucker's negotiations with the Public Charities Division.  New Board members were appointed at the corporation's annual meeting; Tucker was elected president of the Board; and new members were appointed to the Board of Eastern Mass. *Tucker Aff., ¶ 23.*

45.     During the time when these governance matters were being worked through, the new interim executive director, Paul J. Cote, Jr. ("Cote") and other members of the Greater Lynn staff, with the assistance of counsel, were correcting the financial, management, and retirement benefits administration problems that the Board's internal investigation and the Public Charities Division's inquiry had identified.  Accordingly, when Tucker became president, the principal remaining issues that the Public Charities Division had raised and that Griffin, in his final report in October 2000, had recommend that Greater Lynn resolve were the restructuring of the administration of Greater Lynn's employee benefits program; the merge of Eastern Mass. into Greater Lynn; and the amendment of the Board's bylaws.  The Board amended its bylaws in December 2001; a new administrative structure for the employee benefits program was implemented during 2002; and Eastern Mass. merged into Greater Lynn effective July 1, 2003. *Tucker Aff., ¶ 24.*

## LACK OF ANY QUALIFIED TUITION EXPENSES IN PERIOD BEFORE APRIL 11, 2001

46.     Bleau never took any course at any accredited college from November 2000 until April 11, 2001.  *Bleau Depo., at 96, 100-101, 267.*

*47.*     The first course that he took after his departure from Greater Lynn was signed up for on April 12, 2001.  *Bleau Depo., at 96-97, 100-101, 267; see Harrington Affidavit, Exhibit G, at 115-116.*

48.     He did not request payment for this until he sent a letter to Greater Lynn counsel on April 13, 2001, both after the material breach of the Separation Agreement.  *Bleau Depo., at 99-101, 267.*

## SELECTION PROCESS FOR NEW EXECUTIVE DIRECTOR IN 2003

49.     In July 2002, the Greater Lynn Board formed a special committee to select a new executive director and five Board members were appointed to it, including Board president Robert Tucker.  *Tucker Aff., ¶ 25.*

50.     The committee received approximately 120 applications for the position.  From these, the committee selected twenty for further evaluation and chose eleven to interview.  Following those interviews, the committee recommended that the Board consider three candidates and offer the position to one of them.  *Tucker Aff., ¶ 26.*

51.     Bleau applied in August 2003.  He was one of the applicants whom the committee determined not to consider further.  He, along with the approximately 100 other applicants in this category, received a letter thanking them for their interest.  *Tucker Aff., ¶ 27.*

52.     The committee was unaware at the time that Bleau suffers from any disability.  *Tucker Aff., ¶ 28.*

53.     While the committee considered Bleau's application, no member voted to pursue it.  Tucker, a member of the committee, regarded other applicants as more qualified and believed that the new executive director should be someone new to Greater Lynn.  *Tucker Aff., ¶ 29.*

54.     The committee discussed Bleau's application briefly and no member mentioned his or her belief that Bleau was suffering from a disability or that Bleau was unsuited for the position of executive director because he was suffering from a disability.  *Tucker Aff., ¶ 30.*

55.     The person whom the Board selected was well-qualified and did not have any prior connection with Greater Lynn, a fact that was regarded as a significant attribute given the past financial and management difficulties involving Bleau.  *Tucker Aff., ¶ 32.*

## BLEAU'S 2003 BANKRUPTCY

56.     On July 2, 2003, Bleau filed a voluntary petition for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts. *Harrington Affidavit, Exhibits A and B.*

57.     Bleau did not declare his right of action against Greater Lynn as an asset of his estate. *Harrington Affidavit, Exhibit B and C.*

58.     On January 14, 2004, the Chapter 7 Trustee, Joseph Braunstein, filed a Report of No Distribution. *Harrington Affidavit, Exhibit A, Docket.*

59.     On February 18, 2004, the Bankruptcy Court ordered Bleau discharged. *Harrington Affidavit, Exhibits A and D.*

60.     On March 8, 2004, the very day this action was filed, the Bankruptcy Court ordered the bankruptcy case closed.   *Harrington Affidavit, Exhibits A and E.*

## ALLEGED DEFAMATORY STATEMENTS

*61.*     At no point after the Separation Agreement did anyone from Greater Lynn disparage Bleau to any third party. *Cote Aff., ¶ 15; Cowdell Aff., ¶ 10; Affidavit of Elaine White ("White Aff."), at ¶¶ 6, 10(c).*

*62.*     Aside from providing copies of the Griffin Report to the Board of Directors, no one from Greater Lynn distributed the Griffin Report to anyone. *Cowdell Aff., ¶ 10; White Aff., ¶ 10(b).*

*63.*     No prospective employer has ever inquired about Bleau. *Cote Aff., ¶ 11' Cote Aff., ¶ 15; White Aff., ¶ 10(a).*

*64.*     Greater Lynn did not want any publicity concerning the Attorney General

investigation, Bleau's termination, and its past financial difficulties.  *Cowdell Aff., ¶ 10.*

### Alleged Post-Separation Agreement Dissemination of the Griffin Report

*65.*    Bleau has no knowledge of anyone from Greater Lynn disseminating the Griffin Report to a third-party.  *Bleau Depo., at 137.*

66.    The newspaper reporter who inquired about the Griffin Report to Bleau never indicated that he had received it from anyone at Greater Lynn.  *Bleau Dep., at 113-115.*

*67.*    The Griffin Report was submitted to the Attorney General's Office, and the respective general counsels for DMH and DMR.  *Cote Aff., ¶ 7.*

*68.*    The Griffin Report is a public record.  *Cote Aff., ¶ 7.*

*69.*    No one from Greater Lynn disseminated the Griffin Report to any third-party.  *Cote Aff., ¶ 10; White Aff., ¶ 10(b).*

### Elaine White's Alleged Statements to Fellow Worker.

70.    Bleau has no personal knowledge of Greater Lynn employee Elaine White telling a garage worker that Bleau was a "crook" who had stolen money.  *Bleau Depo., at 174, 176.*

71.    Bleau does not know the worker's name who he alleges was told this and that the incident may have occurred prior to Greater Lynn executing the Separation Agreement.  *Id. at 174, 176, 179-180.*

*72.*    The garage worker was a fellow employee of Elaine White, as both were employees of Greater Lynn.  *Id. at 177; White Aff., ¶ 8.*

*73.*    Elaine White never made a disparaging remark concerning Bleau.  *White Aff., ¶¶ 6-8.*

*74.*    At some point during Bleau's leave of absence, Greater Lynn instructed not to go Greater Lynn premises.  At some point prior to Cote becoming Interim Executive Director in

14

about July 2000, Fleet Manager, Charlotte Alimenti, went to Elaine White and told her that Matt, the automotive mechanic, told her that Bleau was showing up at the garage unannounced, requesting service on the company vehicle. At the time, Bleau was driving a company vehicle. At the time, Bleau was still employed by Eastern Mass. As Greater Lynn did not want Bleau to show up on the premises unannounced, White told Alimenti to tell Matt to tell Bleau that he would need to make an appointment with either Alimenti or White before his vehicle could be serviced. Matt, the automotive mechanic, was an employee of Greater Lynn at the time. *White Aff., ¶ 8.*

### Elaine White's Alleged Statements to James McKissock

75.    Bleau has no knowledge of Elaine White saying to James McKissock of the Marquis Resort in New Hampshire that Bleau had "stolen" money. *Bleau Dep., at 182, 184-185, 188.*

76.    Elaine White vacationed at the Marquis Resort in the summer of 2000, before the Separation Agreement. *Bleau Depo., at 182, 184-185, 188.*

77.    Elaine White never made a disparaging remark concerning Bleau to McKissock. *White Aff., ¶ 6.*

78.    Bleau acknowledges that McKissock may have communicated this to him before the Separation Agreement. *Bleau Dep., at 187-188.*

### Paul Cote's Alleged Statements to the Board in April 2001.

79.    Bleau has no personal knowledge of Paul Cote, his replacement as executive director, telling others that Bleau had "stolen" money from Greater Lynn and the retirement plan, had violated ERISA, and that he was going to be indicted. *Bleau Depo., at 212-213.*

80.     Bleau alleges that such statements were made during a joint meeting of the Boards of Greater Lynn and Eastern Mass. in April 2001. *Id. at 213-214.*

*81.*     In the spring of 2001, Bleau himself expected to be indicted by the Attorney General's Office. *See Harrington Affidavit, Exhibit G. Bleau's May 11, 2001 Letter to Attorney General's Office; Bleau Depo., at 191.*

**Local Newspaper Articles.**

*82.*     Bleau cannot point to any newspaper article that states something that is untrue about him. *Bleau Dep., at 209-210; 281-285.*

*83.*     Bleau has no information that Greater Lynn was the source of any negative information in any newspaper article. *Bleau Dep., at 281-285.*

*84.*     No one from Greater Lynn ever made a disparaging remark about Bleau to any reporter or member of the media. *Cote Aff., ¶ 16; White Aff., ¶ 10(d); Cowdell Aff., ¶ 12.*

**Paul Cote's Alleged Statements to Arthur Brady.**

85.     Bleau has no personal knowledge of what, if anything Paul Cote told Arthur Brady, the President of a regional Executive Directors and Providers Council, in 2002. *Bleau Depo, at 138-142; see also Bleau Affidavit, Docket No. 72, ¶ 5.*

86.     If Cote did in fact tell Brady what Bleau alleges was said, namely, that Bleau was under investigation and had caused serious financial problems at Greater Lynn, such statements would have been true. *Tucker Aff., ¶ 12.*

**Alleged Statements to Kennebec Valley Mental Health Center.**

*87.*     Bleau does not know the person from the Kennebec Valley Mental Health Center ("Kennebec Valley") in Maine who told Bleau that he had received negative information concerning Bleau from someone at Greater Lynn. *Bleau Dep., at 144-145.*

88.    The only information Bleau has is that the person from Kennebec Valley received negative information concerning Bleau. *Bleau Dep., at 151.* This person did not tell Bleau who from Greater Lynn provided this person with such information. *Id. at 150.*

89.    In fact, Greater Lynn has never received a job inquiry concerning Bleau. *Cote Aff., ¶ 15; Cowdell Aff., ¶ 11; White Aff., ¶ 10(a).*

**Alleged Statements to DMR.**

90.    Bleau has no information that anyone from Greater Lynn was the source of Deborah Thurber, a supervisor for Mental Retardation Services for DMR, telling him that she had heard he was "under investigation by the Attorney General's Office and that everyone in DMR also thought this was the case." *Bleau Affidavit, Docket No. 72, ¶ 7; White Aff., ¶ 6.*

91.    In fact, Thurber told Bleau that she had received this information from her supervisors at DMR and never gave any indication to Bleau that they had received it from Greater Lynn. *Bleau Depo., at 155.*

92.    Bleau in fact was under investigation by the Attorney General 's Office. *Tucker Aff., ¶ 12; Harrington Aff., Exh. G.*

**Alleged Statements to the North Shore ARC.**

93.    Bleau has no evidence that anyone from Greater Lynn was the source of statements alleging made during board meetings of the North Shore Association of Retarded Citizens ("North Shore ARC") that Bleau had "stolen funds" from Greater Lynn. *Bleau Depo., at 163-164.*

17

***State Trooper Assigned to AG's Office Calling Bleau a "Drug Addict"***

94.   With respect to Bleau's assertion that, in May 2001, a State Trooper's called him a "drug addict", Bleau has no information that Greater Lynn had made any statement to the trooper to that effect. *Bleau Depo., at 198, 202-203.*

***Robert Griffin's Alleged Statements to James Cassetta.***

95.   With respect to Bleau's assertion that James Cassetta, the executive director of Work, Inc., told him in 2003 that Robert Griffin had told him in the previous year that there had been financial problems with Bleau at Greater Lynn and that there was money missing *(Bleau Depo., at 205-209)*, Griffin was a private attorney and Bleau has no information that Griffin did any work for Greater Lynn since October 2000. *Bleau Depo., at 207.*

96.   Such statements, if made, would have been true. *Tucker Aff., ¶ 12.*

Respectfully submitted:

The Defendant,
BRIDGEWELL, INC.,
by its attorneys,

*/s/ William T. Harrington*
William T. Harrington (BBO No 564445)
Glynn, Landry, Harrington, & Rice, LLP
10 Forbes Road, Suite 270
Braintree, MA 02184
(781) 356-1749

*/s/ Edward P. Harrington*
Edward P. Harrington (BBO No. 559482)
8 Winter Street, 12th Floor
Boston, MA 02108
(617) 423-5959

Dated: January 18, 2007

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 18, 2007, I filed this document with the Court electronically via the Court's CM/ECF system and that I served a copy of this documents upon each counsel and party who has appeared in the action but who has not signed up to receive electronic notice, serving a copy by first class mail.

<u>/s/ William T. Harrington</u>
William T. Harrington