UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
ALBERT WILLIAM BLEAU, JR.,           )
        Plaintiff                   )
                                    )           CIVIL ACTION
v.                                  )           NO. 04-10469-WGY
                                    )
BRIDGEWELL, INC., et al,            )
        Defendants                  )
_____)

**AFFIDAVIT OF ROBERT F. TUCKER
IN SUPPORT OF DEFENDANT BRIDGEWELL'S
MOTION FOR SUMMARY JUDGMENT**

I, Robert F. Tucker, hereby depose and state as follows:

1.   I make this affidavit on my own personal knowledge, except where otherwise indicated.

2.   From 1998 through 2003, I was a member of the Board of Directors (the "Board") of the Greater Lynn Mental Health and Retardation Association ("Greater Lynn"). I served as treasurer for two years (1999 and 2000) and as president for three years (2001 through 2003).

3.   Greater Lynn is a regional non-profit mental health agency. It provides residential facilities, outpatient clinic services, job placement and support, counseling, and other mental health services to clients in Middlesex and Essex counties. It receives substantial support from the Commonwealth of Massachusetts, primarily through its Department of Mental Health ("DMH") and Department of Mental Retardation ("DMR").

4.   Greater Lynn is also a public charity under Massachusetts law and is regulated by the Public Charities Division ("Public Charities Division") of the Massachusetts Attorney General's Office.

5.  The business affairs of Greater Lynn are managed by its Board. The Board appoints several officers who are responsible for the day-to-day operations of the agency. When I first became a member of the Board, the executive director was Greater Lynn's principal officer.

6.  The plaintiff, Albert W. Bleau ("Bleau"), was Greater Lynn's executive director at the time I became a member of the Board. He held that position for a longtime, perhaps, since the mid-1970's.

7.  During the fall of 1999, the Board was informed of certain personnel matters, among which were issues that involved Bleau and his (now former) wife, who was also an employee of Greater Lynn. While some of these issues were resolved when the Bleau's wife resigned from her position, others remained open. As a result of these issues, Greater Lynn placed Bleau on paid administrative leave.

8.  The Board received advice of counsel and, relying on such advice, authorized counsel to commence an investigation. The scope of this investigation included Bleau's management of Greater Lynn's employee fringe benefit program; certain expenditures of Greater Lynn funds that Bleau had made or that were made under his direction; and Bleau's management of the operations of Eastern Massachusetts Housing Corporation ("Eastern Mass."), a close affiliate to Greater Lynn of which Bleau was also executive director.

9.  Greater Lynn's counsel at that time were Roderick MacLeish ("MacLeish") and Robert Sherman ("Sherman").

10. In December 1999, the Public Charities Division made an initial inquiry.

11. Early in February 2000, the Massachusetts Attorney General's Office informed the Board that its Public Charities Division had initiated an investigation of Greater Lynn and

that its Criminal Division had initiated a criminal investigation of Bleau. The Board informed the Attorney General's Office that it would cooperate fully.

12.     During the winter and spring of 2000, I met several times with Assistant Attorney General Jamie Katz and Assistant Attorney General Eric Carriker, both assigned to the Pubic Charities Division. They informed me that the Attorney General's Office regarded Greater Lynn to be in serious financial and management difficulty and that the Office placed the responsibility for these difficulties in the hands of the Board and identified Bleau as the individual whose actions had created them. In particular, they asserted that Bleau had made improper expenditures of state contract funds; that he had misused Greater Lynn and employee retirement funds; that Greater Lynn had submitted incorrect financial reports to DMH and DMR. The two AAGs further informed me and other members of the Board that, unless a management agreement were entered into pursuant to which the Board would retain the services of a management advisor, restructure its membership, and appoint a new executive director, the Attorney General's Office would commence an action to place Greater Lynn in receivership.

13.     As part of its response to the Attorney General's Office's investigation, the Board appointed additional counsel to negotiate a resolution of the investigation. These negotiations culminated in a management agreement between Greater Lynn and the Attorney General's Office that was entered into in May 2000. Along the way to this agreement, the Board received information from the Attorney General's Office sufficient to warrant its termination of Bleau's employment.

14.     On April 20, 2000, the Board voted to terminate Bleau's employment. Because of his length of service, the Board voted to negotiate a severance agreement with him and to give him an opportunity to resign.

15. In early May 2000, Greater Lynn and the Attorney General's Office entered into a management agreement, pursuant to which attorney Robert Griffin was appointed to the position of management adviser. A true and accurate copy of the management agreement is attached as Exhibit A.

16. During the period of May through December 2000, I participated on behalf of the Board in continuing negotiations with the Public Charities Division. The Public Charities Division opposed any further role for Bleau with either Greater Lynn or Eastern Mass.; required Greater Lynn to revise its employee benefits program; and sought the resignations of all of the members of the Board and their replacement by persons with no prior contact with or knowledge of Greater Lynn.

17. While Greater Lynn had placed Bleau on administrative leave in the fall of 1999 and voted to terminate him in April 2000, Eastern Mass.'s Board did not and allowed Bleau to continue working.

18. The Public Charities Division also urged Greater Lynn to merge with Eastern Mass. as well as to correct certain accounting matters, primarily interagency loans and transfers, and to liquidate certain assets that Eastern Mass. held for the benefit of Greater Lynn or its employee benefits funds.

19. The Board's efforts to accommodate the Public Charities Division precipitated conflict with Eastern Mass.

20. Negotiations with Bleau on a severance agreement continued throughout the summer of 2000. When Bleau refused to sign the Board's final offer, he was terminated, effective September 8, 2000.

21.     In November 2000, Greater Lynn, Eastern Mass. and Bleau entered into a Separation Agreement and General Release ("Separation Agreement").  The Board intended this Agreement to, among other things, put an end to Bleau's relationship with both Greater Lynn and Eastern Mass.

22.     Following the Separation Agreement, the Public Charities Division continued to press for the replacement of all of the members of the Board.  Further negotiations, in which I participated, resulted in an agreement that, among other things, provided for the resignation of all but two of the Board members (myself and another); the recruitment of new members from among those persons suggested by the Public Charities Division, as well as others with an interest in mental health agency operations; and the amendment of the Board's bylaws to provide for staggered terms and a limit of six years of continuous service.

23.     In December 2000, the Board voted to accept the results of my negotiations with the Public Charities Division.  New Board members were appointed at the corporation's annual meeting; I was elected president of the Board; and new members were appointed to the Board of Eastern Mass.

24.     During the time when these governance matters were being worked through, the new interim executive director, Paul J. Cote, Jr. ("Cote") and other members of the Greater Lynn staff, with the assistance of counsel, were correcting the financial, management, and retirement benefits administration problems that the Board's internal investigation and the Public Charities Division's inquiry had identified.  Accordingly, when I became president, the principal remaining issues that the Public Charities Division had raised and that Griffin, in his final report in October 2000, had recommend that Greater Lynn resolve were:  (1) the restructuring of the administration of Greater Lynn's employee benefits program; (2) the merger of Eastern Mass.

5

into Greater Lynn; and (3) the amendment of the Board's bylaws. The Board amended its bylaws in December 2001; a new administrative structure for the employee benefits program was implemented during 2002; and Eastern Mass. merged into Greater Lynn effective July 1, 2003.

25. In July 2003, a special committee was established to select a new executive director. Five Board members, including myself, were appointed to it.

26. The committee received approximately 120 applications for the position. From these, the committee selected twenty for further evaluation and chose eleven to interview. Following those interviews, the committee recommended that the Board consider three candidates and offer the position to one of them.

27. Bleau applied in August 2003. He was one of the applicants whom the committee determined not to consider further. He, along with the approximately 100 other applicants in this category, received a letter thanking them for their interest.

28. I was unaware at the time and remain unaware that Bleau suffers from any disability.

29. While the committee considered Bleau's application, no member voted to pursue it. Speaking for myself, I regarded other applicants as more qualified and I believed that the new executive director be someone new to Greater Lynn.

30. The committee discussed Bleau's application briefly and no member mentioned his or her belief that Bleau was suffering from a disability or that Bleau was unsuited for the position of executive director because he was suffering from a disability.

31. In my opinion, it would not have been in the best interests of Greater Lynn to re-hire Bleau as executive director and, if Greater Lynn had done so, I believe that the Attorney

6

General's Office would have regarded the appointment as a breach of the management agreement that I had help negotiate.

32. I believe that the Board appointed an individual who is well-qualified and whose lack of involvement in the controversies that had troubled Greater Lynn in the past is a significant advantage to Greater Lynn.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _16_ DAY OF JANUARY, 2007.

Robert F. Tucker

CERTIFICATE OF SERVICE

      I hereby certify that, on January 18, 2007, I filed this document with the Court electronically via the Court's CM/ECF system and that I served a copy of this documents upon each counsel and party who has appeared in the action but who has not signed up to receive electronic notice, serving a copy by first class mail.

                                                */s/ William T. Harrington*
                                                William T. Harrington

Case 1:04-cv-10469-WGY   Document 162   Filed 01/18/2007   Page 8 of 8