# KROKIDAS & BLUESTEIN LLP

ATTORNEYS

141 TREMONT STREET

BOSTON, MASSACHUSETTS 02111

RICHARD M. BLUESTEIN
MARIA J. KROKIDAS
SAMUEL NAGLER
JANET STECKEL LUNDBERG
ROBERT J. GRIFFIN
VINCENT J. PISEGNA
PAUL V. HOLTZMAN

TELEPHONE
(617) 482-7211
TELECOPIER
(617) 482-7212

ELKA T. SACHS
ANTHONY J. CICHELLO
JENNIFER GALLOP
BRENDA DAVIS HARSHAM
LORI LOCASCIO

ELIZABETH C. ROSS
OF COUNSEL

October 13, 2000

**VIA HAND DELIVERY**

Eric Carriker, Assistant Attorney General
Deputy Chief, Division of Public Charities
Public Protection Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698

Re:    Greater Lynn Mental Health and Retardation Association, Inc.
("Association")/Management Advisor's Interim Report

Dear Mr. Carriker:

This letter is in response to your letter of September 22, 2000 in which you ask me to provide the Office of the Attorney General a written interim report in my capacity as management advisor, in accordance with paragraphs (2), (3) and (4) of the May 2, 2000 agreement (the "Management Agreement") between the Attorney General and the Association. You asked that my report address all the matters referenced in paragraphs (2) (a)-(f) and 3 (a) and (b), with particular emphasis on certain areas. What follows is my interim report with particular emphasis on the areas that you requested. Your questions are reprinted in dark print.

**(1)    In your discussion about the Association's accounting procedures and spending practices under paragraph (2)(e), please detail the Association's past procedures and practices regarding the Employee Fringe Incentive Plan ("EFIP"), including: (a) the nature and amount of any inaccurate cost reporting by the Association to the Commonwealth in connection with EFIP; (b) the extent to which any contributions paid by Association employees exceeded costs associated with the EFIP; and (c) any ERISA implications in connection therewith;**

## A.   Description of EFIP

It appears as if the EFIP was established in 1988, effective in fiscal year 1989. The Association does not have a single document that fully describes the EFIP. A partial description

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 2

of the EFIP is included in the Employee Manual (the "Manual") in a section entitled "Employee Benefits." (Attached hereto and marked as Exhibit 1 is a copy of the one and one quarter page description.)  According to the Manual, the EFIP has three main objectives:

1.  Provide traditional employee benefits (medical, dental, disability and life insurance) to all eligible employees;

2.  Utilize savings/gains from existing benefit programs to provide additional benefits such as a contribution to a retirement plan, or tuition reimbursement; and

3.  Provide incentive for employees to become long term, productive members of the Association.

The EFIP self funded certain benefit plans.  Savings from those plans were to provide additional employee benefits.  Specifically, the Manual provides that "(a)ny excess 'refunds' from the self-insurance plan are returned to the employee through the Agency Retirement Plan, Tuition Reimbursement Plan and Wellness Benefit."  The Manual further provides that the "refunds" can also be used for claims reserve, the employee assistance program and administrative/unemployment.

There is no Association document that explains the governing structure of the EFIP. Based upon what was provided by the Association there are minutes of some of the EFIP Committee meetings from 1991-1999.  There are no minutes for many meetings which were scheduled and apparently held.  The minutes that are available do not include motions and votes adopting actions by the EFIP Committee.

Included in the minutes are copies of a draft agreement by and between the Association and John Papanastasiou d/b/a Papanastasiou Insurance Agency ("Papanastasiou") for FY98. This unsigned agreement provided for Papanastasiou to administer the claims processing and to provide employee orientation.  It did not give Papanastasiou authority over the distribution of surplus funds.  There are no other agreements included in minutes of the EFIP Committee meetings.

Upon a review of documents prepared prior to, or at about the time of the effective date of the Management Agreement, there was disagreement between the Association's former executive director and the Association's former corporate counsel as to who and how the EFIP was administered.  On the one hand, the former executive director asserted that the EFIP was overseen by the EFIP Committee which met regularly to review the benefits and finances of the EFIP and to make recommendations concerning benefits.  The EFIP Committee was comprised of the Association executive director, representatives of senior management, officers/directors of the Association, a third party administrator and a volunteer consultant.  There was wide

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 3

circulation to Association employees about the benefits available through the EFIP. On the other hand, former Association corporate counsel claims that the former executive director dictated what benefits would be available to whom and under what conditions. By the sheer force of his personality and his executive level position, the former executive director made policy for the EFIP. Employees were generally kept in the dark about the EFIP expenses, particularly as it related to real estates investments and non-fringe benefit expenses. Former Association corporate counsel's views are substantiated, as described below.

Based upon a review of the minutes of 24 EFIP Committee meetings (also called Investment Committee Meetings) the former executive director attended every meeting, members of senior staff attended 21 meetings and Papanastasiou attended 18 meetings. There was less participation from officers/directors of the Association and a volunteer consultant. Their attendance was 7 meetings and 3 meetings respectively. As mentioned earlier the minutes of the meetings do not include motions and votes. Since there are no votes and governing documents it is difficult to determine what constituted legally binding action by the EFIP Committee. Furthermore, it is unclear as to how the EFIP Committee acted in a manner fully consistent with the Manual, i.e. to provide retirement, tuition, wellness and unemployment benefits in addition to medical, dental and disability benefits. For example:

- In an undated document entitled "Investment Account Balances", which summarizes profit sharing plan account balances as of 06-30-93, there is an entry under V as follows: "In 1992 the Employee Fringe Incentive Plan loaned $150,000 at 8.00% per annum to Greater Lynn Special Needs Housing Corporation as first mortgagee for the purchase of the property located at 65 Central Street, Lowell, MA." Greater Lynn Special Needs Housing Corporation, also referred as "GLSNHC", and which subsequently changed its name to Eastern Massachusetts Housing Corporation ("EMHC"), is a related nonprofit corporation that owns almost all the property out of which the Association operates its programs.

- In a January 5, 1994 document entitled "Agenda" there is an entry under item III Loan Agreement Between GLMH&RA and GLSNHC as follows: "1. $200,000 Loan Agreement, 4% over 50 years. 2. $60,000 – Lease to GLSNHC for NH property (4 units). Charge to Prevention. Actual costs paid only. 3. Need SNHC (sic) vote and Clerk Certificates from CLSNH (sic) & GLMH&RA on loan agreement."

- In an August 31, 1994 document entitled "Investment Committee Meeting Minutes – Draft" at item 6 there is an entry as follows: "Recreation/Vacation account: Billed 75K out of FY 94 wellness account for purchase of the Marquis Cortel property."

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 4

- In an Investment Committee meeting dated March 21, 1995 there is mention of a $70,000 loan for NH property to GLSNHC, the need to review structure of NH loans, restructure rentals for NH and Florida, increase market week rentals and decrease rental costs for off weeks.

- In an April 4, 1995 EFIP meeting attended by Al Bleau and John Papi (sic) at page 4 there is an entry as follows: "utilize cash flows (current refunds) to fund NH/Florida properties."

- In an Investment Committee meeting dated May 30, 1995 the following entries were made at page 2: "... make sure paperwork was set up for $75,000 each NH properties—Loans between John Pappi (sic) and Eastern Mass Housing Corp. 6% ... borrow $395,000 from EFIP to make up for cash flow shortfall improvements. " The following properties were listed:

    1. 135 No. Common Street $200,000 20 year amortization
    2. Essex Plaza $160,000 10 year amortization
    3. Tewksbury $35,000 20 year amortization

- In Finance/Investment Committee Team meeting minutes dated December 10, 1996 under agenda item "1997 Appropriation" the following entry was made: "EFIP to pay $1500 for legislative breakfast, GLMHRA to pay balance."

- In EFIP Meeting Minutes dated December 9, 1997 the following entries were made: "Al explained that there is no money for retirement this year, possibly July 1st of next year. The group expressed that retirement should be first priority in benefits next year because all employees will benefit. Al discussed the possibility of reducing the costs of the vacation property, suspending loan payments so that the EFIP money could be used for other benefits."

- There is an October 5, 1998 letter that directs Papanastasiou to pay $229,288.92 to EMHC and that there are four notes for these properties. The loans are amortized over 50 years at a 2% rate of interest.

- In EFIP Committee minutes dated October 6, 1998 the following entry was made at the bottom of page 1: "... check ... for how much besides the $90,000 from the EFIP is the vacation property subsidized."

In none of the entries is there any evidence that the EFIP Committee approved the transactions. It is apparent that the former executive director made the decisions on the EFIP.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 5

There is no mention of how the transactions provided a benefit to employees. The transactions were not consistent with the Manual. The December 9, 1997, entry followed by the October 5, 1998 and October 6, 1998 entries, illustrate how inconsistent with its mission the EFIP Committee actions were. Despite there being an explicit understanding that the EFIP should focus more on providing retirement benefits for the benefit of all employees, the EFIP continued to fund real estate ventures, and the return on the ventures were far below what would be considered reasonable. The EFIP Committee, directed by the former executive director, was more interested in making real estate deals that provided little, if any benefit to the employees on the whole than in providing benefits in which all Association employees could participate.

B. Inaccurate Cost Reporting

In addition to the mismanagement of the EFIP, there are problems with how the EFIP costs were reported (or not reported) to the Commonwealth. The Association has had an eleven year history of overstating its fringe benefit costs for the purposes of creating a rebate or surplus from which certain additional fringe benefits was provided, but from which numerous inappropriate non-fringe benefit expenses were made. Specifically, loans not properly disclosed on audited financial statements were provided to EMHC, a related party, to purchase community residences and vacation properties. Subsidies were provided to cover operating losses incurred by vacation homes owned by EMHC. The surplus was also used to pay lobbyists, purchase tickets to sporting events and acquire a tanning bed, among other improper items - instead of providing retirement benefits and other benefits.

The Association employees who wanted to participate in the EFIP were required to enroll in the EFIP's medical, dental, disability and life insurance programs. Both the Association and the employees made contributions towards the premiums. The amount of contributions varied by benefit program. For example, the Association paid approximately 85% of the medical premium and only 25% of the disability premium. The employees contributed the balance.

Medical, dental and disability are self insured. The medical premiums are sent to MED TAC, a third party administrator. Up until earlier this year, the dental and disability premiums were sent to Papanastasiou, another third party administrator. Now MED TAC receives the dental and disability premiums. Papanastasiou is also identified in the Manual as the Association's insurance agent. Up until this year, after MED TAC collected the premiums, took an administrative fee and made payments to providers, it transferred the surplus funds to Papanastasiou. Papanastasiou would combine the medical program surplus funds with surplus funds attributed to the dental and disability programs and direct them to a bank account entitled "Papanastasiou Insurance Agency Greater Lynn Mental Health & Retardation Employee Fringe Incentive Plan."

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 6

The EFIP fund was not audited by the Association's CPA. Although the Association's employer identification number was used for the bank account, when the Association's CPA sent confirming letters to banks that held the Association's accounts, the EFIP account was not included because it was in Papanastasiou's name. In short the EFIP plan is an "off the books account" which has never been subject to a certified audit or even a compilation.

The former executive director, who was and still is the executive director of EMHC, acted as the administrator/executive director of the EFIP. Because of his controlling positions, EMHC and the EFIP are related parties. The former executive director arranged for a different CPA firm to audit EMHC. This firm did not report the existence of related party loans between the EFIP and EMHC until the FY1999 audit. Because of this nonreporting, the Association's CPA was not aware of the related party loans. This outcome begs the questions of why were different CPA firms were used, why were numerous related party transactions not reported and why was the EFIP not audited.

In late 1999 and early 2000, when the Association board of directors became aware of the lax administration of the EFIP, the Association board of directors directed its CPA to conduct a review of the EFIP. Since the inception of the program in FY1989 up to and including FY1999, according to the Association's CPA, the total surplus from the self insurance plans that has been rebated to the "off the books account" is $2,508,627. If income earned on the rebate is included, the total is $2,789,773.

According to the Association's CPA, as of the end of FY1999 $1,050,984 of the $2,789,773 was spent on additional employee fringe benefits consistent with the Manual; $638,015 was spent on items not included in the Manual. These items also are not included as being reimbursable under the applicable Commonwealth of Massachusetts rules and regulations governing human services agencies like the Association. The Association's CPA has calculated as of the end of FY1999, there are net assets in the EFIP of $1,190,775 consisting of cash, investments, subsidies due from EMHC and notes receivable due from EMHC. Note that this net asset amount is subject to change if the Association's CPA does a more detailed review of the EFIP, such as an audit.

The premium payments to the third party administrators derived from state contract revenue. The Association used the contract revenues to pay employees, who in turn had money withheld to fund the EFIP. The Association also used state contract revenues to make its matching contributions to the EFIP. For example, in its FY1999 Uniform Financial Statements, Supplemental Expense Schedule, which was submitted to the Commonwealth, the Association represented that the total agency expense for fringe benefits equaled $1,633,178. This amount equals the total amount of premiums paid to the third party administrators for medical, dental and disability. The actual expense of these three insurance programs is $1,101,920. Papanastasiou

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 7

rebated $531,258 to the "off the books account." In FY1999, $174,381 from the EFIP was expended on additional fringe benefits consistent with the Manual, resulting in a balance of $356,877. During FY1999, $460,668 from the EFIP was expended on items not included in the Manual as employee benefits and which are not reimbursable under Commonwealth rules and regulations. Examples of some of these inappropriate expenses include operating subsidies to vacation homes owned by EMHC, lobbyist, limousine service, tickets to sporting events and a tanning bed. Thus, the entire balance of $356,877 and surpluses carried forward from previous fiscal years were expended inappropriately in FY99.

In sum, for cost reporting purposes it is not accurate to list $1,633,178 as the Association's FY99 fringe benefit expense. The Association actually spent $1,101,920 on medical, dental, disability insurance and another $174,381 on other benefits consistent with the Manual for a total FY99 fringe benefit expense of $1,276,301. The $1,633,178 entry is an overstatement.

### C. Excess Contributions by Employees

The employee contributions exceed the cost of the disability insurance program. According to the Association's CPA review of the EFIP, from FY1989 to FY1999 the surplus associated with the self-insured disability insurance program equaled $1,428,437, which is greater than one-half of the $2,508,627 rebated to the "off the books account". Some of the disability insurance surplus was directed to other employee benefits consistent with the Manual. The Association's CPA identified $1,050,984 of appropriate fringe benefits being paid from the "off the books account". To calculate an adjusted disability insurance program surplus which recognizes that some of the $1,428,437 surplus was used to fund the $1,050,984 of appropriate fringe benefits; calculate what percent the disability insurance program is of the entire surplus, ($1,428,437 ÷ $2,508,627 = 57%) apply the percent to $1,050,984 ($1,050,984 x .57 = $599,061) and deduct that amount from the disability insurance surplus ($1,428,437 - $599,061 = $829,376). The adjusted surplus associated with disability insurance is $829,376. Since the employees contributed 75% of the disability insurance premium, it is logical to conclude that the employee contributions exceeded the cost of the disability insurance program.

The same is not true with respect to the medical insurance program. The amount of surplus attributed to the medical insurance is $950,083. The employee contribution toward the premium is only 15%. The medical insurance expenses are greater than the sum of the employees' 15% premium contribution.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 8

## D. ERISA

In addition to the cost reporting errors and the mismanagement of the EFIP, there are ERISA related concerns. There may be both technical and substantive violations of ERISA. The Association has hired an expert counsel to review the ERISA issues. Counsel's report is due shortly.

### Conclusions and Recommendations

1. The Association's former executive director directed the type investments and expenses that the EFIP incurred. There was minimal board involvement. The administration of the EFIP was not consistent with the Manual. The EFIP lacked a plan that described how it operated. The EFIP was not subject to independent oversight or audit.

2. The EFIP provided financing for real estate acquisitions and made other non-reimbursable expenses instead of providing retirement benefits and other broad based benefits to Association employees.

3. Cost reports were approved by the Association's board of directors as being an accurate representation of the Association's expenses and revenues, when in fact the cost reports are inaccurate.

4. The cost reports from 1989 to 1999 should be corrected so that the correct fringe benefit expenses are recorded, and the EFIP should be audited.

5. There needs to be confirmation of whether there are ERISA violations, or violations of any other wage law.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 9

(2)     In your discussion about the Association's accounting procedures and spending practices under paragraph (2)(e), as well as the Association's short and long term financial situation under paragraph 2(b), please also provide a detailed analysis, supported by a balance sheet and income statements, of the Association's future financial viability, including: (i) the Association's debt and its plans for how and over what period that debt will be reduced; (ii) the Association's present and projected cash flow; (iii) any present or projected deficit spending levels; and (iv) the Association's ability to withstand payment of any contingent liabilities, including without limitation any contingent liabilities in connection with the EFIP or any non-reimbursable payments the Association has provided to Albert Bleau following his suspension and termination as the Association's executive director;

<u>Background</u>

The Association's financial operations have not been subject to satisfactory board of directors oversight. At the inception of the Management Agreement, the board of directors did not have a finance committee. Only recently has a vote been taken to establish a finance committee. The lack of a finance committee has impeded the board's ability to make prudent decisions. Important decisions on financial matters have not received scrutiny before reaching the board. One such example is when the board of directors deliberated on whether to proceed with tax exempt financing or to seek alternative financing. In some instances, important matters were not brought to the board of directors. The lax oversight of EFIP is one example. Another example is the manner in which the Association, through its former executive director, made subsidies to EMHC.

The Association established an entry on its books called the "Prevention" account. It appears this is a general catch all account that was used to record costs not reimbursed under state contracts. One such expense included in the Prevention account is financial assistance provided to EMHC in the form of a subsidy to defray operating losses at EMHC's vacation homes. These subsidies are in addition to subsidies made by the EFIP. There is no evidence in the corporate records that the board of directors was aware of the Prevention account. The Association's CPA was not aware of these subsidies from the Prevention account.

In addition to there being no finance committee, the Association did not have a chief financial officer. Apparently the former executive director fulfilled the role of chief financial officer. The lack of a chief financial officer for an agency with over $25M in expenses logically resulted in insufficient budget planning and inconsistent cash flow projections. Also, the lack of a full time chief financial officer concentrated too much power in the former executive director. Without a finance committee or a chief financial officer it is not surprising that the minutes from board of directors meetings reveal the board of directors examined the Association's budget only

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 10

twice in over an eighteen month period.  The board of directors did focus on how much cash was on hand to meet current obligations but such an examination is lacking if it is not done in conjunction with an examination of current year spending compared against the budget.

<u>Current Situation</u>

Due in large part to the failure of having an operating finance committee and a chief financial officer, that as of the effective date of the Management Agreement, the Association from a cash flow perspective was penniless.  The cash flow problem was caused by the Association upfronting operating funds to finance capital improvements on properties owned by EMHC.  This, coupled with delays in obtaining long term financing for EMHC and the Association, nearly resulted in missed payrolls.  Now that the long term financing is in place, the Association's cash position is strong.  Its liquidity ratios, such as days cash on hand and current ratio, are currently at or better than the industry norm.

Two months ago the Association board hired an interim executive director, who has the ability to develop financial reports and budgets.  (Note that the Association is in the final stages of hiring a chief financial officer.)  Attached hereto and marked as <u>Exhibit 2</u>, are financial reports, projections and balance sheets for the Association and EMHC (the "FY2001 Financial Reports").  The FY2001 Financial Reports have been shared with the Department of Mental Retardation ("DMR") and the Department of Mental Health ("DMH").  Listed below are highlights of the FY2001 Reports:

(i)    The FY2000 loss for the Association has been reduced to $280,788, which is about $100,000 less than earlier estimates.

(ii)   The FY2001 projected operating loss against budget is projected at $1,058,344, assuming full staffing.  It is impossible to achieve full staffing due to turnover and the lack of qualified staff.  According to the interim executive director, there should be over $300,000 of savings due to staff vacancies. In addition the interim executive director projects that the balance of the projected operating loss can be absorbed through efficiencies.  In short the interim executive director takes the position that the FY2001 operating budget will be balanced by the end of the fiscal year.

(iii)  The cash flow for FY2001 is positive provided there are no contingent liabilities to be satisfied and the Association meets its cost efficiencies described above.  Based upon the enclosed cash projections, the available cash as of July 1, 2000 equaled $1,040,863.  The projected cash available

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 11

as of July 1, 2001 is $2,621,737. This FY2002 starting cash position is based upon no FY2001 operating deficit and no payment of contingent liabilities.

(iv)    The Association's ability to withstand contingent liabilities is dependent upon whether the Association can operate at a break even level for FY2001 and incur limited contingent liabilities. The best cash scenario is that the contingent liability to the Commonwealth is in the $450,000 to $500,000 range (which consists of non-reimbursables under the EFIP plus certain payments to the former executive director less income generated from sources other than state contract revenues, also referred to as "offsetting income"); no EFIP related contingent liability and a FY2001 break even budget. The worst case scenario is that the contingent liability to the Commonwealth is $700,000 to $750,000, plus penalties (this increase is based in part on the Commonwealth not recognizing offsetting income); the EFIP contingent liability is $500,000 to $1,000,000; and there is a $700,000 to $1,000,000 FY2001 operating budget loss. Under the worst case scenario the July 1, 2001 projected available cash of $2.6M would be insufficient.

(v)    The Association's ability to pay off its long term debt, which consists primarily of notes to EMHC, depends solely on the amount of cash that is available after the discharge of contingent liabilities discussed above. Another way to reduce the long term debt to EMHC would be to either offset the debt with the operating subsidies that the Association has provided to EMHC's vacation properties, or to merge the Association with EMHC.

<u>Conclusion and Recommendations</u>

- The Association has not had the benefit of a finance committee or a chief financial officer and as a result it has suffered from poor financial planning and experienced wide fluctuations in cash flow.

- The Association by voting to establish a finance committee, deciding to hire a chief financial officer and hiring an interim executive director with a strong financial background has put in place the foundation on which to improve its financial operations and accounting procedures.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 12

- The Association's CPA should reexamine the Association's books so that all subsidies, including but not limited to those from the Prevention account to EMHC, can be documented and recorded as a loan payable to the Association or an offset (with imputed interest) to the Association's loans.

- The Association needs to quantify its contingent liability to the Commonwealth and its contingent liability, if any, under the EFIP in order to assess whether the financial burden to be placed on the Association is insurmountable.

(3)    **Please detail the nature of the Association's relationship with Eastern Massachusetts Housing Corporation ("EMHC") under paragraph (2)(a), including the management and control of EMHC properties and finances, and the impact of that relationship on the Association's charitable programs and financial viability;**

The Association was established in 1958. EMHC was established in 1978 under its previous name of Greater Lynn Special Needs Housing Corporation (A copy of EMHC's articles of organization are attached hereto and marked as Exhibit 3.) Its purpose was to hold real estate and lease the same to the Association. EMHC's by-laws which were in effect then, and based upon EMHC's corporate records are still in effect today (a copy of which are attached hereto and marked as Exhibit 4), reflect the close subsidiary/parent relationship between EMHC and the Association. The by-laws provide that the membership of EMHC shall be appointed annually by the President of the Association. The members hold office for one year. No member shall hold office for more than six consecutive years, following which a member shall be ineligible to hold office until the year has elapsed (By-laws, Section 2.1).

Later in 1978 articles of amendment were adopted that clarified the corporate purposes and the liquidation or dissolution provision. (A copy of the articles of amendment is attached hereto and marked as Exhibit 5.)

In 1982 articles of amendment were adopted that expanded EMHC's purposes to purchase and hold real estate and lease the same to any organization exempt under 501(c) (sic) of the Internal Revenue Code. (A copy of these articles of amendment are attached hereto and marked as Exhibit 6.) Also, organizations to receive assets upon liquidation or dissolution was changed to a Greater Lynn organization exempt under 501(c) of the Internal Revenue Code. These changes in 1982 seemed innocuous. Since the Association through the by-laws still controlled EMHC, the Association could make certain that EMHC's assets, which were created solely by the revenues of the Association, would always flow to the benefit of the Association.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 13


In 1989 the purposes were further amended to include advocacy, education, operating programs and fundraising for the mentally ill and the mentally retarded. The amendment also provided for EMHC to lease real estate to individuals. (A copy of these articles of amendment are attached hereto and marked as Exhibit 7). Although at first glance these amendments seemingly placed EMHC in competition with the organization that controlled it, more than likely, these changes were made to make certain EMHC qualified as a Chapter 40(a)(3) organization under Massachusetts General Laws; and allowed EMHC to rent property to individual consumers. Under Chapter 40(a)(3), nonprofit educational corporations are exempt from local zoning restrictions on use. In order to qualify as a Chapter 40(a)(3) nonprofit corporation, based upon court decisions in the mid to late 1980's, nonprofit organizations were encouraged to use the word "education" in its articles of organization, hence the change to EMHC's purposes.

In 1994 the name was changed from Greater Lynn Special Needs Housing Corporation to Eastern Massachusetts Housing Corporation. (A copy of the name change is attached hereto and marked as Exhibit 8.)

In 1995 amendments were adopted which affected Article III of the articles of organization. (A copy of the articles of amendment are attached hereto and marked as Exhibit 9.) The amendments establish that membership shall consist of three to six members with at least one-third being residents of low income neighborhoods.

The last amendment was adopted later in 1995. (A copy is attached hereto and marked as Exhibit 10). The amendment adds to the purposes the provision for decent housing that is affordable to low and moderate income people.

Although the governing documents show that there is a close relationship between the Association and EMHC, based upon a review of the last several years of minutes of board of directors meetings of the respective corporations, it appears as if the Association has not exercised its originally designed powers over EMHC. To wit, the Association has not appointed members to EMHC. In addition, it appears as if the Association has allowed individuals to serve terms of more than six consecutive years. As with the EFIP, it appears as if the Association has been lax in its oversight of EMHC.

The Association and EMHC are related, not only by virtue of the Association's power to appoint EMHC members, but also because: (i) they have two common directors; (ii) EMHC owns nearly all of the Association's leased property; and (iii) they are co-borrowers and co-guarantors on the same tax-exempt bond. Despite the close corporate and legal relationship, over the past ten months the relationship between what is in essence a subsidiary/parent relationship has at times become adversarial. Some of the controversy seems centered on EMHC's view of

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 14


its mission vis a vis the Association.  Other controversy seems centered on personality conflicts between the senior management of the two corporations.

Note that the conflict between the two corporations seems to have started at or around the time that the Association's former executive director was suspended from his position.  Prior to that time, there is no evidence of conflict.  In fact as noted previously, there was the free flow of cash support to EMHC from the Association's Prevention account and the EFIP. The fact that there has been conflict recently raises a larger question of why are there two separate boards? Why has a situation developed where a parent corporation (that is primarily responsible for the assets developed by its subsidiary) has a subsidiary at times acting in a manner inconsistent with it?

Without going into great depth on the nature of EMHC's impact on the Association's charitable programs and financial viability, simply stated EMHC's impact is significant since it owns almost all of the property out of which the Association operates its programs.  The issue to explore is why should the assets that the Association has developed and paid for should not also be owned by the Association.  The original intent of EMHC was to hold and manage real estate for the Association.  The purposes were enlarged, but at the time of the change and up until today, the Association has had the authority to appoint members to EMHC.  Somewhere along the way the Association failed to exercise its authority and EMHC carved out a somewhat independent path from the Association.

<u>Recommendation</u>

At a November, 1999 meeting the Association board of directors voted to explore a merger with EMHC.  It is time to follow up on the Association's vote and merge EMHC into the Association.  After the merger, the Association should divest itself of assets not connected with its mission, i.e. vacation properties and rental properties for low and moderate income housing.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 15

 (4)    **In your discussion about the Association's staffing and employment practices under paragraph (2)(d), please detail: (i) the nature of the past and current relationship between the Association's board of directors and its senior management; (ii) the departure of any senior management staff; (iii) any promotions within or to senior management positions, including the qualifications of the individuals promoted for the positions they filled; and (iv) any other modifications of senior management responsibilities;**

(i) <u>Relationship with Senior Management</u>

 The relationship between the Association's board of directors and its senior management is evolving. In the past, prior to the former executive director's suspension, the relationship was distant. The former executive director directed the Association, EMHC and the EFIP. Other than the former executive director, there was not much interaction between the board of directors and senior management. That changed upon the suspension of the former executive director. Without the strong personality to guide the Association, others came to the forefront to assume leadership responsibilities. Not unexpectedly, there was confusion over the roles of the board of directors and senior management. Whereas in the past, the board and senior management looked to the former executive director for direction, he was no longer present. Board members began to exercise new found authority and were puzzled as to why senior staff would not willingly follow their lead. Senior staff were questioning why the board, which lacked some of senior management's specific skills, should be making decisions on program operating issues, when in the past the board had shown little interest in such matters. In short, the board and senior management were trying to adjust to the roles that they were unaccustomed to playing. Thus in concert with the pressures of an investigation by the Office of the Attorney General and the inability to act decisively on the fate of the former executive director, the relationship between senior staff and the Board was at best strained and at worst hostile. With the hiring of the new executive director, the relationship between the board and senior management has improved as the interim executive director has assisted both groups to understand more fully their respective roles.

(ii) <u>Departure of Senior Staff</u>

 In addition to the termination of Albert Bleau, as executive director, the following individuals resigned from their senior management positions over the past three months: Janine Brown Smith – Contract Manager, Ann Perry – Director of Human Resources and Joan Beasley – Director of Sovner Clinic.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 16

(iii)  Promotions Within or to Senior Management Positions Including Qualifications

One individual was promoted within senior management.  James Cowdell was appointed as Chief Administrative Officer.  (Attached hereto and marked as Exhibit 11 is a copy of the job description.)  According to the interim executive director, James Cowdell met all the job qualifications.  Note that he met the preferred education requirement by substituting experience.

(iv)  Other Modifications of Senior Management Responsibilities

With the appointment of Paul Cote as interim executive director, Elaine White, the acting executive director, has taken on the position as director of operations.  There will be additional senior management changes as the interim executive director implements a reorganization plan that the board of directors adopted several months ago.

**(5)    Please detail and evaluate the past conduct of the Association's board of directors in overseeing the Association's charitable activities under paragraph (3), including particularly the board's oversight of the Association's finances and senior management.**

As described earlier in this letter, the board of directors' past conduct can be characterized as being lax.  The board allowed senior management, in particular, the former executive director too much leeway in managing the Association and the EFIP.  There were not enough checks and balances in place to make sure that the charitable activities of the Association were being fulfilled in a manner consistent with Commonwealth laws, regulations and guidelines governing public charities.  Since the accountability of a public charity rests ultimately with the board of directors, it should follow that the board should be held responsible for the inappropriate expenses of the EFIP.  On the other hand, the board should receive credit for attempting to resolve the problems associated with the EFIP by directing the Association's CPA to review the EFIP expenses.

In the same context, the board of directors should be held responsible for the inadequate financial and lacking accounting systems.  The board should receive credit, however, for hiring Paul Cote as interim executive director as Mr. Cote has made great strides in improving the Association's financial situation.

The board should be held responsible for taking too long on removing the former executive director from the payroll.  However, the board ultimately did remove him.

KROKIDAS & BLUESTEIN LLP

Eric Carriker
October 13, 2000
Page 17


In sum, the Association's board had been lax in exercising its fiduciary responsibilities, but seems to have made progress over the past several months. Whether that progress is too little too late remains to be seen as the Association awaits the results of the analysis of its contingent liabilities.

Sincerely,

Robert J. Griffin


RJG/ma
Enclosures

cc:    Garrick Cole
       Margaret Chow Menzer
       Marianne Greeno
       Jamie Katz

1726\0001\93767.2