# ALBERT W BLEAU JR

Atty. Larry Donoghue
Morgan, Joy and Brown
One Boston Place
Boston, Mass. 02108-4472

December 12, 00

Dear Atty. Donoghue,

I assume you have received the correspondence from James Cowdell to me informing me that GMMHRA has fully complied with the terms of the severance agreement. He also directed me to communicate only with your office.

I filed a complaint against GLMHRA and various officers and staff on October 6th. GLMHRA and these individuals have subjected me to retaliation. This latest directive by James Cowdell is yet another example of retaliation.

GLMHRA has not fulfilled the terms of the severance agreement

The request that I only communicate with your office is a direct violation of the severance agreement and verbal commitments given to me on several occasions by Paul Cote and James Cowdell. They assured me that my termination would be respectful, positive and with continuing communication between GLMHRA and myself. They assured me that no one at GLMHRA would do anything to interfere with my future employment, present duties, or would defame me in any way.

The requirement that no one talk to me is a violation of this agreement. It gives the appearance of wrongdoing and isolates me from one of the largest Human Services agency in the commonwealth.

This action is in sharp contrast to the EMHC Board. I was invited to their board meeting on Monday, December 11th to orient them and Paul Cote on outstanding issues and to make recommendations to the board. (See attached agenda) I have also been asked by board members to make myself available should they have any questions concerning the condo conversion in NH and EMHC financial issues.

With the exception of board member Atty. Sam Vitali, General Counsel for the Lynn Water and Sewer Commission, I was treated with respect and professionalism by the EMHC board members. Sam was his usual condescending, dominating, arrogant self. He didn't yell which was an improvement over past meetings.

**101**

No GLMHRA former employee has been treated with such disrespect, never mind someone who has dedicated 30 years to GLMHRA and 22 years to the Eastern Mass Housing Corporation (EMHC), an affiliate of GLMHRA. Many of us who dedicated our lives to GLMHRA can no longer recognize the company. GLMHRA always had a reputation of caring for its consumers and its present and former employees and treating them with dignity and respect We were proud of our accomplishments and proud to be part of GLMHRA. Major change is needed on the board level and senior staff level for GLMHRA to ever regain the respect it once had.

Thank God for the people in the trenches, the program directors and direct care staff, who are carrying the ball, while the leadership continues "to make major mistakes and to ignore and devalue their employees and consumers and their families".

These corporations would not have enjoyed the success they do today without my years of dedicated, competent service. Their combined assets are in the millions of dollars and their combined operating budgets have gone from $12,000 to over 30 million dollars under by leadership. Thousands of individuals and families have received support and services as a result of these efforts. Thousands of workers have been brought into the Human Services Field by the efforts of GLMHRA and me.

Only during the past year, when I was put on leave, and Elaine was made acting CEO and certain members of the GLMHRA board, GLMHRA Attorneys and Consultants and Eric Carricker and Jamie Katz of the Attorney General's Office took over the GLMHRA have we seen their debt rise, deficits hit over $800,000 in seven months, and services decline and the number of consumers served decrease.

( Note: GLMHRA ended the fiscal year ending June 30th with a deficit of almost $400,000. The financial plan called for GLMHRA to end the year with a $250,000 surplus. EMHC, which has a management contract with GLMHRA, was charged without their approval almost $200,000 in costs that were the responsibility of GLMHRA. Adding up the figures and we see that GLMHRA overspent by over $800,000 with close to $400,000 of this amount being spent on unbudgeted legal and consultant costs authorized by the Board presidents, (Tom Manning and Claire Jackson), treasurers, (Tom Manning and Robert Tucker, the Deputy Director of the Lynn Water and Sewer Commission,), the Acting CEO, Elaine White and the Comptroller (Janine Brown Smith).

My treatment by GLMHRA can only be seen as retaliation against me for filing complaints against GLMHRA, President, Tom Manning; past President and Vice President, Claire Jackson, Elaine White, Janine Brown Smith, Senior Managers Kelly Johnson and Anne Perry: Attys. Eric McKleish, Robert Sherman and Robert Griffin and others who had discriminated against me and violated my civil rights. I agreed to forfeit any complaints against GLMHRA, its agents, staff and board members, as long as GLMHRA complied with the terms of the severance agreement. The ink hadn't dried on the agreement and GLMHRA and its senior staff violated this legally binding contract.

(Note: Attys. McKleish and Sherman are in a law practice together and recently brought in long time DMH and DMR attorney Gray into their practice. Atty. Sherman is a personal friend of State Attorney General Reilly, was an advisor during his recent campaign and did substantial fundraising as well. Reilly was quoted as saying g that he owed his election to Sherman. Sherman and McLeish were responsible for over $300,000 unbudgeted legal and consultant costs billed to GLMHRA from October 99 to May 2000 and the loss of over $800,000 in DMR contract revenue).

Paul Cote and James Cowdell assured me that Elaine White and others would cease from defaming me or retaliating against me. Paul told me that a "gag order" would be put on Elaine White. Yet Elaine continued to defame me and interfere with my duties as Executive Director of EMHC. No supervision, direction or oversight has been given to her or any other staff or any board members by the Executive Director, Paul Cote or his Administrative Assistant, James Cowdell.

I have been told that Elaine is a protected employee, and that no one can do anything against her. This I have been told is because Eric Carricker of the AG's office has ordered people to leave her alone despite her history of incompetence, dishonesty, and vindictiveness. Paul Cote and James Cowdell have not followed through with their commitments made to me verbally and as agreed to in the severance agreement to protect me and my reputation from Elaine and others within the corporation.

(Note: James Cowdell is the past president of the Lynn City Council, and is the current Ward Five councilor. He was recently promoted to administrative assistant with the strong support and lobbying of treasurer, Robert Tucker. This new position was the result of a new reorganization scheme approved by the Board and recommended by Atty. Bob Griffin, the paid agency monitor recommended by Carricker of the AG's office. As a member of the city council and past president, Jim was responsible for approving the members of the Lynn Water and Sewer commission. With Cowdell's support and lobbying they hired Robert Tucker as Community Relations Director and recently promoted him to Deputy Director. As mentioned earlier, Atty. Sam Vitali is the counsel for the Commission and the Vice-President of the EMHC.

The Lynn water and Sewer Commission has been under investigation by the Inspector General's Office (IG) since last April due to alleged irregularities in the award of a 100 million dollar design and sewer construction contract. The IG confiscated all records of the commission in May. The IG can investigate but is dependent on the AG's office to prosecute or mandate any remedies should they be necessary.).

Examples of retaliation and violations of the severance agreement are as follows:

1) In November, I was on my way to the Marquis to meet with the Tilton Planning Board, attorneys Rod Dyer and Bob Deitz and Resort Manager, James MacKissock to finalize the condo docks. and to finalize the final easement issues, when I noticed that my right front tire was bald on the outside and the vehicle was pulling to the right. I was concerned that I could suffer a blow out on the highway causing my SUV to roll

over. I called the agency mechanic at the EMHC garage. (The vehicle is the property of EMHC, and the garage is leased to EMHC and I was the Executive Director of EMHC. GLMHRA oversees the garage for EMHC and EMHC reimburses GLMHRA each year for the salary and fringe of the two garage employees.) Mat responded and put two new front tires on the vehicle. He told me to come back when I returned from NH to have the front end repaired and he seemed to think that new shocks may be necessary and there may be a need for an alignment. He stated that the tie rods were fine. I also told Mat that my emergency brake cable was broken and needed repair. We scheduled a date to have the work done on Thursday of that week.

When I returned from NH on Thursday, Mat told me that Elaine's Assistant, Charlotte Alimenti, told him that Elaine had ordered that no work could be done on the vehicle. She also stated that Elaine White was very upset that Mat had put two new tires on the vehicle. Charlotte stated that Elaine wanted Mat to remember who paid his paycheck and authorized his time sheet. Mat took this as a direct threat to his livelihood. He canceled my appointment. Mat has always had the authority to do emergency repairs on any EMHC vehicle as well as preventative maintenance without any approval from Elaine. Yet, Elaine set up a special approval process for my vehicle only.

Mat said to me that he had a daughter and that he needed this job.
I called James Cowdell to report he incident, and he said he would talk to Paul Cote and have it resolved. He told me to reschedule the appointment.

The following week I called Mat to reschedule the appointment and he told me that Elaine ordered him not to do it. He stated that he had debated the issue with people at the office and couldn't understand their decision since the vehicle was owned by EMHC and it was EMHC's garage. I said, did d Jim or Paul talk to you, and he said no. They told me it was OK. If Elaine or Charlotte give you a problem, call Jim. I then rescheduled with him. The following week, we had a severance meeting with Paul and Jim and they assured me that Elaine would be given a "gag order" and would not be involved with me and that the vhechile would be repaired. That week I called to reschedule and I was told to take the vehicle to Thomas Ford and that the EMHC garage would not repair the vehicle.

It took two weeks to schedule an appointment with Thomas Ford to have the repairs completed.

2) I was working with James MacKissock in NH to market the Marquis and to do the condo conversion. I was also negotiating a severance agreement with him and one of his staff, Robin. Elaine called him and told him that he and Robin would be loosing their medical insurance and would have to be put on COBRA. Jim and the staff saw this as intimidation because they were working with me on the Marquis sale and their severance agreements. I reported this incident by e-mail and voice mail to James Cowdell and Paul Cote.

**104**

3) I informed James Cowdell on four different occasions and Paul Cote during our severance negotiations that my medical bills for my children and me were not being paid. ( see attachment) They assured me they would be taken care of. Yet the non-payments, continued despite the fact that one-month of Cobra had been paid by the EMHC. When I called to complain again to Jim and about Elaine's harassment, he hung up on me and sent me a letter that I could only talk to Atty. Donoghue.

My medical situation to my knowledge is still not resolved and I have almost 1,000 dollars in unpaid medical bills. This is affecting my credit, my position and credibility in the community. Why would the CEO of a company not have his bills paid by the company's insurance carrier, doctors, dentists, and pharmacists wonder, many of whom have known me and my family for over twenty years.

4) On November 27th without my knowledge, GLMHRA canceled my mobile phone. As a result, I lost 12 personal and business messages that were stored in my voice mailbox. I expected and orderly transfer of this number so I could maintain it. My number was canceled, and now all my business and personal relations do not have my mobile number. Also, all the emergency forms I gave to the schools s and the athletic teams for my children now have a disconnected number.

I had four very special messages from my children on my voice mailbox, which I would have been able to record, had the transfer been orderly. They were immediately erased do to the actions of GLMHRA.

This phone was paid by EMHC who did not authorize the shut off of my phone. Only Elaine White and/ or Paul Cote and/ or James Cowdell would have been authorized to disconnect this number.

5) Paul Cote agreed that a joint letter would be sent to all staff, board members and families concerning my resignation. It was supposed to outline my accomplishments and career goals. He also agreed, with James Cowdell present, that a joint press release would be given to the Item as well. They assured me this would be a positive process and that my departure would be amicable and positive for all concerned. They have violated this agreement (see attached Item article). I called Paul Cote on Friday November, 24th and left a voice mail. Paul has not returned my calls, He and Jim have referred me to attorneys for all dialogue and they have allowed Elaine and possibly others to continue with their defamation of my character and with their harassment.

6) They dropped off all my files and personal effects at my garage on Tuesday November, 21st. Paul had agreed that I would be allowed to enter the office after hours to retrieve my belongings. Many files and personal belongings, books and pictures are missing.

I had been requesting these files going back to February. Two of my attorneys requested many of these files in February and March to no avail. I again requested them in July and August. My personal financial files and tax information were there. I have been unable to do my tax returns for 1999.

7) Since I signed the severance agreement, Paul Cote gave an interview to the Lynn Item. In that article, the Item referred to management problems at GLMHRA, obviously referring to me. Paul had agreed to a joint release to the newspaper and not a unilateral statement.

8) They again refused to repair my emergency brake or front end. I have scheduled it with Thomas Ford and my front end is repaired, but my brake will not be repaired until December 22nd.

9) Elaine called James MacKissock at the Marquis the first week in December and counter mandated by directive to Jim to get quotes for the condo insurance from Hastings and Tapley. She again threatened him. I had sent a letter to Hastings and Tapley in late October or early November. They had not responded, obviously as a result of interference from Elaine.

10) I also called your office on two occasions in late November leaving detailed messages concerning the retaliation against me by GLMHRA. You have not returned any of these calls.

Based on the above actions and lack thereof, I have no choice but to file a complaint with the EEOC for retaliation against me by GLMHRA, Elaine White, Paul Cote and James Cowdell. I also believe that your violation of the severance agreement allows me to take whatever action I deem necessary to protect my reputation and chances for future employment.

I believe this may be my only recourse to protect my excellent reputation in the community and in the Human Services Industry and to protect my chances for future employment.

If you have some other alternative, I will listen.

Sincerely,

Albert W. Bleau Jr.



**CLARK UNIVERSITY**
COLLEGE OF PROFESSIONAL AND CONTINUING EDUCATION

> A $45 non-refundable registration fee must be attached in order to process.

# APPLICATION FORM

☑ Mr. ☐ Mrs. ☐ Ms.

Last Name: Bleau  First Name: Albert  Middle Initial: W

Social Security Number: 011 32 6783  Home Phone: 781 477-9072  Work Phone: 751-910 2025

Mailing Address: Street: 127 Redington  City: Swampscott  State: MA  Zip: 01907

E-Mail Address: bleau_al@Email.com

---

**Program Selection:**

☐ Microsoft Office Specialist
☐ PC Service & Support
☐ Microsoft Windows 2000
☐ Oracle DBA
☐ C/S VB/ASP Developer
☐ JAVA Developer
☐ XML and WML Developer

*Web Multimedia Designer*
☐ Web Essentials
☐ Web Design

*Web Graphics Designer*
☐ Graphics Essentials
☐ Web Essentials

*Web Developer*
☐ Web Essentials
☐ Web Design
☒ Web Development

☐ Intro to Programming

*E-Commerce Developer*
☐ Web Essentials
☐ Web Design
☐ Web Development
☐ E-Commerce Development

☐ Intro to DOS  ☐ Intro to Windows

1st Start Date: 4/23/01
2nd Start Date:
3rd Start Date:
4th Start Date:

☒ Day  ☐ Evening

Graduation Date: 7/12/01

Location: (check one)  ☐ Braintree  ☒ Cambridge  ☐ Framingham  ☐ Woburn

---

**Method of Payment:**
☐ Check/Money Order
☐ Cash
☐ Visa/MasterCard
☐ Deferred Payment Option
☐ Plato Loan
☐ Fleet 1st Loan
☐ TERI Alternative Loan
☐ SLM (Salliemae) Loan
☐ Agency ____
☐ Corporation ____
☐ Other ____

$ 9,710.00  Tuition
$ ____  Lab fee
$ 45.00  Registration fee (paid)
$ 75.00  Deferred payment charge
$ ____  Estimated books**
$ 9,790.00  Total
$ ____  Initial payment due 2 wks prior to start date
$ ____  Initial payment required to reserve a seat for Windows 2000 *(includes books)*

** *Not included with tuition payment, except for W2K*

*Please note course content, tuition, fees, book prices and initial payment are subject to change without notice.*

*A tuition payment is due and payable 2 weeks before the start of class and is required to guarantee a seat in class. A $45 non-refundable registration fee is due upon submitting a registration form and must be paid in order to process registration. For those choosing the deferred payment option, a $75 Deferred Payment Charge is due before the start of class and is required to guarantee a seat in class. There is a $30 fee for all returned checks.*

---

**Credit Card Payment:**  ☐ MasterCard  ☐ Visa

Name on Card: ____  Amount to charge $ ____

*I authorize Clark University Computer Career Institute to charge this credit card for the tuition payment that is due upon each due date in accordance to the deferred payment installments.*

Cardholder's Signature ____

**114**

☐ JAVA Developer　　　　　☐ Web Graphics Designer　　　　　☐ E-Commerce Development
☐ XML and WML Developer　　☐ Graphics Essentials　　☐ Intro to Programming　　☐ Intro to DOS　　☐ Intro to Windows

__4/23/01__　　　　　_____　　_____　　_____　　☒ Day
1st Start Date　　　　2nd Start Date　　　　3rd Start Date　　　　4th Start Date　　☐ Evening

__7/12/01__　　　_____　　_____　　_____
Graduation Date　　Graduation Date　　Graduation Date　　Graduation Date

**Location:** (check one)　　☐ Braintree　　☒ Cambridge　　☐ Framingham　　☐ Woburn

**Method of Payment:**
☐ Check/Money Order
☐ Cash
☐ Visa/MasterCard
☐ Deferred Payment Option
☐ Plato Loan
☐ Fleet 1st Loan
☐ TERI Alternative Loan
☐ SLM (Salliemae) Loan
☐ Agency_____
☐ Corporation_____
☐ Other_____

$ 9,710    Tuition
$          Lab fee
$ 45.00   Registration fee  Paid
$ 75.00   Deferred payment charge
$         Estimated books**
$ 9,790.00 Total
$         Initial payment due 2 wks prior to start date
$         Initial payment required to reserve a seat
for Windows 2000 (includes books)

** Not included with tuition payment, except for W2K

*Please note course content, tuition, fees, book prices and initial payment are subject to change without notice.*

*A tuition payment is due and payable 2 weeks before the start of class and is required to guarantee a seat in class. A $45 non-refundable registration fee is due upon submitting a registration form and must be paid in order to process registration. For those choosing the deferred payment option, a $75 Deferred Payment Charge is due before the start of class and is required to guarantee a seat in class. There is a $30 fee for all returned checks.*

**Credit Card Payment:**　　☐ MasterCard　　☐ Visa

Name on Card_____　　Amount to charge $_____

*I authorize Clark University Computer Career Institute to charge this credit card for the tuition payment that is due upon each due date in accordance to the deferred payment installments.*

Cardholder's Signature_____

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐　　　　☐☐☐☐
Card Account Number　　　　　　　　　　　　　　　　Not valid without this expiration date

Authorization No._____　　Authorization No._____
　　　(Initial Payment)　　　　　　　(2nd Payment)

Authorization No._____　　Authorization No._____
　　　(3rd Payment)　　　　　　　　(4th Payment)

Student Signature _[signature]_　　　　　　　　　Date __4/12/01__
Admissions Representative Signature _[signature]_　　Date __4/12/01__

I certify that I have read and received an exact copy of this Application Form, including the Withdrawal Policy and Student Acknowledgements, and I understand my rights and responsibilities as stated on the reverse side of this form.

115



# Tuition Price List

| Program | Tuition |
|---|---|
| PC Service & Support Certificate Program | $7,400.00 |
| Microsoft Windows 2000 Certificate Program | $9,300.00 |
|     Advanced Standing | $8,700.00 |
| Client/Server VB/ASP Developer Master Certificate Program | $7,990.00 |
| Oracle Database Administrator Certificate Program | $9,300.00 |
| JAVA Developer Master Certificate Program | $7,990.00 |
| XML and WML Developer Master Certificate Program | $4,990.00 |
| Web Graphics Designer Master Certificate Program | $8,400.00 |
| Web Multimedia Designer Master Certificate Program | $6,990.00 |
| Web Developer Master Certificate Program | $9,790.00 |
| E-Commerce Developer Master Certificate Program | $10,990.00 |
| *Introduction to Programming Using QBasic* | *$450.00* |
| *Introduction to MS Windows* | *$225.00* |
| *Introduction to MS DOS* | *$225.00* |

**Enroll in a second Certificate Program and save 20% off the cost of the second program.**

*Students must enroll for the dual certificate on or before graduating from the first program. Students then have up to six months to begin the second program. A non-refundable registration fee of $45.00 is due upon submitting a registration form and must be paid in order to process registration.*

Cambridge, Mass. 02138
186 Alewife Brook
2nd floor
Parkway
(1-800-568-1776)

Braintree • Cambridge • Framingham • Woburn (800) 568-1776

REV. 2/2001

**116**

# ALBERT W BLEAU JR

Ms. Jennifer Hollingsworth
Financial Investigator
Criminal Investigator
Office of the Attorney General
One Ashburton Place
Boston, Mass. 02107

May 10, 2001

Dear Ms. Hollingsworth,

I have met on three occasions with you and Officer Ahern. The first meeting was very brief in the parking lot of the Dockside Restaurant in Nahant, the second lasted for about three hours at your office on Thursday, May 3rd and the third meeting was very brief when Michael threw me out of your offices on Tuesday, May 8th.

I participated in all three meetings without the benefit of counsel. I did so because I have done nothing wrong and have violated no laws. After the third meeting, I am convinced that you have no intention to fully investigate the happenings at GLMHRA and the "rip off" of over $500,000 by various Attorney's, board members and employees and consultants of GLMHRA many of whom had ties to the AG's Office.

Your sole intent is to find some way to indict me to justify the actions of these individuals and especially to protect the actions of Attys. Eric McLeish and Robert Sherman who personally billed GLMHRA and EMHC over $200,000 in unnecessary legal and consultant costs. Atty. Sherman is a close, personal friend of the AG and a former Assistant Attorney General. He convinced the AG, Jamie Katz and Eric Carricker of the AG's office to help take over GLMHRA and EMHC, primarily to cover up McLeish's and his fraudulent activities and billing.

I am retaining counsel and will only meet with you in the future in the presence of counsel. Until this occurs, please submit all your questions to me in writing and I will respond in writing.

I requested at both meetings to have the sessions tape-recorded and you and Mr. Ahern refused. On May 8th you stated that you didn't trust my tape recorder. I then requested that you furnish two tape recorders, one for my use and one for your use. You again refused to tape the meeting. When I started taking detailed notes of your questions and mine and the responses, Michael Ahern removed me from the building.

I have enclosed various documents that I wanted to give you on the 8th and that you refused to accept. They demonstrate that: Officials at GLMHRA with their Attorney's

128

and Eric Carricker of the AG's Office fraudulently took over GLMHRA for their own financial and personal benefit. They misrepresented the Self-insured plans and the EFIP to justify my termination, their legal and consultant costs, an amendment to the bond that was disadvantageous to GLMHRA and EMHC and the consumers they serve, the take over of EMHC, and to bilk EMHC of over $600,000 to cover-up their exorbitant legal and consultant costs.

These individuals should be required to reimburse both corporations all legal and consultant costs as well as over $100,000 in excessive salary increases to selected and politically connected individuals: James Cowdell, Elaine White, Keith Bransfied, and Kelly Johnson. Their salary increases place them as the highest paid individuals in the non-profit industry for these positions and they are the least qualified. This is a violation of IRS charitable rules and these salaries should be reimbursed to the organizations.

Paul Cote, the Executive Director is the highest paid non-profit CEO in the state earning over $200,000. This is also a violation of the IRS guidelines for salaries. He is less qualified than me and has more management and consultant staff to assist him.

At the last meeting, you asked me how the EFIP plan was funded. I asked you to define the EFIP. You refused to do so and said you knew what it was. If you knew what it was you wouldn't have asked the question that you did. The EFIP is not funded by anyone. The self insured plans are funded by GLMHRA and EMHC and include Vehicle self insurance for fire theft and collision and property damage, Workmen's comp, medical, dental, disability, unemployment compensation, and building contents insurance.

Surpluses from these self insured plans are then used to pay for the administration of the plans and any audits required, additional benefits for employees and additional services for consumers, any additional premium costs not budgeted in the state budget, an employee retirement plan and for reserves.

Reserves are set aside to protect the GLMHRA against losses not funded in the medical loss fund, a large or multiple fires destroying building contents, unemployment comp claims, and any negligence claims arising out of the Workmen, comp self insurance program. When I left on leave there was approximately $800,000 in reserves. They were distributed in three areas: Mortgages with EMHC, investments, working checking accounts.

The self-insured plans were set up to lower costs for insurance. For example, our medical premiums went up on average only three percent over 12 years while we also increased benefit coverage while other plans escalated with fewer benefits by 8 to 12 %. It also allowed any surpluses to remain with GLMHRA and not in profits with the insurance companies. This gave GLMHRA funds to provide additional benefits to employees and consumers and consequently we had the lowest turnover rate in the State, less than 10% while others experienced over 20 to 30 %. We were the only company not required to use relief agencies to staff our programs resulting in more consistent, better service to our consumers and at a lower cost to the state.

Since benefits have been reduced to the employees, the turnover rate has escalated and GLMHRA is now forced to hire relief agency personnel at $15 - $25 per hour and up. Also, their medical premiums have increased by 20% per year during the past two years versus the 3% under the management of John Papi and me and the EFIP Committee. This has cost GLMHRA and the Commonwealth over $200,000 in additional premium costs taking very needed funds away from consumer services and other employee benefits.

The reserves also made good business sense since it protected GLMHRA against sudden changes in the business climate causing sudden increases in workmen's comp rates or medical premiums. No other non-profit had this competitive advantage. It is estimated that over 21 million dollars could be saved if all Non Profits in the Commonwealth adopted self-insurance programs similar to the one GLMHRA had established.

Additional benefits given to employees and consumers included: Hepatitis shots, tuition reimbursement, crisis services to their families, discounted sporting tickets to Bruins and Celtics and Fleet center events, discounted vacations, retirement benefits, mammogram screening, turkey's at Thanksgiving, and a company outing to name a few.

Various Questions have been asked regarding the Self-Insured Plans and the EFIP.

QUESTIONS:

1) Were the expenditures for self insurance reflected on the 990's and the UFR's?

Yes all expenditures and all surpluses that were generated were expended for eligible fringe benefits and were reflected in the payroll fringe and tax line items and other line items.

2) Were there expenditures that were disallowed by the UFR?

Yes. Any administrative fees paid to GLMHRA would be disallowed. However, under the State revenue retention program, GLMHRA was allowed to retain over $4 million dollars in program surpluses. Also, when the UFR was instituted in 1992-1994, non-profits were allowed to report any funds that they had generated from non-state revenues in prior years going back to 1988. The state actually owed GLMHRA over 1.3 million dollars. This means that GLMHRA could have up to 1.3 million dollars in disallowed costs and not have to find alternate sources of revenue to cover these costs.

3) Where else could a company find funds for disallowed costs?

Disallowed costs are not illegal. They are costs not paid by the contracts. Fundraising dollars, third party revenue, transportation contracts, market rentals, non 07-contract revenue, donations could be used, as well as investment income.

4) Were the reserves reported on the UFR's and the 990's?

When Atty. Leslie Slavin of Laurie and Cutler brought this to my attention in December 1999, I called Terri White and asked her if the reserves had been reported on the 990 and the UFR. When she stated that they had not, I directed her to correct it. I also called James Mecone of the auditing firm. The UFR did not exist prior to 1992-1994 and this type of reporting was not done. This is not to excuse the auditing firm. They should have directed Terri to report it. However, there was no harm done. No taxes were owed on the reserves. All the funds were used for charitable purposes and the state had no claim to these funds since GLMHRA had not retained any where near its allowed $4million dollars and in fact was still in a negative balance with the State. The state still owed them money under reuse and recovery.

Additionally, since the GLMHRA board had voted when the plan was set up that should the plan ever be dissolved and GLMHRA was not in financial straits that the money in the EFIP would be distributed to the employees in the form of an ERISA approved retirement plan, it was thought that the reserve were committed funds. They were also considered an essential part of the self-insured plans, which could not have operated without reserves.

In retrospect, the reserves should have been reported as a restricted asset. The auditing firm was fully aware of this program and recorded thousands of transactions in the interfund between GLMHRA and the EFIP administered by John Papi and should have required us to report this reserve and any transactions that they felt were not reflected on the UFR. Additionally, the auditing firm did the EFIP retirement audit for several years.

5) Was there any other reporting done?

Yes. Demakis and Demakis reported the related party transactions on the audits that were given to the state with the UFR and to Mecone for a joint financial audit that was given to the state. All mortgage loans and leases between the two corporations were reported per regulation. Janine Brown Smith and Kelly Johnson were responsible for reporting these transactions to DMR as part of the pre-qualification application annually.

All 5500 forms required by the DOL have been filed for retirement, dental, medical, dental and disability. Actually, until recently, Mecone and Sanella did the retirement audit for our DOL report.

6) Are the employees owed any money and have ERISA rules been followed?

All ERISA rules were followed while I was in charge. Since I left, GLMHRA has not contributed to the retirement fund per the ERISA plan documents and vote of the board of GLMHRA in 1985.

131

GLMHRA is required to contribute a minimum of about $35,000 per year. Effective this June, three payments will have been due. All present and past employees and I are owed money.

This is a significant ERISA violation. All employees who worked for GLMHRA during the past three years are eligible for these funds.

No other funds are owed the employees. The EFIP was not an employee trust fund. DOL rulings support that the first dollar paid for benefits is the employee's dollar. All surpluses in the reserves of the EFIP belong to GLMHRA and are plan assets. Only the minimum contribution just mentioned belongs to the employees.

Enclosures include a detailed explanation of the self-insured plans with attachments and a copy of the FaniMae Program. (This program is a result of a Fair Housing complaint that I filed against FaniMae in 1990. It resulted in FaniMae setting aside over $200 million dollars in secondary mortgage financing for non-profits and families of handicapped, retarded and mentally ill citizens nationwide. I gave this handout to Carricker, Griffin and both boards of GLMHRA and EMHC. I demonstrated that it was a less expensive and cheaper program than the bond with lower closing costs as well, and the property equity wouldn't be tied up for twenty years. The EMHC voted no on the Bond. However, after threatening phone calls from Cowdell, Tucker and threats from Carricker and Griffin, they changed their vote and the bond was approved. It is interesting to note that Atty. Vitali, (Water and Sewer Commission Attorney) supported the bond despite opposition from all five other EMHC board members. They wanted the bond because the bond had a vehicle that allowed them to put in restrictive language giving them complete control over the two corporations, to remove me permanently, and cover up the over expenditures and pay the $125,000 still owed to McLeish and Sherman.)

If you have any additional questions, please contact me.

Sincerely


Albert w. Bleau Jr.