Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

CA NO. 04-10469-WGY

```
*****************************************
ALBERT WILLIAM BLEAU, JR.,              *
        Plaintiff,                      *
                                        *
v.                                      *
                                        *
BRIDGEWELL, INC.,                       *
        Defendant.                      *
*****************************************
```

    DEPOSITION OF ALBERT W. BLEAU, JR., taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Susan L. Prokopik, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Smith & Duggan LLP, Two Center Plaza, Boston, Massachusetts, on Wednesday, December 13, 2006, at 10:02 a.m.

KACZYNSKI REPORTING

72 CHANDLER STREET, SUITE 3

BOSTON, MASSACHUSETTS 02116

(617) 426-6060

BLEAU-12/13/06

Page 2

1  APPEARANCES:
2
    ON BEHALF OF THE PLAINTIFF:
3
    ALBERT W. BLEAU, JR. (PRO SE)
4   60 R Humphrey Street
    Swampscott, MA  01907
5   (781) 962-2662
6
    ON BEHALF OF THE DEFENDANT:
7
    WILLIAM T. HARRINGTON, ESQ.
8   Glynn, Landry, Harrington & Rice LLP
    Ten Forbes Road
9   Braintree, MA  02184
    (781) 356-1749
10
        and
11
    EDWARD P. HARRINGTON, ESQ.
12  8 Winter Street, 12th floor
    Boston, MA  02108
13  (617) 423-5959
14      and
15  GARRICK F. COLE, ESQ.
    Smith & Duggan LLP
16  Two Center Plaza
    Boston, MA  02108
17  (617) 228-4400
18
19
20
21
22
23
24

Page 3

1       I N D E X
2
   EXAMINATION BY MR. W. HARRINGTON..........Page 4
3
4
5
6
7
       E X H I B I T S
8
   No.    Description         Page No.
9
10  A  Miscellaneous exhibits      4
11  B  Miscellaneous exhibits      4
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          P R O C E E D I N G S
2              - - - - -
3       (Miscellaneous exhibits premarked
4   Exhibit A.)
5       (Miscellaneous exhibits premarked
6   Exhibit B.)
7
8       ALBERT W. BLEAU, JR.
9   having been satisfactorily identified and duly
10  sworn by the Notary Public, was examined and
11  testified as follows:
12
13  EXAMINATION BY MR. W. HARRINGTON:
14  Q. Good morning.  My name is Bill Harrington.  I
15     represent the defendant or one of the defendants
16     in this matter, Bridgewell, Inc.  With me today
17     are Attorneys Garrick Cole and Attorney Edward
18     Harrington who also represent Bridgewell.  I'm
19     going to ask you some questions today.
20          Before we begin, I just want you to
21     state your name and spell your last name for the
22     record.
23  A. Albert W. Bleau, Jr.  B L E A U.
24  Q. Okay.  Mr. Bleau, have you ever been deposed

Page 5

1     before?
2  A. Yes, I have.
3  Q. On how many occasions?
4  A. I think only once.
5  Q. Okay.  And are you familiar with the process of a
6     deposition?
7  A. To a certain extent, yeah.
8  Q. Okay.  Well, basically here I'm going to ask
9     questions on this case and I'm just going to
10    assume that you understand the question unless
11    you tell me that you don't and ask me to rephrase
12    it.  If you do, I'll try to rephrase it.  If you
13    need to take a break at any time, please tell me.
14    We can take a break.
15 A. Yeah.  If I can just ask a question on the
16    process.  Now, when this is done, the
17    interrogatories -- when the deposition is done, I
18    get a copy of this to review?
19 Q. What will happen, I think what we'll agree is
20    that when it's done, I think I receive the
21    official transcript.  I will send you a copy of
22    the transcript with the exhibits.  You have an
23    opportunity to review them, review the
24    transcript, make sure that the stenographer takes

KACZYNSKI REPORTING

6154fee3-10b9-4c16-a965-4b6685388d0f

Page 26

```
 1  A. Gee, I think she filed in '90 -- right around
 2     that time.  It was either '97 or early '98.  I
 3     believe.  Something like that.
 4  Q. Were you represented by counsel in your divorce?
 5  A. I was initially and it was getting too expensive.
 6     I couldn't afford it.
 7  Q. Was she represented by counsel?
 8  A. Yes.
 9  Q. Who was her counsel?
10  A. Um, it was a guy from Revere.  I can't think of
11     his name off the top of my head.
12  Q. Do you know where Linda Bleau lives currently?
13  A. Yes.  She lives in Nahant.
14  Q. Do you know her address?
15  A. She's in a temporary address because her house
16     burnt down last year so she's in a -- 8 Fox Hill
17     Road in Nahant.  Her home is under reconstruction
18     right now.
19  Q. And do you have children?
20  A. I do.
21  Q. How many children do you have?
22  A. I have two with Linda and two from my previous --
23     my marriage prior to that.
24  Q. Okay.  Are any of your children under the age of
```

Page 27

```
 1     20?
 2  A. I have two.
 3  Q. Where do they live?
 4  A. They live with -- we have joint legal and
 5     physical and -- joint physical and legal custody.
 6     Right now they're both living with my ex-wife.
 7  Q. And that's Linda Bleau, right?
 8  A. Right.
 9  Q. Where do you currently live?
10  A. I live at 60 R Humphrey Street, Swampscott, Mass.
11  Q. And do you have any current plans -- do you have
12     any plans on moving in the near future?
13  A. All my work is down here so I really --
14  Q. Okay.  You have no plans at this point?
15  A. No.
16  Q. Mr. Bleau, I'm showing you two binders that have
17     been premarked as Exhibit A and Exhibit B.  I'm
18     going to be asking you some questions on those.
19         If you look at the second binder, B, if
20     you turn to page 91.  Turn to page 91.
21  A. Yeah.
22  Q. If you look at pages 91, that would be tab 39 on
23     the Exhibit B.  Those five pages beginning on
24     page 91, that's the separation agreement and
```

Page 28

```
 1     general release that you signed; is that correct?
 2  A. You're talking about page 91 and 95, right?
 3  Q. Yes.
 4  A. Yes.  Well, I mean, I assume it is.
 5  Q. Well, look through it.  Take your time.  Look
 6     through it.  And I apologize.  I did not provide
 7     the clearest copy but --
 8  A. Yeah.  This looks to be it.
 9  Q. Okay.  And on the fifth page, which is page 95 of
10     tab 39 --
11  A. Right.
12  Q. -- that's your signature; is that correct?
13  A. That's correct.
14  Q. And you signed that on November 6, 2000; is that
15     correct?
16  A. That's right.
17  Q. And prior to signing this, you read it; is that
18     correct?
19  A. I did read it, yeah.
20  Q. Okay.  And it states that your employment -- let
21     me just take a step back.  You worked at the
22     Greater Lynn Mental Health and Retardation
23     Association; is that correct?
24  A. That's right.
```

Page 29

```
 1  Q. I'm going to try to refer to that as Greater Lynn
 2     or GLMHRA.
 3  A. Right.
 4  Q. And currently, sir, I think you know that it's
 5     currently named Bridgewell?
 6  A. Right.
 7  Q. But all those terms will mean the same thing.
 8     Basically I'm referring to the Greater Lynn
 9     Mental Health and Retardation Association.  Your
10     employment at Greater Lynn was terminated on
11     September 8, 2000; is that correct?
12  A. That's what it says here, yeah.
13  Q. Well, is that when you were taken off the
14     payroll?
15  A. That's when I was taken off the payroll.
16  Q. Okay.  And then going back a little bit, back on
17     April 20, 2000, the board of directors of Greater
18     Lynn voted to terminate you; is that correct?
19  A. That's correct.
20  Q. Okay.  And then approximately September 14 or 15,
21     2000, you received a letter saying you have been
22     terminated; is that correct?
23  A. The first letter I got was a letter from Donoghue
24     with a draft severance agreement.  That was
```

Page 30

1  sometime in August.
2  Q. Okay. So right now you don't have a memory of
3     receiving a letter in mid September saying you
4     have been terminated; is that a fair statement?
5  A. If you have one here and I look at it, I believe
6     I probably -- I remember getting one prior to
7     that saying if I didn't sign the severance
8     agreement then I would be -- that there was no
9     negotiation. Either take it or leave it.
10 Q. Okay.
11 A. But it didn't include Eastern Mass. Housing. The
12    initial severance agreement sent to me only
13    included termination from Greater Lynn. It
14    didn't have any mention of Eastern Mass. Housing.
15 Q. Prior to September 8th, Attorney Donoghue -- and
16    just for the record, it's D O N O G H U E --
17    Attorney Donoghue who represented Greater Lynn --
18 A. Right.
19 Q. -- sent to you a draft settlement agreement --
20 A. Right.
21 Q. -- saying, Sign this. If you don't sign it,
22    you're terminated. Off the payroll on September
23    8th. Is that correct?
24 A. I believe that's correct, yes.

Page 31

1  Q. You never signed it; is that correct?
2  A. That's right.
3  Q. You were terminated from Greater Lynn?
4  A. That's correct.
5  Q. Okay. So then during that time, you were working
6     for Eastern Mass. Housing Corporation; is that
7     correct?
8  A. That's correct.
9  Q. And I'll just call that Eastern Mass. or EMHC.
10    You were working there part-time?
11 A. I was working there about 14 -- I was supposed to
12    work 14 hours a week but I was probably working
13    more than that because of conflicts and problems
14    going on.
15 Q. You were getting paid approximately 34,000 a year
16    from Eastern Mass.
17 A. 34,000 I think it was either 600 or 700 dollars.
18 Q. And your position there was the executive
19    director?
20 A. That's right.
21 Q. And those two companies, Eastern Mass. and
22    Greater Lynn, were affiliated corporations; isn't
23    that correct?
24 A. They were considered related parties under

Page 32

1  Massachusetts regulations, which would be --
2  another term would be affiliated or related
3  party.
4  Q. I mean, in fact, Greater Lynn created Eastern
5     Mass.; isn't that correct?
6  A. No. They didn't create them, no. Greater Lynn
7     did not create Eastern Mass.
8  Q. Who created Eastern Mass.?
9  A. Three members of the board of directors were the
10    incorporators of Eastern Mass. But it was set up
11    as a separate corporation.
12 Q. Okay. And under the bylaws, the board of
13    directors of Eastern Mass. was picked by Greater
14    Lynn; isn't that correct?
15 A. No. That was -- that was the -- thrown out by
16    the IRS. The IRS rejected the articles --
17    rejected our articles of amendment and stuff that
18    we submitted them and they said that Eastern
19    Mass. could not be a separate 501(C)3
20    corporation, that we had a choice of either -- it
21    would be a foundation, Greater Lynn, because the
22    articles of organization gave too much control to
23    Greater Lynn and it was not an independent
24    corporation under their standards so we revised

Page 33

1  everything we sent to the IRS and set up Eastern
2  Mass. as a completely independent corporation.
3  Q. Okay. Going back to page 91 at tab 39 of Exhibit
4     B, paragraph number two, it basically says you
5     were terminated from Greater Lynn on September
6     8th. Then your employment at Eastern Mass. was
7     terminated effective November 10, 2000; is that
8     correct?
9  A. Mm-hmm.
10 Q. The next line says, "Mr. Bleau shall be permitted
11    to submit a letter of resignation if he so
12    chooses." Did I read that correctly?
13 A. Mm-hmm.
14 Q. When you signed that, you knew that it said that,
15    right?
16 A. Right.
17 Q. Did you ever submit a letter of resignation?
18 A. No, I didn't.
19 Q. Okay. "The parties further agree that the
20    corporations shall issue a letter, in the form
21    attached as Exhibit A, informing employees,
22    consumers and friends of the corporations that
23    Mr. Bleau has resigned his employment with the
24    corporations to pursue other interests."

Page 34

1  Did I read that correctly?
2  A. That's right.
3  Q. When you signed that, you knew it said that; is
4     that correct? You read this before you signed
5     it, right?
6  A. I read it before I signed it.
7  Q. And at the time you signed it, there was no draft
8     letter attached; is that a fair statement?
9  A. Yeah. I was told it would be coming.
10 Q. But just to answer my question. There was no
11    letter attached to the agreement at the time you
12    signed it?
13 A. That's correct.
14 Q. Okay.
15 A. And I refused to sign it.
16 Q. Let me --
17 A. I refused to sign the agreement.
18 Q. Let me -- just answer my question. At the time
19    you signed, you were aware that there was no
20    letter attached; is that correct?
21 A. Right. There was two meetings.
22 Q. I'll ask the question.
23 A. I refused to sign the agreement.
24 Q. But you did sign it?

Page 35

1  A. I did sign it.
2  Q. Okay. And at the time you signed it, there was
3     no letter attached?
4  A. That's right.
5  Q. And there was no letter being shown to you; is
6     that correct?
7  A. We discussed the contents in detail of what the
8     letter would have at that time. They said they
9     were drafting it and would get it to me.
10 Q. But the agreement states that the letter was
11    simply going to refer -- to state that you
12    resigned your employment to pursue other
13    interests; is that correct? Is that what --
14    that's what was agreed?
15 A. No. That isn't what was agreed.
16 Q. Okay. Let's focus on this agreement, though.
17    You agree that according to this document,
18    Bridgewell or Greater Lynn and Eastern Mass.
19    agreed to send out a letter stating that you
20    resigned to pursue other interests; is that
21    correct? What the written agreement says.
22 A. The written agreement says that.
23 Q. Okay.
24 A. The interpretation is not what you have put to

Page 36

1     those words.
2  Q. But your understanding of that was that
3     Bridgewell or Greater Lynn and Eastern Mass. was
4     going to send out something more extensive than
5     that?
6  A. Yeah. We talked about actually doing a special
7     newsletter, being part of the newsletter. Paul
8     Cote and James Cowdell agreed to that. It would
9     detail my accomplishments at Greater Lynn and it
10    would be mailed to the entire newsletter list.
11    That means all the elected and appointed
12    politicians, all the neighbors of where we had
13    group homes, all the present and former staff,
14    all the consultants.
15        It was a mailing list -- talking 1,500
16    or more, close to 2,000 people so that was my
17    understanding of what this -- what would be
18    included in this. And they assured me that that
19    was going to happen.
20 Q. That was before you signed?
21 A. That was during the signing. I initially --
22 Q. But before you put pen to paper, you are saying
23    they told you that?
24 A. They told me that. They said they would be

Page 37

1     getting back to me. We would wrap this thing up
2     by the end of the week. In good faith I said --
3     they said, We got to get this to the board. This
4     is what they agreed. They want this done this
5     week. You need to sign this. I said, Fine. I
6     said, Okay. I'll sign.
7         When I tried to get back to them, they
8     refused to talk to me.
9  Q. Okay. Let's go back a little bit into I think
10    you referred to some discussions with Jim Cote --
11 A. Cowdell and Paul Cote.
12 Q. I'm sorry. With Paul Cote, which is C O T E, and
13    Jim Cowdell.
14 A. Right.
15 Q. How many times prior or at the time -- how many
16    times did you meet with them before you signed
17    the agreement?
18 A. Yeah. I --
19 Q. Just one, two, three?
20 A. No. It was at least -- I think it was at least
21    three times.
22 Q. Okay. Where did you meet?
23 A. We met at the president of the Lynn City
24    Council's office.

### Page 86

```
 1    prior meeting.  We had agreed to specific
 2    language.  The letter we had agreed to wasn't
 3    exactly what I had --
 4  Q. On the language with respect to the letter that
 5    was going to be in the agreement that was agreed
 6    to at the previous meeting, can you tell me what
 7    that language was?
 8  A. Well, it was supposed to specify -- mailed out to
 9    the newsletter list.  That was supposed to be in
10    the language.  It was supposed to state --
11    outlining his accomplishments and contributions
12    to Greater Lynn.  So those are three things that
13    were not -- that we had agreed would be in there.
14  Q. Okay.
15  A. And they said -- so when they came back, they
16    made some excuse that they hadn't really drafted
17    it.  They had given it to somebody to draft and
18    -- but we had an understanding of what it meant.
19    That's what really counted.
20  Q. When you signed the settlement agreement that
21    begins on page 91 of tab 39 -- if you can turn to
22    page 91.
23  A. Yeah.  You said 39?
24  Q. No.  Page 91.
```

### Page 87

```
 1  A. Oh, 91.  I'm sorry.  Yeah.
 2  Q. Page 91.  When you signed that agreement, you
 3    knew that the language of that agreement did not
 4    require Greater Lynn to send out a newsletter; is
 5    that a fair statement?
 6  A. They informed me when they said issue a letter,
 7    that that meant -- they said -- that means it's
 8    going to go out to all these people.  That's what
 9    they told me.  It said "shall issue a letter."
10    It doesn't say newsletter.  They said, Yeah.
11    That's what that means.
12  Q. But you also --
13  A. So I said, Okay.  All right.
14        So I believed them.
15  Q. Okay.  But you also expected going into that
16    meeting that the final agreement would explicitly
17    state that the letter would outline your
18    accomplishments, right?  When you went to that
19    meeting, you expected the agreement to state
20    that, right?
21  A. Right.  And that he resigned his employment.
22    Right.
23  Q. But just going back to your expectation, your
24    going to the meeting, you expected that that
```

### Page 88

```
 1    written agreement would explicitly state that the
 2    letter would outline your accomplishments?
 3  A. Right.
 4  Q. And the agreement presented to you for signature
 5    did not state that; is that correct?
 6  A. No.  This did not state that.
 7  Q. Okay.  The agreement here states that the letter
 8    is going to inform these various people that you
 9    resigned to pursue other interests?
10  A. Right.
11  Q. That's a fair paraphrasing of what that agreement
12    states, right?
13  A. Yeah.  But I didn't expect -- they didn't -- I
14    mean, a letter that would say, Al Bleau has
15    resigned to pursue other interests.  Thank you.
16        No.  There would be some other
17    elaboration there obviously.  You know.
18  Q. What language of this separation agreement can
19    you point to that requires Greater Lynn to issue
20    a letter outlining your accomplishments?  Can you
21    point to any language in this separation
22    agreement?
23  A. Well, the interpretation.  When they said he
24    would -- he resigned his employment.  You know.
```

### Page 89

```
 1    So you get into "resigned his employment."
 2    You're talking about when a person resigns his
 3    employment, they talk about what they
 4    accomplished and why they resigned and what
 5    they're going to be doing and elaborate on what
 6    they're doing.
 7        So the interpretation is -- as simple
 8    and as straight-forward as that was was
 9    interpreted to mean all we had talked about.
10    They had it here -- even though they didn't say
11    newsletter, they did say they would send it out
12    to all the employees, consumers and friends of
13    the corporation, which is basically the
14    newsletter list.  Even though they didn't say
15    newsletter list, that is basically who the
16    newsletter list is.
17  Q. Okay.  It further says, "Mr. Bleau has resigned
18    his employment with the corporations to pursue
19    other interests."
20  A. Right.
21  Q. That's all it says?
22  A. That's it, yes.
23  Q. And if you turn to page three of the agreement,
24    which is at 93, on paragraph nine, that paragraph
```

Page 90

1  -- I'll just read it. "The parties agree that
2  this settlement agreement with its attachments"
3  -- as an aside, there was no attachment; is that
4  right?
5  A. Yeah.
6  Q. -- "is a fully integrated document and
7  constitutes the entire agreement between them.
8  The parties expressly disclaim reliance on any
9  representations, written or oral, other than
10  those contained in this document."
11        Did I read that correctly?
12  A. Yeah.
13  Q. You read that before you signed the agreement,
14  right?
15  A. That's correct.
16  Q. Okay. Now, part of this agreement, you -- if you
17  turn to page 92, which is page two of the
18  agreement, 92 in that binder at paragraph two at
19  the top, in that paragraph you basically waive
20  any and all claims, legal claims you have against
21  Greater Lynn, Eastern Mass., or any of their
22  employees and agents, including attorneys, right?
23  A. Mm-hmm.
24  Q. You have to say yes or no.

Page 91

1  A. Yes.
2  Q. Okay. So you were aware when you signed that
3  that you were releasing, waiving all claims that
4  you had at that point against Greater Lynn --
5  A. Up to the signing of the agreement. Up to that
6  point, yeah.
7  Q. Okay.
8  A. I think prior.
9  Q. So you realized you were waiving any claim you
10  had against Greater Lynn for defamation; is that
11  correct?
12  A. Up to that point.
13  Q. Yes.
14  A. Up to November --
15  Q. You signed on November 6th; is that correct?
16  A. Right, right. November 6, right.
17  Q. So you knew you were waiving all claims of
18  defamation, all claims based on disclosure of
19  medical records, all claims of discrimination; is
20  that correct?
21  A. That's correct.
22  Q. And in exchange for that --
23  A. No. Wait a minute. That's based on my knowledge
24  at the time.

Page 92

1  Q. I'm just saying -- I understand that you say that
2  you wouldn't have signed if you knew now what you
3  knew then. I mean, if you knew then what you
4  know now. Right?
5  A. Yeah. I had no idea what was going on.
6  Q. I'm saying when you signed it, you were aware
7  that you were agreeing to waive your right to
8  pursue claims against Greater Lynn for any claim
9  you had at that point. Is that a fair statement?
10  A. That's right.
11  Q. Now, in exchange for that release and for signing
12  this agreement, Greater Lynn and Eastern Mass.
13  agreed to pay you compensation; is that correct?
14  A. That's right.
15  Q. They agreed to pay you a gross amount of $84,300;
16  is that correct?
17  A. Right.
18  Q. They also agreed to pay for health insurance, for
19  insurance coverage that was worth according to
20  the agreement $10,900; is that correct?
21  A. No.
22  Q. I'm focusing on paragraph five.
23  A. That was in exchange for what they owed me
24  already. This was a negotiation. Because they

Page 93

1  owed me $60,000 in retirement contributions and
2  they owed me 60 days' vacation pay. If you total
3  all that up, it comes close to $70,000.
4  Q. You were waiving all claims against Greater Lynn
5  and Eastern Mass., right?
6  A. That's how we -- that's part of the way we
7  arrived at that figure.
8  Q. I understand. You're waiving claims; they're
9  paying you money, right?
10  A. Right.
11  Q. Do you think your claims are worth something --
12  it's a settlement, right?
13  A. No. I had votes of the board voting -- I had a
14  vote of the board and -- I mean, there was a vote
15  of the board to say to deposit this money. I
16  have the minutes, which I have submitted to the
17  court.
18  Q. My point is there is a dispute as to whether they
19  owed you anything -- you claim they owed you
20  money; they claimed they didn't. Is that a fair
21  statement?
22  A. I guess you could say that, yeah.
23  Q. Okay. By signing this agreement, you were paid
24  the $84,300?

24 (Pages 90 to 93)

BLEAU-12/13/06

Page 94

1  A. Right.
2  Q. Plus health coverage worth $10,900, which is a
3     total of $95,200; is that correct?
4  A. Right.
5  Q. Plus, you were basically deeded the motor vehicle
6     you were driving that was owned by Eastern Mass.;
7     is that correct?
8  A. That's right.
9  Q. What kind of car were you driving at the time?
10 A. It was a Ford Expedition.
11 Q. Okay. And you agreed when you signed this
12    agreement that the value, the fair market value
13    of that vehicle was $21,600; is that correct?
14 A. Right.
15 Q. Okay. So that's roughly over $106,000 that
16    you're receiving by signing that agreement; is
17    that correct?
18 A. That's correct.
19 Q. Also under this agreement, Greater Lynn agrees to
20    pay some training courses --
21 A. Right.
22 Q. -- for you for a two-year period; is that
23    correct?
24 A. Right.

Page 95

1  Q. It was $5,000 per year up to $10,000; is that
2     correct?
3  A. Right.
4  Q. And you needed that because you believed that you
5     needed to be retrained; is that correct?
6  A. Well, because I wanted to explore other licenses
7     and plus my social work license is up for renewal
8     every year and you have to go to, you know, so
9     many CEUs. Sometimes a couple thousand dollars
10    just to go -- for that. For your licensing and
11    stuff like that.
12 Q. But at that point in time, you're thinking of
13    having a career change; isn't that correct?
14 A. No. Not entirely, no. I mean, that was -- I
15    mean, I was looking to combine -- basically to
16    combine the two. I continued to apply for
17    positions in human services as well as in
18    business. A variety of different jobs. I
19    figured I could apply my skills. I mean, it's an
20    asset, you know.
21 Q. Just try to listen to my question. It will just
22    make it go more smoothly.
23       Your understanding of what Judge Keeton
24    has ruled in this case is that with respect to

Page 96

1     the tuition, any obligation of Greater Lynn to
2     pay you tuition is only for the period from
3     November 6, 2000 until --
4  A. April 11.
5  Q. -- April 11, 2001; is that correct?
6  A. Right.
7  Q. And there was an order somewhere that he had
8     issued that directed you to provide either the
9     court or Bridgewell invoices showing any courses
10    you took during that time period; is that
11    correct?
12 A. Right.
13 Q. You never took any courses during that time
14    period; is that correct?
15 A. I never really went to look at it. I think I
16    enrolled in Clark University. The computer
17    courses there in May.
18 Q. Okay.
19 A. And I enrolled in some other computer courses
20    prior to that but they don't meet this strict
21    definition of leading to licensing -- well,
22    certification --
23 Q. Let me just --
24 A. It's hard to say. I took an Excel course. I

Page 97

1     took some other computer courses prior to that.
2  Q. If I can just remind you. Try to answer my
3     question. It will make it more smooth.
4  A. Yeah.
5  Q. If you direct -- I direct your attention to page
6     114 of tab 39. Page 114.
7  A. Yeah.
8  Q. Okay. Is that an application form that you
9     filled out to Clark University?
10 A. Right.
11 Q. That's for some computer course; is that correct?
12 A. That's correct.
13 Q. And that was the first course that you had filled
14    out for after your leaving Greater Lynn; is that
15    correct?
16 A. No. As I just told you, before this, I signed up
17    for some other computer courses.
18 Q. Okay. This application, which it shows on page
19    115, you dated on April 12, 2001; isn't that
20    correct?
21 A. Yes. That's right. This is primarily the --
22    eight-week summer -- started in the summer --
23 Q. You filled it out on April 12, 2001; is that
24    correct?

25 (Pages 94 to 97)

KACZYNSKI REPORTING

Page 98

1  A. Right.
2  Q. That was after the period specified by Judge
3     Keeton; is that correct?
4  A. That's correct.
5  Q. And going back to page 51, which is the
6     settlement agreement -- is it 51? I'm sorry.
7     91. My mistake. Actually, go to page 92.
8  A. Yeah.
9  Q. That paragraph 5C, that obligation is that
10    Greater Lynn is supposed to pay the college or
11    the educational institute the money directly; is
12    that correct?
13 A. Right.
14 Q. Okay.
15 A. It says -- I don't understand that.
16 Q. Okay. Well, let me read the last sentence of
17    that paragraph. "Payments made pursuant to this
18    paragraph shall be made directly to the college
19    and not to Mr. Bleau."
20         Did I read that correctly?
21 A. Right.
22 Q. Okay. Now, for the period between November 6,
23    2000 and April 11, 2001, that period of time, did
24    you ever submit any invoice to Greater Lynn or

Page 99

1     one of its attorneys directing them or asking
2     them to pay that invoice for tuition or --
3  A. They told me not to. Donoghue told me -- wrote
4     me a letter telling me not to. Saying I had no
5     more rights under the severance agreement but I
6     had -- they had totally complied with it and that
7     was it and not to submit anything to him.
8  Q. Okay. So you agree during that period of time
9     you never submitted any request to Greater Lynn
10    to pay any tuition bill; is that correct?
11 A. I don't know that that's true. I think I ended
12    up sending the bills to them. I ended up -- how
13    did you get them obviously if I didn't send them
14    to you?
15 Q. I'm just asking the questions.
16 A. Yeah. I sent them to them. Despite Donoghue
17    telling me he wasn't going to honor anything in
18    the agreement.
19 Q. Okay. If you turn to page 110 of tab number 39.
20 A. Yeah.
21 Q. Okay. That is a letter dated April 11, 2001.
22 A. Right.
23 Q. Actually, that's not what I'm looking for. On
24    page 117 of tab 39. If you can turn to page 117.

Page 100

1  A. Yeah.
2  Q. Okay. That is a letter dated April 13, 2001; is
3     that correct?
4  A. Yeah.
5  Q. That's a letter you wrote to Paul Cote; is that
6     correct?
7  A. Right.
8  Q. You sent that out on April 13, 2001; is that
9     correct?
10 A. Right.
11 Q. Now, that states in that letter, you request --
12    well, you tell Mr. Cote that you have enrolled in
13    the Clark University's web development
14    certificate program.
15 A. Right.
16 Q. Right? You say you'll begin on April 23, 2001;
17    is that correct?
18 A. Right.
19 Q. You ask him to send a check immediately to Clark
20    University, correct?
21 A. Right.
22 Q. That's on April 13, 2001; is that correct?
23 A. What's that?
24 Q. That's on April 13, 2001, right?

Page 101

1  A. Yes.
2  Q. Prior to you sending that letter, had you ever
3     sent a letter to Greater Lynn or any of its
4     attorneys requesting payment of tuition?
5  A. I sent letters on November 16, on December, 2000.
6     November 16, 2000. December, 2000. All
7     addressing issues with the severance agreement
8     and noncompliance with the severance agreement.
9     I think those have been filed with the court.
10         And I received a letter -- I received a
11    letter from Donoghue -- I sent it November 16th.
12    He sent me some letter saying I cannot contact --
13    have any communication with staff. I didn't --
14    so I have all these letters listed with the
15    court.
16 Q. Okay. But try to listen to my question. I'm
17    wondering from the period of time from November
18    6, 2000 until April 11, 2001, did you ever submit
19    a letter requesting payment of tuition?
20 A. Up until April 11th?
21 Q. Yeah. During that time period. Did you ever
22    submit a letter requesting payment of tuition?
23 A. I think this was the first one.
24 Q. That's April 13; is that correct?

Page 110

1    that was the RICO. I think I attached it to the
2    amended RICO complaint.
3  Q. At some point you attached it and filed it with
4    the court; is that correct?
5  A. Yes.
6  Q. So by doing that, whether it was a public record
7    before or not, now it's a public record; is that
8    correct?
9  A. By attaching it?
10 Q. You filed that report with the court, right?
11 A. Right.
12 Q. Okay. When did you first become aware of the
13   Griffin report?
14 A. When I was called by an attorney.
15 Q. By a reporter?
16 A. A reporter from the North Shore Sunday --
17 Q. Okay.
18 A. Adam Reilly I believe was his name.
19 Q. Just try to focus on when did you learn of it.
20 A. It was -- I would say February, March, 2000 --
21   was that 2002 or 2004? I'm trying to think now.
22   2002.
23 Q. Okay. At that time you were running for State
24   Senate; is that correct?

Page 111

1  A. Right.
2  Q. A reporter called you, right? A reporter called
3    you during that time?
4  A. Right.
5  Q. The reporter is from The Herald or --
6  A. Boston Herald News Corporation.
7  Q. And was it your understanding that the reporter
8    wrote for The Herald or wrote for a local paper?
9  A. Well, his paper is owned by The Herald. It's all
10   -- North Shore Sunday. He was the editor of the
11   North Shore Sunday.
12 Q. Do you recall the name of that reporter?
13 A. I think it was Adam Reilly if I'm not mistaken.
14 Q. And Adam Reilly indicated that he had received or
15   reviewed a report of Robert Griffin; is that
16   correct?
17 A. He said, I want to know what your response is to
18   Robert Griffin's report. I said, What report?
19   And he said, Well, he said, I got this 100, 200
20   page, whatever it was, report. And I said, Well,
21   I said, Why don't you -- I have never seen it. I
22   wasn't aware of it. I said, Why don't you bring
23   the report and we'll sit down and we'll go
24   through it? Just send me a copy. And he said,

Page 112

1    Well, I'll get back to you.
2       He made some statements about that --
3    that it made some comments about my leadership at
4    Greater Lynn and made some statements about --
5    about me personally. I said, Well -- he said it
6    says confidential on it. I said, Well, how did
7    you get it?
8       He wouldn't tell me. So that was kind
9    of the conversation.
10 Q. So during this conversation, this reporter or
11   editor told you he could not tell you how he
12   obtained this report; is that a fair statement?
13 A. Um, I asked him -- I asked him how he got it. He
14   said, I'll get back to you.
15 Q. Okay. He never indicated to you that he received
16   it from Greater Lynn; is that correct?
17 A. He indicated that he got it from -- I thought he
18   said something -- I left -- I had the impression
19   when I left that it was given to him by the
20   Boston office of the Boston Herald. Okay? So
21   the impression that I got from him is that nobody
22   went into the North Shore Sunday and gave it to
23   him. That that was given to him by Boston Herald
24   News Corporation because they're an affiliate and

Page 113

1    the issue was a local issue.
2  Q. Okay.
3  A. So he got it from somebody in his -- in the
4    Boston Herald office in Boston. That was the
5    impression I got.
6  Q. It's a fair statement that you can't recall what
7    he said but the impression you got from him was
8    that he received it from The Boston Herald; is
9    that correct?
10 A. My guess is that --
11 Q. I don't want you to guess.
12 A. Yeah.
13 Q. That's a fair statement, right?
14 A. But he knew who gave it to him. He knew who the
15   report came from. I had that feeling.
16 Q. I know you may have feelings. I'm trying to get
17   what was said. Did the person ever indicate to
18   you that they received it or The Boston Herald
19   received it from someone from Greater Lynn?
20 A. They never disclosed it.
21 Q. Do you have any information that Greater Lynn
22   provided that report to The Boston Herald or to
23   that editor? Do you have any information?
24 A. All I know is that the report -- I was told that

Page 114

1    the report was supposedly only given to members
2    of the board and agents of Greater Lynn.
3    "Agents" being Attorneys MacLeish, Sherman and
4    Griffin and the Attorney General's office. So --
5  Q. If you could --
6  A. So my understanding is that that report was
7    supposed to be confidential and --
8  Q. Okay. If you could turn to page 70 of tab 39.
9  A. Yeah.
10 Q. Okay. That is the beginning of the Griffin
11    report dated October 13, 2000; is that correct?
12 A. Yeah.
13 Q. And it goes through -- all the way through page
14    86 of tab 39, which is -- it's 17 pages long; is
15    that correct? If you turn to page 86.
16 A. Um, this here? Yeah.
17 Q. Is that 86?
18 A. Yeah. 86, yeah.
19 Q. So that letter was sent to -- Assistant Attorney
20    General by the name of Eric Carriker?
21 A. Yes.
22 Q. And it indicates that copies were sent to four
23    individuals, is that correct, on page 86?
24 A. That's what it says.

Page 115

1  Q. Okay. Garrick Cole is the attorney sitting next
2    to me?
3  A. Yes.
4  Q. Do you know who Margaret Chow Menzer is?
5  A. Rings a bell but I can't place it.
6  Q. Not someone who works for Greater Lynn, right?
7  A. Not that I know of, no. I don't know -- I don't
8    know.
9  Q. Okay. Marianne Greeno.
10 A. I don't know.
11 Q. You don't know who that person is?
12 A. No.
13 Q. Jamie Katz?
14 A. Yeah.
15 Q. Jamie Katz is an Assistant Attorney General,
16    right?
17 A. Yes. In the trial division.
18 Q. You don't know whether Jamie Katz may have
19    provided this to The Herald, right?
20 A. Jamie Katz?
21 Q. Yeah.
22 A. Um, right now -- I haven't done any discovery on
23    this particular issue as far as --
24 Q. I'm just trying to get what you know right now.

Page 116

1  A. I know who had the report. Every board member
2    had a copy of the report. Greater Lynn. I know
3    that.
4  Q. Now --
5  A. Because I was told that.
6  Q. Who told you that?
7  A. Who told me that? Nancy Rizzo.
8  Q. Okay.
9  A. Board member.
10 Q. Now --
11 A. And Norm Thibodeau, board member.
12 Q. When did they tell you that?
13 A. 2002?
14 Q. Now, did you ever -- when did you first receive a
15    copy of this?
16 A. After -- after this guy called me up and then I
17    called him back. And I said, Well, let's have
18    the meeting. Bring me a copy of the report. I
19    want to see it. And he said, No, we're not -- we
20    decided we're not going to do that.
21        And then he just alluded -- every time
22    he wrote a news article, he pulled excerpts out
23    of it and used it in the news articles.
24 Q. Let me ask you this question again. When did you

Page 117

1    first receive the Griffin report?
2  A. After I heard that it existed, that was the first
3    I heard that there was this report and it had
4    negative comments about me in it, I -- it was --
5    I started calling around to find out about where
6    the report was and who had it. How I could get a
7    copy.
8        And it was shortly thereafter. I would
9    say -- I was calling around. Within two weeks
10    there was a big manila envelope with the report
11    in it stuck in my front door.
12 Q. You don't know who gave you the report?
13 A. I -- I honestly don't know but -- I think it was
14    a member -- I think it was a member of the board
15    of directors of Greater Lynn. One of the board
16    members.
17 Q. But you don't know?
18 A. I have a pretty good idea.
19 Q. Well, but do you know or don't know?
20 A. I mean, do I know 100 percent certain before I
21    depose somebody and put them under oath? No.
22 Q. Okay.
23 A. But do I have a pretty good idea who gave it to
24    me? Yeah. Do I have somebody who will probably

Page 134

1  Q. The next line says, "Their continued existence
2     and dissemination of the contents constituted
3     defamation towards the plaintiff."
4         Did I read that correctly?
5  A. Yeah.
6  Q. Okay. "Neither defendant clarified" --
7         Let me take that back. I was
8     misreading that. Now, in that paragraph four,
9     what did any defendant -- Greater Lynn or Eastern
10    Mass. or actually any defendant in this case,
11    what did they do after November 6, 2000 --
12    November 6, 2000? What did they do with respect
13    to those reports that disparaged you?
14 A. Well, the fact is that they -- they had --
15    MacLeish and Sherman and Greater Lynn knew they
16    had my response to that and they knew that
17    various accusations in that report were
18    incorrect, including the ERISA ones, and the
19    state and Federal personal service regulations.
20    And they never went back to the sources that they
21    gave those reports to. And they let stand even
22    to this today.
23        I just applied for a consultant's job
24    up in Lawrence, which will be added to this.

Page 135

1  Q. Okay.
2  A. And the contents of those reports to this day are
3     being discussed and disseminated against me every
4     time I apply for a job.
5  Q. Okay.
6  A. Details from those reports.
7  Q. Focus on what did any -- what did Greater Lynn or
8     Eastern Mass., what did they do after November 6,
9     2000 to disseminate those reports?
10 A. They disseminated the contents in conversations
11    to people when I applied for positions. When I
12    applied for the position at Greater Lynn itself
13    for the executive director position.
14 Q. Okay.
15 A. They let stand those reports. And the fact is --
16 Q. You let stand those reports. What do you mean by
17    that?
18 A. They never issued a letter that there -- you
19    know, if they had those reports running around,
20    they issued a letter in the severance agreement,
21    now somebody says, Gee, I got this report. I got
22    this letter that Al Bleau did all these things.
23        Now you have a dichotomy here. You
24    have this and you have this. Which one do you

Page 136

1     believe? I would rather have that out there than
2     just one side. At least I would have had my
3     letter so I figured that it wouldn't be perfect
4     but it would at least would counter that.
5         I mean, people right now to this day
6     are saying I'm going to be indicted by the
7     Attorney General. To this day.
8  Q. Okay. But you agree that the Griffin report
9     mentions you were terminated in that report. It
10    mentions in that report, right, that you were
11    terminated by Greater Lynn; is that correct?
12 A. Right.
13 Q. Okay. But do you have any information of someone
14    from Greater Lynn disseminating either of those
15    reports after November 6?
16 A. The MacLeish, Sherman and Griffin report? What
17    do you mean by "dissemination"?
18 Q. Sending them an excerpt, handing them a report.
19 A. Well, I know the newspaper had it.
20 Q. Okay. That newspaper. One instance?
21 A. Yeah.
22 Q. Any other instance?
23 A. I know the newspaper had it. I know people have
24    quoted from it in the sense they made statements

Page 137

1     about it when I have applied for jobs. New board
2     members who have come onto Greater Lynn have been
3     informed about the contents of the report who
4     weren't even on the board of directors at that
5     time when that report was issued.
6         And I mean, that's --
7  Q. Okay. But do you have -- with respect to that
8     report, you have no information that Greater Lynn
9     provided that report, right?
10 A. Not yet. I haven't done any discovery on that.
11 Q. But it's a fair statement. You have no
12    information of anyone from Greater Lynn ever
13    distributing that report to anyone after that
14    severance agreement?
15 A. I don't have any information but supposedly no
16    one but an agent or somebody at Greater Lynn --
17    unless you're assuming the Attorney General's
18    office sent that out. I think that's pretty
19    far-fetched but --
20 Q. Could have been someone from the Attorney
21    General's office, right?
22 A. That gave it out to the newspaper?
23 Q. Could have been, right?
24 A. Could have been a lot of people.

Page 138

1  Q. Could have been those other two people listed on
2     the copy list at the bottom of the Griffin
3     report. You don't know who they are, right?
4  A. No.
5  Q. In a way you're guessing that it was Greater
6     Lynn; is that correct?
7  A. On the dissemination. I see it as a legitimate
8     issue for discovery.
9  Q. Okay. Paragraph five, this is page two of your
10    affidavit, which is at tab ten, which is document
11    number 72.
12 A. Mm-hmm.
13 Q. That paragraph five states, "Plaintiff received
14    negative and defaming references from Greater
15    Lynn employees and board members when he applied
16    for other positions and consulting jobs."
17 A. Mm-hmm.
18 Q. This is what I want to focus on. "Art Brady,
19    executive director of a Lawrence based human
20    services agency" -- he has another title as
21    well -- "told the plaintiff that he could not
22    speak before his group because he did not want to
23    offend Paul Cote and that Paul Cote had told him
24    that the plaintiff was under investigation and

Page 139

1     had caused serious financial problems at Greater
2     Lynn amongst other things and he wouldn't say
3     what Paul had said." Did I paraphrase that
4     correctly?
5  A. Yeah. He wouldn't get into details. He talked
6     in general --
7  Q. Let me just ask the question.
8  A. Yeah.
9  Q. When did you apply to the human services agency
10    in Lawrence?
11 A. Um, well, it was in 2002.
12 Q. Okay. So fair statement, it was after April 11,
13    2001, right? It was after April 11, 2001; is
14    that correct?
15 A. After April 11th. As far as the defamation?
16 Q. When you applied to the human services agency, it
17    was in 2002, right?
18 A. This particular issue, yeah.
19 Q. Okay. In connection with that, you spoke with
20    the head of -- a guy named Art Brady, right?
21 A. Yeah.
22 Q. Art Brady told you that you could not speak
23    before his group. What did he mean by that?
24 A. He was the president of the Regional Executive

Page 140

1     Director Council for Essex and Middlesex county,
2     which comprised about 30 or 40 executive
3     directors.
4  Q. Okay. So you weren't applying for a job, right?
5  A. No. It was part of my -- well, it was a
6     combination of things. I also wrote a letter to
7     come and meet with him to discuss the possibility
8     of my -- developing a consulting relationship
9     with his company. In addition to that, I asked
10    to come before his group and I also contacted the
11    regional director at that same time and initially
12    it was indicated that I could go before this
13    group.
14       I talked to the regional director.
15    What's her name?
16 Q. Okay. But according --
17 A. Maggie Chalmers.
18 Q. According to what Mr. Brady told you as to what
19    Mr. Cote had told him, Mr. Cote didn't say
20    anything untrue, right?
21 A. Yeah.
22 Q. Well, he had indicated to Mr. Brady that you were
23    under investigation; is that correct?
24 A. Yeah. Basically I had stolen money from Greater

Page 141

1     Lynn is what he said.
2  Q. What did Mr. Brady tell you exactly as to what
3     Mr. Cote had told him?
4  A. That I was involved in financial improprieties.
5  Q. That is it?
6  A. Huh?
7  Q. That's all that Mr. Brady said?
8  A. Financial improprieties. He said financial
9     improprieties. That he didn't want to -- you
10    know, he's working with Paul now and he didn't
11    know if he wanted to upset Paul, you know, by
12    having me -- it might be uncomfortable for Paul
13    Cote to have a former executive director of
14    Greater Lynn there.
15       Paul had told him some things about me
16    that I had done at Greater Lynn that included
17    blah, blah, blah. Financial improprieties. So I
18    said -- I basically, you know, Why don't you give
19    me exactly what he said about financial
20    improprieties or the fact that I, you know, I
21    have stolen funds? Give me what you're talking
22    about.
23       He said, I don't really want to talk
24    about it right now.

BLEAU-12/13/06

Page 142

1  Q. Okay. And this conversation happened sometime in
2     2002?
3  A. I think I included that letter in my -- the
4     letter that I sent Art Brady as part of my
5     submission.
6  Q. You don't have to look at that. Your memory
7     right now is 2002 but if there is a letter in
8     your submissions, it would be soon thereafter
9     that letter; is that a fair statement?
10 A. Well, I don't know. I sent -- I mean, I have
11    been trying to apply for these jobs and do all
12    this stuff right from when I left. So some
13    people I contacted twice. Some people --
14 Q. Okay. Let me stop you right there. At least
15    according to your affidavit that you signed and
16    submitted to the court, paragraph five, you say
17    this happened in 2002?
18 A. Yeah.
19 Q. Okay.
20 A. I know I have that letter because I pulled that
21    out. Because he's one of the people I'm going to
22    be talking to. I pulled that letter out.
23 Q. Let me ask you this. Art Brady, have you had any
24    contact with him during this lawsuit?

Page 143

1  A. I sent him a letter.
2  Q. And did he respond to that letter?
3  A. I can't remember. I don't think -- I don't know
4     if he sent me back something or not. I don't
5     think he did.
6  Q. And you sent him a letter, basically a draft
7     affidavit that you wanted him to sign?
8  A. Right. Yeah.
9  Q. Okay.
10 A. Yeah.
11 Q. And you have no memory of him responding to that;
12    is that correct?
13 A. I don't think he did. And I never followed up
14    with a phone call. I don't think I followed up
15    with a phone call to him. I just haven't had the
16    time.
17 Q. Okay. Focusing now on paragraph six of document
18    number 72, which is found at tab ten --
19 A. Paragraph six?
20 Q. Yeah. It talks about --
21 A. Where are we talking about? Where are we now?
22 Q. Tab ten.
23 A. We're in this one, right?
24 Q. I think we're --

Page 144

1  A. Volume II.
2  Q. We're right here.
3  A. We're here. Okay.
4  Q. Paragraph six. Bottom of that page, page two.
5  A. Yeah.
6  Q. It talks about the Kennebec Valley Mental Health
7     Center in Maine and the human resource director
8     told you in the fall of 2004 after you had
9     applied for the executive director's position
10    that staff at Greater Lynn were making statements
11    about your performance that would make it
12    difficult for anyone to hire you. Is that what
13    happened?
14 A. Yeah.
15 Q. Okay. So in the fall of 2004, you applied to the
16    Kennebec Valley Mental Health Center and you had
17    a conversation with the human resources director;
18    is that correct?
19 A. It's more complicated than that.
20 Q. So you didn't have a conversation with her or
21    him?
22 A. I did. But it's more complicated.
23 Q. Okay. What is that person's name?
24 A. I forget his name right now. I mean, I included

Page 145

1     that in one of my things but I --
2  Q. Is it your understanding he still works there?
3  A. He is still there to my knowledge. As of when I
4     started discovery, he was still there. Adams is
5     the executive director. And then this guy's name
6     -- I can't remember.
7  Q. Okay. You can't remember his name. But you had
8     a phone call with him?
9  A. I filed a discrimination complaint against him.
10 Q. You filed a discrimination complaint against
11    them?
12 A. Against that agency for not hiring me based on
13    age discrimination.
14 Q. When was that?
15 A. That was at the time I applied.
16 Q. Okay. Do you have a lawyer that represents you
17    in that?
18 A. No.
19 Q. Let me just -- is that case still pending?
20 A. No.
21 Q. What happened with it?
22 A. We reached an agreement in mediation that I would
23    meet with them and they would assist me on
24    finding -- because I was concerned that -- why I

37 (Pages 142 to 145)

Page 150

```
 1  Q. Now, during this call, did he indicate that he
 2     had spoken with someone directly from Greater
 3     Lynn?
 4  A. Yes.
 5  Q. Did he indicate who he spoke with?
 6  A. I didn't ask him.
 7  Q. Okay. So as you sit here today, he never told
 8     you that he spoke with, you know, a particular
 9     person at Greater Lynn who told him negative
10     information about you, right?
11  A. At the time I was like -- first of all, I decided
12     not to push it beyond that and ask him any more
13     questions. I felt it was very nice of him to
14     tell me what he did. It just confirmed
15     everything that I had expected was happening.
16     And he basically said, Yeah. He didn't mention
17     the person's name. I didn't ask him to.
18        But he had called Greater Lynn and he
19     basically said, What they're saying about you and
20     reporting about what you accomplished and did at
21     Greater Lynn, he said, No one is going to hire
22     you and you better get over there and get it
23     straightened out because you will never get a
24     job.
```

Page 151

```
 1     That was his direct quote.
 2  Q. He told you during this lunch that he had called
 3     Greater Lynn about you?
 4  A. He had had -- he -- did he say he called them? I
 5     believe he did. Yes. That he had called -- he
 6     had a conversation with somebody. Whether it was
 7     a phone call or a person to person, I'm not sure.
 8     But he had a -- he had a conversation that could
 9     have been either person to person or telephone.
10     I didn't get specific with him.
11        Was it a call? Were you in personal
12     contact with them so --
13  Q. He didn't indicate whether he initiated the
14     conversation or he just happened to meet someone
15     from Greater Lynn?
16  A. No. It was a result of my applying for the job
17     up there. He was doing a reference check.
18  Q. That's what he indicated to you?
19  A. Yeah.
20  Q. But he didn't indicate the person with whom he
21     spoke, right?
22  A. He did not give me the name.
23  Q. Now, same document going -- it's page three of
24     your affidavit but it's included on page two of
```

Page 152

```
 1     document number 72. Tab ten. Paragraph seven.
 2        MR. E. HARRINGTON: Off the record.
 3     (Off the record.)
 4     (Lunch recess.)
 5
 6
 7
 8
 9
10
11
12        Afternoon Session
13  Q. Mr. Bleau, I think we stopped off at your
14     affidavit of 7/20/2005, paragraph seven.
15  A. Which volume was that now?
16  Q. This was volume I, tab ten.
17  A. Tab ten. All right.
18  Q. And the second page. The top of that. Paragraph
19     seven. And basically what I'm trying to do is
20     just go through your allegations of
21     postsettlement defamation. And paragraph seven
22     talks about Deborah -- paragraph seven talks
23     about Deborah Thurber. I think it's -- it's the
24     second page in. Paragraph seven.
```

Page 153

```
 1  A. Oh, yes. I got it.
 2  Q. And basically she used to work for Greater Lynn.
 3     Now works for the Department of Mental
 4     Retardation. And that she told you that Elaine
 5     White told her that you had stolen retirement
 6     money. When did Deborah Thurber tell you that?
 7  A. That was a meeting that took place -- when did
 8     Deborah tell me that? I know the meeting took
 9     place in February of 2000. And it included all
10     the senior and middle managers of Greater Lynn.
11  Q. Let me just stop you. Are you sure it's
12     February, 2000 or 2001?
13  A. No. This was pre the severance agreement, yeah.
14  Q. So this Deborah Thurber statement is preseverance
15     agreement?
16  A. When Elaine said I stole the retirement money,
17     right, that was at a -- that was -- took place
18     sometime, I believe, in February, 2000. Right.
19  Q. Okay. So that first part of paragraph seven,
20     presettlement agreement?
21  A. Right.
22  Q. Then it says, "She," meaning Deborah Thurber,
23     "also stated recently in 2005 that she could not
24     hire the plaintiff since he was under
```

6154fee3-10b9-4c16-a965-4b6685388d0f