Page 154

1  investigation by the Attorney General's office."
2  A. She also reiterated that I had -- that
3     allegation. That's why I put them together.
4     That I had stolen the retirement money. That
5     that was still -- that was again told to her at
6     that time, which was a year ago.
7  Q. Okay. When in 2005 did she tell you this?
8  A. Um, trying to remember. I had sent something to
9     DMR for training. I submitted a proposal. And
10    --
11 Q. Okay.
12 A. So I can't -- it was probably six months after,
13    you know. I'm trying to think. She left that
14    job. She used to work for Art Brady and then she
15    got this job with the state under Chalmers.
16    Maggie Chalmers.
17 Q. Okay. So fair statement, at some point in 2005
18    she told you this, right?
19 A. That's correct.
20 Q. Was this on the phone or in person?
21 A. This was in person.
22 Q. Just -- it's in person?
23 A. In person, yeah.
24 Q. Okay. And she told you during this 2005

Page 155

1     conversation that she couldn't hire you because
2     you were under investigation by the Attorney
3     General's office. She told you that at that
4     point?
5  A. She said that -- well, what she actually said was
6     that she had been told by supervisors in the
7     Department of Mental Retardation and she said
8     that everyone knows -- referring to nonprofit --
9     where she came from, which was Art Brady's
10    organization, that I had stolen the retirement
11    money and that I was going to be indicted.
12         Deborah Phelps was present at this
13    meeting as well. And I'm trying to think if
14    there was someone else present. There may have
15    been one other person present. Another former --
16    I'm not sure if Stacy Regal was there or not. I
17    think Deborah Phelps was present, former employee
18    of Greater Lynn, as well as Deborah Thurber.
19    There may have been one other person present.
20 Q. So this 2005 conversation she gave no indication
21    to you that Greater Lynn had provided her the
22    information that you were under investigation by
23    the Attorney General's office, right?
24 A. Did she say she got that from Greater Lynn?

Page 156

1     Well, Greater Lynn was one of the nonprofits that
2     she -- was the source of her information.
3  Q. Okay. You say that. What's the basis of you
4     saying that Greater Lynn was a source of her
5     information with respect to what she told you in
6     2005?
7  A. Well, because that's the way the conversation was
8     going. Deborah Phelps was there, who was then an
9     employee of Greater Lynn. They were all talking
10    about this particular issue.
11 Q. So Deborah Phelps at this point in time was
12    working for Greater Lynn?
13 A. She was still an employee.
14 Q. What was her position there?
15 A. She was a fund developer.
16 Q. But Deborah Thurber during this conversation
17    states that -- something about everyone in the
18    Department of Mental Retardation thought that you
19    were under investigation by the Attorney
20    General's office, right?
21 A. Yeah. She said everyone. I mean, she said --
22    basically she made a broad-based statement that
23    everyone -- I was, of course, more concerned at
24    the time about DMR because I had -- I was

Page 157

1     attempting to get a training contract to do
2     training. So that was the focus of my -- what
3     this refers to primarily because I was -- that
4     was my focus.
5         I mean, I was aware that other
6  nonprofits were spreading this rumor because, you
7     know, I had heard about it from other sources as
8     well. And then Greater Lynn -- when I wrote
9     this, I wanted to be specific to DMR because I
10    had submitted a proposal. I had submitted -- you
11    know, I was inquiring about the possibility of me
12    doing training.
13 Q. All right. And in fact, you had been at least at
14    one point under investigation by the Attorney
15    General's office, right?
16 A. I met with the Attorney General in 2001. May of
17    2001. And I issued a letter to Jennifer
18    Hollingsworth.
19 Q. Okay. At that point, May, 2001, you believe that
20    the Attorney General's office wanted to indict
21    you; isn't that correct?
22 A. I stated that in my letter, that they -- I got
23    the -- the impression I got from the meeting was
24    because the way the meeting went that -- I mean,

Page 162

1  A. Oh, it was probably a conversation that I had
2     with her -- well, obviously before I filed this.
3     You know, it was during 2005. It may have been
4     around the time I was doing this. I had run into
5     her and had a conversation with her or something
6     so I'm not --
7  Q. Okay. Fair statement it was sometime in 2004,
8     2005?
9  A. She had mentioned some things before that to me.
10    But I really -- hadn't really pressed her. I
11    think she had mentioned the -- people had said
12    things about me. She mentioned on other
13    occasions but specifically on this particular
14    occasion, I pressed her on it and asked her for
15    more specifics.
16         Prior to that, she had made mention so
17    this -- these were comments she had been making
18    to me for some time after she was hired. She
19    started working over there.
20 Q. Okay. But at some point in the months before you
21    submitted this affidavit in July, 2005 --
22 A. Sometime before. Six months. Could have been
23    eight. Whatever.
24 Q. Okay.

Page 163

1  A. She was more specific, yeah.
2  Q. Let me just finish the question.
3         You talked to her about it and got more
4     detail. The details she provided was that people
5     from Greater Lynn had told people of the board of
6     the ARC about you stealing retirement money?
7  A. Right.
8  Q. Okay. Did she indicate who from Greater Lynn
9     told them, told the board?
10 A. Told the staff?
11 Q. Yeah.
12 A. No. All she said was that these were all senior
13    and middle managers of the North Shore
14    Association. They were all people in management
15    positions.
16 Q. The North Shore -- I'm trying to figure out who
17    did she indicate from Greater Lynn, who gave this
18    information out?
19 A. I don't know that she necessarily knew that.
20 Q. Okay. But did she ever indicate that people from
21    Greater Lynn were giving this information out?
22 A. No. She never said that. All she said is they
23    had heard from Greater Lynn. They didn't specify
24    a name of a person. They didn't say, you know --

Page 164

1  Q. Okay.
2  A. So I mean, people said, We heard from Greater
3     Lynn, but they didn't say, Well, so and so at
4     Greater Lynn told me this. They didn't specify a
5     name of a person.
6  Q. Okay. So this woman, Helen Grilley, said that
7     unnamed managers at ARC told her that unnamed
8     people --
9  A. She had named people at the ARC. I can list the
10    name of the people that were at her meetings. I
11    can get all those names of all the people.
12 Q. But Grilley is the only one who told you this,
13    right?
14 A. Um, she's one -- as I said, there were two other
15    employees who also reported to me that they had
16    been told information by the human resources
17    director directly. North Shore human resource
18    director. That I had been terminated for -- I
19    was under investigation for stealing retirement
20    money and specifically said that they were told
21    that by -- by employees at Greater Lynn. But
22    they wouldn't say who they were.
23 Q. Now, who are those other two employees of the
24    ARC?

Page 165

1  A. Dianne Pallochi. She was a former contract
2     manager for Greater Lynn Mental Health. She now
3     works at the ARC. And Minna Sorrell Bleau. Now
4     my wife. She worked at the North Shore. She
5     left Greater Lynn to work at the ARC for two
6     years as a program manager.
7  Q. So did your wife ever work at Greater Lynn?
8  A. Yes. She left Greater Lynn after -- we started
9     dating, she resigned and she got hired by the
10    ARC. They didn't know she knew me or anything.
11    So when she walked in there, they started talking
12    about me. She just dummied up and didn't say
13    anything and they just -- they just told her a
14    lot of negative things about me that Greater Lynn
15    employees had told them.
16 Q. The ARC was telling her this, not anyone from
17    Greater Lynn?
18 A. Right.
19 Q. Okay.
20 A. Right.
21 Q. Now, what was your wife's name when she worked at
22    Greater Lynn?
23 A. Minna Daymude.
24 Q. Could you just spell that last name for the

Page 174

1  A. I sent him a letter and then I called him I think
2     on two occasions. Right after the agreement was
3     signed. Elaine went to the shop.
4  Q. Just --
5  A. You asked me for an example. She went to the
6     motor shop where we repaired our vehicles. And
7     that's when she started -- she told the
8     maintenance supervisor who runs the shop that I
9     was a crook and I had stolen money and all this.
10    She refused to repair my vehicle.
11 Q. Okay.
12 A. My vehicle --
13 Q. But refusing to repair your vehicle, at this
14    point that's your car and you don't work for
15    Greater Lynn or Eastern Mass. anymore?
16 A. No. They had agreed, Cowdell agreed that the
17    vehicle would be in operating condition, would
18    have no problems. They agreed that that would
19    be, you know, that -- when I had the problem with
20    the vehicle, the severance agreement hadn't even
21    been -- I don't believe it had been completed
22    yet. I went down to the garage.
23       And it needed -- I think it was a front
24    end or brakes. It was something that was

Page 175

1     dangerous to the vehicle that had to be repaired.
2     I was told I shouldn't drive it. And she refused
3     to fix it. Then she made all kinds of comments
4     about me.
5  Q. Okay.
6  A. But it was --
7  Q. Is the refusal to fix, is that part of your
8     defamation claim against her?
9  A. I wrote that in the letter. I think it's one of
10    the letters that you have.
11 Q. Try to focus on the question.
12       Is her refusal to fix the vehicle part
13    of your defamation claim against Greater Lynn?
14 A. Well, in the context that she did that; namely,
15    defaming me to telling this guy I had stolen
16    retirement money. That I was this. I mean, she
17    -- and I brought that to Jim's attention. I
18    called him up right afterwards. I said, You and
19    Paul Cote said that this would stop, that you
20    would tell Elaine White she's to cease and desist
21    from defaming me and disparaging me and you
22    haven't done it.
23 Q. Let me stop you right there. What is the basis
24    of you saying Elaine White disparaged you to the

Page 176

1     --
2  A. Maintenance guy.
3  Q. The maintenance person.
4  A. Yeah. She told him that, you know -- her usual
5     line that she had been telling everybody. That I
6     stole the retirement money and that --
7  Q. Okay.
8  A. -- et cetera.
9  Q. What is the basis of you -- you weren't there,
10    right? You weren't there when Elaine White
11    supposedly said this, right?
12 A. No. He told me. I said, Are you going to fix my
13    vehicle?
14       He told me what she said.
15 Q. Who is "he"?
16 A. The director of the garage.
17 Q. What's his name?
18 A. Um, he no longer works there either. He left.
19 Q. Do you know -- do you recall his name?
20 A. You know, I'm getting old. I forget things now.
21 Q. Okay.
22 A. But he --
23 Q. All right. So --
24 A. He works in Lynn. I can find him. What's his

Page 177

1     name? It's on the tip of my tongue.
2  Q. Okay. At that time, that person was a fellow
3     employee of Greater Lynn; isn't that correct?
4  A. He was -- he worked for Eastern Mass. Housing but
5     he was under payroll. He was under the control
6     of Eastern Mass. Housing Corporation. He
7     repaired our vehicles but we had his payroll --
8     the arrangement we had with Greater Lynn is
9     anyone who we hired at Eastern Mass. in order so
10    we wouldn't have to file, you know, 980s and
11    Social Security, it would be cheaper for both
12    corporations especially if they were doing work
13    on Greater Lynn stuff to have the payroll be
14    under Greater Lynn so we had him under Greater
15    Lynn but he is under the control of Eastern Mass.
16 Q. But he is an employee of Greater Lynn?
17 A. That's correct.
18 Q. Okay. All right. So then you send this letter
19    to Mr. Cowdell and you have a couple phone calls
20    with him?
21 A. Right.
22 Q. And basically you say -- you complain about
23    Elaine White and this incident in the garage. Is
24    that a fair statement?

BLEAU-12/13/06

Page 178

1  A. Yeah. The fact that she had -- was continuing to
2     say the same things that were being said before.
3     She hadn't stopped.
4  Q. Aside from that incident with the maintenance
5     person, is there any other thing that you
6     complained about to Mr. Cowdell at that point?
7  A. Yeah. The fact that the letter.
8  Q. What did you say to him about that letter?
9  A. That, you know, that they haven't -- they haven't
10    given me a draft copy of the letter for us to
11    finalize, which they had agreed to me they were
12    going to get to me that week.
13 Q. And what did he say?
14 A. I think Jim hung up on me.
15 Q. He hung up right at that point?
16 A. Pretty much so. And then I got this letter in
17    the mail.
18 Q. Okay. When you say "pretty much so," what did he
19    say right before he hung up, if anything?
20 A. I asked him what he was going to do about this
21    thing with Elaine White. That they were
22    violating the agreement. I still hadn't received
23    the letter. That he and Paul Cote had, you know,
24    were very nice and agreed they were going to do

Page 179

1     all this stuff and now they weren't following
2     through on it.
3        And I just remember him hanging up on
4     me.
5  Q. Okay. And you had two conversations with him?
6  A. I left him a message. I had called him and left
7     him a message I think on his answering machine at
8     one point and then I called him back. And he
9     said he was going to get back to me or something.
10    It was very brief.
11 Q. Okay.
12 A. He was going to check into something. And then
13    it was something like that. I had a conversation
14    with him. He hung up. And then I got this
15    letter.
16 Q. Now, when did this incident in the garage occur?
17 A. I don't know. I wrote it in my stuff. It was
18    right after I signed the severance agreement.
19 Q. Fair statement that it was prior to Greater Lynn
20    and Eastern Mass. signing the severance
21    agreement, right?
22 A. I don't know.
23 Q. Okay. So it may have been before Greater Lynn
24    signed it, right?

Page 180

1  A. Well, this was in the 16th that he sent me this.
2     That's when he dated this letter. And I don't
3     know what day of the week that is but I know that
4     I got this letter from him, you know, very
5     shortly after I had the conversation with him.
6  Q. Okay. But with respect to the incident in the
7     garage with Elaine White, do you recall when that
8     occurred with -- in reference to Greater Lynn
9     signing the severance agreement?
10 A. I don't know -- I know I signed it. And I know
11    the -- some of the issues that I had with the
12    vehicle was discussed at the last meeting with
13    Cowdell and Cote. And one of them dealt -- I'm
14    trying to remember. One of them dealt with some
15    damage that had been done to the vehicle in a
16    parking lot or something. And I brought that
17    into Thomas Ford and that was taken care of by
18    Eastern Mass. Housing Corporation.
19       But then this other issue that was the
20    safety issue that I was, of course, concerned
21    about, Elaine refused to address it. That's when
22    she made these statements about me.
23 Q. Okay. Aside from that, let's call that what
24    happened like the incident that happened in the

Page 181

1     garage.
2  A. Yeah.
3  Q. Anything else that Elaine White did after you
4     signed the severance agreement that you say
5     defamed you?
6  A. That's still subject to discovery.
7  Q. Okay. So as of right now, you have no
8     information of Elaine White ever defaming you
9     after you signed the settlement agreement except
10    with respect to this conversation in the garage;
11    is that a fair statement?
12 A. I don't know if that's a fair statement, no, no.
13    Because I have had other things said to me. I
14    haven't been able to depose people or get
15    affidavits to have them certify things that have
16    been said.
17 Q. I'm just trying to find out what your personal
18    knowledge is. What information do you have right
19    now as to Elaine White ever defaming you after
20    the settlement agreement aside from this
21    conversation in the garage soon after?
22 A. Well, there was Jim McKissock up at the Marquis
23    resort. She continued to go up there. Those are
24    staff that I had hired to run the Marquis resort

46 (Pages 178 to 181)

Page 182

1  and I was -- and Jim McKissock who was running
2  that for us, you know, I talked to him shortly
3  thereafter. That would have been -- oh, gee.
4       That would have been during that --
5  those winter months after 2001. And you know, he
6  relayed information. The same. Saying Elaine
7  White -- she was still going up there on
8  vacations with her family. She went up there
9  that summer and she went there the following
10 summer.
11 Q. What's his name?
12 A. Jim McKissock.
13 Q. He told you this when?
14 A. I had numerous conversations with him -- because
15 at the time I left Eastern Mass., we were in the
16 final stages of having that converted to
17 condominiums.
18 Q. That period of time is before the settlement
19 agreement, though, right?
20 A. It was still going on at the settlement. I was
21 still working on it after the agreement was
22 signed. I was still working on it on behalf of
23 Eastern Mass. into December. So the settlement
24 agreement was signed but I was still working -- I

Page 183

1  was still closing out some things for Eastern
2  Mass. Housing, one of which was the Marquis
3  resort.
4  Q. That's November time frame, right?
5  A. That was December. November and into -- I think
6  by -- I think the last thing I did with that is I
7  wrote -- I wrote a memo on December 7th,
8  somewhere around there, to Eastern Mass. as far
9  as unfinished issues and things they needed to
10 follow up on.
11 Q. Okay.
12 A. That was my last -- I'm trying to think if I had
13 a meeting with them at that time. December 1st.
14 Or if I had a meeting with the board, with Paul
15 Cote I think, on -- December 1st or something.
16 We had a meeting or something like that. I
17 presented the final stuff.
18 Q. Okay. That point in time, let's say December 1st
19 or around there, after that period, did this
20 person -- I think you said McKissock?
21 A. McKissock, yeah.
22 Q. Did he ever tell you after that period about what
23 Elaine White was telling him?
24 A. Yeah. I had a conversation with him -- I mean, I

Page 184

1  haven't called Jim back to set anything up with
2  him. I had a conversation with him during the
3  year after that. Yeah.
4  Q. What did he say at that point?
5  A. Basically the same kind of stuff. You know.
6  Q. What?
7  A. Basically I'm a crook. I stole stuff and I was
8  going to be indicted and stuff.
9  Q. So he was accusing you of being a crook?
10 A. No. This is information he received from Elaine
11 White.
12 Q. But was he saying Elaine White had recently told
13 him that?
14 A. I can't remember that.
15 Q. Okay.
16 A. I mean, because I know that she had been up
17 there. Because she had vacationed up there that
18 summer. Because I talked to him. He said she
19 had just come up with her whole family for two
20 weeks even though Greater Lynn wasn't -- they had
21 changed the relationship of letting staff and
22 clients go up there. They were charging them
23 more money.
24      I forget what the new plan they set up

Page 185

1  but she kept her reservation and she went up
2  there for a couple weeks with her family.
3  Q. But he never told you that, Elaine White just
4  recently told me that you're a crook. He never
5  said that?
6  A. No. I can't -- I mean, a lot of this stuff, as
7  you say, is two or three years ago. I'm going to
8  have to -- I haven't contacted Jim about these
9  affidavits for discovery yet.
10 Q. Now, do you know where he is?
11 A. Yeah.
12 Q. Where is he?
13 A. He's still up there as far as I know. He's in --
14 Laconia.
15 Q. At the Marquis resort?
16 A. Marquis resort, yeah.
17 Q. Now, from the time you signed the settlement
18 agreement until about December 1st meeting,
19 during that period of time, did this person ever
20 tell you about Elaine White talking to him about
21 you?
22 A. I don't -- you know, I don't have that
23 recollection right now. I mean, I have to go
24 back through my notes and stuff. I mean, did I

Page 186

1   talk to Jim McKissock between November 16th and
2   December 1st? I'm sure I did because I was
3   dealing -- I think I have correspondence from the
4   law firm up there that I was working with on the
5   --
6 Q. Okay.
7 A. I think in December -- I'm -- I'm trying to think
8   when I went and got the approval from the
9   planning board. That was all in October,
10  November. I was up there meeting with the zoning
11  board of appeals, the planning board. I was
12  filing stuff with the Attorney General's office
13  up there.
14          I had to file my stuff with the
15  Attorney General. I mean, all that stuff was
16  going on at the time I was signing the severance
17  agreement. I was moving forward with the Marquis
18  hotel conversion to condominiums.
19 Q. A lot of that work was done before you signed the
20  severance agreement, right?
21 A. We started work on it that -- the winter -- no.
22  We started work on it -- before Greater Lynn was
23  having all its financial problems. It was -- we
24  started work on this whole plan for conversion in

Page 187

1   I think --
2 Q. If you can just focus on my question.
3 A. Yeah.
4 Q. Most of your work for the Marquis resort and your
5   communications with Mr. McKissock, McKissock, was
6   before you signed the settlement agreement,
7   right?
8 A. I have all that stuff. I have to look at it
9   because I'm trying to think when the meetings
10  were taking place. But yes, I mean, I would say
11  -- it was all in process but all the major
12  important stuff such as the architectural stuff,
13  I think I already had the votes of the board up
14  there. I'm not sure about the planning board. I
15  mean, the zoning board of appeals but I think I
16  had the planning board vote. I'm not sure about
17  the zoning board of appeals.
18 Q. Okay. I'm really --
19 A. I was still working on that stuff. Even though I
20  signed the severance agreement, I was still --
21  putting that stuff -- because my -- it was my
22  name that was on the condo conversion with the
23  Attorney General's office in New Hampshire.
24 Q. Okay.

Page 188

1 A. Because you need a designated person and then
2   when Cote got in, he refused to do it. He didn't
3   want to fill out all the confidential information
4   and financial information, all the stuff you had
5   to submit.
6 Q. I just want to cut you off there. I'm just
7   trying to focus on you say that this guy Jim
8   McKissock --
9 A. Right.
10 Q. -- told you that Elaine White was defaming you?
11 A. Right.
12 Q. Some of those conversations at least occurred
13  before you signed the settlement agreement?
14 A. Some of those occurred during the summer when she
15  vacationed up there.
16 Q. Okay. You are unclear as to whether any of those
17  conversations occurred after the settlement
18  agreement; isn't that correct?
19 A. No. They did occur afterwards as well. They
20  were going to try -- because Cote was trying to
21  fire McKissock.
22 Q. Okay. When did those conversations occur?
23 A. They were ongoing because he was trying to get
24  rid of all those people up there.

Page 189

1 Q. I don't -- I'm just trying to focus on
2   conversations with McKissock and you where
3   McKissock is saying Elaine White said this about
4   you.
5 A. Just about every time I talked to him. You know.
6   If we had any discussions about Greater Lynn, he
7   would ask me. He would shake his head and, you
8   know, What's going on over there? How they were
9   treating him and stuff. The conversation would
10  -- and I would ask him what are people saying.
11          So basically that was the -- other than
12  business stuff we were talking about that was
13  important, after that I really didn't have any
14  business to talk with him except I asked him what
15  was going on because I didn't have any pipeline
16  into Greater Lynn and then that's when -- I found
17  out at some point that they sold it.
18 Q. Okay. And McKissock was saying Elaine White is
19  repeatedly telling him that you stole the
20  retirement money?
21 A. Right.
22 Q. Anything else that she was saying to him?
23 A. Um, it was some references to my, you know, you
24  know, as far as, you know, whether I was fit to

Page 190

1  do the job and that kind of stuff. But I can't
2  remember specifics.
3  Q. What references? Like what?
4  A. As I said, I can't remember specifics.
5  Q. Okay.
6  A. When I have a chance to do discovery, which I
7     have not been permitted to do --
8  Q. I don't want to argue --
9  A. I'll --
10 Q. I'm just trying to find out what you know. What
11    information you have.
12 A. Yeah.
13 Q. Let's talk about -- a meeting in May, 2001 with
14    the Attorney General's office.
15 A. Right.
16 Q. How did -- actually, I think you had several
17    meetings with them; isn't that correct?
18 A. One. I don't know if you could call it a
19    meeting. It was extremely unprofessional. It
20    was in a parking lot of a restaurant.
21 Q. Okay. Did the Attorney General's office contact
22    you or did you contact them?
23 A. Trying to get the sequence of events here. Um --
24 Q. Actually, if I can just interrupt you. If you

Page 191

1  can turn to the volume II, which is I think
2  Exhibit -- this one. Exhibit B. And tab 39.
3  And page 128.
4  A. 128?
5  Q. Yeah. 128.
6  A. Yeah. May 10. Right.
7  Q. That's a letter that you sent to Jennifer
8     Hollingsworth of the criminal -- of the Attorney
9     General's office.
10 A. Financial investigator, right.
11 Q. On May 10, 2001; is that correct?
12 A. Right.
13 Q. Okay. And this references three meetings; is
14    that correct?
15 A. Right.
16 Q. The first meeting you say was very brief in the
17    parking lot of the Dockside Restaurant in Nahant?
18 A. Right.
19 Q. When did that occur?
20 A. Well, sometime -- before this, I would say
21    probably a week or two weeks prior to that maybe.
22 Q. Okay.
23 A. It's hard to say. I had just finished coaching a
24    girls' soccer team. I got out of the car. I

Page 192

1  walked out. All of a sudden a guy walks out and
2  starts asking me questions in the middle of a
3  parking lot. I said, Don't you think it's
4  inappropriate to be in the middle of a parking
5  lot?
6  Q. I want to focus on the time frame. Fair to say
7     that that first meeting occurred one or two weeks
8     before this May --
9  A. I think it was the week before. I think what
10    happened is we agreed on a date the following
11    week as I remember it.
12 Q. Your best estimate is about a week before, right?
13 A. Yeah. That would be my guess, yeah.
14 Q. How did that meeting come about?
15 A. It came about because I filed a complaint with
16    the Inspector General's office.
17 Q. When did you file that complaint?
18 A. In January or February of 2001.
19 Q. January or February. Do you have a copy of that
20    complaint?
21 A. I went in there and met with an attorney in that
22    office. I can't remember the exact -- and the
23    short of it is that they told me that they were
24    getting pressure from the Attorney General's

Page 193

1  office and they couldn't -- they told me to go to
2  the newspapers, that they couldn't do anything
3  with it.
4  Q. And you were asking the Inspector General's
5     office to investigate Greater Lynn, right?
6  A. No. The Water and Sewer Commission.
7  Q. Nothing to do with the Greater Lynn?
8  A. Well, only -- only the relationship of -- certain
9     people in the Water and Sewer; namely, Bob Tucker
10    and Sam Vitali and James Cowdell, but it was in
11    relation to the Water and Sewer Commission and
12    the -- which was under investigation by the
13    Inspector General at the time.
14       They subpoenaed all the records. I
15    went in there around that issue.
16 Q. Okay. And you wanted to tell the Inspector
17    General's office that you believed that three
18    members of either the board of Greater Lynn or
19    officers there had conflicts of interest, right?
20 A. Yeah.
21 Q. Okay. Now, was this meeting in the parking lot,
22    was that a planned meeting or were you surprised
23    to see Officer Ahern?
24 A. Um, after -- after I -- when I went into the

Page 198

1  Q. Did they indicate -- let me take that back. Did
2     you feel during the second meeting that you were
3     being investigated?
4  A. Well, what bothered me in the second meeting is
5     they wouldn't -- they still wouldn't allow tape
6     recording and when -- they wouldn't let me take
7     minutes of the meeting.
8  Q. Did you feel they were investigating you or not?
9  A. I did because they weren't exploring MacLeish's
10    and Sherman's legal bills.
11 Q. Okay. So you did. The answer is you did?
12 A. Yes. So I felt that there was something -- there
13    was something amiss here.
14 Q. And you wanted to tape record this, right?
15 A. I wanted -- yeah. I wanted to tape record it.
16 Q. Did you tape record any of these meetings?
17 A. I tape recorded my -- what I did was when I left
18    the meeting, through memory, I asked myself the
19    questions and I tape recorded my answers. So I
20    had it from memory. Right after the meeting, the
21    first thing I did when I left the meeting is
22    that's what I did.
23 Q. Okay. And then you lost that tape, right?
24 A. They stole it.

Page 199

1  Q. Okay. So you had a follow-up meeting on May 8th,
2     right?
3  A. Right. That was -- you're right.
4  Q. That wasn't a scheduled meeting, right?
5  A. Yeah. That was scheduled. We met on May 3rd.
6     We went as far as we could on things and then I
7     told them I was going to bring some stuff in
8     because I had all the analysis done by Martena
9     Fallon on the EFIP program.
10 Q. I want to cut you off right there. So the May 8
11    meeting was scheduled, right?
12 A. As was the May 3, yeah.
13 Q. You come in May 8th. It's a very brief meeting
14    and you're thrown out of that meeting. Is that a
15    fair statement?
16 A. Well, they started -- we had a meeting. I mean,
17    when I say "brief," I would say -- I mean, I was
18    in the meeting. They asked me some questions.
19    When I first arrived, I went to the bathroom.
20    That's when I think they took the tape out of my
21    tape recorder. I came back to the meeting. They
22    started asking me questions. They asked me a
23    number of questions about the EFIP again.
24 Q. I just want to focus on the question. I forget

Page 200

1     what the question was.
2  A. No. Was it brief?
3  Q. Okay.
4  A. So it was a brief meeting. I started taking
5     notes. They said, That's it. You're taking
6     notes. The meeting is over.
7  Q. Previously to that, you had asked to tape record
8     the meeting. They said no. Is that correct?
9  A. Yeah. I asked them again when I went in the
10    second time. They again refused.
11 Q. The second time is the May 8th meeting, right?
12 A. Right, right.
13 Q. You asked again. They refused, right?
14 A. Right.
15 Q. Then you started taking detailed notes and they
16    stopped the meeting?
17 A. I was just writing down their questions. So when
18    they asked me a question, I would write the
19    question down.
20 Q. At any point did they give you a Miranda warning?
21 A. No.
22 Q. Okay. Did they ever advise you that you may want
23    to have counsel?
24 A. They told me I couldn't have counsel. They

Page 201

1     wouldn't meet with me if I had counsel present.
2  Q. They said that?
3  A. Yeah. They said there would be no meetings at
4     all. This was an informational thing. This was
5     not an investigation. They said this was not --
6     he said what this was, he says -- here is what
7     they said. We're meeting because we've gotten --
8         (Off the record.)
9  A. They told me it wasn't --
10 Q. Actually, I'm just stopping you because there's
11    no question.
12 A. Okay.
13 Q. I just want to try to do this orderly.
14        It's a fair statement that at this
15    meeting that you accused the Attorney General's
16    office; namely, Eric Carriker, as being engaged
17    with Greater Lynn in fraudulently taking over
18    Greater Lynn for their own benefit. Is that a
19    fair statement?
20 A. When I met with them?
21 Q. Yeah.
22 A. No.
23 Q. So you did that in the May 10th letter, though?
24 A. After processing it and looking at the whole

Page 202

1    process. You know, I mean, I understood this
2    meeting to be -- to get clarification on issues
3    that were out on the table. And I was being
4    brought in to provide information to them.
5    That's why they said there's no need for an
6    attorney here. If there is an attorney, we won't
7    have the meeting. This is a chance for you to
8    give us your side of the story on these issues
9    because, you know, we have these things that have
10   been submitted.
11         I said, Fine. Sounds good to me.
12 Q. Okay. Let me move on a little bit. Actually, at
13   the end of that meeting the officer called you a
14   drug addict; is that correct?
15 A. Yeah. As he led me to the elevator, yeah.
16 Q. Now, do you believe that he received information
17   from Greater Lynn that you were a drug addict?
18 A. Well, I don't know where else he was going to get
19   it.
20 Q. But you have no idea? Is that a fair statement?
21 A. Yeah.
22 Q. You have no idea where -- why he said that or
23   what basis he said that; is that a fair
24   statement?

Page 203

1 A. I have no proof that somebody from Greater Lynn
2   told him that, no.
3 Q. You have no evidence whatsoever; is that a fair
4   statement?
5 A. Yeah.
6 Q. Okay. Now, was there something in 2003 where a
7   CEO of a company that Robert Griffin had some
8   affiliation with made some comments about what
9   Griffin had told him?
10 A. Yeah. As part of my marketing plan, you know, to
11   try and get consultation with companies of
12   strategic planning and also, you know, I was
13   also, as I said, licensed as an insurance broker
14   and stuff. I was looking to develop self-insured
15   plans.
16         This particular company, which is Work,
17   Inc., they were already self-insured. I knew the
18   former executive director who had died. He was a
19   very progressive guy and he did a lot of the same
20   stuff I did. He had self-insurance for
21   everything just like I did at Greater Lynn.
22 Q. Let me stop you right there. Who did you have a
23   conversation with?
24 A. James Cassetta who took over as his executive

Page 204

1   director.
2 Q. And when was this conversation?
3 A. It was in 2000 -- I think it was 2001.
4 Q. Well --
5 A. Right around that time. Trying to think.
6 Q. Let me stop you right there and direct your
7   attention --
8 A. I can't remember.
9 Q. -- to exhibit tab two. Tab two I think is right
10  here.
11 A. Yeah.
12 Q. Tab two, page -- the bottom of page eight.
13 A. Yeah.
14 Q. And this document, just for the record, is a
15   memorandum of law that you submitted on October
16   1, 2004 that's document number 26. It's at tab
17   two and it says that Griffin is the general
18   counsel of May Institute and Work, Inc. And then
19   the next page it says, "In 2003" --
20 A. This is different. This is a different thing.
21   That's different.
22 Q. Let me stop you there. Let's talk about this
23   what you were talking about in this document.
24   "In 2003, one executive director of one of

Page 205

1   Griffin's companies informed me of false and
2   derogatory comments made by Griffin about my
3   employment at Greater Lynn."
4         What's that? Just tell me who said
5   that, when they said it.
6 A. Oh, that was James Cassetta. That was James
7   Cassetta.
8 Q. That's the one you were talking about before?
9 A. Yeah. That's James Cassetta. I met with him and
10   he had been recently hired. He used to be the
11   executor director of North Suffolk.
12 Q. You met with him when?
13 A. Um, it was around that time. I have -- I can be
14   more accurate with my notes and stuff.
15 Q. Okay. But fair statement, sometime in 2003?
16 A. Yeah. I sent him a letter --
17 Q. I'm just trying to focus on the question.
18   Sometime in 2003 you met with him?
19 A. It was in early 2003.
20 Q. Okay.
21 A. Before I applied for Greater Lynn. Position at
22   Greater Lynn.
23 Q. And he told you that Griffin had told him about
24   false and derogatory comments?

Page 206

```
 1  A. Yeah. We got talking about --
 2  Q. Just -- is that what happened?
 3  A. Yeah. Yeah.
 4  Q. Okay. Did he indicate when Griffin had told him
 5     this?
 6  A. Very recently. He had just gotten hired as
 7     executor director so it was within the year.
 8  Q. So it was -- when -- it was sometime after he was
 9     hired as executor director?
10  A. Right.
11  Q. And he had hired -- he had been hired within one
12     year of this conversation, right?
13  A. Something like that.
14  Q. At the time Griffin was not -- certainly Griffin
15     was not an employee of Greater Lynn?
16  A. What's that?
17  Q. At that time, Griffin is not an employee of
18     Greater Lynn?
19  A. No. But Griffin --
20  Q. It's a yes or no.
21  A. An employee?
22  Q. Yeah.
23  A. I don't know that. He's done a lot of legal work
24     for Greater Lynn with the Rate Setting
```

Page 207

```
 1     Commission. With -- he has been an attorney on
 2     and off with Greater Lynn for a long time.
 3  Q. Okay.
 4  A. Fifteen years.
 5  Q. Fair statement, you have no information that
 6     Griffin has represented Greater Lynn since the
 7     October, 2000 report to the Attorney General. Is
 8     that a fair statement?
 9  A. Yeah. Right.
10  Q. And did -- I think you said James Cassetta?
11  A. Yeah.
12  Q. Cassetta. Did he say to you what he said Griffin
13     had told him?
14  A. Not -- not -- specific verbatim language but
15     basically the same kind of stuff that's been
16     circulating around as far as, you know --
17  Q. What's your best memory of what was said?
18  A. Oh, gees. The whole conversation started around
19     the issue of, you know, what happened at Greater
20     Lynn and what happened to him. The similarities
21     because he was run out of North Suffolk. And
22     Mecone was the auditing firm there who missed --
23     who did not record certain things in the audit
24     report. Namely, third-party reimbursement.
```

Page 208

```
 1     He had it as assets and it turns out
 2     they were uncollectables. And North Suffolk went
 3     into financial -- almost bankruptcy. And
 4     Cassetta ended up being the fall guy over there.
 5     And we got talking about that. And then he said,
 6     Well, you know -- he told me where he was at work
 7     and he talked about Griffin and what Griffin had
 8     told him.
 9        You know, that I had been -- had some
10     financial problems with me over at Greater Lynn
11     and there was some money missing and stuff. Then
12     when I started --
13  Q. But --
14  A. When I started talking to him about Griffin, he
15     got very defensive. I started to get more
16     specific. I said, Griffin used to be my private
17     attorney. He was my attorney for five years.
18     Then now he's over here representing Greater
19     Lynn. I said, You know, if I were you, I would
20     watch out. He said, No, he is a good man.
21        That was the end of the conversation.
22     I just dropped it and we got into how I could
23     work for his company and what I could do, what
24     they had available and what the goals of the
```

Page 209

```
 1     company. And I just went away from it and tried
 2     to keep it very professional after that. Just on
 3     target of how I could, you know, work for the
 4     company as a consultant.
 5  Q. Okay. Have there been any newspaper articles
 6     that you believe are defamatory?
 7  A. Yeah. I think a lot of the stuff that's been in
 8     the Swampscott Reporter. It's been in the
 9     Marblehead Reporter. North Shore Sunday. Quotes
10     to Tucker. Quotes from --
11  Q. Okay. What has Tucker been quoted as saying in
12     the paper?
13  A. Something to the effect that there was -- you
14     know, mismanagement of financial problems and
15     he's come in to correct -- there's always been
16     allegations of leadership problems. Management
17     problems. Financial funding issues. You know,
18     loss of funding from GMH and DMR.
19  Q. That was an issue, wasn't it?
20  A. No. When I was there, I had $600,000 in sole
21     source contracts ready to go until MacLeish got
22     in and canceled them. I had a million in
23     expansion money lined up with GMH and DMR from
24     July 1st through June 30, 2000. MacLeish brought
```

Page 210

1    in Perkins Consultant Group who recommended the
2    board to stop and cancel all the contracts. That
3    was part of why they ran into financial problems.
4  Q. Do you have any copies of newspaper articles that
5    you allege are defamatory?
6  A. I do. I had a number of them. I had -- tell you
7    the truth, I have been looking -- I've had to --
8    I've moved like three times since this case
9    started. And actually four times. So -- every
10   time I move, things go into boxes and get
11   shuffled around. I went into my basement this
12   past weekend again looking for stuff. I found a
13   lot of stuff but I didn't find the specific news
14   articles I was looking for.
15       I need to try and find a day where I
16   can go into the library and go through the -- go
17   through the -- what do you call it?
18 Q. Microfiche?
19 A. Microfiche, yeah. And pull those out. Because I
20   have -- I know the --
21 Q. Okay. If I can direct your attention to tab 39.
22   Exhibit B.
23       (Recess.)
24 Q. Mr. Bleau, aside from Elaine White in this

Page 211

1    incident in the garage with her talking to an
2    auto mechanic, isn't it true that you cannot name
3    one person from Greater Lynn who disparaged you
4    after you signed the settlement agreement and
5    without -- can you provide a person with like a
6    date or time frame with statements after the
7    settlement agreement, someone from Greater Lynn
8    that disparaged you?
9  A. Yes. Paul Cote with Art Brady is an example.
10   The human resource director up at Kennebec Valley
11   Mental Health Center.
12 Q. Okay. But just I'm talking about Greater Lynn
13   employees.
14 A. Yeah. He called -- he called the Greater Lynn.
15   He was in contact with Greater Lynn to get a
16   reference on my following up on my employment
17   history.
18 Q. But you can't provide a name of someone from
19   Greater Lynn who disparaged you?
20 A. No. But I'll have it.
21 Q. Right now.
22 A. I'll get it.
23 Q. With respect to Paul Cote, what did Paul Cote say
24   after the settlement agreement that disparaged

Page 212

1    you?
2  A. He said that I was -- that I stole -- I stole
3    money from Greater Lynn. I stole money from the
4    retirement plan. I violated ERISA and that I was
5    going to be indicted by the Attorney General's
6    office, et cetera.
7  Q. Paul Cote said that?
8  A. That's what I was told.
9  Q. Okay. When did he say this?
10 A. Most of the time that he worked there. I mean,
11   Nancy Rizzo reported that he had said that to her
12   at meetings and Art Brady in my conversations
13   with him indicated that he had -- he didn't say
14   indictment but he said, you know, that I was
15   involved in financial improprieties according to
16   Cote. And Deborah Thurber, who was a former
17   employee, also, as I mentioned, reported that.
18 Q. But Deborah Thurber wasn't an employee of Greater
19   Lynn at the time, right?
20 A. At that time she wasn't, no.
21 Q. So with respect to Greater Lynn employees, you
22   have Elaine White with respect to the garage
23   statement?
24 A. Mm-hmm.

Page 213

1  Q. Then you have Paul Cote who -- but you never
2    heard Paul Cote say this, right?
3  A. No. He never said it to me directly. He said it
4    to -- he said it to the board members of Eastern
5    Mass. Housing Corporation in April of 2001 so I
6    have Steve Speropolous, Peter McGinn, Norm
7    Thibodeau. Martena Fallon. Who were all --
8    Ralph Fredette is now deceased but they were all
9    witnesses to this conversation.
10 Q. Okay. He said that. I'm sorry. On what day was
11   that?
12 A. That was sometime in April, 2001.
13 Q. Was it before or after April 11?
14 A. Pardon me?
15 Q. Do you know whether it was before or after April
16   11?
17 A. It's in Martena Fallon's latest affidavit.
18 Q. But you may not know --
19 A. What?
20 Q. You're not sure whether it was before or after
21   April 11; is that correct?
22 A. All I can say it's in her affidavit. I don't
23   remember the exact date.
24 Q. Okay. And this Paul Cote statement was made to

54 (Pages 210 to 213)

Page 234

1  Q. Ahern said that, right?
2  A. MacLeish ordered a drug screen of me with less
3     than five hours' notice so --
4  Q. That was presettlement, right? That drug screen,
5     right?
6  A. Right. That's when I was on leave.
7  Q. And Ahern works for the Attorney General's
8     office?
9  A. Right.
10 Q. The drug use, are you a drug addict?
11 A. No.
12 Q. Have you used cocaine before?
13 A. Have I used cocaine? I have in the past, yeah.
14 Q. When was the last time you used cocaine?
15 A. Oh, God. Years. Eight years. Seven, eight,
16    nine. Ten years. Long time ago.
17 Q. Have you used it on company property?
18 A. Never.
19 Q. Have you used it in the company car that you were
20    given?
21 A. Used it in the company car?
22 Q. Yes.
23 A. No.
24 Q. Now, were you receiving any treatment let's say

Page 235

1     from -- from October, '99 through the time you
2     left Greater Lynn? Were you receiving any
3     treatment for any alcohol or drug use?
4  A. I was receiving counseling -- I started going
5     into counseling -- I'm trying to think. '95 or
6     '96. And then had marital counseling with Linda
7     and then -- so it was pretty much ongoing.
8  Q. What was the nonmarital counseling? What was
9     that about?
10 A. It was -- it dealt with use of alcohol. It dealt
11    with use of any illegal substances and dealing
12    with stress. Dealing with how to exercise.
13    Positive health.
14 Q. Okay. How long --
15 A. Alternative health to stay healthy. Stay
16    involved in exercise. Dealt with a hol -- the
17    holistic approach to staying healthy, mentally
18    and physically.
19 Q. How long did you have that counseling for?
20 A. That was continuing right through until -- I
21    don't know when I stopped going to him but it was
22    -- after the -- it was sometime in 2001, 2002. I
23    can't remember offhand.
24 Q. So from '95 to '96 to 2001, 2002, that time

Page 236

1     frame, you were seeing a counselor for problems
2     with alcohol and illegal drugs. Is that a true
3     statement?
4  A. No, no. It was primarily dealing with -- I
5     initially went to this counselor because the
6     board was basically -- I was just having
7     difficulty in just dealing with the board. I was
8     just -- I was really concerned with -- I thought
9     they were very self-interested and unethical. It
10    was really bothering me.
11       It started off there. Got into how I
12    was relating to them and then getting into my own
13    personal issues. And then Linda and I went into
14    separation so we went to marital. We used my
15    counselor along with others for marital
16    counseling.
17 Q. Let me just stop you right there. Who was your
18    counselor?
19 A. Mitch Cohen. Psychologist from Gloucester.
20 Q. Okay. And then you received some marriage
21    counseling; is that correct?
22 A. Through him and also through somebody from the
23    employee assistance program. They recommended a
24    marriage counselor from Salem we went to.

Page 237

1  Q. What was that person's name?
2  A. I don't remember. That was through EAP.
3  Q. How long did you have marriage counseling?
4  A. We went -- I don't know how many sessions. Then
5     my ex-wife didn't want to go anymore so that was
6     the end of that.
7  Q. Now, have you received counseling since you left
8     Greater Lynn? Aside from Mitch Cohen.
9  A. Yeah. I've gone to -- I've gone to a
10    psychologist up in Maine on a few occasions to
11    deal with some issues with my present wife but
12    some of those are basically spin-offs from --
13    some of the financial and other problems that
14    I've had as a result of what's happened with
15    Greater Lynn.
16 Q. So you agree that part of the basis of you seeing
17    a psychologist up in Maine is to deal with
18    emotional distress over you leaving Greater Lynn
19    and not being able to find a job?
20 A. The defamation I think is a part of it. The
21    defamation has definitely been the major factor.
22 Q. Who have you seen up in Maine?
23 A. Um, trying to think of his -- Feinstein. Gee, I
24    can't remember. Isn't that terrible? I can't

Page 238

1   remember. I think I've got his card here. It's
2   a counseling center in Portland. And I've been
3   seeing -- we saw a husband and wife team there.
4       It's Feintech. Debra Feintech. I'm
5   trying to think --
6   Q. Spell the last name, please.
7   A. Feintech. F E I N T E C H. Trying to think of
8   the husband's name. First name.
9   Q. That's fine. Let's move on.
10  A. I can't remember his first name.
11  Q. Now, let's say in August, 2003 you apply and the
12      board has access to the Griffin report, the
13      MacLeish reports and they relied on that. Do you
14      consider that improper for them not to have hired
15      you?
16  A. If they were not told the truth, basically not
17      had my -- the Tena Fallon response, which was
18      given to Robert Tucker and Paul Cote, my response
19      to that that was given and the fact -- I mean,
20      there's a lot of -- the letter from Van Kampen
21      saying that Greater Lynn was way off-base on the
22      bond issue. The letter from Leslie Slavin that
23      said -- and the fact that both those reports
24      talked about ERISA violations and Greater Lynn

Page 239

1   ended up taking the money and spending it in the
2   general fund. And if it was ERISA, it would have
3   been in the employee trust fund.
4       So it was obviously not covered by
5   ERISA or Greater Lynn wouldn't have been able to
6   use it to pay all the legal fees and stuff.
7   Q. Well, let me --
8   A. So I mean, they defeated -- I mean, they really
9   shot themselves in the foot by taking that money
10  and not using it for employee benefits.
11  Q. The Griffin report doesn't say it's an ERISA
12      violation. Doesn't it say there's some issues
13      here?
14  A. No, no. They addressed that and attached the
15      MacLeish report to substantiate that.
16  Q. Isn't more of the focus the accounting of the
17      employee --
18      MR. COLE: Fringe incentive.
19  Q. Fringe incentive plan and then the use of buying
20      like for sporting goods and -- not sporting
21      goods. Sporting tickets.
22      Let me withdraw the question. I'm not
23      going to get into that.
24      So you say if the board in August, 2003

Page 240

1   sees your application and knows that you were
2   terminated -- you were terminated. There is no
3   question about that, right? You had been fired
4   from Greater Lynn?
5   A. Wrongfully terminated, which by that time they
6   should have realized it was a wrongful
7   termination.
8   Q. So your basis of your complaint for their failure
9   to hire you in August of 2003 was by that time
10  they should have realized the errors of their
11  ways and realized the previous termination of you
12  was incorrect? Is that what it comes down to?
13  A. And not only that, they shouldn't have been
14  relying on -- according to Nancy Rizzo, they were
15  still saying the reason I couldn't be hired is I
16  was mentally unstable, a drug addict and an
17  alcoholic. Now, those are -- they're protected
18  under the Americans with Disabilities Act. I'm
19  in treatment. I have never had a problem.
20      Every single -- every evaluation I
21  ever had at Greater Lynn was excellent. I
22  started the company. I grew it to $30 million.
23  Never had a financial problem. All of a sudden
24  MacLeish comes in. Now there is a financial

Page 241

1   problem. Never existed before. I had a
2   nine-month audit from DeNucci's office. He said
3   it was the best run corporation that he has ever
4   audited in the history of the Commonwealth.
5   Q. Okay. But you agree you were fired from Greater
6   Lynn?
7   A. Right.
8   Q. Mr. Bleau, if you could turn to tab 39, page
9   four.
10  A. Yeah.
11  Q. Okay. Page four is a letter dated February 4,
12      2000, to Thomas Manning, the president of the
13      board of directors of Greater Lynn from the
14      Attorney General's office; is that correct?
15  A. Right.
16  Q. Have you ever seen this letter before?
17  A. If I haven't seen it, I certainly am aware of its
18      contents. It may have been shown to me. At
19      least its contents were -- like somebody might
20      have said, Oh, by the way, we got a letter --
21      Because I know he came to a meeting. I
22      believe Carriker ended up coming to him. Oh,
23      this is from Jamie Katz.
24  Q. That letter basically says, to summarize, that

Page 266

1  Q. Okay. Now, on page four, you didn't sign those,
2     right?
3  A. Yeah. I signed them.
4  Q. Did you provide us with a signed copy?
5  A. I'm pretty certain I did.
6  Q. Now, looking through -- and take your time --
7     looking through these interrogatory answers and
8     since the interrogatories aren't included, you
9     may have to refer to Exhibit 36 for the
10    questions, but are these the actual interrogatory
11    answers that you served, that you say you signed?
12 A. As far as I know they are. They look like it.
13 Q. You can take your time just to see if they are or
14    not.
15 A. I believe so. I don't know why you have an
16    unsigned copy. I'm just wondering if this is
17    something that I -- why would you have an
18    unsigned copy? I wonder if I brought those with
19    me. I mean, if there is a dispute -- if there's
20    a dispute, I have my laptop here. I can open it
21    up and -- my final interrogatories is on my
22    laptop so if I have to, I can look it up.
23 Q. Interrogatory number four asks you to state all
24    facts basically concerning the whole tuition

Page 267

1     situation.
2  A. We went through that, yeah.
3  Q. And you just say that your bills and the request
4     for tuition payments to Clark University have
5     been submitted to Attorney Laurence Donoghue?
6  A. Right.
7  Q. We've already talked about that letter, right?
8  A. That's correct.
9  Q. And that letter was April 13, 2001?
10 A. We already went through that, yes.
11 Q. There's no other letters, right?
12 A. No. We discussed this as far as the -- the
13    clarification of what is considered leading to
14    certification. Remember? That was the
15    clarification I talked about. Getting a
16    certificate --
17 Q. Okay. But you don't have that document, do you?
18 A. Do I have it --
19 Q. Seeking clarification.
20 A. To Donoghue requesting that -- you mean
21    clarification of that? I'll look for that.
22 Q. I'm just wondering, interrogatory number four
23    asks for all facts that identify all documents
24    you contend support your claim for tuition fees

Page 268

1     and you basically say bills and requests for
2     tuition payments to Clark University --
3  A. I did not mention in that interrogatory the fact
4     -- because I'm still unclear about what --
5     whether that was eligible for reimbursement under
6     the severance agreement.
7  Q. Okay.
8  A. Okay? That still is not clear to me.
9  Q. "Number one. Please state all facts and identify
10    all documents that you contend support your
11    claims under the ADA Rehabilitation Act." And
12    you say, you talk about the Griffin report being
13    distributed to prospective employers and clients
14    and press, board members, political and
15    government employees.
16 A. Where are you now?
17 Q. This is interrogatory number two.
18 A. Okay.
19 Q. Again, you cannot state that you have knowledge
20    of the Griffin report ever being distributed to
21    anyone by Greater Lynn after the settlement
22    agreement; is that correct?
23 A. Being distributed to?
24 Q. To anyone. Greater Lynn distributing the Griffin

Page 269

1     report to anyone outside of Greater Lynn after
2     the settlement agreement. You have no
3     information on that?
4  A. That the actual report --
5  Q. Yeah.
6  A. -- was given to somebody?
7  Q. Yeah.
8  A. Contents, yes. Report, no.
9  Q. You have no information as to anyone at Greater
10    Lynn with a name who distributed any contents --
11 A. Yeah. Paul Cote -- Paul Cote, as I mentioned.
12    Elaine White. Other board members have stated
13    and I think with discovery we'll find -- I mean,
14    that information was -- that only could have been
15    gotten from that Griffin report or the MacLeish
16    report. Because that's where it was.
17 Q. But you don't know who the Griffin report was
18    distributed to?
19 A. I'm talking about the contents. The contents
20    were shared obviously with many people.
21 Q. Okay. You believe that the contents of the
22    report were shared with many people, right?
23 A. Right.
24 Q. You from that say Greater Lynn must have

Page 274

1  Q. You indicate three witnesses in Maine and one in
2     New Hampshire.
3  A. Yeah. I think -- do I have that list with me?
4     No. I think in Maine I'm looking at -- Kennebec
5     Valley Mental Health. Either one or two people.
6     Human resources director and the executive
7     director. I'm looking at --
8  Q. And their names again?
9  A. Adams. And -- MacAdams. I'm trying to think.
10    Human resource director. I can't remember
11    offhand.
12 Q. Okay.
13 A. I also have -- I gave you a whole big list to you
14    guys with all these people on it. You have it in
15    here. I saw it in here.
16 Q. I'm just trying -- from your memory. I'm just
17    wondering who those four people are.
18 A. Yeah. There's also Tri-County Mental Health
19    Center where I applied. And I've gotten some
20    indication that there was a negative feedback or
21    defamation from Greater Lynn human resources or
22    executive staff regarding my employment at
23    Greater Lynn.
24         Also, this company in New Hampshire

Page 275

1     that I mentioned to you, which is the -- I have
2     them listed -- that was one of the first ones I
3     applied for. Housing Cooperative I think it was
4     called. Portsmouth. It's Portsmouth, New
5     Hampshire. They had an executive director
6     position available.
7  Q. Do you have a name of a person from there or --
8  A. Um, I do in all my notes. I don't have it here
9     with me, no.
10 Q. Okay. Let me just -- let's say you applied to a
11    job. They like you. Thinking of hiring you.
12    They call Greater Lynn. They speak to someone
13    from human resources. The person from Greater
14    Lynn says, Albert Bleau was executive director
15    from these dates and he left voluntarily to
16    pursue other interests.
17         Let's say that's the report. Do you
18    consider that a violation of the settlement
19    agreement?
20 A. Say that again. If they said what?
21 Q. Let's say the person from human resources gives
22    the dates of employment and say that you resigned
23    to pursue other interests. Let's say that's the
24    response and that's it. They don't say anything

Page 276

1     else. Do you consider that a violation of the
2     settlement agreement?
3  A. Yeah. I would. Because the letter isn't there.
4     The letter should have -- the other thing that I
5     had talked about with Cote and Cowdell was when
6     we talked about the letter of recommendation, you
7     know, because they were supposed to do a letter
8     of recommendation. They said that will be part
9     of the letter. You can use that as part of a
10    letter of recommendation.
11         So I assumed that when that letter was
12    done that that would be the basis for what would
13    be used for any inquiries about my employment.
14 Q. Okay. So you believe that they were required
15    under the agreement to recommend you for any
16    position?
17 A. No. Not necessarily recommend me but if somebody
18    has been executive -- somebody has been an
19    executive director for 28 years, found a company.
20    We're talking -- we're not talking entry level
21    position here. Okay? You're applying to General
22    Electric. And they say, Gee, you worked at
23    General Electric. You were the CEO for 30 years.
24    What do you know about Al Bleau?

Page 277

1        Oh, his dates of employment are blah,
2     blah, blah, blah. That's all the information we
3     can give.
4  Q. Okay.
5  A. I mean, that isn't exactly -- if you were on the
6     other end and you're going to hire this guy to be
7     the CEO of your company and that's all they tell
8     you, I think you start wondering, Hey, is there
9     something else here?
10        Then you start asking other questions.
11    Then you start calling other people and it just
12    keeps mushrooming.
13 Q. Your understanding is that would be a violation
14    of the agreement, right?
15 A. That wouldn't -- I would see that potentially as
16    a violation. I would be more concerned about
17    them saying, I'm sorry. We can't answer any
18    questions because Mr. Bleau is under indictment.
19    We can't answer any questions because we've been
20    ordered to refer all your questions to our
21    private -- our lawyer and counsel in Boston named
22    Lawrence Donoghue, et cetera, et cetera.
23        I would consider that a major
24    violation.

Page 278

1  Q. Those two type of responses right there, you
2     don't have any information as to that ever
3     happening, right?
4  A. I have an indication that it has. I haven't
5     gotten that deposed yet because the people -- I
6     think now that some people have left the human
7     resources department, I think they'll be more
8     forthcoming now that they're not threatened with
9     loss of their jobs. I think these people will be
10    more willing to tell me these things than they
11    were --
12 Q. Okay.
13 A. -- when they were working there. I assume -- and
14    Lydia, for example, they were afraid they would
15    lose their jobs. Now they're no longer there,
16    Deborah Phelps is no longer there, a lot of these
17    people have left and I think as they leave,
18    they're more willing to tell the truth.
19 Q. Okay. But have they told you things? Or you're
20    just hoping or assuming that since they're gone
21    maybe they'll open up and tell you things they
22    haven't told you before?
23 A. I have gotten indications that, you know, that
24    things have been said when people call. And it's

Page 279

1     been inconsistent.
2  Q. Who have you received indications from?
3  A. If you remember, I have asked you in my
4     interrogatories to give me that information.
5  Q. Who have you received indications from?
6  A. About what people have been saying?
7  Q. Yeah.
8  A. Um, from -- as I said, these employers who have
9     called. And from when I've talked to Deborah
10    Phelps and --
11 Q. Okay.
12 A. -- Deborah Thurber.
13 Q. We've already talked about all that.
14 A. Yeah.
15 Q. Okay.
16 A. I mean, I have attempted to talk to Sue and Ann
17    Perry and some other people there. You know --
18 Q. Let me just try to move on a little bit.
19       (Recess.)
20 Q. Back on the record, Mr. Bleau. I think you
21    indicated you want to clarify something for the
22    record.
23 A. Yeah. You asked me if there was any other
24    indication -- this doesn't really -- I can't

Page 280

1     directly relate this to employment but Ward 4
2     councilor, Richard Colucci, had a conversation
3     with me. Stated to me that he felt I really got
4     screwed. That they're really back stabbers over
5     there at Greater Lynn. He mentioned James
6     Cowdell specifically having spread rumors about
7     me, about my financial improprieties at Greater
8     Lynn. Within the city council of Lynn. Elected
9     politicians in the city.
10          He basically said, you know, The guy's
11    a back stabber. He can't be trusted after you
12    helped him out after he got fired from North
13    Shore Employment Training. You gave him a job
14    and et cetera, so this was very recently. As a
15    matter of fact, this was less than six months ago
16    he told me.
17 Q. Okay. Now, what's this person's name again?
18 A. Richard Colucci. He is a ward 4 councilor for
19    the City of Lynn.
20 Q. What did you tell Richard Colucci about why you
21    left Greater Lynn?
22 A. I didn't tell him anything. He just started
23    talking. And he just -- unsolicited. He just
24    basically --

Page 281

1  Q. I just want you to identify some documents, if
2     you can. If you look at tab 39 and go to page 99
3     within that. Okay. Page 99 and 100 is a copy of
4     a letter that you sent to the EEOC on November
5     22, 2000; is that correct?
6  A. Right.
7  Q. Not looking at 101. Just 99 and 100.
8  A. Right.
9  Q. Okay. So you sent that out on November 22nd?
10 A. Yeah.
11 Q. Now, the page 101 --
12 A. Oh, yeah. Threatened people with loss of job --
13 Q. I'm trying to get out of here soon. Page 101 to
14    106, that's a true letter you sent to Attorney
15    Donoghue on December 12? Is that true?
16 A. Yeah. You can see here it's December 11th. I
17    told you I was still doing Eastern Mass. work
18    right up --
19 Q. But I'm looking at the December 12, 2000 letter.
20    Pages 101 through 106. That's a true copy of the
21    letter you sent out on that day; is that correct?
22 A. Yeah.
23 Q. Now page 109. I believe you may have attached
24    this newspaper article to some letter you sent.

Page 282

1  Do you see that?
2  A. Yeah. This is my original complaint.
3  Q. Do you consider that article to be defamatory?
4  A. I do.
5  Q. And when was that published?
6  A. Um, this was published right after the severance
7     agreement was signed.
8  Q. Okay.
9  A. It was in December.
10 Q. Is there anything -- can you point to where in
11    this article you think that there's an indication
12    that Greater Lynn has defamed you or disparaged
13    you?
14 A. Yeah. When he says here he left -- he says "left
15    a career in state government to become temporary
16    director of Greater Lynn Mental Health and
17    Retardation in the wake of troubled times facing
18    the agency's leadership."
19 Q. Okay.
20 A. This is Thor Jourgensen who is the city editor.
21    I consider that defamatory considering I was on
22    the school committee in Lynn for four years. I
23    grew up in the city of Lynn.
24 Q. I don't want to interrupt you. I want -- you

Page 283

1     point to different things in that article.
2  A. That is --
3  Q. "In the wake of troubled times facing the
4     agency's leadership." Any other words you --
5  A. Want me to tell you what it should have said?
6  Q. No, no, no. I just want you to point to this
7     article as to what you think is disparaging.
8  A. No. That's basically the statement that bothered
9     me there.
10 Q. You agree that that is not a quote from Mr. Cote,
11    right?
12 A. That's information that was given to the Lynn
13    Item by Mr. Cote in my opinion.
14 Q. It doesn't -- where does it say there that that
15    information is coming from Mr. Cote?
16 A. Hmm?
17 Q. Can you point to where in the article it
18    indicates that that information is coming from
19    Mr. Cote?
20 A. There's nothing in there that says it is.
21 Q. So you're guessing that it came from him?
22 A. I am also because -- you know, two years later I
23    was told by the editor of The Item in a meeting
24    that -- exactly the same thing. Even more

Page 284

1     elaboration. That the Greater Lynn had told him,
2     This is what we hear from Greater Lynn. They
3     have said that. Blah, blah, blah, blah.
4           That was from the editor of the Lynn
5     Item. And the --
6  Q. Okay. I just want to stick to this article.
7  A. Yeah.
8  Q. There's no indication that Mr. Cote even was
9     interviewed for this article, right?
10 A. There is a quote down here that says, "I am very
11    much a believer in the individual achieving
12    maximum independence. The question is, how can
13    we work with them, he said."
14 Q. That's the only quote from Mr. Cote in that whole
15    article; is that correct?
16 A. Yeah.
17 Q. Is that correct?
18 A. Yeah. So that indicates that he had a direct
19    conversation with the reporter.
20 Q. Okay. But doesn't it also indicate in the first
21    paragraph that there had been a dinner the night
22    before where Mr. Cote was introduced as the new
23    executive director? Isn't there an indication in
24    the article?

Page 285

1     You don't know whether that's a quote
2     from his speech he made the night before or
3     whether he granted an interview, right? I mean,
4     you don't know whether he granted an interview?
5  A. No. I don't.
6  Q. Okay. Now, page 110. Here is 110 through 113.
7  A. Right.
8  Q. That's a true copy of a letter that you sent to
9     all the board members of Greater Lynn and Eastern
10    Mass. on April 11, 2001; is that correct?
11 A. Yes.
12 Q. Okay. Page 117 and 118. That's a true copy of a
13    letter that you sent to Paul Cote on April 13,
14    2001; is that correct?
15 A. Mm-hmm.
16 Q. You got to say yes or no.
17 A. Oh, yes.
18 Q. Page 119, that's a true copy of a letter you sent
19    to the Department of Mental Health, the
20    commissioner, on April 13, 2001; is that correct?
21 A. Yeah.
22 Q. And you attached to that letter a copy of the
23    April 11, 2001 letter to the board members; is
24    that correct?