UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| ALBERT WILLIAM BLEAU, JR., | ) | |
| Plaintiff | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 04-10469-WGY |
| | ) | |
| BRIDGEWELL, INC., et al, | ) | |
| Defendants | ) | |
| _____ | ) | |

## JOINT PRETRIAL STATEMENT

The plaintiff, Albert William Bleau, Jr. ("Plaintiff" or "Bleau") and the defendant,

Bridgewell, Inc., formerly the Greater Lynn Mental Health and Retardation Association

("Defendant" or "Greater Lynn") hereby submit the following Joint Pre-Trial Statement pursuant

to this Court's January 11, 2007 Procedural Order.

## I.    SUMMARY OF EVIDENCE

### A.    Bleau

1.    Plaintiff, Albert W. Bleau Jr. was the Executive Director of Bridgewell, Inc.

(GLMHRA) from April 8, 1974 until he was put on leave in October 1999. Plaintiff was also the

Executive Director of EMHC from 1978 until November 8, 2000 when he agreed to resign from

EMHC as a condition of the Severance Agreement. During his leadership, GLMHRA grew from

an agency of less than $60,000 to an agency of close to $30 Million Dollars with over 600

employees and EMHC grew from an agency of zero assets to possess over seventy pieces of real

estate and an annual budget of over $3 Million dollars. Each year during his leadership the

corporations ended their fiscal years with budget surpluses and both corporations were highly

respected by its primary state funding agencies, DMR, DMH and by HUD. Prior to the plaintiff

being placed on leave the GLMHRA finished the fiscal year ending June 30, 1999 with a budget

surplus and EMHC finished fiscal years 1999 and 2000 with budget surpluses as well. Additionally, GLMHRA was fully licensed by the DMH and had also received a three year Quest (DMR's Quality Assurance Standard) Certification with Distinction.

2. Beginning on or about 1996 to 2000, the plaintiff was receiving counseling from a private therapist and in 1997-98 this also included marital counseling with his wife who was a senior manager at GLMHRA in charge of most of GLMHRA's Mental Retardation Services. Additionally, the plaintiff and his wife were referred for marital counseling and mediation by the agency's Employment Assistance Program. During the spring of 1999, the plaintiff transferred direct supervision of his wife to Elaine White, Director of Operations and in August plaintiff's wife filed a grievance against Elaine White and a complaint against the plaintiff that was interpreted by GLMHRA to be a complaint of sexual harassment.

3. Attorney Roderick MacKleish and Robert Sherman were hired without the knowledge or approval of the plaintiff in violation of the agency's personnel practices that gave sole hiring authority of consultants to the plaintiff to investigate the complaint and he expanded his role to investigate the agency's self insured benefit programs called the Employee Fringe Incentive Plan. The plaintiff and his wife were asked to take a month's leave during the investigation. Board members and staff were sworn to silence or they would be prosecuted and terminated from their positions. As a result of this investigation, plaintiff's wife's charges were not affirmed and she was asked to resign from the agency. The plaintiff's leave was extended until after a meeting with the board in December when they voted to have him return from leave in January 2001 with the charge to clarify issues relating to the EFIP and to reorganize the management team.

4.    During this time MacLeish and Sherman had prepared a report accusing the plaintiff of wrongdoing and alleging violations of ERISA law. The December meeting with the board had allowed the plaintiff the opportunity to respond to some of the allegations in the report, although the plaintiff at this time did not know that the report existed or of its contents.

5.    Following the December meeting, the plaintiff met with and ERISA attorney, Leslie Slavin who issued a letter stating that the EFIP was not a violation of ERISA and recommending that an amended 990 be filed. This letter was shared with the board, Robert Sherman and with the Fiscal Manager, Teri Kasper.

6.    Certain members of Senior staff became upset about the reorganization plan, specifically Elaine White, Janine Brown Smith and Kelly Johnson since the reorganization directly affected them. MacKleish and Sherman, without the board's knowledge or permission shared the confidential report that he had prepared for the board with select senior staff and organized a meeting with staff of the Attorney General's office where allegations were made against the plaintiff and the confidential report shared. As a result of this action, the board reversed its decision to have the plaintiff return from leave.

## OTHER FACTS RELEVANT TO PLAINTIFF'S CLAIM

1.    At the April 2000 board meeting where a vote was taken to terminate the plaintiff, Robert Sherman shared a bill from an EAP mediator and accused the plaintiff of misspending government funds. The disclosure of plaintiff's counseling and referral by EAP was a clear violation of the state and federal privacy Act and HIPPA mental health confidentiality regulations. It also influenced the vote of 4-3 with one abstention to terminate the plaintiff as Executive Director of GLMHRA.

2.      Some time in February 2000, the plaintiff received a copy of the MacLeish

Sherman report and jointly with his attorney filed a response. Following a meeting in April with

MacLeish and Fiscal manager, Terri Kasper, after Kasper disclosed that there were mistakes in

the report, an addendum was drafted by the plaintiff and sent to GLMHRA and MacLeish.

3.      The MacLeish report was attached by Griffin to his October 13, 2000 report to the

Board and the Attorney General's Office and did not include the plaintiff's response or plaintiff's

addendum. The report also did not include an August correspondence from the Bondholders or

Attorney Leslie Slavin's January 13, 2000 letter regarding the EFIP plan or the detailed analysis

of the EFIP and the vacation benefit to consumers and staff prepared by Martena Fallon. These

documents would have supported the plaintiff's claim that he had engaged in no wrongdoing.

The report contained financial information contradictory to what was presented to bondholders

by GLMHRA and what the plaintiff has ascertained from a review of the financial records. The

report did not sight the cause of the budget deficits as being excessive legal and consultant costs

and mismanagement while the plaintiff was on a leave of absence and gave the impression that

the plaintiff was responsible for the projected overspending and mismanagement.

4.      The Griffin report was given to board members of GLMHRA and to the principal

funding agencies in the commonwealth for non profit providers; namely, DMH and DMR. There

were no controls on the information to prevent its contents from being disseminated to others.

5.      Contents of the report were shared with Arthur Brady, Executive Director of a

Lawrence based non profit agency who was also President of the Region III Provider's Council.

It was also shared with Michael Walsh, Human Resources Director of Kennebec Valley Mental

Health Center in Maine and Garden St. Apartments in Lawrence where the plaintiff had applied

for employment or contract work. Contents of the report were also shared with GLMHRA staff. A copy of the report was also given to a reporter of the North Shore Sunday.

6.    The report was withheld from the plaintiff during the negotiation of the severance agreement and withheld from board members of EMHC. GLMHRA knew that the report had been circulated to state agencies while at the same time agreeing not to defame or disparage the plaintiff. The plaintiff as a result was not able to negotiate a change in the report or to force its return as a condition of the Agreement.

7.    Robert Griffin was a paid attorney for the plaintiff from 1988 to 1994 while the plaintiff was a court appointed receiver for Associated Group Homes.

8.    The plaintiff in an October 1999 meeting with MacLeish, Human Resources Director, Anne Perry, Vice president Tom Manning and secretary Tina Adams requested that they call in the state auditor's office if they suspected problems with the self insured plans and his request was denied. MacLeish stated that they wanted to resolve this internally and did not want to involve outside parties. GLMHRA ended up paying a private auditing firm $120,000 in unbudgeted funds to audit the EFIP program.

9.    The defendant breached the Severance Agreement and never sent out the letter agreed to in the Severance Agreement to friends of the GLMHRA and engaged in bad faith and possibly fraudulent negotiations. The defendant had every intention to attempt to dissolve EMHC and take over its assets prior to the signing of the agreement and for this reason withheld the Griffin report and its recommendation from the plaintiff and the EMHC board.

10.    The plaintiff has alleged that various GLMHRA board members and staff including Paul Cote, Robert Tucker, Elaine White and James Cowdell have engaged in defaming and disparaging remarks concerning the plaintiff.

11. Roderick MacLeish and developed a personal relationship with GLMHRA Director of Contracting, Janine Brown Smith and this was witnessed by employees James Cowdell and Deborah Clemente who informed the plaintiff and the plaintiff subsequently informed President Claire Jackson and Treasurer, Robert Tucker. MacLeish with support from Brown Smith and Elaine White attempted to have the plaintiff hire MacLeish and Sherman as corporate counsel in the spring and fall of 1999 at a retainer of $50,000 per year.

12. GLMHRA did not have a non discriminatory reason for plaintiff's Termination and believed him to be disabled and unable to perform his duties.

**B.    Bridgewell**

Greater Lynn is a regional non-profit mental health agency.  It is a public charity under Massachusetts law, is regulated by the Public Charities Division of the Massachusetts Attorney General's Office, and receives substantial support from the Commonwealth of Massachusetts, primarily through its Department of Mental Health ("DMH") and Department of Mental Retardation ("DMR").

Bleau was Greater Lynn's executive director since the mid-1970's.

***Investigation of Wrongdoing and Termination of Bleau.***  During the fall of 1999, allegations surfaced involving Bleau that caused the Greater Lynn Board to place him on paid administrative leave in late October 1999.  The Board retained counsel to commence an investigation of Bleau's management of Greater Lynn's employee fringe benefit program; certain expenditures of Greater Lynn funds that Bleau had made or that were made under his direction; and Bleau's management of the operations of Eastern Massachusetts Housing Corporation ("Eastern Mass."), a close affiliate to Greater Lynn of which Bleau was also executive director.

In early February 2000, the Public Charities Division of the Massachusetts Attorney General's Office ("Public Charities Division") informed the Board that its Public Charities Division had initiated an investigation of Greater Lynn.  At this time, the Criminal Division of the Massachusetts Attorney General's Office also informed the Board that it had initiated a criminal investigation of Bleau.

The Board cooperated fully with the Attorney General's Office.  During the winter and spring of 2000, Robert F. Tucker ("Tucker"), a member of the Greater Lynn Board, met several times with Assistant Attorney General Jamie Katz and Assistant Attorney General Eric Carriker, both assigned to the Pubic Charities Division.  Katz and Carriker informed Tucker that the Attorney General's Office regarded Greater Lynn to be in serious financial and management difficulty and that the Office placed the responsibility for these difficulties in the hands of the Board and identified Bleau as the individual whose actions had created them.  In particular, they asserted that Bleau had made improper expenditures of state contract funds; that he had misused Greater Lynn and employee retirement funds; that Greater Lynn had submitted incorrect financial reports to DMH and DMR.

The two AAGs further informed Tucker and other members of the Board that, unless a management agreement were entered into pursuant to which the Board would retain the services of a management advisor, restructure its membership, and appoint a new executive director, the Attorney General's Office would commence an action to place Greater Lynn in receivership.

On April 20, 2000, the Board voted to terminate Bleau's employment.  Given his length of service to the company, the Board voted to negotiate a severance agreement with Bleau and to offer him the opportunity to resign.

In early May, 2000, Greater Lynn and the Attorney General's Office entered into a Management Agreement whereby Greater Lynn agreed to retain a management adviser who would oversee the company, report to the Public Charities Division, and make recommendations. Attorney Robert Griffin was appointed management adviser.

During the period of May through December 2000, Board President Tucker participated on behalf of the Board in continuing negotiations with the Public Charities Division. The Public Charities Division opposed any further role for Bleau with either Greater Lynn or Eastern Mass.; required Greater Lynn to revise its employee benefits program; and sought the resignations of all of the members of the Board and their replacement by persons with no prior contact with or knowledge of Greater Lynn.

While Greater Lynn had placed Bleau on administrative leave in the fall of 1999 and voted to terminate him in April 2000, Eastern Mass.'s Board did not do the same and allowed Bleau to continue working.

The Public Charities Division also urged Greater Lynn to merge with Eastern Mass. as well as to correct certain accounting matters, primarily interagency loans and transfers, and to liquidate certain assets that Eastern Mass. held for the benefit of Greater Lynn or its employee benefits funds.

Negotiations with Bleau on a severance agreement continued throughout the summer of 2000. Bleau refused to sign the final proposed agreement and his salary was discontinued, effective September 8, 2000.

***Bleau's October 2000 EEOC Complaint.*** On October 6, 2000, Bleau filed a discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"), alleging that his termination was on the basis of his gender, age, and perceived

disability.  At some point in October, Bleau also filed a complaint against Greater Lynn with the Fair Labor and Business Practices Division of the Massachusetts Attorney General's Office.

***The Griffin Report.***  On October 13, 2000, at the request of the Public Charities Division, Attorney Griffin submitted his 17-page report (the "Griffin Report" or the "Report") to the Public Charities Division.  The Report criticized Bleau's leadership at Greater Lynn and criticized the Board for giving Bleau too much leeway in the management of Greater Lynn and the EFIP.  The Report also criticized the Board for taking too long (April 20 until September 8, 2000) in removing Bleau from the payroll.  The Report made various recommendations, including the merger of Eastern Mass. into Greater Lynn.  Copies of the Griffin Report were sent to the respective legal counsels for both DMR and DMH.

***The Separation Agreement.***  In October, given Bleau's continued role with Eastern Mass. and because of Bleau's complaints, Greater Lynn reinitiated discussions with Bleau to negotiate an agreement covering Bleau's separation from both Greater Lynn and Eastern Mass. and containing a general release in favor of both Greater Lynn and Eastern Mass.  James Cowdell and acting Executive Director Paul J. Cote, Jr. ("Cote"), negotiated the separation agreement with Bleau.

On November 6, 2000, Cote and Cowdell presented the Separation Agreement and General Release (the "Separation Agreement") to Bleau for signature.  Through oversight, the Separation Agreement that was presented to Bleau for his signature referenced a letter attached as Exhibit A that would state that he resigned to pursue other interests.  No letter was drafted or brought to the signing.  It was agreed that in the near future a letter would be prepared stating simply that Bleau had left the Agency to pursue other interests. The letter would be non-specific regarding reasons for the departure.  Bleau understood that no draft letter was attached.

Bleau signed the Agreement on November 6, 2000 and acknowledges that that he read the Agreement before signing.  Pursuant to the Separation Agreement, Greater Lynn and Eastern Mass. paid $84,3000 in compensation and agreed to pay for his health insurance for twelve months in the amount of $10,900 (for a total of $95,200.00).  *Separation Agreement, ¶ 5A.*  In addition, the corporations agreed to deed to Bleau the company vehicle used by Bleau at no cost, that had an agreed upon fair market value of $21,600.  *Id. at ¶ 5B.*

In addition, the companies agreed to pay up to $10,000 in training funds.  Under this provision, for a period of two years, the companies would "pay an amount for Mr. Bleau's enrollment in a program or course of training at an accredited college of Mr. Bleau's choice, or any training course leading to licensing or certification."  Such payments would not exceed $5,000 in each year and the payments would be made directly to the college.  *Id. at ¶ 5C.*

By signing the Separation Agreement, Bleau also acknowledged his indebtedness to Greater Lynn in the amount of $13,918.21 as a result of loans, and that Greater Lynn would be able to deduct this amount from the amount in his deferred compensation account.  Greater Lynn would pay the net amount in the account to Bleau within 30 days.  *Separation Agreement, ¶ 6.*

In exchange, Bleau released all claims against Greater Lynn, Eastern Mass., and their respective employees, agents, and attorneys.  *Separation Agreement, ¶ 4.*  Bleau also agreed that "he shall not portray in a false way or disparage the professional reputation of the Corporations, their directors, managers or employees" *(Id. at ¶ 7)* and to withdraw, within 48 hours, his complaint with the EEOC.  *Id. at ¶ 8.*

***Post-Separation Discussions re Letter.***  Within days of signing the Agreement, Bleau was repeatedly calling Cowdell and making demands and accusations.  On November 16, 2000, Cowdell sent Bleau a letter telling him that all further contact with Greater Lynn should be made

to Greater Lynn's attorney, Laurence Donoghue of Morgan Brown & Joy in Boston.  Despite

this, Bleau continued to contact Cowdell.  He repeatedly demanded that Greater Lynn send out a

multi-page announcement setting forth his accomplishments at Greater Lynn.  Sometime in late

November or December 2000, Bleau provided Cowdell with a document entitled "Albert Bleau:

A Life of Service".  Bleau demanded that Greater Lynn send it out to Greater Lynn's newsletter

list, local newspapers, and elected officials.  He made clear that he did not want the document to

be changed.   Cowdell informed him that Greater Lynn would send out a brief letter stating that

he resigned to pursue other interests.  Bleau complained, and made clear that he did not want

such a letter to be sent out.

Greater Lynn and Bleau were never able to reach a resolution as Bleau made clear that he

did not want Greater Lynn to send out a letter stating that he resigned to pursue other interests,

and insisted that the announcement promote him and list, in multiple pages, his accomplishments

at Greater Lynn.

***Bleau's Breaches of the Separation Agreement.***  In early 2001, Bleau sent out letters to

17 terminated Greater Lynn employees, disparaging Greater Lynn and recommending to the

former employees to file complaints against Greater Lynn with the Massachusetts Attorney

General's Office.  On April 11, 2001, Bleau sent out a letter to each member of the Boards of

both Greater Lynn and Eastern Mass., making various disparaging remarks about Greater Lynn

management.  On April 13, 2001, Bleau sent identical letters to the Commissioner of DMR and

the Commissioner of DMH requesting, among other things, that Greater Lynn be placed

immediately into receivership and attaching his April 11 letter to the Boards.  Bleau also

requested that he be made the receiver.

By early May, Bleau was also requesting the Attorney General's Office to investigate

11

Greater Lynn and notifying the Attorney General's Office that he expected to be indicted.

***Conclusion of Attorney General's Investigation and Further Restructuring of Greater Lynn.*** Following the Separation Agreement, the Public Charities Division continued to press for the replacement of all of the members of the Board. Further negotiations resulted in an agreement that provided for the resignation of all but two of the Board members; the recruitment of new members; and the amendment of the Board's bylaws to provide for staggered terms and a limit of six years of continuous service.

In December 2000, new Board members were appointed at the corporation's annual meeting; Tucker was elected president of the Board; and new members were appointed to the Board of Eastern Mass.

During the time when these governance matters were being worked through, the new interim executive director, Paul J. Cote, Jr. ("Cote") and other members of the Greater Lynn staff, with the assistance of counsel, were correcting the financial, management, and retirement benefits administration problems that the Board's internal investigation and the Public Charities Division's inquiry had identified. Accordingly, when Tucker became president, the principal remaining issues that the Public Charities Division had raised and that Griffin, in his final report in October 2000, had recommend that Greater Lynn resolve were the restructuring of the administration of Greater Lynn's employee benefits program; the merge of Eastern Mass. into Greater Lynn; and the amendment of the Board's bylaws. The Board amended its bylaws in December 2001; a new administrative structure for the employee benefits program was implemented during 2002; and Eastern Mass. merged into Greater Lynn effective July 1, 2003.

***Lack of Any Qualified Tuition Expenses In Period Before April 11, 2001.*** Bleau never took any course at any accredited college from November 2000 until April 11, 2001. The first

course that he took after his departure from Greater Lynn was signed up for on April 12, 2001.

Bleau did not request payment for this until he sent a letter to Greater Lynn counsel on April 13,

2001, both after the material breach of the Separation Agreement.

    *Selection Process of New Executive Director in 2003.*   In July 2003, the Greater Lynn

Board formed a special committee to select a new executive director and five Board members

were appointed to it, including Board president Robert Tucker.  The committee received

approximately 120 applications for the position.  From these, the committee selected twenty for

further evaluation and chose eleven to interview.  Following those interviews, the committee

recommended that the Board consider three candidates and offer the position to one of them.

    Bleau applied in August 2003.  He was one of the applicants whom the committee

determined not to consider further.  He, along with the approximately 100 other applicants in this

category, received a letter thanking them for their interest.  The committee was unaware at the

time that Bleau suffers from any disability.   While the committee considered Bleau's

application, no member voted to pursue it.  The committee discussed Bleau's application briefly

and no member mentioned his or her belief that Bleau was suffering from a disability or that

Bleau was unsuited for the position of executive director because he was suffering from a

disability.

    The person whom the Board selected was well-qualified and did not have any prior

connection with Greater Lynn, a fact that was regarded as a significant attribute given the past

financial and management difficulties involving Bleau.

    *Bleau's 2003 Bankruptcy*.  On July 2, 2003, Bleau filed a voluntary petition for

bankruptcy protection under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et*

*seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of

Massachusetts. Bleau did not declare his right of action against Greater Lynn as an asset of his estate. On February 18, 2004, the Bankruptcy Court ordered Bleau discharged and, on March 8, 2004, the bankruptcy case was ordered closed.

*Alleged Defamatory Statements.* At no point after the Separation Agreement did anyone from Greater Lynn disparage Bleau to any third party. Aside from providing copies of the Griffin Report to the Board of Directors, no one from Greater Lynn distributed the Griffin Report to anyone. No prospective employer has ever inquired about Bleau. Greater Lynn did not want any publicity concerning the Attorney General investigation, Bleau's termination, and its past financial difficulties.

## II.    AGREED FACTS

1.      Greater Lynn is a public charity under Massachusetts law and is regulated by the Public Charities Division of the Massachusetts Attorney General's Office.

2.      Greater Lynn receives substantial revenue from both the Massachusetts Department of Mental Health and Department of Mental Retardation.

3.      Bleau was placed on paid administrative leave in late October 1999.

4.      The Public Charities Division of the Attorney General's Office started an investigation of Greater Lynn concerning allegations regarding Bleau in early 2000.

5.      On April 20, 2000, the Greater Lynn Board voted to terminate Bleau's employment. Given his length of service to the company, the Board voted to negotiate a severance agreement with Bleau and to offer him the opportunity to resign.

6.      In early May, 2000, Greater Lynn and the Attorney General's Office entered into a Management Agreement whereby Greater Lynn agreed to retain a management adviser who

would oversee the company, report to the Public Charities Division, and make recommendations. Attorney Robert Griffin was appointed management adviser.

7.    Negotiations with Bleau on a severance agreement continued throughout the summer of 2000.  Bleau refused to sign the final proposed agreement and his salary was discontinued, effective September 8, 2000.

8.    On October 6, 2000, Bleau filed a discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"), alleging that his termination was on the basis of his gender, age, and perceived disability.

9.    On October 13, 2000, Attorney Griffin submitted his 17-page report (the "Griffin Report" or the "Report") to the Public Charities Division.  The Report criticized Bleau's leadership at Greater Lynn and criticized the Board for giving Bleau too much leeway in the management of Greater Lynn and the EFIP.  The Report made various recommendations, including the merger of Eastern Mass. into Greater Lynn.  Copies of the Griffin Report were sent to the respective legal counsels for both DMR and DMH.

10.   On November 6, 2000, Bleau signed the Separation Agreement and General Release (the "Separation Agreement").

11.   At the time of signing, Bleau was aware that, despite the reference to an Exhibit A, there was no letter attached.

12.   Soon after the Agreement was signed, Greater Lynn paid Bleau $84,3000 in gross compensation.  Greater Lynn also paid for Bleau's health insurance for twelve months as agreed in the amount of $10,900 (for a total of $95,200.00).  Greater Lynn also transferred to Bleau at no cost the company vehicle that Bleau used, with an agreed fair market value of  $21,600.

13.     In early 2001, Bleau sent out letters to 17 terminated Greater Lynn employees, disparaging Greater Lynn and recommending to the former employees to file complaints against Greater Lynn with the Massachusetts Attorney General's Office.

14.     On April 11, 2001, Bleau sent out a letter to each member of the Boards of both Greater Lynn and Eastern Mass., making various disparaging remarks about Greater Lynn management.  Bleau had applied to Greater Lynn on April 5, 2001 for the open CFO position.

15.     On April 13, 2001, Bleau sent identical letters to the Commissioner of DMR and the Commissioner of DMH requesting, among other things, that Greater Lynn be placed immediately into receivership and attaching his April 11 letter to the Boards.  Bleau also requested that he be made the receiver.

16.     Bleau never took any course at any accredited college during the period from November 2000 until April 11, 2001.  The first course that he took after his departure from Greater Lynn was signed up for on April 12, 2001 and did not begin until later April.

17.     On July 2, 2003, Bleau filed a voluntary petition for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts.

18.     Bleau did not declare his right of action against Greater Lynn as an asset of his estate.

19.     On February 18, 2004, the Bankruptcy Court ordered Bleau discharged and, on March 8, 2004, the bankruptcy case was ordered closed.

20.     In the summer of 2003, Greater Lynn posted a job opening for executive director/CEO and Bleau applied for such position in August 2003.

21.     Greater Lynn did not choose to interview Bleau for such position and eventually hired someone else.

**III.**    **CONTESTED ISSUES OF FACT**

1.     Whether Greater Lynn did not rehire Bleau in August 2003 because it perceived him to have a disability.

2.     Whether Greater Lynn ever published any defamatory and false statement about Bleau during the period after the Separation Agreement was signed in November 2000.

3.     Whether Greater Lynn breached the Separation Agreement with respect to issuing a letter stating that Bleau resigned to pursue other interests and to pay certain education expense.

**IV.**    **JURISDICTIONAL QUESTIONS**

None

**V.**    **QUESTIONS RAISED BY PENDING MOTIONS**

On January 18, 2007, Bridgewell filed a Motion for Summary Judgment.  The court has scheduled oral argument on the motion for February 13, 2007.  The resolution of this motion could dispose of all or some of Bleau's claims.

On January 31, 2007, in his Opposition to Bridgewell's Motion for Summary Judgment, Bleau also asserted a Cross-Motion for Summary Judgment.

**VI.**    **ISSUES OF LAW**

**A.**    **Bleau**

1.     Whether a person's right to sue is an asset under Bankruptcy Law and whether plaintiff's complaint to EEOC needed to be reported to the magistrate considering that the bankruptcy had reached its final stages and the final report was entered at the court on January 14, 2004.

17

2.      Whether The Charitable Immunity Law was intended to protect non profits from acts of negligence or violations of law and meant to protect them from violations of employee law such as Workmen's Comp, ADA and Defamation or from third party contracts such as a Severance Agreement.

3.      Whether the defendant was responsible to correct false information about the plaintiff in the Griffin and MacLeish-Sherman Reports that had been distributed to state agencies and board members and whose contents were shared with others and in not doing this would they be committing defamation and a major breach of the Severance Agreement?

4.      Whether defendant's major breach of the Severance Agreement would absolve the plaintiff from complying with all provisions of the agreement?

5.      Whether the action of Bridgewell and its agents, MacLeish, Sherman and Griffin a violation of RICO and if this is a the case, does it indicate and support discriminatory amicus under the ADA and does it not constitute retaliation under ADA and the Rehabilitation Act and fraud in the negotiation of the severance agreement thus voiding any provisions binding on the plaintiff?

6.      If there is defamation and a breach of a contract doesn't this indicate and support discriminatory amicus under the ADA and does it not constitute retaliation under ADA and the Rehabilitation Act?

7.      Does mixed motive analysis apply in this case as decided in the June 2003 Supreme Court Desert Palace, Inc., dba Caesars Palace Hotel & Casino v. Costa?

### B.    Bridgewell

An issue raised by Bridgewell's pending Motion for Summary Judgment is the legal effect of Bleau's Chapter 7 bankruptcy filing on July 2, 2003 and of his failure to declare his causes of action on his bankruptcy petition and schedules.

## VII.    REQUESTED AMENDMENTS TO PLEADINGS

### 1.    Bleau

None.

### 2.    Bridgewell

Bridgewell asks that, with respect to the defamation claim construed by the Court, Keeton, J., that Bridgewell be allowed to assert the affirmative defense that any liability it has be capped at $20,000 pursuant to G.L. c. 231, § 85K, given that Bridgewell is a public charity under Massachusetts Law.

## VIII.    ADDITIONAL MATTERS

### 1.    Bleau

None.

### 2.    Bridgewell

The Court, Keeton, J., has previously made the following rulings:

-    that, in executing the Separation Agreement on November 6, 2000, Bleau made a knowing and voluntary waiver of all claims he had at that time against the defendants. *Docket No. 64, at 12.*

-    Bleau's letters of April 11, 2001 constituted a material breach of the non-disparagement provision of the Separation Agreement such that Greater Lynn was excused from the performance of future obligations under that Agreement. *Docket No. 93, at 5-8.*

19

-    Greater Lynn is responsible (under Paragraph 5C of the Separation Agreement) for any qualified education expenses (up to $2,500) that Bleau incurred from November 2000 to April 11, 2001 so long as such invoices were previously sent to Greater Lynn. *Docket No. 93, at 12-13.*

The end result of the Court's October 25, 2005 Order was that, in addition to the claim under Paragraph 5C of the Separation Agreement (tuition payments), the only claims that survive are:

(i)    ADA and Rehabilitation Act claims that arose after the execution of the Separation Agreement in November 2000;

(ii)    defamation claims that arose after the execution of the Separation Agreement in November 2000; and

(iii)    the claim for breach of Paragraph 2 (letter) of the Separation Agreement between November 2000 and April 11, 2001. The Court allowed discovery that would be relevant to these claims. *Docket No. 93, at 12, 14-15; see also Docket No. 109, at 5; Docket No. 123, at 4.*

## IX.    PROBABLE LENGTH OF TRIAL

4-5 days. Bench trial.

## X.    WITNESSES

### A.    Bleau

1.    Martena Fallon
75 Foxhill Rd.
Nahant, MA 01908

2.    Peter McGinn
71 Sheila's Way
Lynn, MA 01904

3.    Stephan Speropolous
122 Eastman St.

Swampscott, MA 01907

4.     Tina Adams
C/O NSARC
62 Holten St.
Danvers, MA 01923

5.     Albert Bleau
505 Paradise Rd. #208
Swampscott, MA 01907

6.     Deborah Thurber
6 Cliff Ave.
Lynn, MA 01905

7.     Jan DeStefano
C/O NSARC
62 Holten St.
Danvers, MA 01923

8.     Gerald McCarthy
C/O NSARC
62 Holten St.
Danvers, MA 01923

9.     Timothy Demakis
C/O Demakis and Demakis
56 Central Ave.
Lynn, MA 01901

10.    Mr. Arthur Brady
Executive Director
American Training
102 Glenn St.
Lawrence, MA 01843

11.    Kathleen O'Keefe
Garden St. Apartments
One Canal St.
Lawrence MA 01840

12.    Nancy Weinstein
Garden St. Apartments
One Canal St.
Lawrence, MA 01840

13.    Alan Kort
       Lynn Daily Item
       35 Exchange St.
       Lynn, MA 01901

14.    Thor Jorgenson
       Lynn Daily Item
       35 Exchange St.
       Lynn, MA 01901

**B.    <u>Bridgewell</u>**

Each of the witnesses below will be factual witnesses.

1.    James Cowdell
      3 Mary Ellen Drive
      Lynn, MA 01904

2.    Elaine White
      Bridgewell, Inc.
      471 Broadway
      Lynnfield, MA 01940

3.    Paul J. Cote, Jr.
      Department of Public Health
      250 Washington Street
      Boston, MA 02108

4.    Robert F. Tucker
      Lynn Water & Sewer Commission
      400 Parkland Avenue
      Lynn, MA 01905

5.    Robert Griffin, Esq.
      Krokidas & Bluestein
      600 Atlantic Avenue, Suite 1900
      Boston, MA

6.    Robert Sherman, Esq.
      Greenberg Traurig
      One International Place
      Boston, MA 02110

7.    Roderick MacLeish, Esq.
      Greenberg Traurig
      One International Place

Boston, MA 02110

8.    Laurence Donoghue, Esq.
      31 Dewey Road
      Saugus, MA 01908

9.    Eric Carriker, AAG
      Public Charities Division
      Massachusetts Attorney General's Office
      One Ashburton Place
      Boston, MA 02108

10.   Jamie Katz
      Housing Finance Authority

11.   James Mecone
      Grant Thornton
      Boston, MA

12.   Thomas Manning
      13 Pierce Avenue
      Beverly, MA

13.   Terri White
      Bridgewell, Inc.
      471 Broadway
      Lynnfield, MA 01940

14.   Kelly Johnson
      Bridgewell, Inc.
      471 Broadway
      Lynnfield, MA 01940

15.   Claire Jackson
      18 Chestnut Street
      Lynn, MA

16.   Nancy Rizzo
      145 Puritan Road
      Swampscott, MA

17.   Norman Thibodeau
      40 North Franklin Street
      Lynn, MA

18.   Ann Perry

76 Pittman Road
Marblehead, MA 01945

19.    John Papanastasiou
4 East Street
Ipswich, MA 01938

20.    Samuel Vitali
60 Andrew Street
Lynn, MA

21.    Charles Comeau
605 Eastern Avenue, Unit 205
Lynn, MA

22.    Gerald Morrissey, Commissioner
Department of Mental Retardation
160 N. Washington Street
Boston, MA 02114

23.    Mary Lou Sudder,
Massachusetts Society for the
Prevention of Cruelty to Children
99 Summer Street
Boston, MA 02110

24.    Amanda Chalmers
N. East Regional Office
Department of Mental Retardation
P.O. Box A
Hawthorne, MA 01937

25.    Paul Lanzikos
35 High Street
Beverly, MA

26.    Susan Villett
12 Westview Circle
Peabody, MA 01960

27.    Anita Shipman
38 Woodchester Drive
Milton, MA 02186

28.    Keith Bransfield
17 Hilda Road

Lynn, MA 01904

29.    James Purdy
       9 Larch Row
       Wenham, MA 01984

30.    Debra O'Blenes
       46 Glenwood Road
       Lynn, MA 01904

31.    Paul Sahovey
       57 Seaview Ave.
       Marblehead, MA 01945

32.    Barnett Sherman
       Van Kempen American Capital
       40 Broad Street, Suite 915
       Boston, MA 02109

33.    Jennifer Hollingsworth, Criminal Investigator
       Massachusetts Attorney General's Office
       One Ashburton Place
       Boston, MA 02108

34.    Mitchell Cohen
       1 Center Street
       Gloucester, MA 01930-5720

## XI.    PROPOSED EXHIBITS

### A.    Agreed

1.    Minutes, April 20, 2000, Greater Lynn Board Meeting;

2.    Management Agreement between Mass. AG's Office and Greater Lynn, signed by Greater Lynn on May 5, 2000;

3.    Letter, dated October 13, 2000, from Robert J. Griffin, Esq. to Eric Carriker, AAG;

4.    Separation Agreement and General Release, signed by Bleau on November 6, 2000, signed by EMHC on November 10, 2000 and by Greater Lynn on November 13, 2000;

5.    Undated memorandum entitled "Albert Bleau:  A Life of Service";

6.      Undated Letter, from Bleau to various former employees of Greater Lynn;

7.      Letter, dated April 11, 2001, from Bleau to each member of the Greater Lynn and EMHC Boards;

8.      Application by Bleau for course at Clark University, dated April 12, 2000;

9.      Letter, dated April 13, 2001, from Bleau to Gerald Morrissey, Commissioner of DMR;

10.     Letter, dated April 13, 2001, from Bleau to Mary Lou Sudder, Commissioner of DMH;

11.     Bleau's Bankruptcy Petition and schedules;

12.     Letter, dated August 8, 2003, from Bleau to Robert Tucker, President of Greater Lynn Board applying for CEO position, with enclosed resume;

13.     Letter, dated August 19, 2003, from Greater Lynn to Bleau re rejection;

14.     Letter, dated October 15, 2003, from Bleau to James Cowdell, Greater Lynn;

15.     List of names of all applicants for CEO position in August 2003;

**B.      Exhibits Which at Least One Party Reserves Right to Object**

Undersigned counsel for Bridgewell states that he has not received various of the exhibits listed below, and reserves the right to object on this basis.

A.      Letter, dated January 18, 2000, from Leslie Slavin, Esq. to Bleau;

B.      Letter, dated February 4, 2000, from Jaime Katz, Chief of Public Charities Division, Mass. AG's Office, to Thomas Manning, President, Greater Lynn Board

C.      Letter, dated February 22, 2000, from Roderick MacKleish, Esq. to Wayne Godlin, Van Kempen American Capital;

D.      Letter, dated April 12, 2000, from Roderick MacKeish, Esq. to Wayne Godlin, Van Kempen American Capital;

E.      Letter, dated April 20, 2000 from Stephen Speropoulos, President EMHC, to Eric Carriker, AAG;

F.      Letter, dated April 21, 2000, from S. Rosenfeld, Bleau counsel, to Jamie Katz, AAG;

G.    Bleau's Addendum to Rosenfeld's April 21, 2000 Letter to Katz;

H.    Letter, dated April 21, 2000, from S. Rosenfeld, Bleau counsel, to R. MacKleish;

I.    Letter, dated April 21, 2000, from Bleau to Thomas Manning, President, Greater Lynn Board;

J.    Letter, dated April 26, 2000, from Bleau to Donald Lonnbery, VP of Warren Bank;

K.    Bleau's Cash Flow-fiscal Documents, dated May 2, 2000;

L.    Summary of Bleau's accomplishments, dated May 2, 2000;

M.    Letter, dated May 24, 2000, from Bleau to Greater Lynn and Eastern Mass. Boards;

N.    Complaint, by M. Fallon to BBO re MacKleish and Sherman, dated May 2, 2000;

O.    Letter, dated May 9, 2000, from Roderick MacKleish to AAG Eric Carriker responding to April 21 letter of S. Rosenfeld, Esq.;

P.    Letter, dated May 10, 2000, from Garrick Cole, Esq. to Stephen Rosenfeld, Esq., counsel to Bleau;

Q.    Letter, dated May 22, 2000, from Stephen Rosenfeld, Esq., counsel for Bleau, to Garrick Cole, Esq.;

R.    Vote taken at May 23, 2000, Greater Lynn Board Meeting;

S.    Letter, dated May 29, 2000, from Garrick Cole, Esq., to Stephen Rosenfeld, Esq.;

T.    Letter, dated June 12, 2000, from Bleau to Paul Keating, Esq.;

U.    Response of BBO, dated June 13, 2000, to M. Fallon;

V.    Minutes of Eastern Mass. Board's June 29, 2000 Meeting;

W.    Letter, dated July 5, 2000, from Robert Tucker, Treasurer of Greater Lynn, to Bleau;

X.    Minutes of Eastern Mass. Annual Meeting on July 6, 2000;

Y.    Letter, dated July 14, 2000, from Van Kampen American Capital to E. White, Greater Lynn;

Z.      Bleau's financial analysis, dated July 14, 2000;

AA.     Letter, dated July 25, 2000, from Laurence Donoghue, Esq. to Bleau and enclosed draft Separation Agreement;

BB.     Minutes of Eastern Mass. Board's August 2, 2000;

CC.     Proposed Separation Agreement, dated on or about August 7, 2000;

DD.     Minutes of Eastern Mass. Board's August 2, 2000;

EE.     Letter, dated August 10, 2000, from Laurence Donoghue, Esq. to Bleau;

FF.     Letter, dated August 14, 2000, from Laurence Donoghue, Esq. to Bleau;

GG.     Newspaper Article, dated August 15, 2000, in the <u>Laconia Citizen</u>.

HH.     Three emails, sent on August 15, 2000, from Bleau to L. Donoghue, Esq.;

II.     Letter, dated August 16, 2000, from Laurence Donoghue, Esq. to Bleau, with enclosed draft of Separation Agreement;

JJ.     E-mail, sent August 17, 2000 at 7:12 p.m. from Bleau to Laurence Donoghue, Esq.;

KK.     E-mail, sent August 18, 2000 at 11:18 a.m. from Bleau to Laurence Donoghue, Esq.;

LL.     Letter, dated August 25, 2000, from Laurence Donoghue, Esq. to Bleau;

MM.     Letter, dated August 25, 2000, from Paul Cote, Greater Lynn to Bleau;

NN.     E-mail, sent September 5, 2000 at 3:06 p.m. from Bleau to Laurence Donoghue, Esq., with revised Separation Agreement;

OO.     Letter, dated September 8, 2000, from P. Cote, Greater Lynn, to Easter Mass. Board re management contract;

PP.     Letter, dated September 8, 2000, from P. Cote, Greater Lynn, to Easter Mass. Board re term sheet;

QQ.     Eastern Mass. agenda for September 13, 2000 meeting;

RR.     Certification by Eastern Mass. Board, dated September 13, 2000, to remove Greater Lynn as signatories on bank account;

SS.  Letter, dated September 14, 2000, from Bleau to Mary Lou Sudder, Commissioner of DMH;

TT.  Letter, dated September 14, 2000, from Bleau to Gerald Morrissey, Commissioner of DMR;

UU.  Letters, dated September 14, 2000, from Bleau to Congressman J. Tierney; Senator Fred Berry; and Governor Paul Cellucci;

VV.  Letter, dated September 15, 2000, from Laurence Donoghue, Esq. to Bleau;

WW.  Letter, dated September 21, 2000, from Bleau to J. Katz, AAG;

XX.  Letter, dated September 21, 2000, from Bleau to Thomas Manning and Elaine White, Greater Lynn;

YY.  Letter, dated September 22, 2000, from Eric Carricker, AAG, to Robert J. Griffin, Esq.;

ZZ.  Letter, dated September 27, 2000, from Bleau to Greater Lynn and Eastern Mass. Boards;

AAA.  Letter, dated October 4, 2000, from Laurence Donoghue, Esq. to Bleau;

BBB.  EEOC Complaint by Bleau, dated October 6, 2000;

CCC.  Analysis of M. Fallon, dated October 9, 2000;

DDD.  Letter, dated October 11, 2000, from L. Donoghue, Esq. to Bleau;

EEE.  Letter, dated October 12, 2000, from Bleau to L. Donoghue, Esq.;

FFF.  Memo, dated October 20, 2000 from Bleau to Stephen Speropolous, President, EMHC Board;

GGG.  EEOC letter, dated October 24, 2000 to Bleau;

HHH.  Draft Separation Agreement, dated November 1, 2000;

III.  Draft Separation Agreement, dated November 3, 2000;

JJJ.  Undated memorandum entitled "Albert Bleau:  A Life of Service";

KKK.  Letter, dated November 16, 2000, from James Cowdell, CAO, Greater Lynn, to Bleau;

LLL.   Email, sent on November 21, 2000 from Laurence Donoghue, Esq. to Bleau;

MMM.        Letter, dated November 22, 2000, from Bleau to Rance O'Quinn, EEOC;

NNN.   Letter, dated November 22, 2000, from Bleau to Robert Sanders, EEOC;

OOO.   Letter, dated November 28, 2000, from R. Sanders, EEOC, to Bleau;

PPP.   Letter, dated December 12, 2000, from Bleau to Laurence Donoghue, Esq.;

QQQ.   Letter, dated December 12, 2000, from Bleau to EEOC;

RRR.   Memo, dated January 20, 2001, from M. Fallon to Eastern Mass. Board;

SSS.   Letter, dated April 5, 2001, from Bleau to Greater Lynn seeking CFO position;

TTT.   Letter, dated April 13, 2001, from Bleau to Paul Cote, Executive Director of
Greater Lynn;

UUU.   Letter, dated April 19, 2001, from Laurence Donoghue to Bleau;

VVV.   Letter, dated April 27, 2001, from Laurence Donoghue to Bleau;

WWW.        Letter, dated May 5, 2001, from M. Fallon to R. Tucker;

XXX.   Letter, dated May 8, 2001, from Bleau to L. Donoghue, Esq.;

YYY.   Letter, dated May 10, 2001, from Bleau to Jennifer Hollingsworth, Criminal
Investigatory, AG's Office;

ZZZ.   Letter, dated May 14, 2001; from L. Donoghue to Bleau;

AAAA.        Letter, dated May 22, 2001, from Bleau to L. Donoghue, Esq.;

BBBB.        Letter, dated May 25, 2001, from B. Guryan, Esq. to Bleau;

CCCC.        Letter, dated June 20, 2001, from Bleau to L. Donoghue, Esq.;

DDDD.        Letter, dated September 25, 2001; from Centrulo & Capone to Bleau;

EEEE. Letter, dated December 7, 2001, from Bleau to J. Cowdell, Greater Lynn;

FFFF.  Letter, dated December 27, 2001, from L. Donoghue, Esq. to Bleau;

GGGG.        Letter, dated April 2, 2002, from Bleau to L. Donoghue, Esq.;

HHHH.  Letter, dated April 11, 2005, from Bleau to Greater Lynn;

IIII.  Eastern Mass. Audit, dated September 2, 1999, for 1998 and 1999;

JJJJ.  Greater Lynn combined financials and audit of Eastern Mass. and Greater Lynn, dated September 29, 1999, for 1998-1999.

KKKK.  Copy of bond covenants, dated May 29, 2000;

LLLL. Bankruptcy Trustee, final report, dated January 2004, and other bankruptcy documents concerning Bleau's bankruptcy;

MMMM.  Bleau's W-2 forms and tax returns 2000 to present (Bridgewell still awaiting these from Bleau)

Respectfully submitted,
The Defendant,

BRIDGEWELL, INC.,
By its attorneys,

/s/ William T. Harrington
William T. Harrington (BBO No 564445)
Glynn, Landry, Harrington, & Rice, LLP
10 Forbes Road, Suite 270
Braintree, MA 02184
(781) 356-1749

/s/ Edward P. Harrington
Edward P. Harrington
8 Winter Street, 12th Floor
Boston, MA 02108
(617) 423-5959

The Plaintiff,
ALBERT WILLIAM BLEAU, JR.

Albert Bleau (wTH)

505 Paradise Road, No. 208
Swampscott, MA 01907

CERTIFICATE OF SERVICE

I herby certify that, on February 5, 2007, I filed this document with the Court electronically via the Court's CM/ECF system and that I served a copy of this document upon the pro se plaintiff both by first class mail and by e-mail.

/s/ William T. Harrington
William T. Harrington