UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
ALBERT WILLIAM BLEAU, JR.,            )
            Plaintiff                 )
                                      )          CIVIL ACTION
v.                                    )          NO. 04-10469-WGY
                                      )
BRIDGEWELL, INC., et al,              )
            Defendants                )
_____)

## DEFENDANT'S TRIAL BRIEF

As per the Court's November 11, 2007 Procedural Order, the defendant, Bridgewell, Inc.,

formerly the Greater Lynn Mental Health and Retardation Association (hereinafter referred to as

"Defendant" or "Greater Lynn") hereby submits its Trial Brief.

## INTRODUCTION

The plaintiff, Albert W. Bleau, Jr. (the "plaintiff" or "Bleau"), brings this action against

Greater Lynn, his former employer, alleging that it discriminated against him on the basis of his

perceived disabilities of being a drug addict, alcoholic, and mentally ill in violation of the

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (the "ADA") and the

Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"). As construed by the

Court, Keeton, J., the complaint also asserts claims of state law defamation, wrongful

interference with contractual relations, breach of the Separation Agreement and General Release

that the parties entered into in November 2000 (the "Separation Agreement"), and a claim based

on a violation of Internal Revenue Service regulations. *Docket No. 28, 13-14.*

By a series of orders by the Court, Keeton, J., on various dispositive motions of the

parties, all defendants except Greater Lynn have been dismissed and the only claims remaining

against Greater Lynn are:

1.      ADA and Rehabilitation Act claims to the extent they arose after the execution of the Separation Agreement in November 2000.

2.      Defamation claims to the extent they arose after the execution of the Separation Agreement in November 2000.

3.      Claim for breach of Paragraph 2 (issuance of letter re departure) of the Separation Agreement from the time of the Separation Agreement until April 11, 2001, when Bleau materially breached the Agreement; and

4.      Claim for breach of Paragraph 5C of the Separation Agreement (tuition payments) from the time of the Separation Agreement until April 11, 2001.

*Docket No. 93, at 12, 14-15; see also Docket No. 109, at 5; Docket No. 123, at 4.*

On January 18, 2007, Greater Lynn filed a Motion for Summary Judgment. The Court scheduled a hearing on the motion for February 13, 2007. However, the plaintiff was unable to attend the hearing and the Court has taken the Motion under advisement.

## PROPOSED FINDINGS OF FACT

*1.*      Greater Lynn is a regional non-profit mental health agency. It is a public charity under Massachusetts law; is regulated by the Public Charities Division of the Massachusetts Attorney General's Office; and receives substantial support from the Commonwealth of Massachusetts, primarily through its Department of Mental Health ("DMH") and Department of Mental Retardation ("DMR"). *Agreed Facts 1-2.*

2.      The plaintiff, Albert Bleau, was Greater Lynn's executive director since the mid-1970's.

## Investigation of Wrongdoing and Termination of Bleau.

*3.*      During the fall of 1999, allegations surfaced involving Bleau that caused the Greater Lynn Board to place him on paid administrative leave in late October 1999. *Agreed Fact 3.*

4.      The Board retained counsel to commence an investigation of Bleau's management of Greater Lynn's employee fringe benefit program; certain expenditures of Greater Lynn funds that Bleau had made or that were made under his direction; and Bleau's management of the operations of Eastern Massachusetts Housing Corporation ("Eastern Mass."), a close affiliate to Greater Lynn of which Bleau was also executive director.

5.      In early February 2000, the Public Charities Division of the Massachusetts Attorney General's Office ("Public Charities Division") informed the Board that its Public Charities Division had initiated an investigation of Greater Lynn.  *Agreed Fact 4.*  At this time, the Criminal Division of the Massachusetts Attorney General's Office also informed the Board that it had initiated a criminal investigation of Bleau.

6.      The Board cooperated fully with the Attorney General's Office.  During the winter and spring of 2000, Robert F. Tucker ("Tucker"), a member of the Greater Lynn Board, met several times with Assistant Attorney General Jamie Katz and Assistant Attorney General Eric Carriker, both assigned to the Pubic Charities Division.  Katz and Carriker informed Tucker that the Attorney General's Office regarded Greater Lynn to be in serious financial and management difficulty and that the Office placed the responsibility for these difficulties in the hands of the Board and identified Bleau as the individual whose actions had created them.  In particular, they asserted that Bleau had made improper expenditures of state contract funds; that he had misused Greater Lynn and employee retirement funds; that Greater Lynn had submitted incorrect financial reports to DMH and DMR.

7.      The two AAGs further informed Tucker and other members of the Board that, unless a management agreement were entered into pursuant to which the Board would retain the services of a management advisor, restructure its membership, and appoint a new executive

director, the Attorney General's Office would commence an action to place Greater Lynn in receivership.

8.    On April 20, 2000, the Board voted to terminate Bleau's employment. *Agreed Fact 5.* Given his length of service to the company, the Board voted to negotiate a severance agreement with Bleau and to offer him the opportunity to resign. *Agreed Fact 5.*

*9.*    In early May, 2000, Greater Lynn and the Attorney General's Office entered into a Management Agreement whereby Greater Lynn agreed to retain a management adviser who would oversee the company, report to the Public Charities Division, and make recommendations. Attorney Robert Griffin was appointed management adviser. *Agreed Fact 6.*

10.    During the period of May through December 2000, Board President Tucker participated on behalf of the Board in continuing negotiations with the Public Charities Division. The Public Charities Division opposed any further role for Bleau with either Greater Lynn or Eastern Mass.; required Greater Lynn to revise its employee benefits program; and sought the resignations of all of the members of the Board and their replacement by persons with no prior contact with or knowledge of Greater Lynn.

11.    While Greater Lynn had placed Bleau on administrative leave in the fall of 1999 and voted to terminate him in April 2000, Eastern Mass.'s Board did not do the same and allowed Bleau to continue working.

12.    The Public Charities Division also urged Greater Lynn to merge with Eastern Mass. as well as to correct certain accounting matters, primarily interagency loans and transfers, and to liquidate certain assets that Eastern Mass. held for the benefit of Greater Lynn or its employee benefits funds.

13.     Negotiations with Bleau on a severance agreement continued throughout the summer of 2000. *Agreed Fact 7.* Bleau refused to sign the final proposed agreement and his salary was discontinued, effective September 8, 2000. *Id.*

**Bleau's October 2000 EEOC Complaint.**

*14.*     On October 6, 2000, Bleau filed a discrimination complaint with the federal Equal Employment Opportunity Commission ("EEOC"), alleging that his termination was on the basis of his gender, age, and perceived disability. *Agreed Fact 8.*

15.     At some point in October, Bleau also filed a complaint against Greater Lynn with the Fair Labor and Business Practices Division of the Massachusetts Attorney General's Office.

**The Griffin Report.**

*16.*     On October 13, 2000, at the request of the Public Charities Division, Attorney Griffin submitted his 17-page report (the "Griffin Report" or the "Report") to the Public Charities Division. *Agreed Fact 9.* The Report criticized Bleau's leadership at Greater Lynn and criticized the Board for giving Bleau too much leeway in the management of Greater Lynn and the EFIP. *Id.* The Report also criticized the Board for taking too long (April 20 until September 8, 2000) in removing Bleau from the payroll. *Id.* The Report made various recommendations, including the merger of Eastern Mass. into Greater Lynn. *Id.* Copies of the Griffin Report were sent to the respective legal counsels for both DMR and DMH. *Id.*

**The Separation Agreement.**

17.     In October, given Bleau's continued role with Eastern Mass. and because of Bleau's complaints, Greater Lynn reinitiated discussions with Bleau to negotiate an agreement covering Bleau's separation from both Greater Lynn and Eastern Mass. and containing a general

release in favor of both Greater Lynn and Eastern Mass. James Cowdell and acting Executive Director Paul J. Cote, Jr. ("Cote"), negotiated the separation agreement with Bleau.

18.     On November 6, 2000, Cote and Cowdell presented the Separation Agreement and General Release (the "Separation Agreement") to Bleau for signature. Through oversight, the Separation Agreement that was presented to Bleau for his signature referenced a letter attached as Exhibit A that would state that he resigned to pursue other interests. No letter was drafted or brought to the signing.

*19.*     It was agreed that in the near future a letter would be prepared stating simply that Bleau had left the Agency to pursue other interests. The letter would be non-specific regarding reasons for the departure. Bleau understood that no draft letter was attached. *Agreed Fact 11.*

*20.*     Bleau signed the Agreement on November 6, 2000 and acknowledges that that he read the Agreement before signing. *Agreed Fact 10.*

*21.*     Pursuant to the Separation Agreement, Greater Lynn and Eastern Mass. agreed to pay $84,3000 in compensation and paid his health insurance for twelve months in the amount of $10,900 (for a total of $95,200.00). *Separation Agreement, ¶ 5A.* In addition, the corporations agreed to deed to Bleau the company vehicle used by Bleau at no cost, that had an agreed upon fair market value of $21,600. *Id. at ¶ 5B.*

22.     Paragraph 5C of the Separation Agreement provides as follows:

> For a period ending two years after execution of this Agreement, the Corporations [Greater Lynn and Eastern Mass.] will pay an amount for Mr. Bleau's enrollment in a program or course of training at an accredited college of Mr. Bleau's choice, or any training course leading to licensing or certification. The total amount to be paid pursuant to this paragraph shall not exceed $5,000 in each year (a total of up to $10,000). Payments made pursuant to this paragraph shall be made directly to the college and not to Mr. Bleau.

23.     By signing the Separation Agreement, Bleau also acknowledged his indebtedness to Greater Lynn in the amount of $13,918.21 as a result of loans, and that Greater Lynn would be able to deduct this amount from the amount in his deferred compensation account.  Greater Lynn would pay the net amount in the account to Bleau within 30 days.  *Separation Agreement, ¶ 6.*

24.     In exchange, Bleau released all claims against Greater Lynn, Eastern Mass., and their respective employees, agents, and attorneys.  *Separation Agreement, ¶ 4.*  Bleau also agreed that "he shall not portray in a false way or disparage the professional reputation of the Corporations, their directors, managers or employees" *(Id. at ¶ 7)* and to withdraw, within 48 hours, his complaint with the EEOC.  *Id. at ¶ 8.*

25.     Paragraph 2 of the Separation Agreement provides in pertinent part as follows:

> Mr. Bleau shall be permitted to submit a letter of resignation, if he so chooses.  The parties further agree that the Corporations shall issue a letter, in the form attached as Exhibit A, informing employees, consumers and friends of the Corporations that Mr. Bleau has resigned his employment with the Corporations to pursue others interests.

26.     No draft letter was attached at the time of signing and that Bleau was aware of this when he signed the Agreement.  *Undisputed Fact, 26.*

27.     The Separation Agreement also contains an integration clause, providing:

> The parties agree that this Settlement Agreement, with its attachments, is a fully integrated document and constitutes the entire agreement between them.  The parties expressly disclaim reliance on any representation, written or oral, other than those contained in this document.

28.     At his deposition, Bleau acknowledged that he read both this provision and the Agreement before signing.  Bleau Depo., at 28, 90.  Also, by signing the Agreement, Bleau also acknowledged that he had "thoroughly reviewed all aspects of this Agreement" and that he had "read and fully understands all of the provisions of this

Agreement and is voluntarily entering into this Agreement." *Id. at ¶ 10.* At his

deposition, Bleau also acknowledged that he knew that no draft letter was attached (Bleau

Depo, at 34-35), that he knew the Agreement simply stated that the letter would state that

he resigned to pursue other interests (Id. at 35), and that he did not like the language

concerning the letter and how the Agreement did not specify that the letter would list his

accomplishments and contributions. *Id. at 85-86.*

**Post-Separation Discussions re Letter.**

29.    Soon after the Separation Agreement was signed, Greater Lynn did pay Bleau

$84,300 in gross compensation, deeded the vehicle to him, and paid his health insurance for one

year. *Agreed Fact 12.*

30.    Within days of signing the Agreement, Bleau was repeatedly calling Cowdell and

making demands and accusations. On November 16, 2000, Cowdell sent Bleau a letter telling

him that all further contact with Greater Lynn should be made to Greater Lynn's attorney,

Laurence Donoghue of Morgan Brown & Joy in Boston. Despite this, Bleau continued to

contact Cowdell. He repeatedly demanded that Greater Lynn send out a multi-page

announcement setting forth his accomplishments at Greater Lynn.

31.    Sometime in late November or December 2000, Bleau provided Cowdell with a

document entitled "Albert Bleau: A Life of Service". Bleau demanded that Greater Lynn send it

out to Greater Lynn's newsletter list, local newspapers, and elected officials. He made clear that

he did not want the document to be changed. Cowdell informed him that Greater Lynn would

send out a brief letter stating that he resigned to pursue other interests. Bleau complained, and

made clear that he did not want such a letter to be sent out.

32.    Greater Lynn and Bleau were never able to reach a resolution as Bleau made clear that he did not want Greater Lynn to send out a letter stating that he resigned to pursue other interests, and insisted that the announcement promote him and list, in multiple pages, his accomplishments at Greater Lynn.

33.    Greater Lynn was never able to reach an agreement with Bleau as to the content of the letter, as Bleau's demands were not comparable to the Agreement's language that the letter state that he had resigned to pursue other interests.

**Bleau's Breaches of the Separation Agreement.**

*34.*    In early 2001, Bleau sent out letters to 17 terminated Greater Lynn employees, disparaging Greater Lynn and recommending to the former employees to file complaints against Greater Lynn with the Massachusetts Attorney General's Office. *Agreed Fact 13.*

*35.*    On April 11, 2001, Bleau sent out a letter to each member of the Boards of both Greater Lynn and Eastern Mass., making various disparaging remarks about Greater Lynn management. *Agreed Fact 14.*

*36.*    On April 13, 2001, Bleau sent identical letters to the Commissioner of DMR and the Commissioner of DMH requesting, among other things, that Greater Lynn be placed immediately into receivership and attaching his April 11 letter to the Boards. *Agreed Fact 15.* Bleau also requested that he be made the receiver. *Id.*

37.    By early May, Bleau was also requesting the Attorney General's Office to investigate Greater Lynn and notifying the Attorney General's Office that he expected to be indicted.

**Conclusion of Attorney General's Investigation and Further Restructuring of Greater Lynn.**

38.    Following the Separation Agreement, the Public Charities Division continued to press for the replacement of all of the members of the Board.  Further negotiations resulted in an agreement that provided for the resignation of all but two of the Board members; the recruitment of new members; and the amendment of the Board's bylaws to provide for staggered terms and a limit of six years of continuous service.

39.    In December 2000, new Board members were appointed at the corporation's annual meeting; Tucker was elected president of the Board; and new members were appointed to the Board of Eastern Mass.

40.    During the time when these governance matters were being worked through, the new interim executive director, Paul J. Cote, Jr. ("Cote") and other members of the Greater Lynn staff, with the assistance of counsel, were correcting the financial, management, and retirement benefits administration problems that the Board's internal investigation and the Public Charities Division's inquiry had identified.

41.    Accordingly, when Tucker became president, the principal remaining issues that the Public Charities Division had raised and that Griffin, in his final report in October 2000, had recommend that Greater Lynn resolve were the restructuring of the administration of Greater Lynn's employee benefits program; the merge of Eastern Mass. into Greater Lynn; and the amendment of the Board's bylaws.

42.    The Board amended its bylaws in December 2001; a new administrative structure for the employee benefits program was implemented during 2002; and Eastern Mass. merged into Greater Lynn effective July 1, 2003.

**Lack of Any Qualified Tuition Expenses In Period Before April 11, 2001.**

*43.* Bleau never took any course at any accredited college from November 2000 until April 11, 2001. *Agreed Fact 16.* The first course that he took after his departure from Greater Lynn was signed up for on April 12, 2001. Id. Bleau did not request payment for this until he sent a letter to Greater Lynn counsel on April 13, 2001, both after the material breach of the Separation Agreement. *Id.*

**Bleau's 2003 Bankruptcy.**

44. On July 2, 2003, Bleau filed a voluntary petition for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts. *Agreed Fact 17.*

*45.* Bleau did not declare his right of action against Greater Lynn as an asset of his estate. *Agreed Fact 18.*

*46.* On February 18, 2004, the Bankruptcy Court ordered Bleau discharged and, on March 8, 2004, the bankruptcy case was ordered closed. *Agreed Fact 19.*

**Selection Process of New Executive Director in 2003.**

47. In July 2003, the Greater Lynn Board formed a special committee to select a new executive director and five Board members were appointed to it, including Board president Robert Tucker. The committee received approximately 120 applications for the position. From these, the committee selected twenty for further evaluation and chose eleven to interview. Following those interviews, the committee recommended that the Board consider three candidates and offer the position to one of them.

48. Bleau applied in August 2003. *Agreed Fact 20.* He was one of the applicants whom the committee determined not to consider further. Agreed Fact 20-21. He, along with the

approximately 100 other applicants in this category, received a letter thanking them for their interest.

49.    The committee was unaware at the time that Bleau suffers from any disability.

50.    While the committee considered Bleau's application, no member voted to pursue it.  The committee discussed Bleau's application briefly and no member mentioned his or her belief that Bleau was suffering from a disability or that Bleau was unsuited for the position of executive director because he was suffering from a disability.

51.    The person whom the Board selected was well-qualified and did not have any prior connection with Greater Lynn, a fact that was regarded as a significant attribute given the past financial and management difficulties involving Bleau.

52.    Greater Lynn did not perceive Bleau as suffering from an impairment that substantially limited a major life activity.

53.    Greater Lynn, in assessing Bleau's August 2003 application, did not base its decision on any perceived disability.

54.    In addition, Greater Lynn declined to rehire Bleau for legitimate non-discriminatory reasons.  Specifically, Greater Lynn did not rehire Bleau as:

   a.    Bleau had previously been terminated from his position at Greater Lynn;

   b.    Greater Lynn had obtained information that Bleau had engaged in misconduct as executive director;

   c.    The Massachusetts Attorney General's Office, because of Bleau's conduct, had investigated Greater Lynn and had threatened to place Greater Lynn into receivership if it did not, *inter alia*, remove Bleau;

   d.    The Massachusetts Attorney General's Office had initiated a criminal

investigation of Bleau;

e.    The Attorney General's Office made clear to Greater Lynn that it regarded Greater Lynn to be in serious financial and management difficulty and that it was opposed to any further role for Bleau in either Greater Lynn or Eastern Mass., which it recommended be merged into Greater Lynn (Id. at ¶ 10);

f.    In November 2000, Bleau and Greater Lynn entered into a Separation Agreement, under which Greater Lynn paid Bleau over $100,000, and Greater Lynn expected it to end its relationship with Bleau.

g.    In 2003, Greater Lynn was looking for a person as its new executive director who was not involved in the controversies of the past;

h.    Greater Lynn believed the person whom it hired was more qualified than Bleau for the position;

i.    Rehiring Bleau would have been inconsistent with Greater Lynn's representations to the Attorney General's Office and would have risked alienating the Attorney General's Office and returning Greater Lynn to the situation of 2000.

j.    Greater Lynn's decision not to rehire Bleau was not because he had filed an EEOC complaint close to three years earlier.

**Alleged Defamatory Statements.**

55.    At no point after the Separation Agreement did anyone from Greater Lynn disparage Bleau to any third party.

56.    Aside from providing copies of the Griffin Report to the Board of Directors, no one from Greater Lynn distributed the Griffin Report to anyone.

57.    No prospective employer has ever inquired about Bleau.

58.    Greater Lynn did not want any publicity concerning the Attorney General investigation, Bleau's termination, or its past financial difficulties.

## PROPOSED RULINGS OF LAW

1.    The Court adopts the previous rulings of the Court as the law of the case:

a.    that, in executing the Separation Agreement on November 6, 2000, Bleau made a knowing and voluntary waiver of all claims he had at that time against the defendants. Docket No. 64, at 12.

b.    that Bleau's letters of April 11, 2001 constituted a material breach of the non-disparagement provision of the Separation Agreement such that Greater Lynn was excused from the performance of future obligations under that Agreement.  Docket No. 93, at 5-8.

c.    that Greater Lynn is responsible (under Paragraph 5C of the Separation Agreement) for any qualified education expenses (up to $2,500) that Bleau incurred from November 2000 to April 11, 2001 so long as such invoices were previously sent to Greater Lynn. Docket No. 93, at 12-13.

**Effect of Bleau's 2003 Bankruptcy**

2.    When Bleau filed a schedule of assets at the time he filed his petition for Chapter 7 protection on July 2, 2003, he was required to declare all of his assets.  *See 11 U.S.C. § 521(a); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 (3rd Cir. 1988).*

3.    Under the Bankruptcy Code, the assets included in the debtor's estate must include all legal and equitable interests the debtor possessed at the time of filing for bankruptcy, including any cause of action the debtor has at the time the case is commenced.  *11 U.S.C. §§ 541(a); In re Di Georgio, 200 B.R. 664 (C.D. Cal. 1996); Payless, supra, 989 F.2d 570; Graupner v. Town of Brookfield, 450 F.Supp.2d 119, 124 (D.Mass. 2006) (Saylor, J.); Welsh v. Quabbin Timber, Inc.,*

*199 B.R. 224, 228 (D.Mass. 1996) (Gorton, J.).*

4.    As of July 2, 2003, Bleau's causes of action for his breach of contract claims and defamation claims had already accrued and he was required under the Bankruptcy Code to declare such causes of action as assets in his bankruptcy schedules.

5.    By voluntarily filing for Chapter 7 bankruptcy protection on July 2, 2003 without declaring his breach of contact and defamation causes of action against Greater Lynn, Bleau is now judicially estopped from asserting them in this action. *Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.), Inc.,* *989 F.2d 570, 571 (1st Cir.), cert. denied, 510 U.S. 931 (1993).*

6.    Bleau also lacks standing to pursue such claims, even if he did verbally disclose them to the bankruptcy trustee.  This is because a cause of action "is a property right which passes to the trustee in bankruptcy, even if such cause of action is not included in schedules filed with the Bankruptcy Court." *Welsh* *supra, 199 B.R at 229 quoting* *Carlock v. Pillsbury Co.,* *719 F.Supp. 791, 856 (D.Minn. 1989).*

7.    Under Section 554(c) of the Bankruptcy Code, "property that is not formally scheduled is not abandoned and therefore remains part of the estate, and the debtor loses all rights to enforce it in his own name." *Jeffrey v. Desmond, 70 F.3d 183, 186 n. 3 (1st Cir. 1995); Graupner, supra, 450 F.Supp.2d at 125.*

8.    Therefore, upon his discharge from bankruptcy, the right to maintain Bleau's pre-July 2, 2003 claims remained part of the bankruptcy estate and did not revert to Bleau.  *See 11 U.S.C. § 554(c), (d); Jeffrey, supra, 70 F.3d at 186; Welsh, supra, 199 B.R. at 229.*

9.    Accordingly, given that Greater Lynn's obligations under the Separation Agreement ended as of April 11, 2001 *(Docket No. 93, at 8)*, Bleau's claims for breach of the Separation Agreement are barred and his only remaining claims are his employment

discrimination claim based on Greater Lynn's failure to rehire him in August 2003 and his defamation claim to the extent it relies on post-July 2, 2003 statements.

**ADA and Rehabilitation Claims**

10.    In analyzing claims for disability discrimination under the ADA and Rehabilitation Act, courts apply the burden shifting framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).*

11.    Under this framework, Bleau must make out a prima facie case of discrimination. If he does this, the burden would shift to Greater Lynn to present evidence of a legitimate, non-discriminatory reason for the employment decision. At this point, the burden would shift back to Bleau to demonstrate that the non-discriminatory reason is a mere pretext and that the real reason is discrimination. *Clifford v. Barnhart, 449 F.3d 276, 280-281 (1st Cir, 2006), citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817.*

12.    To establish a claim of disability discrimination under both the ADA and the Rehabilitation Act, Bleau must show not only that he is disabled, but also that he is qualified to perform the essential functions of the job in question and that his employer took adverse employment action against him on the basis of his disability. *Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d 538, 5410542 (1st Cir. 1999); Pacella v. Tufts University School of Dental Medicine, 66 F.Supp.2d 234, 237 (D.Mass. 1999) (Young, C.J.).*

13.    Bleau must also establish that he had similar qualifications to the person Greater Lynn hired. *Clifford v. Barnhart, 449 F.3d 276, 281 (1st Cir. 2006).*

14.    An individual is "disabled" within the meaning of both acts if he has (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) been regarded as having such an impairment. *See 42*

*U.S.C. § 12102(2)* & 29 U.S.C. § 705(20)(B)(i).

15.     Bleau alleges only that Greater Lynn "perceived," or regarded, him as disabled. To prove that Greater Lynn regarded him as disabled, Bleau must show that Greater Lynn (1) mistakenly believed that he had a physical impairment that substantially limits a major life activity; or (2) mistakenly believed that an actual, nonlimiting impairment substantially limits a major life activity.  *See Sullivan v. Neiman Marcus Group, Inc.,* 358 F.3d 110, 117 (1st Cir. 2004) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999)).

16.     Bleau has failed to establish a prima facie case of discrimination based on Greater Lynn's failure to rehire him.  There is no evidence that Greater Lynn perceived Bleau as suffering from an impairment that substantially limited a major life activity, or that, in assessing Bleau's August 2003 application, Greater Lynn based its decision on any perceived or contrived disability.

17.     In addition, even if a prima facie case was established, Greater Lynn has come forward with undisputed evidence establishing that Greater Lynn declined to rehire Bleau for legitimate non-discriminatory reasons.

**Retaliation Claim**

18.     To succeed on a claim of retaliation, the plaintiff has to prove that he (1) engaged in protected conduct, (ii) suffered an adverse employment action, and (iii) the two were causally linked.  *Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003) (ADA); *Weber v. Cranston Sch. Comm.,* 212 F.3d 41, 48 (1st Cir. 2000) (Rehabilitation Act).

19.     Here, the only protected action Bleau engaged in was his October 2000 and October 2003 EEOC complaints.  The only "adverse employment action" was Greater Lynn's failure to rehire him in August 2003.

20.    As there no evidence that Greater Lynn decided not to rehire Bleau because he had filed an EEOC complaint close to three years earlier, judgment shall enter in favor of the defendant on Bleau's retaliation claims under both the ADA and Rehabilitation Act.

**Defamation Claims**

21.    As per the Court's previous orders, any defamation must have occurred after the Separation Agreement in November 2000.  In addition, given the Court's ruling concerning the effect of Bleau's bankruptcy filing on these proceedings, any defamation must have occurred after July 2, 2003.

22.    Under Massachusetts law, in order to prove defamation, Bleau must establish that Greater Lynn "was at fault for the publication of a false statement regarding [him], capable of damaging [his] reputation in the community, which either caused economic loss or is actionable without proof of economic loss.  *White v. Blue Cross and Blue Shield of Massachusetts, Inc., 442 Mass. 64, 66 (2004), citing Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630 (2003) and Restatement (2d) of Torts, § 558 (1977).*

*23.*    The publication requires that Greater Lynn communicate the defamatory statement to a third party.  *White v. Blue Cross and Blue Shield of Massachusetts, Inc., 442 Mass. 64, 66 (2004); Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630 (2003).*

24.    Bleau has failed to prove any actionable defamation and, as such, judgment shall enter in favor of the defendant on such claim.

**Breach of Separation Agreement Claims**

25.    Under the law of the case, any breach of the Separation Agreement by Greater Lynn must have occurred before April 11, 2001.  *Docket No. 93, at 8.*  Moreover, given Bleau's July 2, 2003 bankruptcy petition, Bleau is estopped from asserting any claim arising before the

date of his bankruptcy filing.

26.      Accordingly, judgment shall enter for the defendant on Bleau's claims for breach of the Separation Agreement.

27.      Moreover, regardless of the bankruptcy issues, judgment would enter in favor of the defendant as Bleau has failed to meet his burden.

### *Breach of Separation Agreement – Paragraph 2*

28.      While the parties disagree as to what was said during pre-execution discussions concerning the letter, such differences are immaterial as the Separation Agreement contains an integration clause.

29.      Bleau's breach of contract claim based on Paragraph 2 seeks to enforce an alleged oral promise that is contradictory to the plain language of the integrated contract and, as such, is barred.

*30.*      Moreover, while the plaintiff's complaint does not assert a claim of rescission based on any fraudulent inducement, such a claim would be time-barred under M.G.L. c. 260, §§2A, 12.  This is because this suit was commenced on March 8, 2004 and the plaintiff has testified that he believed within days that Greater Lynn had not intended to comply with the agreement at the time of entering into it.  *Bleau Depo. at 245-246, 257-258.*

31.      Moreover, Greater Lynn did not breach the Separation Agreement as it proceeded in good faith and was never able to reach an agreement with Bleau as to the content of the letter, as Bleau's demands were not comparable to the Agreement's language that the letter state that he had resigned to pursue other interests.

32.      Given that Bleau is seeking to enforce an alleged "agreement" that contradicts the plain terms of the fully-integrated Separation Agreement and regards any letter complying with

the written Separation Agreement as being in breach of the alleged verbal pre-signing agreement he is seeking to enforce, his claim must fail, judgment on this claim shall enter in the defendant's favor.

### Breach of Separation Agreement – Tuition

33.    On October 25, 2005, the Court, Keeton, J., ruled that Bleau had materially breached the Separation Agreement on April 11, 2001, relieving Greater Lynn of any further obligations under it after that date. *Docket No. 93, at 8, 14-15.* The Court also ruled that Greater Lynn was responsible, under Paragraph 5C of the Separation Agreement, for any qualified tuition payments up to $2,500 that Bleau incurred from November 2000 until April 11, 2001. *Docket No. 93, at 12.* The Court made clear that Greater Lynn was only responsible for tuition fees from an accredited college or any training course leading to licensing or certification and only for invoices previously submitted to Greater Lynn. *Id. at 13.* The Court then directed Bleau to submit to the Court "tuition invoices from any college that he attended between November 2000 and April 11, 2001." *Id. at 12.*

34.    As Bleau never submitted any invoice to Greater Lynn for any course he took between November 2000 and April 11, 2001 and that he, in fact never took any course during this period and that his first course that he took after his departure from Greater Lynn was signed up for on April 12, 2001, judgment shall enter in favor of the defendant on this claim.

Respectfully submitted:

The Defendant,
BRIDGEWELL, INC.,
by its attorneys,

*/s/ William T. Harrington*
William T. Harrington (BBO No 564445)
Glynn, Landry, Harrington, & Rice, LLP
10 Forbes Road, Suite 270
Braintree, MA 02184
(781) 356-1749

*/s/ Edward P. Harrington*
Edward P. Harrington (BBO No. 559482)
8 Winter Street, 12th Floor
Boston, MA 02108
(617) 423-5959

Dated:  February 28, 2007

CERTIFICATE OF SERVICE

I hereby certify that, on February 28, 2007, I filed this document with the Court electronically via the Court's CM/ECF system and that I served a copy of this documents upon each counsel and party who has appeared in the action but who has not signed up to receive electronic notice, serving a copy by first class mail.

*/s/ William T. Harrington*
William T. Harrington